```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE WESTERN DISTRICT OF WISCONSIN

 3     - - - - - - - - - - - - - - X

 4     UNITED STATES OF AMERICA,        :

 5          Plaintiff,                  :

 6               v.                     :   Case No.

 7     SPECTRUM BRANDS, INC.,           :   3:15-cv-00371

 8     a Delaware corporation,          :

 9          Defendant.                  :

10     - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          Friday, April 29, 2016

13             Deposition of ALAN H. SCHOEM, a witness

14     herein, called for examination by counsel for

15     Plaintiff in the above-entitled matter, pursuant to

16     notice, the witness being duly sworn by MARY GRACE

17     CASTLEBERRY, a Notary Public in and for the District

18     of Columbia, taken at the offices of Mayer Brown,

19     1999 K Street, N.W., Washington, D.C., at 10:00 a.m.,

20     Friday, April 29, 2016, and the proceedings being

21     taken down by Stenotype by MARY GRACE CASTLEBERRY,

22     RPR, and transcribed under her direction.
```

Page 2

```
 1    APPEARANCES:
 2
 3        On behalf of the Plaintiff:
 4           THOMAS E. ROSS, ESQ.
 5           ALAN P. PHELPS, ESQ.
 6           MONICA C. GROAT, ESQ.
 7           United States Department of Justice
 8           Consumer Protection Branch
 9           450 Fifth Street, N.W.
10           Washington, D.C.  20001
11           (202) 305-3630
12             and
13           HARRIET KERWIN, ESQ.
14           Consumer Product Safety Commission
15           4330 East West Highway
16           Bethesda, Maryland  20814
17           (301) 504-7923
18
19
20
21
22
```

Page 3

```
 1    APPEARANCES: (Continued)
 2
 3        On behalf of Defendant:
 4           TIMOTHY L. MULLIN, JR., ESQ.
 5           Miles & Stockbridge
 6           100 Light Street
 7           Baltimore, Maryland  21202
 8           (410) 385-3641
 9             and
10           ERIKA JONES, ESQ.
11           Mayer Brown
12           1999 K Street, N.W.
13           Washington, D.C.  20006
14           (202) 263-3000
15
16
17
18
19
20
21
22
```

Page 4

```
 1              C O N T E N T S
 2    WITNESS          EXAMINATION BY COUNSEL FOR
 3    ALAN H. SCHOEM        PLAINTIFF  DEFENDANT
 4    BY MR. ROSS          6
 5    BY MR. MULLIN              280
 6       AFTERNOON SESSION - 156
 7
 8
 9              E X H I B I T S
10    GOVERNMENT EXHIBIT                  PAGE
11    No. 84: Report of Alan H. Schoem       12
12    No. 85: Supplemental Report of Alan H.   41
13       Schoem
14    No. 86: Excerpt from Schoem trial testimony   113
15    No. 87: Excerpt from Federal Register    211
16    No. 88: Printout from CPSC website      226
17    No. 89: Printout from CPSC website      226
18    No. 90: June 24, 2010 letter to Kerrie   231
19       Campbell from Belinda Bell
20    No. 91: February 7, 2008 letter to Kerrie   253
21       Campbell from Judith Hayes
22
```

Page 5

```
 1    PREVIOUSLY MARKED EXHIBITS       REFERENCED
 2    No 28:              240
 3    No 72:              185
 4    No 74:              20
 5    No 75:              36
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

2  (Pages 2 to 5)

1          P R O C E E D I N G S
2    Whereupon,
3          ALAN H. SCHOEM,
4    business address at 14809 Rolling, Green Way, North
5    Potomac, Maryland 20878, was called as a witness by
6    counsel for Plaintiff, and having been duly sworn by
7    the Notary Public, was examined and testified as
8    follows:
9          EXAMINATION BY COUNSEL FOR PLAINTIFF
10   BY MR. ROSS:
11       Q.   Good morning, Mr. Schoem.  My name is Tom
12   Ross.  I'm a trial attorney with the U.S. Department
13   of Justice.  Here to my right is Alan Phelps, senior
14   litigation counsel; Harriet Kerwin from the Consumer
15   Product Safety Commission; and Monica Groat, also
16   from my office.  We're here at the offices of Mayer
17   Brown in Washington, D.C. for the deposition of Alan
18   Schoem in the ongoing lawsuit United States vs.
19   Spectrum Brands, Number 3:15-cv-00371 in the Western
20   District of Wisconsin.
21       Mr. Schoem, have you been deposed before?
22       A.   Yes, I have.

1        Q.   So you generally understand the ground
2    rules for a deposition?
3        A.   Yes.
4        Q.   Well, I'll just emphasize one which is you
5    should try not to talk over one another so that we
6    can have a clean transcript.  Besides that, I just
7    ask that you please answer my questions as completely
8    and truthfully as you can and we should get through
9    the day.
10       If I don't say the question very well or
11   you don't understand me, please ask me to repeat it.
12   I don't want misunderstanding to get in the way of
13   answers.
14       Is there any reason that you can't provide
15   truthful and complete testimony today?
16       A.   No.
17       Q.   You're not on any medication or have any
18   kind of illness that would prevent you from
19   testifying truthfully?
20       A.   No.
21       Q.   Would you please state your business
22   address and your full name for the record?

1        A.   Yes.  It's Alan H. Schoem, 14809 Rolling,
2    R-o-l-l-i-n-g, Green Way, North Potomac, Maryland
3    20878.
4        Q.   And has Spectrum retained you as an expert
5    witness in this case?
6        A.   Yes, they have.
7        Q.   And I understand that you're asserting
8    expertise regarding the Consumer Product Safety
9    Commission's policies and procedures and also the
10   company's CPSC compliance programs, is that right?
11       A.   Yes.
12       Q.   Are there any other topics on which you're
13   asserting expertise in connection with your
14   testimony?
15       A.   With respect to Spectrum's policies and
16   procedures for reporting to CPSC or for evaluating
17   information to determine whether a report to CPSC
18   would be appropriate.
19       Q.   And based on your review of the case, have
20   you formed opinions in this matter?
21       A.   Yes.
22       Q.   And are those opinions fairly summarized

1    in the second report you provided on April 22nd,
2    2016?
3        A.   Yes.
4        Q.   And are the bases of those opinions fully
5    stated in that report?
6        A.   Yes, to the best of my ability.
7        Q.   And all of the documents and other
8    materials that you reviewed are listed in your
9    report?
10       A.   Yes, except I don't know that I listed
11   CPSC statutes, Code of Federal Regulations.  I
12   didn't -- I don't think I listed the Consumer Product
13   Safety Improvement Act, so statutory and Commission
14   interpretative regulations may not be in here.
15       Q.   Do you expect to testify at trial or in
16   hearing in this case?
17       A.   If I'm asked to do so, yes.
18       Q.   Now, before we get into the substance of
19   my questions here today, you generally understand the
20   subject matter of this action?
21       A.   Yes.
22       Q.   Do you understand that this is a case in

1   which the United States is seeking civil penalties
2   and injunctive relief for violations of the reporting
3   requirement under Section 15(b) of the CPSC?
4      A.   Right, I understand the government has
5   alleged that Spectrum has violated the reporting
6   requirements and is seeking an injunction concerning
7   what I would call a compliance program to be able to
8   review information and determine whether a report is
9   required to CPSC.
10      Q.   And do you understand that the government
11   is also alleging that Spectrum knowingly distributed
12   in commerce products that were subject to a voluntary
13   recall subject to a public announcement at CPSC?
14      A.   Yes, but I wasn't asked to testify as to
15   that.
16      Q.   Is that not part of a CPSC compliance
17   program?
18      A.   It could be part of a compliance program,
19   yes, but I wasn't asked to testify about whether
20   there was a violation or not.
21      Q.   Well, we'll get more into the specifics
22   later but the CPSC and the CPSA deal with more than

1   simply the Section 15(b) reporting requirement, don't
2   they?
3      A.   Yes.
4      Q.   And there is a number of different ways a
5   firm can violate the Consumer Product Safety Act,
6   right?
7      A.   There are a number of prohibited acts in
8   the Commission statutes, yes.
9      Q.   And selling recalled products -- and I'll
10   just use that for shorthand because the statute is so
11   cumbersome -- is one of those prohibited acts?
12      A.   Yes.
13      Q.   Now, just so that we're all talking about
14   the same thing, you understand that the coffee makers
15   that are the subject of this matter were sold by
16   Applica Consumer Products between approximately 2008
17   and 2012?
18      A.   Yes.
19      Q.   So when you refer to the coffee makers,
20   I'm talking about those specific models, do you
21   understand?
22      A.   Yes.  I use Spectrum in place of Applica

1   in my report, treating them as one entity.
2      Q.   That was going to be my next point.
3   Sometimes I'll refer to them as Spectrum and Applica
4   if it's necessary to make a distinction, but you
5   understand that for purposes of the present
6   litigation, Spectrum includes Applica?
7      A.   Yes.
8      Q.   I'm going to show you an exhibit that
9   we're marking as Government Exhibit 84.
10         (Government Exhibit No. 84 was
11         marked for identification.)
12   BY MR. ROSS:
13      Q.   Mr. Schoem, if you turn to page 21 of this
14   document, it shows that this is the report that you
15   submitted on April 15th, 2016.  Do you see that?
16      A.   Yes.
17      Q.   So this is the initial expert report that
18   you provided in this case?
19      A.   Yes.
20      Q.   And in this report, you opine both on
21   Spectrum's reporting obligation or lack thereof and
22   the state of its CPSC compliance programs, right?

1      A.   Yes.
2      Q.   And your conclusions are set forth on
3   page 21 in section 8, right?
4      A.   Yes.
5      Q.   To paraphrase, your first conclusion here
6   is that Spectrum did not have a reporting obligation
7   for the coffee maker at issue in this lawsuit, right?
8      A.   That is correct.
9      Q.   And is that your opinion for the entire
10   time period from 2008 until the company reported in
11   April of 2012?
12      A.   Yes.  And again, it's based on the
13   documents that I reviewed that I listed in that
14   report.
15      Q.   Are there other documents about this case
16   that you haven't reviewed that might bear on your
17   opinion?
18      A.   Only if the government -- I only know what
19   documents I reviewed and they're listed.  There were
20   incomplete files provided by the government so I
21   don't have those files.
22      Q.   You're saying there was an incomplete file

Page 14

1   in the instant case?
2       A.   Not in the instant case that I'm aware of.
3   I mean, the government produced documents and I
4   reviewed those documents, but some of the files that
5   the government produced are not complete.
6       Q.   When you were retained as an expert in
7   this case, did you request from Spectrum's counsel
8   the materials you thought you would need to render an
9   opinion?
10      A.   No, they provided me with materials and in
11  some cases I may have asked for additional materials
12  that were provided.  And then everything I looked at
13  is listed in the report.
14      Q.   So if you didn't list it in the report,
15  other than the legal standards that we discussed, you
16  didn't look at it?
17      A.   That's correct.
18      Q.   Now, the second paragraph here says that,
19  during the relevant time period, the Commission staff
20  consistently concluded that moderate risk of burns or
21  scalding from spilled coffee did not rise to the
22  level of a substantial product hazard.  And again,

Page 15

1   I'm summarizing that.
2           Is that a separate opinion that you're
3   offering or is that a subset of your first opinion?
4       A.   I don't know that it matters.  It's a
5   separate -- I'll call it a separate opinion.
6       Q.   I just want to make sure that I talk about
7   them correctly.
8           And the third opinion that you list here
9   states that Spectrum had reasonable procedures in
10  place to allow it to evaluate information to
11  determine whether it had a reporting obligation to
12  the CPSC, right?
13          MR. MULLIN:  Let me object to the form of
14  the question.  I think you said "had" and this says
15  "has."  You may have misspoken.
16  BY MR. ROSS:
17      Q.   Spectrum has reasonable procedures to
18  allow it to report to the CPSC.  That's your third
19  opinion?
20      A.   Yes.
21      Q.   Now, with respect to your third opinion
22  here about compliance programs, you are talking about

Page 16

1   the compliance programs as they exist at present,
2   right?
3       A.   Yes.  And when you say compliance program,
4   what do you mean?  What specifically do you mean by
5   that?
6       Q.   I'm talking about the matters that you
7   discuss with respect to opinion 3 in your report, all
8   of the different processes and the different
9   functions that you discussed.
10      A.   Okay.
11      Q.   You're talking about those processes and
12  features as they exist today?
13      A.   Yes.
14      Q.   You don't know and weren't asked to
15  evaluate what their processes were, say, five years
16  ago?
17      A.   That's correct.
18      Q.   And you have no way of knowing what their
19  processes and procedures will be five years from now,
20  do you?
21      A.   No.
22      Q.   Would you kindly turn to page 15 of your

Page 17

1   report?  Do you see the paragraph, it's the second
2   full one down that starts with, "My review of other
3   case files"?
4       A.   Yes.
5       Q.   And to paraphrase, you state that, based
6   on your review of those files, the CPSC has
7   consistently concluded that moderate risks from
8   coffee spills are not a substantial product hazard,
9   right?
10      A.   Yes.
11      Q.   Now, when you drafted this report and you
12  reached that conclusion, were you under the
13  impression that the CPSC had not found a substantial
14  product hazard in any coffee maker case in the last
15  10 years?
16      A.   No, when I -- no.  I'm saying that the
17  Commission staff was consistent in its decisions.
18  Consistent to me doesn't mean always.  It means
19  routinely or regularly.  If you're getting at the one
20  case -- that's my answer.
21      Q.   Were you aware of that particular case
22  when you wrote this opinion, keeping in mind that

5 (Pages 14 to 17)

1 this was your initial report that we're talking about
2 here?
3     A.   That particular case meaning the one where
4 the Commission staff made a preliminary determination
5 of hazard?
6     Q.   Yes.
7     A.   Yes, I was aware of that case.
8     Q.   And did you have the actual preliminary
9 determination form by the time you submitted this
10 report?
11     A.   Yes, I did.
12     Q.   And did you have a close letter from that
13 case indicating that a substantial product hazard had
14 been found at the time you submitted this initial
15 report?
16     A.   Yes.  And while I amended this report, it
17 doesn't change my conclusion.  The staff was still
18 consistent in its determinations.
19     Q.   Well, we'll get to that in a second.  You
20 didn't think it was worth mentioning that there was a
21 case that found the opposite of the other ones you're
22 talking about here?

1     A.   Actually, I had forgotten.  I mean, that's
2 all I can tell you is I forgot.  I went back and
3 looked at my notes.  I have notes that show that
4 staff had made a preliminary determination in one
5 case which, as I say in my supplemental report, it's
6 inconsistent with all of the other decisions that the
7 staff made.
8     Q.   Now, just so we're clear, we're talking
9 about case 9-423?
10     A.   RP090423.
11     Q.   So when you were writing this opinion, you
12 didn't think it would be helpful or necessary to
13 disclose to the Court that the CPSC had in fact found
14 a coffee maker to be an SPH in the prior case?
15     A.   I wasn't trying to hide anything from the
16 Court.  As I said, it was just inadvertently left
17 out.  But it doesn't change my opinion because the
18 staff was still consistent.  I consider that case to
19 be an aberration.  It's inconsistent with all the
20 other decisions that the staff made.
21     Q.   And by it's inconsistent, you're just
22 referring to the ultimate conclusion of the existence

1 of a substantial product hazard, right?
2     A.   I'm referring to the fact that in all of
3 the other cases, the staff concluded there was no
4 substantial product hazard and, in that one case, the
5 staff made a preliminary determination that in their
6 view there was a substantial product hazard.
7     Q.   Right.  So it's inconsistent in your mind
8 in the sense that the ultimate conclusion was
9 different from the other cases?
10     A.   Well, the ultimate conclusion was
11 different but the facts were very similar.
12     Q.   I'm going to show you a document that's
13 previously been marked as Exhibit 74.  Just please
14 take a minute to review the document.
15     A.   I'm familiar with the document.
16     Q.   Mr. Schoem, is this the preliminary
17 determination that the CPSC made in case RP090423?
18     A.   Yes.
19     Q.   And when we were talking about the case
20 that you didn't mention in your initial report, this
21 is the case we're talking about, right?
22     A.   Yes.

1     Q.   Now, if you look at the first page, it
2 states that the potential problem is hot liquid,
3 grounds or steam can suddenly eject from the brewer
4 and scald consumers, right?
5     A.   Yes, that's what it says.
6     Q.   And under section 1 here, Defect, the CPSC
7 staff found that a defect did in fact exist, right?
8     A.   Yes.
9     Q.   Because T-disks apparently should not
10 suddenly explode, right?
11     A.   That's -- whatever the language is, yes.
12     Q.   Now, just to be clear, in our case where
13 we're talking about coffee makers where the handles
14 fall off.  Do you dispute that the information that
15 Spectrum had reasonably supported the conclusion that
16 those were defective?
17     A.   If I were looking at that information, I
18 would say there is a problem with the handle.  It
19 appears to meet the Commission's definition in its
20 interpretative regulation of what a defect is.
21         And it wasn't that all the handles were
22 falling off.  Some were coming loose.  Some appear to

1  fall off.  Some cracked, some broke.

2      Q.   Just for shorthand, we'll refer to handle

3  failure as a handle breaking, but you sort of

4  understand the universe of different failures we're

5  talking about, right?

6      A.   Yes.

7      Q.   Because when somebody pours a cup of

8  coffee out of a carafe, they don't expect the handle

9  to fall off or break or loosen or any of those

10  things, right?

11      A.   Right.

12      Q.   And it's not what you would expect a

13  coffee maker carafe to be designed to do, right?

14      A.   Right.  I'm sure Spectrum didn't design it

15  to do that, but that's correct.

16      Q.   So based on just a common sense

17  understanding of how coffeepots work, do you think

18  it's reasonable that this happening hundreds and

19  hundreds of times demonstrates a possible defect?

20      A.   Yes.

21      Q.   Now, if you would please turn to the next

22  page.

1      A.   Bates 18771?

2      Q.   That's right.  Do you see the section

3  titled Severity of risk, or Severity of the risk?

4      A.   Yes.

5      Q.   Under that, it says, "Seriousness of

6  injury:  Possible scarring to face, arms and chest

7  areas from second degree burns or possible serious

8  eye injuries."  Did I read that right?

9      A.   Yes.

10      Q.   Do you dispute that hot coffee could cause

11  possible scarring to face, arms and chest areas from

12  second degree burns?

13      A.   I'm not disputing what the staff concluded

14  in this report.

15      Q.   I'm asking a little more broadly than

16  that.  Based on your experience at the CPSC and out,

17  do you dispute that hot coffee can cause serious

18  burns?

19      A.   I think it's possible.

20      Q.   So that's, yes, it can cause serious

21  burns?

22      A.   It's possible that it can cause serious

1  burns.

2      Q.   And based on your experience, are you

3  familiar with reports of hot coffee causing second

4  degree burns?

5      A.   In some of the files that I looked at,

6  there were reports of second degree burns.

7      Q.   And some of those reports in some cases

8  mention second degree burns requiring medical

9  treatment, right?

10      A.   Yes.  And in all of those cases that I

11  reviewed other than this one, the staff closed those

12  cases without seeking any type of recall.

13      Q.   We'll get to that in a second.  I'm just

14  asking --

15      A.   Right, but I wanted my answer to be

16  complete.

17      Q.   I'm just asking whether you dispute that

18  coffee, if hot enough, can cause serious injury to a

19  consumer.

20      A.   I suppose it can, yes.

21      Q.   Now, under Inherent severity of risk,

22  section 3 says, "The firm has received approximately

1  435 reported incidents, 200 U.S. incidents, 61

2  reports of scalding or bodily contact," and it goes

3  on from there.  Do you see that?

4      A.   Yes, I do.

5      Q.   Setting aside the other Applica cases for

6  a second, how does the number of incidents reported

7  in this case compare to the other files that you

8  reviewed?

9      A.   This is similar to some of the other files

10  that I reviewed.  I'm sorry, if you set aside the

11  Applica cases?

12      Q.   I'm talking about --

13      A.   Non-Applica cases.

14      Q.   Non-Applica cases.  All the other

15  Section 15 cases in the PDs that you reviewed, did

16  any of them have 435 incidents?

17      A.   I don't recall specifically.  I don't

18  believe so.

19      Q.   Did any of them have close to that number?

20      A.   I would have to look at the files.

21      Q.   Did any of them have close to 600 reports

22  of burns?

Page 26

1      A.   I would have to look at the files.  If you
2  have them, I'm happy to look at the other preliminary
3  determinations that the staff made.
4      Q.   Well, is that part of what you did in
5  reviewing those case files and determining that this
6  was an aberration?
7      A.   Yes.
8      Q.   You looked not only at the ultimate
9  conclusion but also the number of incidents and
10  reported injuries and things of that nature?
11      A.   I looked at them, yes.
12      Q.   And you concluded that this was sort of in
13  the same realm, numerically, as those cases?
14      A.   Yes, especially when you take into account
15  the Applica cases which you wanted me to exclude but
16  if you take them into account, they're similar, at
17  least in one case.
18      Q.   Now, this analysis comparing all of these
19  other cases, is it set forth anywhere in your expert
20  report?
21      A.   Well, I talk about the other cases that I
22  looked at in my report.

Page 27

1      Q.   You just testified that when you concluded
2  that this was an aberration from the other
3  non-Applica cases, that you compared all these
4  different figures, right?
5      A.   Yes, I looked at all of the different
6  figures when I was making that statement in my
7  report.
8      Q.   And what I'm asking is just simply did you
9  set forth any of that detail analysis in your report?
10      A.   No, I didn't.  And what I was looking at
11  is how the staff viewed hot liquid contacting a
12  consumer's body and the type of injury that could
13  result or that had been shown to have resulted from
14  that coffee or hot liquid contacting the consumer's
15  body.  And in looking at that information and in
16  looking at the ultimate conclusions that the staff
17  reached, I was saying that the staff was consistent
18  in its decisions to close those cases.
19           And as I say elsewhere in my report, I'm
20  not sure that it makes any difference whether there
21  is 100 or 200 or 50 or 1,000 incidents, the
22  underlying issue is still the same.  If hot liquid

Page 28

1  contacts a consumer, is that the type of risk that
2  would lead to a conclusion that it could create a
3  substantial product hazard, and I said the staff was
4  consistent in its opinions and conclusions that that
5  was not that situation, didn't rise to the level of a
6  substantial hazard.
7      Q.   Now, when a preliminary determination
8  panel meets and a staff considers whether a product
9  poses a substantial product hazard, do they consider
10  the prevalence of the defect?
11      A.   They look at the likelihood, they look at
12  the severity, they look at the number of products
13  that are involved, they look at the incidents that
14  are involved.  They look at the things that are on
15  that PD form.
16      Q.   And do they look at the number of
17  incidents involved because whether there is
18  1 incident or 1,500 incidents could bear on the
19  number of people who could potentially be harmed by
20  this product?
21      A.   Yes, you look at that, but if there is no
22  harm that can result in a substantial product hazard

Page 29

1  or a preliminary determination of a substantial
2  product hazard, it doesn't really matter whether it
3  was 1 incident or 50 or 1,500.
4      Q.   Now, preliminary determinations are not
5  made in all Section 15 cases, right?
6      A.   That's correct.
7      Q.   And you talk about that in your report?
8      A.   Yes.  If the company reports on the Fast
9  Track, for example, there is no preliminary
10  determination made.
11      Q.   Well, they're also not made in preliminary
12  investigation cases, are they?
13      A.   They don't have to be made, that's right.
14  If it doesn't get escalated to what the Commission
15  staff calls a CA investigation, then there may be no
16  PD made.
17      Q.   And you also make note of the fact that
18  the CPSC doesn't share preliminary determination
19  forms with firms or make staff's analysis public,
20  right?
21      A.   That's correct.
22      Q.   And is the analysis that CPSC staff

8 (Pages 26 to 29)

Page 30

1  undertakes in making a preliminary determination
2  different than what the law requires firms to do in
3  determining whether they have to report to CPSC in
4  the first place?
5      A.   The reporting obligation is broader than
6  the obligation to conduct a recall.
7      Q.   Can a firm be found to have violated the
8  reporting requirement even if it turns out after the
9  fact that the product wasn't defective?
10     A.   I suppose so.  As I say, I don't think the
11 staff has ever sought a penalty where it did not also
12 seek a recall.
13     Q.   Are you aware of court cases that have
14 construed that issue?
15     A.   Construed which issue?
16     Q.   Whether a firm can be found to have
17 violated the reporting requirement even if the
18 product ultimately turns out not to be defective.
19     A.   I don't recall a court case where the
20 product was not found ultimately to be defective.  I
21 don't know if you're talking about Mirama case or
22 something else that you have in mind.

Page 31

1      Q.   And can a firm be found to have violated
2  the reporting requirement even if it turns out
3  ultimately that the product did not present a
4  substantial product hazard?
5      A.   In theory, yes.
6      Q.   Isn't the point of the reporting
7  requirement to get information into the hands of the
8  CPSC so that the CPSC can do a more thorough
9  evaluation of the risk and decide on a remedy?
10     MR. MULLIN:  Object to the form of the
11 question, but you can answer.
12     THE WITNESS:  Generally, yes.  But where a
13 firm has knowledge and doesn't believe that a product
14 rises to the level that they could create a
15 substantial product hazard or presents an
16 unreasonable risk of serious injury or death, the
17 reporting obligations are triggered.
18 BY MR. ROSS:
19     Q.   And that's your legal opinion sitting here
20 today?
21     A.   No, I wouldn't call it a legal opinion.
22 It's just fact based.  I'm looking at the facts of

Page 32

1  what the Commission has done in a variety of cases
2  where it has reached conclusions that products are a
3  substantial product hazard.
4      Q.   So the determination of whether a firm
5  violated its reporting obligation is not a legal
6  question?
7      A.   It's probably ultimately a legal question
8  for a judge or a jury.
9      Q.   As a general matter, do you agree that the
10 reporting standard has a lower threshold than the
11 standard that the staff applies in determining
12 whether a preliminary or a substantial product hazard
13 exists?
14     A.   Say that again, please.
15     Q.   Is the reporting standard subject to a
16 lower threshold than the threshold that the staff
17 applies in making a preliminary determination?
18     A.   As I said, the reporting obligation is
19 broader than the obligation of a company to conduct a
20 recall.
21     Q.   Now, one last question about this
22 document.  Under the substantial hazard

Page 33

1  classification B, staff notes --
2      A.   Are you reading from the report?
3      Q.   I'm reading from the report.
4      MR. MULLIN:  No, he's looking at the PD
5  form.
6  BY MR. ROSS:
7      Q.   Or PD form.  Well, first of all,
8  section 3, Assessment of the sustainability of the
9  hazard, the staff finds here that this was a
10 substantial product hazard classification B, right?
11     A.   Yes.
12     Q.   And staff notes at the very end that the
13 firm reports 19 incidents with the redesigned units
14 including the incident involving the 10-year-old girl
15 whose second degree burns required surgery.  Do you
16 see that?
17     A.   Yes.
18     Q.   Now, at your time at the CPSC which
19 spanned, what, almost 40 years, was it?
20     A.   31.
21     Q.   31?  I can't count.  In your 31 years at
22 the CPSC, how often did you tell firms that you

9 (Pages 30 to 33)

Page 34

1  didn't want to know about products that could cause
2  second degree burns requiring 10-year-old children to
3  have surgery?
4        MR. MULLIN:  Object to the form of the
5  question.
6        THE WITNESS:  I have no idea.
7  BY MR. ROSS:
8      Q.  Does it sound like something you would
9  have said when you were in the Office of Compliance?
10     A.  I would have to look at the facts to
11 determine what I would say or wouldn't say to a
12 company.
13     Q.  But if you found that a product had a
14 defect which was capable of causing burns to children
15 requiring them to have surgery, do you think you
16 would have told the firm, no, thank you, I don't
17 think the CPSC needs to know about that issue?
18     A.  I would want to look at what was going on
19 in that situation.  I would ask the company to let me
20 know what was going on.  I would want to look at
21 whether the surgery was related to the burns, whether
22 there was something else going on.  I would want to

Page 35

1  get factual information.
2      Q.  Now, you're talking about in the process
3  of determining whether there is substantial product
4  hazard, right?
5      A.  Both substantial product hazard and
6  whether there is a reporting obligation.
7      Q.  But in order for you to get that
8  information in the first place, the firm had to tell
9  you about it, didn't it?
10     A.  If the Commission didn't have any
11 independent source for the information, then yes.  I
12 mean, there were situations where companies would
13 call and say I've got this situation, do you think
14 this is reportable.  And in some cases, the staff
15 would say, no, we don't think that's reportable and
16 in other cases, we would say, yes, we either think
17 it's reportable or why don't you provide us some
18 additional information and then we can give you some
19 more specific guidance.
20        When I was there, we tried to work with
21 companies to give guidance or whether they really
22 needed to submit a full report under the regulations

Page 36

1  or whether it was something that the Commission --
2  where they didn't need to submit a full report.
3      Q.  But unless the Commission found out about
4  this fact itself somehow, it really would have been
5  reliant on the firm to raise this issue, wouldn't it?
6      A.  Firms have an obligation to report to the
7  Commission if they have reportable information.
8      Q.  So that the CPSC then can assess the risk
9  and decide whether corrective action is necessary,
10 right?
11     A.  Right, whether it believes, in its
12 opinion, that corrective action is necessary.
13     Q.  And by corrective action, we're talking
14 about recalls, right?
15     A.  Either repair/replacement or refund, which
16 in shorthand is a recall.
17     Q.  I'm going to show you an exhibit,
18 Mr. Schoem, that we marked as Government Exhibit 75.
19        Mr. Schoem, are you familiar with this
20 document?
21     A.  Yes, I've seen it.
22     Q.  Is this what's known as a preliminary

Page 37

1  determination or a PD letter?
2      A.  Yes.
3      Q.  And in this letter, staff is informing the
4  company that it's made a finding, or at least a
5  preliminary determination, of a substantial product
6  hazard under the Consumer Product Safety Act, right?
7      A.  Yes.
8      Q.  And unlike the preliminary determination
9  form itself, this letter would have been provided to
10 the firm, right?
11     A.  Yes.
12     Q.  Now, does this PD letter explain the basis
13 of the Commission's decision?
14     A.  Generally, yes.
15     Q.  And what do you mean by that?
16     A.  I mean it says specifically, hot liquid,
17 grounds or hot steam can suddenly eject from the
18 product and scald consumers.
19     Q.  Where are you reading?
20     A.  First page, the second paragraph, last
21 sentence.
22     Q.  And in your opinion, is that description

1 sufficient for firms to know that they have to report
2 issues like this in the future?
3     A.   That's probably sufficient for BSH, Bosch
4 Tassimo, to know that the staff considers this to be
5 reportable, this being hot liquid, grounds or hot
6 steam suddenly ejecting from the product and scalding
7 consumers.
8     Q.   And if BSH had not received this letter,
9 how is it to know that this issue is reportable?
10     A.   It would look at the interpretative
11 regulation that the Commission has issued and the
12 criteria that the Commission has set forth and then
13 it would have to make a decision whether it has
14 information that it believes is reportable.  This
15 helps Bosch inform its decisions in the future as to
16 whether it has a reporting obligation if it has
17 similar risks presented by one of its coffee makers,
18 in my opinion.
19     Q.   Now, did you have this document when you
20 wrote your initial report?
21     A.   Yes.  Yes, I believe I did.
22     Q.   So like the preliminary determination

1 form, you were aware that a substantial product
2 hazard had been found in this case, right?
3     A.   I had forgotten but I was aware in that it
4 was in my notes, I had read the document, and when I
5 was writing my report I just didn't think of it
6 because it was an outlier.
7     Q.   So you just excluded it as an aberration?
8     A.   I wouldn't say I -- I didn't intentionally
9 exclude it when I was writing my report.  I had
10 forgotten about it.  But it didn't change my report
11 and my conclusions because I do consider this to be
12 an outlier.
13     Q.   It wasn't important enough to remember?
14     A.   That's a matter of opinion, I guess.  It
15 doesn't -- because it doesn't change my opinion, it
16 wasn't important in that sense, but if I had it to do
17 over again, I would have specifically referenced it.
18     Q.   Now, in a PD letter like this, is CPSC
19 staff, at least in this particular case, requesting
20 that the firm engage in a voluntary corrective
21 action?
22     A.   What's the question?

1     Q.   On the second page here, do you see the
2 section Voluntary corrective actions?
3     A.   Yes.
4     Q.   The staff is requesting that the firm take
5 corrective action, right?
6     A.   Yes.
7     Q.   And is that because the CPSC cannot force
8 corrective action without taking legal action?
9     A.   Yes.
10     Q.   And so the CPSC in most cases agrees with
11 the firm on the corrective action that's taken,
12 right?
13     A.   Well, they ask the firm to take corrective
14 action.  The firm will submit a proposed corrective
15 action plan and then the Commission staff will
16 evaluate that plan and decide whether it's acceptable
17 as proposed or whether it needs to be modified in
18 some way.
19     Q.   So the firm consults with the CPSC during
20 this process and they ultimately arrive at a
21 corrective action for that case?
22     A.   Consults in that the firm typically goes

1 back, puts together a corrective action plan, submits
2 it to the Compliance staff, the Compliance staff
3 reviews it and then there is a discussion if the
4 Compliance staff thinks that changes should be made
5 in the corrective action plan that's been proposed by
6 the company.  So it's a discussion that take place.
7     Q.   Mr. Schoem, I'm going to show you a new
8 exhibit which we're marking as Government Exhibit 85.
9          (Government Exhibit No. 85 was
10           marked for identification.)
11 BY MR. ROSS:
12     Q.   Now, if you would please take a look at
13 page 21 and verify that this is the supplemental
14 report you provided on April 22nd, 2016.
15     A.   Yes, it is.
16     Q.   So we've already covered this but --
17     A.   We have.  There is one other thing that I
18 should have changed in this report that I didn't
19 change.
20     Q.   Okay.
21     A.   When I went back and reread it, on page
22 16, in the -- is it the second paragraph, last

Page 42

sentence, says that, "There is no evidence that the staff communicated with Spectrum, or anyone else in the industry, a different position in the relevant time period." I should have corrected that. That's the sentence that's incorrect, because while they didn't communicate with Spectrum, obviously they communicated with Bosch a position different in that relevant time period than they communicated to the other companies and to Spectrum.

But the only change between the April 15th and April 22nd report that I did actually make was on page 15.

Q. And the reason that that didn't ultimately affect your conclusions is because you had the document and you considered it before you submitted your initial report, right?

A. Well, again, I said I forgot. I mean, I would have included this in the original report and I would have changed that sentence on page 16 in my original report if I had remembered that the staff had made a preliminary determination. I was looking at a lot of documents in a very short time frame with

Page 43

a very short fuse as to when the report had to be submitted. I guess we got -- were able to get an extra week's extension which allowed me to write a report. So it was inadvertent that I didn't reflect that the staff had made a class B determination. That's all I can tell you.

Q. I would just like it to be clear. This is information that you had in your possession before you wrote your first report, right?

A. Yes, that is correct.

Q. And had you not forgotten, you could have included that discussion in your initial report?

A. Yes.

Q. So other than addressing RP090423, are there any changes of note to this report?

A. No, other than what I just mentioned that I reflected that I wish I had changed on page 16.

Q. In fact, your conclusions on page 21 are verbatim what you concluded in your initial report, right?

A. Yes.

Q. Now, I would like to discuss each topic in

Page 44

your report at least in terms of the three conclusions that you reached, but we're going to address them in a slightly different order.

A. Okay.

Q. I would first like to discuss topic 3 which is your discussion of Spectrum's compliance programs.

A. Okay.

Q. Now, on page 1 of your report, you talk about your experience as a consultant with Marsh USA, right?

A. Yes.

Q. And you write, "I assisted firms in complying with federal agency regulatory requirements and industry voluntary standards." Do you see that?

A. Where are you reading? Which paragraph?

Q. The third paragraph down.

A. Yes.

Q. You say, "I assisted firms in complying with federal agency regulatory requirements and industry voluntary standards, complying with CPSC reporting requirements, establishing procedures for

Page 45

minimizing the need for product recalls, preparing for and deploying product recalls, and recovering from product recalls." Did I read that right?

A. Yes, you did.

Q. Now, you were at Marsh USA for approximately how long?

A. Seven years. September 2004 through December 31st of 2011.

Q. And in that time, did a company retain you to assess their existing CPSC compliance programs to determine whether they were sufficient?

A. Yes, both CPSC compliance programs and other non-CPSC programs.

Q. And what kind of regulatory standards would you use in assessing their compliance programs?

MR. MULLIN: Object to the form of the question.

THE WITNESS: What do you mean by regulatory standards?

BY MR. ROSS:

Q. Well, you wrote, "federal agency regulatory requirements," so why don't we phrase it

Page 46

1   that way.

2        What federal agency regulatory

3   requirements did you take into account in assessing

4   the company's compliance programs?

5     Q.   In the case of CPSC, we would look at the

6   statute and the interpretative regulation, and in the

7   case of NHTSA, we would look at NHTSA's reporting

8   requirements.   In the case of Food & Drug

9   Administration, we would look at their requirements

10   for reporting or conducting recalls for products like

11   medical devices or foods.

12     Q.   And what kind of industry voluntary

13   standards would you assess during that process?

14     A.   We would look at what voluntary standard

15   applicable to the products that the company produced

16   were in existence.

17     Q.   Are you talking about manufacturing

18   standards?

19     A.   Yes.   It would be things like UL

20   standards.   We had people in the group who were

21   expert in ISO standards.   And we typically get a list

22   from the manufacturers or the company who we were

Page 47

1   evaluating, we would ask them to provide us with a

2   list of the -- what they knew to be -- what they

3   believed to be the applicable voluntary or mandatory

4   standards for their products.

5     Q.   So when you were doing this kind of

6   assessment, you were part of a team at Marsh that

7   would go meet with the client and assess their

8   programs?

9     A.   Yes.   Sometimes it was the team and

10   sometimes it would just be myself.

11     Q.   And do you consider yourself to be a

12   subject matter expert on industry voluntary standards

13   for manufacturing small appliances?

14     A.   Not particularly.   I couldn't be able to

15   tell a company how to manufacture a product.   I could

16   work with them on identifying voluntary standards

17   that might exist for a product.   We would do that by

18   going to test labs and ask them to identify the

19   voluntary standards that exist.

20     Q.   Did you do that in this case?

21     A.   No.   I wasn't asked to identify voluntary

22   standards that might be applicable to these products.

Page 48

1     Q.   So typically when you would go -- again,

2   we're talking about your time at Marsh -- when you

3   would go and assess a company's compliance programs

4   for CPSC, what kind of review would that entail?

5     A.   It could entail going into the facility

6   and talking to key employees, key executives who had

7   responsibility in different product areas.   In other

8   cases it might be doing phone interviews with

9   individuals within the company and then looking at

10   their existing documents to see what they said.

11     Q.   And what kind of existing documents would

12   you review?

13     A.   Any documents that they had in place that

14   dealt with how they evaluated safety of products.   So

15   we would look at things like consumer complaints or

16   how they maintained or collected information about

17   consumer complaints, incident reports, call center

18   information, quality control information, how they

19   collected this information, whether they maintained

20   it in a central database, for example, whether they

21   had a committee that evaluated this information

22   routinely, periodically, whether they had persons who

Page 49

1   were responsible for making decisions on whether

2   there was a reporting obligation, whether they had an

3   escalation procedure within the company to get a

4   complaint that might go into a call center to

5   somebody at a higher level who would be deciding

6   whether to report to a regulatory agency.

7     Q.   Would you help assess companies' training

8   programs to ensure that they could carry out these

9   duties sufficiently?

10     A.   I don't recall we assessed existing

11   training programs but we would inform companies that

12   they needed to have training programs in place to

13   train their employees on what to do and how to do it,

14   and then we would sometimes go in to a company and do

15   a training program by having different scenarios that

16   we would throw out.   And the way we would do it is

17   you might have 30-40 people in the room, you would

18   put them five or six people at a table, you would

19   throw out different scenarios and then you would ask

20   the people sitting around the tables to give their

21   opinions on what they would do if faced with a

22   particular product scenario.   And then we would use

13 (Pages 46 to 49)

Page 50

1    that, tie that back to the compliance program that
2    they had in existence, make sure that they were doing
3    what their compliance program said they should do or
4    training them on how to function under their
5    compliance program.
6        Q.   Because a compliance program, when you're
7    talking about a big company like Spectrum, it's a
8    fairly broad term, right?
9        A.   I suppose so.
10       Q.   Well, it involved numerous different
11   functions and features within an organization to
12   ensure that they can meet their CPSC requirements,
13   right?
14       A.   Yes, but what we would do with some
15   companies, you might have a very big company and they
16   would have different divisions within the company.
17   And we would typically go into a particular division
18   and work with them on a compliance program, and then
19   tell the parent company that you should have similar
20   programs, not necessarily identical but similar or
21   close to identical programs in each of your other
22   subdivisions so that the company as a whole is

Page 51

1    operating in the same consistent manner.
2        Q.   You're talking about training in
3    particular.  When you talked about having these
4    meetings with 30 to 40 people and throwing out
5    scenarios, that's to ensure that people knew how to
6    do the jobs that they were assigned, right?
7        A.   Right.  And I would consider that to be a
8    training program.
9        Q.   Me too.  And that's important because
10   things like quality systems, process validation,
11   complaint handling, people aren't born with innate
12   knowledge of how to do these things, are they?
13       A.   No, and that's why you have a manual and
14   you have training programs to explain to people what
15   to do and how to do it.
16       Q.   And when you're talking about small
17   appliances, you might have features that present
18   hazards that only an engineer might be able to
19   identify, right?
20       A.   Maybe for specific features but a call
21   center employee can listen for key words, for
22   example.  If the consumer calls in and says the

Page 52

1    product -- I was burned or this product seems
2    dangerous or I thought that it wasn't safe, you
3    collect that information and then you may need to
4    bring in an engineer in to evaluate the product to
5    see what was going on, why the consumer was making
6    that complaint, whether there was something going on
7    with the product that might present some risk.
8        Q.   My point is that throughout this
9    process -- and please tell me if you disagree with
10   me.  Throughout the process that starts with
11   designing a product and ends with monitoring products
12   that are being used in the field, there are many
13   points in that chain where people need training and
14   specialized knowledge in order to do their jobs?
15       A.   That sounds reasonable.
16       Q.   And you agree it's important that though
17   consumers may not have that specialized knowledge, if
18   they say things like this product is defective, this
19   product is dangerous, this product is a burn hazard,
20   that the company should take that seriously and
21   evaluate it, right?
22       A.   Yes.

Page 53

1        Q.   Now, Spectrum in particular is a fairly
2    large company, right?
3        A.   That's my understanding, yes.
4        Q.   Well, I looked this up yesterday and it
5    appears to be almost a $7 billion company with 12,000
6    employees, right?
7        A.   I haven't looked at them.
8        Q.   Well, it's a very large consumer appliance
9    manufacturer, right?
10       A.   I'll not disagree with you.
11       Q.   It probably has a fairly expansive system
12   in place starting from designing products to
13   monitoring them in the field to ensure that safe
14   products are in consumers' hands, right?
15       A.   That's what companies typically do, yes.
16       Q.   That's what your testimony is at least?  I
17   don't want to mischaracterize it.
18       A.   Well, my testimony is that Spectrum has
19   procedures in place so that it can determine whether
20   it has a reporting obligation to CPSC.
21       Q.   Just so I'm clear about that, is your
22   opinion limited to Spectrum actually has these

14  (Pages 50 to 53)

Page 54

1    programs in place or are you opining that they
2    actually function the way they're supposed to?
3       A.   I'm saying that they have procedures in
4    place.
5       Q.   You're saying that the procedures as they
6    exist in the various documents that you reviewed
7    appear to be reasonable, right?
8       A.   In the documents that I reviewed and in
9    the interviews that I conducted with Nigel Stamp,
10   their procedures appear to be reasonable and designed
11   to collect information that can be evaluated to
12   determine whether a report to CPSC is appropriate.
13      Q.   Would you please turn to page 17 of your
14   report?  Under section 7 which says, "Spectrum's
15   internal reporting processes and procedures," the
16   first sentence, you note that you reviewed the
17   referenced documents and had discussions with Nigel
18   Stamp, Spectrum's senior director of global quality
19   and regulatory, right?
20      A.   Yes.
21      Q.   And are the documents you're referring to
22   the ones that are listed in Attachment 1?

Page 55

1       A.   Yes, Attachment 1 to -- yes.
2       Q.   Now, with respect to Spectrum's compliance
3    programs, is the material that you considered the
4    material that's on page 2 of Attachment 1 that starts
5    with deposition of Nigel Stamp?
6       A.   Yes.
7       Q.   And do you recall how much of Mr. Stamp's
8    deposition pertained to the company's current
9    compliance program?
10      A.   I don't recall specifically how much.
11      Q.   A lot or a little?
12      A.   I don't remember.
13      Q.   And the sum total of the other documents
14   that you reference here, about 57 pages of documents,
15   right?
16      A.   I don't think they were that many.
17      Q.   Not 57 total documents.  57 pages.
18      A.   Yeah, I don't remember that it was
19   57 pages but I didn't count.
20      Q.   Well, it wasn't hundreds, right?
21      A.   No.
22      Q.   When did you meet with Mr. Stamp to

Page 56

1    discuss Spectrum's compliance program?
2       A.   I didn't meet with him in person.  It was
3    a telephone conferences.
4       Q.   Approximately how many conferences?
5       A.   Two.
6       Q.   And how long did those last?
7       A.   An hour, hour and a half each.
8       Q.   And other than reviewing the documents on
9    page 2 of Attachment 1 and these two calls with
10   Mr. Stamp, did you do anything else to gather
11   information about Spectrum's compliance programs?
12      A.   No.
13      Q.   So the entirety of your opinion is based
14   off of that subset of information?
15      A.   Yes.
16      Q.   Had you met Mr. Stamp before this case?
17      A.   No.  And I still haven't met him except by
18   phone.
19      Q.   Well, did you know him other than through
20   your employment in this case as an expert?
21      A.   No.
22      Q.   Now, based on your review again, you

Page 57

1    conclude that Spectrum has reasonable internal
2    processes and procedures to collect and evaluate
3    information on the safety of its products, right?
4       A.   Yes.
5       Q.   Now, when it says processes and procedures
6    to collect and evaluate information relating to the
7    safety of its products, are you really referring to
8    the process for assessing and obtaining consumer
9    complaints and escalating them through the company?
10      A.   Yes, as a part of it.
11      Q.   Are you familiar with a CPSC publication
12   that talks about good manufacturing practices?
13      A.   Generally, yes.
14      Q.   Well, it's a publication that the CPSC has
15   released since the late '70s, right?
16      A.   Right.
17      Q.   So it's been out there for quite some
18   time, what the CPSC thinks pertains to safety with
19   respect to manufacturing processes, right?
20      A.   Right.
21      Q.   And at least in that booklet, the issues
22   that the CPSC identifies are much more

Page 58

1  all-encompassing than the scope of your report,
2  right?
3      A.  I don't recall specifically what's in the
4  manufacturing guide but I know it's fairly detailed.
5      Q.  Well, you don't discuss --
6      A.  But that -- I'm sorry.
7      Q.  Do you discuss or consider how Spectrum
8  obtains raw materials for its products?
9      A.  No.  I didn't go into a deep dive with
10 Spectrum on how it qualifies -- how it sources
11 materials, for example.  I wasn't focused on that.  I
12 was focused on information that Spectrum collects,
13 obtains, receives that pertain to product risk,
14 product safety and how it uses that information to
15 determine whether it has an obligation to report to
16 CPSC.
17     Q.  What I'm trying to differentiate so that
18 we can steer the discussion in the right direction is
19 between how Spectrum obtains information and
20 addresses safety issues that arise when the products
21 are in consumers' hands versus how Spectrum prevents
22 unsafe products from going into commerce in the first

Page 59

1  place.  Do you understand that distinction?
2      A.  Yes.  And I didn't look at the latter.  I
3  didn't look at how they design their products in the
4  first instance, I didn't look at how they manufacture
5  their products.
6      Q.  Now, we'll get into more detail into this
7  later, but when we're talking about the reporting
8  requirement, is the purpose of the reporting
9  requirement to prevent unsafe products from getting
10 into consumers' hands or to simply address dangerous
11 products after they've already injured people?
12     A.  Well, it can be both because if a company
13 is engaged in continuous improvement, for example,
14 and its engineers identify a safety problem with a
15 product that could present a substantial risk of
16 injury to the public, to consumers, then that would
17 trigger a reporting obligation.
18         So it doesn't have to be only after
19 products are in the marketplace.  Companies routinely
20 are continuously evaluating their products.  It might
21 be based on consumer complaints but doesn't have to
22 be.

Page 60

1      Q.  So in order to obtain sufficient
2  information to prevent unsafe products from getting
3  into the marketplace in the first place, a company's
4  compliance programs need to actually address the
5  process by which products go into the marketplace, is
6  that right?
7      A.  Companies should have procedures in place
8  to design safety into their product as the products
9  are being manufactured.  And I didn't evaluate
10 whether Spectrum has such procedures in place.
11     Q.  So before we get into the specifics of
12 what you did, even if a company has a pristine
13 process in place for addressing consumer complaints,
14 if it is deficient in how it evaluates and prevents
15 unsafe products from getting into the marketplace in
16 the first place, can you say that that compliance
17 program is sufficient to allow the company to comply
18 with the reporting requirements of the CPSA?
19     A.  In a broad sense, yes, because companies
20 produce products taking safety into account and they
21 design safe products, what they believe to be safe
22 products or reasonably safe products and then things

Page 61

1  happen in the marketplace that they just don't --
2  didn't anticipate would happen.  But companies
3  should, in manufacturing products, should design
4  safety into the product.  They should be doing
5  regular testing and evaluation of their products
6  before they're put into the marketplace.  And if
7  things happen when the product is in the marketplace,
8  then that's information that you need to evaluate to
9  determine whether, for example, you have a reporting
10 obligation to a regulatory agency.
11     Q.  So you're saying companies should have a
12 program in place to ensure the safety of products
13 before they go out the door, right?
14     A.  Yes.  You design safety into products.
15 And that's what I think that the CPSC's manufacturing
16 guide addresses.
17     Q.  But that's not the subject of your
18 testimony here?
19     A.  That's correct.
20     Q.  And I'm just trying to clarify what we're
21 talking about.  You don't actually know about that
22 first half of the process, the premarket process that

16 (Pages 58 to 61)

Page 62

1  spectrum goes through to ensure that its products are
2  safe, right?
3      A.   That's correct.
4      Q.   And if it turned out that that process was
5  woefully deficient, even if the consumer complaint
6  side was pristine, would that change your ultimate
7  opinion on the sufficiency of Spectrum's compliance
8  programs?
9      A.   It might.
10     Q.   So without further information, you can't
11 say for sure at all that their compliance programs
12 are sufficient, can you?
13     A.   Well, I can -- within the scope of what I
14 was evaluating, I can, yes.
15     Q.   So you can say this part of the program is
16 reasonable, that's what you're saying?
17     A.   Yes.
18     Q.   But without knowing the other parts, you
19 can't be sure that Spectrum actually does have
20 sufficient programs in total to comply with the
21 CPSA's reporting requirement, right?
22     A.   Right.  My report only talks about the

Page 63

1  area of Spectrum's program that I looked at and my
2  conclusions are based on the portions of the Spectrum
3  program that I looked at.
4      MR. MULLIN:  Good time for a break or no?
5      MR. ROSS:  I have a couple more questions
6  on this line and then I'll have a new line so --
7      MR. MULLIN:  Sure.
8      MR. ROSS:  If you don't mind.
9      MR. MULLIN:  No, that's fine.
10 BY MR. ROSS:
11     Q.   Now, let's talk for a minute about these
12 other Applica/Spectrum CPSC cases that you mentioned
13 below.  Do you know what I'm talking about here?
14     A.   Yes, the one ending in 23 and 25?
15     Q.   Well, the two PI cases plus the four cases
16 that you say Spectrum proactively reported, right?
17     A.   Yes.  So we're getting away from this part
18 of the report now?
19     Q.   No.
20     A.   Or you're going to tie it in?
21     Q.   I think it ties in.  You state here that
22 documents I reviewed show that since 2005,

Page 64

1  Applica/Spectrum proactively reported coffee maker
2  issues to CPSC on at least four different occasions,
3  including the instant case.  And then you mention the
4  two PI cases where staff closed the investigations,
5  right?
6      A.   What page are you reading from?
7      Q.   17, bottom of page 17.
8      A.   Okay.
9      Q.   The question I have is, what is the
10 relevance of these Applica cases in your mind to
11 whether Spectrum has sufficient compliance programs
12 today?
13     A.   I think the programs that they have today,
14 I suspect, build on programs that they had in place
15 in the past.  My only point was to show that Spectrum
16 has reported to CPSC in the past.  But I didn't
17 evaluate their programs in the past.  I only
18 evaluated their current program.
19     Q.   Do you know how many of these six cases
20 arose at a time when Spectrum even owned Applica?
21     A.   No.
22     Q.   Well, let's see --

Page 65

1      A.   It may not be any.  It may be a few.
2      Q.   Well, the two PI cases were both prior to
3  June 2010 when Spectrum bought Applica, right?
4      A.   That sounds right, yes.
5      Q.   So I assume you're not saying that Applica
6  and Spectrum had the same kind of reporting systems
7  at that time, right?
8      A.   Yeah, because I don't know what exactly
9  they had in place at that time.
10     Q.   Right, because that wasn't part of your
11 review?
12     A.   Right.  I was just making the point that
13 they did report in those four cases.
14     Q.   And in those four cases, they were Fast
15 Track cases, right?
16     A.   That's correct.
17     Q.   So there was no finding by staff of a
18 substantial product hazard one way or the other,
19 right?
20     A.   Right.
21     Q.   And do you know whether Spectrum today has
22 any of the same personnel in its compliance programs

1    at Applica at that time?

2        A.   I don't recall.  There may be something in

3    Nigel Stamp's deposition but I don't recall.

4        Q.   So you don't know if they had the same

5    personnel and you don't know if they had the same

6    kind of systems and programs that Spectrum has today,

7    right?

8        A.   Right.

9        Q.   So can you say with any certainty that the

10   fact that Applica reported cases before Spectrum even

11   owned it shows that Spectrum has a commitment to

12   compliance?

13       A.   Well, there was some overlap because Nigel

14   Stamp got there in I think it was 2010, and in his

15   deposition, he talked about -- he used terms that are

16   similar to what's done today.  He talked about the

17   weekly meetings and the quality reports.  And in

18   fact, what he told me is that the report is still

19   known today -- the daily report that he gets is still

20   known as the Applica quality report.  They never

21   changed the name.  It's essentially the same report

22   so he's getting the same information or same type of

1    information, presumably, that he got when Spectrum

2    didn't own Applica.

3        Q.   So it's your understanding that Applica,

4    six or seven years ago, has similar or had similar

5    compliance programs to what Spectrum has today?

6        A.   I can't say how similar they were.  They

7    had some kind of programs in place.

8        Q.   So you can't really draw a conclusion one

9    way or the other as to whether Spectrum has better or

10   worse programs than Applica did, right?

11       A.   I didn't try to compare Spectrum programs

12   with Applica programs.

13       Q.   Just a final question or two and then we

14   can break.  Mr. Stamp was at the company when it

15   reported the instant case, right?

16       A.   I believe so.

17       Q.   And do you know what Mr. Stamp's

18   involvement was in the reporting process at that

19   time?

20       A.   I don't recall specifically.  I don't

21   think he was directly involved but I don't recall.

22       Q.   Well, he signed the Section 15 report,

1    right?

2        A.   He signed the second one, I think, the

3    supplemental report.  The first one was signed by a

4    lawyer and then he signed a supplemental document.

5    That's my recollection.

6        Q.   And was he the head of quality at that

7    time?

8        A.   I believe so.

9        Q.   So is it your understanding that he has a

10   materially different role today than he did in April

11   of 2012?

12       A.   I don't think it's different but --

13       Q.   And --

14       A.   I just remember from the deposition that

15   there was a transition period in there where he was

16   taking over from somebody else when he was in Florida

17   and he wasn't making the decisions at the time and I

18   don't recall the breakdown of the dates when he

19   specifically then assumed complete responsibility.

20       Q.   And again, you didn't assess whether these

21   programs actually function in practice the way

22   they're supposed to on paper, right?

1        A.   Right.  I looked at the programs that they

2    have and not how they were actually functioning,

3    other than to the extent to which Nigel Stamp

4    explained to me how the programs function.

5        Q.   And if the Court in this case were to find

6    that quality did not do its job in assuring that

7    information was considered and ultimately reported in

8    the instant case, could that have personal

9    ramifications for Mr. Stamp?

10       A.   I don't know.

11       Q.   Does Mr. Stamp have a personal stake in

12   the outcome of this case?

13       A.   I don't know.

14       Q.   If the Court determines that Mr. Stamp did

15   not do his job in April 2012, do you think that could

16   make him look pretty bad?

17            MR. MULLIN:  Object to the form of the

18   question.  You can answer.

19            THE WITNESS:  It depends on what his job

20   was, what his responsibility was.

21   BY MR. ROSS:

22       Q.   Well, you just testified that you thought

Page 70

1    his responsibility was pretty much the same then as
2    it is today, right?
3        A.   I think I said -- and if I didn't, I
4    should have said I don't know exactly what his
5    responsibility was then, that there was some
6    transition period and I don't recall the dates when
7    he became more fully involved in the process.  And
8    I'm not sure what his role is in terms of designing
9    products, if any.
10       Q.   So whether or not the Court finds that
11   Spectrum violated its reporting obligation you don't
12   think would affect Mr. Stamp at all?
13       A.   It may not because Mr. Stamp's
14   responsibility is to collect information relevant
15   to -- as I understand it, relevant to -- information
16   that's relevant to whether there is a safety problem
17   with a product and then to escalate that information
18   within the company where it ultimately goes to the
19   legal office, who makes a decision on whether there
20   is a reporting obligation.  And I identify in my
21   report the information that I understand that Nigel
22   Stamp's group takes into consideration and escalates

Page 71

1    within the company.
2            MR. ROSS:  We can take a break now.  Off
3    the record, please.
4            (Recess.)
5    BY MR. ROSS:
6        Q.   Mr. Schoem, now that we're back from a
7    break, I would like to just discuss some of the
8    various aspects of Spectrum's compliance programs
9    that you discuss in your report.  Now, one of the
10   things you talk about is Spectrum's call center,
11   right?
12       A.   Yes.
13       Q.   And that's obviously a critical component
14   of finding out about product failures in the field,
15   right?
16       A.   That's one component, yes.
17       Q.   Well, if you don't have a number for
18   consumers to call, it's kind of hard for them to
19   complain to you, right?
20       A.   They seem to do it by email and a few
21   apparently actually write letters.
22       Q.   Well, the first paragraph here, before we

Page 72

1    even get to the emails and letters, you talk about
2    written quality reports, right?
3        A.   Show me where you're --
4        Q.   The first paragraph under call center on
5    page 18.
6        A.   Okay.  Yes.
7        Q.   Now, in connection with your analysis, did
8    you review any quality reports?
9        A.   I may have seen one in an exhibit to a
10   deposition but not specifically, no.
11       Q.   Was that a current quality report or
12   historical one?
13       A.   It was probably an historical one.
14       Q.   Do you know whether in fact the quality
15   reports at Spectrum contained the information that
16   you say they contain here?
17       A.   I based what I said that they contain on
18   my discussions with Nigel Stamp.
19       Q.   The next few paragraphs here talk about
20   keyword searches and product retrievals, right?
21       A.   Yes.
22       Q.   And that's what we were talking about

Page 73

1    earlier about how customer service agents are trained
2    to identify particular keywords that they can
3    escalate it to people at the company who might be
4    able to do something about it, right?
5        A.   Yes.
6        Q.   Now, sitting here today, do you know
7    whether in fact consumer call center agents are
8    trained to listen for keywords?
9        A.   Well, they have a document that lists the
10   keywords and I'm told that they are told to listen
11   for these keywords and if they have them, then
12   they're supposed to retrieve -- attempt to retrieve
13   the product from the consumer who is complaining
14   about the product.
15       Q.   As part of your investigation, did you
16   interview any call center employees?
17       A.   No, I didn't.
18       Q.   Did you interview any PI specialists?
19       A.   No.  The only person I interviewed was
20   Nigel Stamp.
21       Q.   Did you review any data that verifies that
22   the company received 25 to 30 percent of its returns

19  (Pages 70 to 73)

1  that it requests?
2      A.  No.  All the information in this report is
3  based on the documents that I reviewed and on the two
4  interviews with Nigel Stamp.
5      Q.  Now, next here you say that Spectrum
6  evaluates the products after they're received, right?
7      A.  Yes.
8      Q.  How does that entail?
9      A.  What Mr. Stamp advised, and there is a
10  chart that kind of shows this, is the product comes
11  back and it goes to an engineer who is within
12  Mr. Stamp's department or division.  The engineers,
13  as they evaluate the product, are trying to verify
14  whether what the consumer said happened, happened or
15  could have happened.
16      So they do a technical evaluation of the
17  product and then write a report.  The report is then
18  reviewed by various people within the company with
19  responsibility in that area and then a final report
20  is written and that's provided to Mr. Stamp.
21      Q.  As part of your investigation, did you
22  review any engineering analyses?

1      A.  No.
2      Q.  Did you speak with any staff responsible
3  for evaluating products that are returned by
4  consumers?
5      A.  As I said, the only person I talked to is
6  Nigel Stamp.
7      Q.  Did you inquire into the training that
8  Spectrum provides to ensure that employees know how
9  to do their jobs?
10      A.  No, I didn't.
11      Q.  Do you know whether in fact Spectrum
12  provides any training at all to its employees?
13      A.  My recollection is Nigel Stamp told me
14  that employees are trained but I don't know the
15  extent to which they're trained and what that
16  entails.
17      Q.  If I told you that Nigel Stamp had signed
18  an interrogatory under penalty of perjury in this
19  case stating that they do not in fact train employees
20  with regard to anything dealing with CPSC compliance,
21  would that change your opinion on the reasonableness
22  of Spectrum's compliance programs?

1      MR. MULLIN:  Object to the form of the
2  question.
3      THE WITNESS:  Employees in a call center
4  don't necessarily have to be trained on CPSC
5  reporting obligations and reporting requirements.
6  What they have to be trained on is, if a consumer
7  complains about a product safety-related issue, you
8  need to document that, you need to record it.
9      They have quality issues and product
10  incident issues.  They have two types of tracking, I
11  guess you could call it.  If there is a consumer
12  complaint about an injury, that is supposed to be
13  escalated to a specialist.  If it's a potential
14  injury, then that's handled by the call center.
15      So whether it's important for call center
16  employees to know about reporting obligations, maybe
17  in a general sense, but what they have to be trained
18  on is if you obtain information that's
19  safety-related, you need to document, here's this
20  procedure that you go through.
21      Q.  I'm not actually talking about training on
22  what the CPSC reporting obligation is.  What I'm

1  saying is if you were to learn that throughout this
2  entire process from gathering complaints to
3  retrieving products to evaluating them, the whole
4  process that you described, that not a single one of
5  these employees is trained, would that impact your
6  opinion on whether this compliance program is
7  reasonable?
8      MR. MULLIN:  Object to the form of the
9  question.
10      THE WITNESS:  Not trained on what?
11  BY MR. ROSS:
12      Q.  How to do their jobs at all.
13      MR. MULLIN:  Object to the form of the
14  question.  You can answer.
15      THE WITNESS:  I just find it hard to
16  believe that they're not trained to some extent.  If
17  they're given a document that says, look for these
18  keywords and if they're told to record this
19  information in their data systems, then that's what I
20  understand that they did.
21      I don't know what Mr. Stamp said in the
22  interrogatory.  I didn't read that.

Page 78

BY MR. ROSS:

Q. Well, we're talking about the entire compliance program that you're talking about here now, not just the call center employees.

Now, you testified earlier that training is an important part of ensuring compliance, right?

A. Yes, I said that employees should be trained on their responsibilities.

Q. And we talked about how people aren't necessarily born with innate knowledge of how to do all the things that's necessary to ensure that dangerous products are kept away from consumers, right?

A. That's right.

Q. So if Spectrum doesn't in fact train any of its employees how to do those things, can they possibly have a reasonable compliance program?

MR. MULLIN: Object to the form of the question.

THE WITNESS: I think that could be a weakness. If they're not -- you have to have a program in place. You have to train your employees

Page 79

on how to follow that program. You have to train them on what their duties and responsibilities are.

And that can be as simple as a new employee comes in and you say here's your manual and here's your duties and responsibilities and here's your supervisor, if you have any questions, go ahead and do it. I smile because I recall the depositions of some of the compliance officers and they said they had no training, it was just kind of on the job, learn how to do it and talk to your supervisors.

BY MR. ROSS:

Q. We're going to talk about the CPSC in a few moments here. I'm talking about Spectrum for the time being. Now, you talk about quality meetings here, right?

A. Where are you looking?

Q. The last full paragraph on page 19. Do you see the paragraph?

A. Yes.

Q. Have you attended any quality meetings?

A. At Spectrum?

Q. Yes.

Page 80

A. No.

Q. You use various terms here for when certain individuals participate in the meeting. What does generally participate mean?

A. Where are you reading so I can see exactly what I said?

Q. Well, "The Home Global Quality members who generally participate in the meeting." It's the first sentence.

A. They don't all necessarily attend every meeting. It is my understanding from Mr. Stamp some participate in person, some participate by phone. He doesn't necessarily attend every meeting. He might have a delegate at the meeting acting on his behalf, so I used the term generally.

Q. When is it appropriate for Mr. Stamp to attend a meeting? Again I'm using your words.

A. He didn't say. He just said that he attends -- I mean, my impression was when there are really important, key issues that are being discussed, he would try to participate either in person or by phone but he travels a lot. So it's

Page 81

appropriate in part when he's available.

Q. So you don't know how often any of these people actually attend these meetings, right?

A. No. I know which entities are supposed to attend the meetings.

Q. Do you know how long the meetings generally last?

A. No, I don't.

Q. Do you know how long they discuss any given quality or safety issue?

A. No.

Q. Do you know the kinds of quality or safety issues that are discussed other than what you state here?

A. Not specifically, no.

Q. Do you know if one of the kinds of safety or quality issues they might discuss is a coffee maker that could cause second degree burns?

A. If they're getting a lot of complaints that are beyond what they would normally get, from my understanding they would discuss that. If there were injuries to consumers, they would discuss that or

21 (Pages 78 to 81)

1    could discuss that.
2        Q.   As a general matter, whether or not you
3    think a company ultimately should report, would you
4    agree that it's important for the company to actually
5    consider safety issues so they can decide whether
6    reporting is appropriate?
7        A.   That's a key part of deciding whether you
8    have a reporting obligation, whether there is a
9    safety issue with the product as opposed to, say, a
10   quality issue.
11       Q.   Now, would you agree that hot coffee that
12   can cause serious burns is a potential safety issue?
13       A.   I think you asked that earlier and I said
14   it's possible.
15       Q.   That's why I used the word potential.
16   It's a possible safety issue, right?
17       A.   It's possible, yes.
18       Q.   Because it could cause serious injury to a
19   consumer?
20       A.   It's possible.
21       Q.   So whether or not you ultimately think the
22   company should report such an issue, you do think

1    it's important that the decision makers get together
2    and actually evaluate information about the incidents
3    that they've received?
4        A.   Yes.
5        Q.   Do you know whether in the instant case
6    the decision makers ever got together to discuss
7    information about the coffee makers prior to March
8    2012?
9        A.   I don't know.
10       Q.   If I were to tell you that there is no
11   record whatsoever that the safety committee
12   responsible for reporting discussed this issue at all
13   over the first three years that they were receiving
14   incidents, would you consider that to be reasonable?
15           MR. MULLIN:  Object to the form of the
16   question.
17           THE WITNESS:  I don't know what they were
18   considering.
19   BY MR. ROSS:
20       Q.   Well, I'm telling you to consider for
21   purposes of this question that they didn't meet at
22   all so they didn't consider anything for three years.

1    Do you think that's reasonable?
2        A.   They can consider information without
3    meeting.
4        Q.   Do you know whether in fact the safety
5    committee in the instant case considered this issue
6    at all?
7        A.   I don't know.
8        Q.   Do you know if it was ever raised for
9    discussion?
10       A.   I don't know because I wasn't asked to
11   look at that.
12       Q.   The last paragraph on page 19, you start
13   talking about escalation to the legal department.
14       A.   Yes.
15       Q.   Do you see that?  And you state that
16   quality considers certain information, evaluates
17   products, compares them to call center information
18   and a number of other things, right?
19       A.   Right.
20       Q.   So is this ultimately Mr. Stamp's
21   responsibility?
22       A.   Yes.  That's what he advised me.  It was

1    his responsibility to escalate it, except in the case
2    of product incidents where there is actually an
3    injury.  And that's a separate track which goes right
4    up either to the business or even legal department.
5        Q.   But you would agree that a product can
6    present a risk of harm to a consumer even if an
7    injury hasn't occurred yet, right?
8        A.   Yes.
9        Q.   I mean, if a coffee maker was set on fire
10   and burned down an empty house, it's still a pretty
11   risky product, right?
12       A.   Right.  And -- yes.
13       Q.   So if Mr. Stamp is ultimately responsible
14   for escalating issues that don't result in injury,
15   it's fairly important that he actually does what you
16   say he does, right?
17       A.   Yes, either he or a surrogate does that.
18   If he's not in attendance at the meeting and it's
19   something that needs to be escalated, then whoever
20   he's left as the responsible person, he's responsible
21   for escalating.
22       Q.   What kind of issues might Mr. Stamp

Page 86

1  escalate directly without having the kind of meeting
2  that you discuss here?
3      A.  He felt that when there was a really
4  critical safety issue, he didn't have to have a
5  meeting to escalate it to the next level.
6      Q.  Now, when you were having this discussion,
7  did Mr. Stamp give you specific examples of cases
8  that he's actually dealt with in real life?
9      A.  No.
10      Q.  So you didn't go back and try to connect
11  his decision making to see if you agreed with the way
12  he evaluated safety hazards, did you?
13      A.  No.  He just told me the process that he
14  has in place and the steps that he takes and I
15  accepted what he said as to what he does.
16      Q.  And if any of the information that he
17  conveyed to you was incorrect, that could ultimately
18  change the opinions that you present in this report,
19  right?
20      A.  I don't know if I would say any
21  information but, yes, I do leave myself room to say
22  if new or different information becomes available, it

Page 87

1  could result in my modifying or changing the report.
2      Q.  Down on page 20, you have one paragraph
3  under Requests for corrective action.  Do you see
4  that?
5      A.  Yes.
6      Q.  And basically what you state here is that
7  Spectrum indeed has a process for requests for
8  corrective action?
9      A.  Yes.
10      Q.  And you talk about products going in the
11  wrong boxes.  They know how to fix that, right?
12      A.  Right.
13      Q.  Do you know anything else about how this
14  process works?
15      A.  Not specifically.  That was an example
16  that Mr. Stamp gave of a nonsafety issue that would
17  be dealt with simply.
18      Q.  So is that your answer?
19      A.  Yeah.  As I say, that they can make a
20  request for corrective action based on consumer
21  complaints, quality issues.  They may see information
22  that's reported on Amazon that consumers are

Page 88

1  complaining about a product, they're not happy with
2  it, they're not satisfied with it and so they can do
3  a request for corrective action to address those
4  complaints that are coming in.
5      Q.  Now, when you were at Marsh and you were
6  doing evaluations of companies' compliance programs,
7  is one of the pieces of data that you would look at
8  information on the company's ability to identify and
9  resolve issues like this?
10      A.  Either that or we would tell them that
11  they need to have procedures in place so that they
12  can identify and resolve issues.
13      Q.  But again, having a procedure in place and
14  actually being able to identify and correct problems
15  are two distinct issues, right?
16      A.  They're distinct but interrelated.  You
17  have to identify the problem to be able to fix it.
18      Q.  What I'm saying is, having a program in
19  place and actually executing that program the way
20  it's supposed to be are two separate issues, right?
21      A.  They're both important issues, separate
22  and important.

Page 89

1      Q.  You didn't interview anybody who deals
2  with requests for corrective action besides
3  Mr. Stamp, right?
4      A.  Correct.
5      Q.  And you didn't review any data about how
6  long it takes the company, for instance, to identify
7  root cause and actually correct problems with its
8  products?
9      A.  No.  The impression that I had was when a
10  returned product comes in, the engineering evaluation
11  is not a lengthy process but I don't have any
12  specific information on the amount of time that would
13  be spent on it.
14      Q.  And the company's ability to identify or
15  cause and correct in a timely fashion are sort of
16  important aspects of keeping unsafe products out of
17  consumers' hands, aren't they?
18      A.  Yes, I think so.
19      Q.  Now, the next paragraph here, you talk
20  about product holds, right?
21      A.  Yes.
22      Q.  And this is obviously critical to keeping

Page 90

1  unsafe products out of consumers' hands, right?
2     A.  Yes.
3     Q.  Because at the point where you've
4  identified an unsafe product and put it on hold, you
5  already know, presumably, about the risk, right?
6     A.  Presumably, or you might not know about
7  the risk and you put it on hold until you can
8  evaluate the risk.
9     Q.  Well, if you're concerned that a product
10 might present a safety hazard, it's pretty important
11 that you can put it on hold and keep it there, right?
12    A.  Yes.
13    Q.  And, Mr. Schoem, would you expect that a
14 company would take reasonable precautions to ensure
15 that product that's on hold in fact stays on hold?
16    A.  Reasonable precautions, yes.  But we're
17 all human.
18    Q.  Might a reasonable precaution include some
19 sort of monitoring of a product on hold?
20    A.  Might.
21    Q.  Might reasonable precautions include
22 having to find processes and procedures for handling

Page 91

1  held products?
2     A.  Might.
3     Q.  Might reasonable people want to have
4  defined processes for handling held products during a
5  recall specifically?
6     A.  Might.
7     Q.  Now, you told me earlier that the sale of
8  recalled coffee makers in this case was out of the
9  realm of your testimony here, right?
10    A.  Right.
11    Q.  So you didn't review any documentation
12 about that?
13    A.  No, other than the allegation in the
14 complaint of the government.
15    Q.  Do you think the fact that the company
16 sold recalled coffee makers is relevant to its
17 product hold procedures?
18    A.  Well, relevant in terms of today, yes.
19 Again, I didn't look at what was done then.
20    Q.  Well, you did review one product hold
21 procedure, right?
22    A.  I read a document and talked to Mr. Stamp.

Page 92

1     Q.  Well, you reviewed a document called
2  Spectrum Product Hold Process Chart, right?
3     A.  Yes, that's a document I --
4     Q.  And you reviewed the document entitled
5  Spectrum Product Holds, WI-8-3-A Document Revision A,
6  Effective July 20 of 2013, right?
7     A.  Yes.
8     Q.  Now, the latter document that I
9  referenced, is that the actual SOP that Spectrum
10 follows for product holds?
11    A.  That's the document that I was provided.
12 That is the most current document that reflects what
13 they do today.
14    Q.  Do you happen to know why that document
15 was revised in July of 2013?
16    A.  No.  And there was -- that may be the
17 document that I looked at but I didn't see any
18 difference between the earlier version and the
19 revised version.  I know there was one document in
20 this file, and I don't recall specifically if it was
21 that one, where I scratched my head and said, okay,
22 they've got a revision but I don't know that there is

Page 93

1  any changes.  But I would have to look at the two
2  documents to answer what the revision was.
3     Q.  Now, I know that you didn't, again, verify
4  how these processes actually work in practice, but if
5  I were to tell you that Spectrum concluded that it
6  sold the recalled products in part because it lacked
7  defined procedures for executing a recall from an
8  operations standpoint, might that indicate a weakness
9  in their product hold processes?
10       MR. MULLIN:  Object to the form of the
11 question.
12       THE WITNESS:  When did they sell the
13 recalled product?
14 BY MR. ROSS:
15    Q.  June of 2013, approximately three weeks or
16 so before -- it would be four weeks.  I take that
17 back.  They discovered the issue approximately four
18 weeks before they revised the product hold SOP.
19    A.  And your question is?
20    Q.  My question is, if Spectrum concluded that
21 it lacked defined procedures for executing a recall
22 from an operations standpoint, might that bear on the

1  effectiveness of its product hold procedures?
2      MR. MULLIN: Object to the form of the
3  question.
4      THE WITNESS: It might.
5  BY MR. ROSS:
6      Q.  If Spectrum had concluded that it had
7  failed to inform all of its customers about a product
8  hold because it had an old distribution list, might
9  that bear on the effectiveness of its product hold
10  procedures?
11      MR. MULLIN: Object to the form of the
12  question.
13      THE WITNESS: It might but I don't know
14  the facts of what was happening then, so I'm just
15  answering your "might" questions.
16  BY MR. ROSS:
17      Q.  And that's all I'm asking. Now, if
18  Spectrum fails to tell its warehouses when recalled
19  products are being shipped there such that the
20  products are never actually put on hold, does that
21  bear on the reasonableness of a product hold
22  procedure?

1      A.  Say that again.
2      Q.  If Spectrum never tells its warehouses
3  when recalled products are actually coming in the
4  door, could that impact the effectiveness of a
5  product hold procedure?
6      MR. MULLIN: Object to the form of the
7  question.
8      THE WITNESS: I suppose it could.
9  BY MR. ROSS:
10      Q.  Well, if they don't know that it should be
11  put on hold and they put it into salable inventory,
12  that's a problem, right?
13      A.  Could be.
14      Q.  And these are at least in a sense
15  process-related problems, right?
16      A.  Could be process-related problems, could
17  be human problems. Somebody could have been told and
18  they didn't follow instructions. I just don't know.
19  I don't know what was happening then.
20      Q.  And that's the important distinction here,
21  right, is that you can have all these processes, but
22  if people don't actually follow them, you can't

1  ensure that unsafe products are staying out of
2  consumers' hands, can you?
3      A.  Not if reasonable processes and procedures
4  that are in place aren't being followed. That would
5  be a problem.
6      Q.  Now, the final thing that you address here
7  is Spectrum's legal department, right?
8      A.  Right.
9      Q.  And that's at the bottom of page 20 going
10  to 21?
11      A.  Yep.
12      Q.  And this is I think obviously an important
13  part of the process because apparently legal here
14  decides whether to report matters to the CPSC. Is
15  that consistent with your understanding?
16      A.  Yes.
17      Q.  And you start this section with,
18  "According to Mr. Stamp," correct?
19      A.  Yes.
20      Q.  So did you base anything in this
21  particular portion of the summary on documents or
22  data or did you entirely rely on what Mr. Stamp told

1  you?
2      A.  I entirely relied on what Mr. Stamp told
3  me.
4      Q.  So you don't know in fact whether the
5  legal department considers all the sources of
6  information that are referenced in this paragraph?
7      A.  I only know what Mr. Stamp told me that
8  they do.
9      Q.  Okay. So you can't sitting here today
10  tell me whether any of this is actually true other
11  than what Mr. Stamp told you?
12      A.  Other than what Mr. Stamp told me, that's
13  correct.
14      Q.  Did you ever ask Mr. Stamp why Spectrum
15  reported coffee makers when they did?
16      A.  No, I didn't.
17      Q.  So you don't actually know what sort of
18  facts and information the company considered in
19  deciding whether or not to report the coffee makers?
20      A.  You're talking about the four that they --
21  I'm sorry, you're talking about this one?
22      Q.  I'm talking about the instant case.

Page 98

1    A.  Yes, I was told -- I was told by Mr. Stamp
2  and it's in a document, it may have been in the full
3  report on this matter, that there was a class action
4  lawsuit that had been filed basically for economic
5  issues and Spectrum made a strategic decision to
6  report under Fast Track to CPSC so it could get rid
7  of the class action litigation and settle it as a
8  nuisance matter.
9    Q.  And that's in March 2012/April 2012 time
10  period, right?
11    A.  I believe so, yes.  That was when the
12  report was made.
13    Q.  Did you ask Mr. Stamp about any other
14  high-level discussions about whether this should be
15  reported in, say, three and a half years prior to
16  that time period?
17    A.  No, I didn't.
18    Q.  Sitting here today, do you know what
19  information if any Spectrum considered or relied upon
20  in deciding whether or not to report?
21    A.  Well, I was told that -- again, I was told
22  that Spectrum relied on, among other things, previous

Page 99

1  interactions it had with CPSC, either as Spectrum or
2  Applica.
3    Q.  But sitting here today --
4    A.  But I don't know -- I wasn't privy to the
5  discussions that they had so I don't know exactly
6  what documents were discussed.
7    Q.  Well, you don't actually know that any
8  such discussions happened before March 2012, do you?
9    A.  No.
10    Q.  And if they had never considered this
11  issue at a high level prior to March 2012, how can
12  you say that they relied upon prior interaction with
13  the CPSC?
14    A.  Because I was told that the legal office,
15  among other things, considers previous interactions
16  that the company had with the Commission.  So I'm
17  basing it on what I was told and what was represented
18  to me.
19    Q.  And that's assuming that the legal office
20  considered the issue of reporting prior to March 2012
21  at all, right?
22    A.  Right.

Page 100

1    Q.  Because if they didn't discuss it prior to
2  March 2012, they couldn't possibly have relied on
3  something, right?
4      MR. MULLIN:  Object to the form of the
5  question.
6      THE WITNESS:  They wouldn't necessarily
7  have to discuss it.  I mean, if you've got somebody
8  who is responsible for reporting to CPSC and if in
9  fact they looked at previous decisions by the CPSC
10  that particular issues were not a substantial product
11  hazard, there might not be anything to discuss.  It
12  would be, okay, the Commission has decided that hot
13  liquids from coffee makers contacting consumers isn't
14  a substantial product hazard, therefore perhaps there
15  is nothing to discuss.
16  BY MR. ROSS:
17    Q.  So you don't actually know whether anybody
18  considered or discussed this issue in the legal
19  department prior to March 2012?
20    A.  All I can tell you is what Mr. Stamp
21  represented to me.
22    Q.  So --

Page 101

1    A.  Is that information that the legal
2  division takes into account in deciding whether to
3  report includes previous interactions with the
4  Commission.
5    Q.  So that's no?  Sitting here today, you
6  can't tell me when the company considered this issue
7  and when they supposedly relied on these prior
8  interactions prior to March 2012?
9    A.  The answer is no.
10    Q.  How does a company get rid of a class
11  action by reporting a case to the CPSC?
12    A.  I don't know what -- what I read was that
13  they resolved it by some type of a nuisance element,
14  that my impression was the class action had to do
15  with quality issues involving the product, I guess
16  with the carafe handle falling off.  Consumers felt
17  that they weren't getting the value for their money
18  and rather than engaging in protracted -- my
19  impression from reading the document is rather than
20  engaging in protracted litigation in the class action
21  lawsuit, it was easier to report to the Commission
22  and do a recall of the products, and in that way

26  (Pages 98 to 101)

1  getting rid of the class action.  I don't know how
2  the class action was resolved other than what I read
3  that it was resolved for nuisance value.
4       Q.   So it's your understanding that the basis
5  of Spectrum's decision to report was that it would be
6  easier to recall 159,000 coffee makers over three and
7  a half years than to defend against what you say is a
8  meritless lawsuit?
9       A.   I don't know if it was easier and I don't
10 know if it was a meritless lawsuit.  That's what was
11 represented in the documents that I read.  And
12 somebody at Spectrum made the decision that to
13 resolve the class action lawsuit -- which, you know,
14 maybe that would have resulted in a recall anyway.  I
15 don't know, if they had lost -- that they decided to
16 report to the Commission, that the documents indicate
17 they would not have otherwise reported to the
18 Commission this matter, but did so to resolve the
19 class action lawsuit.
20      Q.   Could the company have conducted a recall
21 without informing the CPSC?
22      A.   Well, companies do so at their peril.  The

1  Commission doesn't like companies doing recalls for
2  any reason where they haven't been informed.
3       Q.   And if Spectrum had wanted the Commission
4  to make a determination that this defect did not
5  present a substantial product hazard, Spectrum could
6  have filed a conventional Section 15 report, right?
7       A.   Yes.
8       Q.   And then they could have had the
9  Commission make the determination of whether or not
10 the product presented a substantial product hazard,
11 right?
12      A.   Right.  They could have done that and
13 relying on the previous decisions of the Commission,
14 staff might very well have concluded that there was
15 not a substantial product hazard.
16      Q.   But they didn't do that, right?
17      A.   But they didn't do that.  They reported it
18 in the Fast Track like they did with other cases.
19      Q.   Now, if you look at page 21, you state,
20 "It is my opinion that Spectrum has reasonable
21 procedures in place that allows it to evaluate
22 information to determine whether it has a reporting

1  obligation to the CPSC."  Did I read that correctly?
2       A.   You did.
3       Q.   And that's your conclusion, that
4  Spectrum's programs are reasonable?
5       A.   The programs that I looked at -- perhaps I
6  should have qualified this.  The programs that I
7  looked at -- the documents that I looked at and the
8  explanation that Mr. Stamp gave me tells me -- leads
9  me to conclude that they have reasonable procedures
10 in place to evaluate the information that I
11 identified that they evaluated and to determine
12 whether they have a reporting obligation to CPSC.
13      Q.   In reaching that conclusion, you based
14 your analysis entirely on your interview with
15 Mr. Stamp and the documents you reviewed, correct?
16      A.   Yes.
17      Q.   You did not conduct any kind of
18 independent investigation to determine whether the
19 programs actually functioned that way in practice,
20 right?
21      A.   That's correct.
22      Q.   And in reaching that conclusion of

1  reasonableness, you didn't base that on any kind of
2  industry best practices or ISO standards or anything
3  of that nature, right?
4       A.   No, but I based it on experience that I've
5  had in going into the companies and evaluating their
6  procedures and looking to see whether the company, at
7  least on paper, represents that it has a process for
8  collecting safety-related information and escalating
9  that information within the company to the ultimate
10 decision makers.
11      Q.   So it's just your view of what
12 reasonableness means, right?
13      A.   Yes.  And my view is formed by the
14 interaction I've had with other companies where I've
15 done these valuations.
16      Q.   And prior to the point where you make this
17 conclusion, in the entire preceding section, that's
18 simply a summary of information you reviewed and what
19 Mr. Stamp told you, right?
20      A.   Basically, yes.
21      Q.   And so you summarize the programs and then
22 you say that they're reasonable?

27 (Pages 102 to 105)

## Page 106

1    A.   Yes.

2    Q.   I'm going to move on to a new topic.

3  Would you please turn to page 4 of your report?

4    A.   Yes.

5    Q.   I would like to discuss just for a bit the

6  background information you provide on the CPSC.  And

7  just so I'm clear, is the time period that you're

8  talking about here 2005 to 2008?

9    A.   It kind of all depends.  We can do it

10 section by section.  Sometimes I limit it to 2005 to

11 2008.  Other times it may be broader than that.

12   Q.   Do you see the --

13   A.   I mean, when I say the Commission began

14 operating 1973, it's obviously not 2005 to 2008.

15   Q.   I'm talking about when you're talking

16 about their policies and procedures and how they

17 evaluate risks in this section, is that the time

18 period you're talking about?

19   A.   Generally, but I think I also say that

20 procedures haven't changed.

21   Q.   Do you see subsection A, Reporting?

22   A.   Yes.

## Page 107

1    Q.   And you state, "The CPSC learns about

2  potential safety problems with products through a

3  variety sources including consumer complaints, trade

4  secrets, media reports, a public database at

5  www.saferproducts.gov," and then you talk about

6  NEISS, right?

7    A.   Right.  Trade complaints as opposed to

8  trade secrets.

9    Q.   And then you state, one other way in which

10 the CPSC learns about potential consumer product

11 safety problems is through a mandatory reporting

12 requirement found at Section 15(b) reports, and I'm

13 paraphrasing, is that right?

14   A.   Yes.

15   Q.   And then you cite the reporting standard

16 under 15 U.S.C. Section 2064(b), right?

17   A.   Yes.

18   Q.   Now, Mr. Schoem, you were the head of the

19 Office of Compliance for a number of years, right?

20   A.   Yes.

21   Q.   When you were the head of the Office of

22 Compliance, how many years was it, seven,

## Page 108

1  thereabouts?

2    A.   Yes.

3    Q.   Did you think the reporting requirement

4  was just one other way in which you learned about

5  information?

6    A.   It was an important way in which the

7  Commission learned about information.  I mean, I

8  always tell companies that the Comission has so many

9  data sources, they will eventually learn about safety

10 problems with the product independently but

11 companies -- a key way that they do learn is through

12 company reports because companies may be in the best

13 position to have reportable information.

14   Q.   And is part of the reason that the

15 reporting requirement is so important because it gets

16 information into the Commission's hands more quickly

17 than maybe waiting for data to filter through NEISS?

18   A.   It can get there more quickly but NEISS is

19 not the primary way that the Commission would learn

20 about product-specific information.  NEISS is fairly

21 generic.  It's good for identifying product trends

22 but not so much for identifying problems with

## Page 109

1  specific products.  But the Commission gets lots of

2  consumer complaints, not just through

3  saferproducts.gov but through its hotline, for

4  example.

5    Q.   So you wouldn't use NEISS, for instance,

6  to try to -- you wouldn't use that as the basis for

7  determining the hazard that a product presents, would

8  you?

9    A.   It's good for looking at patterns and

10 trends with products.  I mean, if you had a lot of

11 NEISS incidents involving electrical fires or scalds,

12 you might want to take a look at an industry as a

13 result of what you're seeing through the NEISS data.

14 If you saw lots of injuries being treated in hospital

15 emergency rooms from cribs, for example, children who

16 are in cribs being injured, that might send a message

17 to the Commission staff that, gee, there seem to be a

18 lot of NEISS incidents involving cribs, we need to go

19 investigate to find out what's going on with cribs

20 generally, and you might do that by going in to

21 individual companies and asking for information.  But

22 you wouldn't necessarily know whether it's a

1   product-specific incident.

2     Q.  So if you were trying to determine whether

3   a specific product needed to be reported, you don't

4   think it would be reasonable to rely exclusively on

5   the information contained in NEISS, saferproducts.gov

6   and the other CPSC databases, right?

7     MR. MULLIN:  Object to the form of the

8   question.

9     THE WITNESS:  Well, not in NEISS but in

10  saferproducts.gov, there is product-specific

11  information.  And when a consumer complains to the

12  Commission, submits a complaint to the Commission and

13  is taken to a hotline, for example, that complaint is

14  supposed to be sent back to the company for comment.

15  If the Commission does an in-depth investigation of a

16  particular company's product, that in-depth

17  investigation is supposed to be sent back to the

18  company.

19  BY MR. ROSS:

20    Q.  And that's one of the ways in which the

21  Commission notifies companies of potential problems

22  involving its products, right?

1     A.  It notifies it of complaints and issues

2   that -- of which the Commission has been apprised and

3   provides that information to the company so that it

4   can consider it along with any other information it

5   has to determine if there is a reporting obligation,

6   or to evaluate the information and determine that

7   there is something inaccurate, misleading or wrong

8   about the information that the Commission obtained.

9     Q.  So does the CPSC go about investigating

10  complaints that it doesn't think could possibly be

11  reportable?

12    A.  I think when the Commission conducts an

13  investigation, it doesn't necessarily know whether

14  there is something that's reportable.  So it might

15  get -- it might see a media report, it might get a

16  consumer complaint about a product.  You don't

17  know -- you want to learn more about what's going on

18  with that product.  And so if it's of interest to a

19  compliance officer or if it's of interest to somebody

20  else in the Commission who has got authority to

21  assign an in-depth investigation, for example, they

22  can assign it so that you can try and find out what's

1   going on with that particular product.

2     Q.  But the CPSC wouldn't do an in-depth

3   investigation if the product was just the wrong color

4   or something, right?

5     A.  I wouldn't think so, no.

6     Q.  The CPSC is trying to determine whether a

7   product might be dangerous, right?

8     A.  Yes.

9     Q.  Or at least in part?  It's part of that

10  process, right?

11    A.  Might present some risk to consumers that

12  the Commission should be concerned about.

13    Q.  And if the Commission had decided this

14  kind of product can't possibly create a reporting

15  obligation, it wouldn't bother to try to do that kind

16  of investigation, would it?

17    A.  I wouldn't say that because there were

18  cases where staff just went ahead and assigned

19  in-depth investigations even though it was the type

20  of risk that the staff was never going to follow up

21  on, never going to pursue.

22    Q.  Can you give me an example of that?

1     A.  No.  I just know that it happened when I

2   was at CPSC where an in-depth investigation would be

3   assigned and then the supervisor would then look at

4   it and say, why did you bother assigning this?  You

5   know, this isn't the type of issue we're going to

6   deal with, we're going to do anything about.  So it

7   happens.

8     Q.  To get back to my original question, can a

9   company decide whether it has to report based solely

10  on sort of national injury trends relating to a

11  category of products?

12    A.  It's a factor for them to consider but no,

13  it's not something you would rely on exclusively.

14    Q.  I'm going to show you what we're marking

15  as Government Exhibit 86.

16     (Government Exhibit No. 86 was

17     marked for identification.)

18  BY MR. ROSS:

19    Q.  Mr. Schoem, did you provide testimony in

20  the case United States vs. Mirama Enterprises back in

21  early 2000?

22    A.  Yes.

Page 114

1    Q.   And you testified at the hearing in which
2    the government was seeking a civil penalty, right?
3    A.   Yes.
4    Q.   And the attorney who worked with you on
5    that case was Mr. Jasperse, right?
6    A.   Yes.
7    Q.   And at the time that you gave this
8    testimony, which was around 2002, you were the head
9    of the Office of Compliance, correct?
10   A.   Yes.
11   Q.   And you gave this testimony in court and
12   under oath, right?
13   A.   Yes.
14   Q.   Just like you're testifying here today
15   under oath?
16   A.   That's correct.
17   Q.   Would you please turn to page 1-31?  And
18   you'll see the numbers in the top right-hand corner
19   of the transcript.  Do you see line number 10?
20   A.   Yes.  "How many employees"?
21   Q.   "How many employees does the CPSC have to
22   help it oversee 15,000 types of products?"  Do you

Page 115

1    see that question?
2    A.   Yes.
3    Q.   Now, the 15,000 number, that's referring
4    to the many different types of consumers products
5    over which the CPSC has jurisdiction, right?
6    A.   Yes.
7    Q.   And within each of those product
8    categories, a product could present any number of
9    different hazards, right?
10   A.   Yes.
11   Q.   So if you use coffee makers, for example,
12   it could present a scalding hazard, right?
13   A.   Yes.
14   Q.   Or a laceration hazard, right?
15   A.   Yes.
16   Q.   Or an electrical hazard, right?
17   A.   Yes.
18   Q.   Or a fire hazard, right?
19   A.   Correct.
20   Q.   Any number of hazards?
21   A.   Any number.
22   Q.   And even within the category of coffee

Page 116

1    makers, you could have a number of different
2    products, right?
3    A.   Yes.
4    Q.   Or you could have a drip coffee machine,
5    right?
6    A.   Yes.
7    Q.   A single-serve coffee machine?
8    A.   Yes.
9    Q.   Or any number of different kinds of
10   products, right?
11   A.   Correct.
12   Q.   So there is potentially an enormous
13   combination of product types and hazards presented
14   that the CPSC oversees in the ordinary course of its
15   business, right?
16   A.   Right.
17   Q.   And on page 1-31, you're asked, "How many
18   employees does the CPSC have to help it oversee
19   15,000 types of products?"
20       And your response is, "Our authorized
21   ceiling is 480 employees, but we typically have
22   somewhere around 460 to 470 at any time."  Do you see

Page 117

1    that?
2    A.   Yes, I do.
3    Q.   And is the number of employees at CPSC
4    much different than that today?
5    A.   I don't think so.  Probably a few more.
6    Q.   Now, the next question you were asked here
7    starting on line 14 is, "Does the CPSC have enough
8    employees to do its job?"
9        And you respond, "No.  Of course, that's
10   what probably every employee in a federal agency says
11   but, in my view, we don't."  Do you see that?
12   A.   I do.
13   Q.   And if you scroll down a little bit, you
14   give some explanation and you say, "We have 15,000
15   products within our jurisdiction.  It's an extremely
16   large mission, and we do the best we can with the
17   resources that we have."  Do you see that statement?
18   A.   I do.
19   Q.   Is that statement as true today as it was
20   in 2002 when you were testifying under oath?
21   A.   Yes, other than I wouldn't say we do the
22   best we can.  I would say that they do the best they

1  can.
2      Q.  Do you agree that the CPSC has an
3  extremely large mission?
4      A.  Yes.
5      Q.  Do you agree the CPSC does the best it can
6  with the resources that it has?
7      A.  Yes.
8      Q.  Now, in the question that continues to the
9  next page, you're asked if the CPSC can proactively
10 investigate each product.  Specifically you're asked,
11 "Is it possible for the Commission with less than
12 500 people to proactively go out and identify every
13 dangerous product?"  Do you see that question?
14     A.  I do.
15     Q.  And your response is, "No.  We can't
16 initiate investigations into every potential product
17 hazard or every defect, and that's why we rely very
18 heavily on the reporting provision in the Consumer
19 Product Safety Act."  Do you see that?
20     A.  Yes, I do.
21     Q.  Do you agree that the CPSC today still
22 relies very heavily on the reporting requirement?

1      A.  I do.
2      Q.  And do you agree today that the CPSC does
3  not have sufficient resources to proactively
4  investigate every potential consumer product that
5  presents a safety problem?
6      A.  I do.
7      Q.  Now, we're still on page 1-32.
8  Mr. Jasperse asks you, "How does relying on the
9  reporting requirement help the Commission?"
10         And you respond, "In my view, the singular
11 most important provision in any of the statutes that
12 we administer is the reporting requirement under
13 15 U.S.C. 2064(b).  Congress understood that
14 manufacturers, distributors, importers and retailers
15 typically are in the best position to know what's
16 going on with their products.  And so Congress
17 required that companies report potentially dangerous
18 products to the Commission immediately upon learning
19 of a problem?"  Do you see that?
20     A.  Yes, I do.
21     Q.  Do you agree that's as true today as it
22 was in 2002?

1      A.  I do.
2      Q.  Do you agree that it was Congress' intent
3  that companies report potentially dangerous products
4  to the Commission immediately upon learning of the
5  problem?
6          MR. MULLIN:  Object to the form of the
7  question.
8          THE WITNESS:  Yes.
9  BY MR. ROSS:
10     Q.  And under the CPSC's regulations,
11 immediately means 24 hours, right?
12     A.  Right, but then it's qualified.
13     Q.  And companies have 10 days to report or to
14 investigate an issue, and potentially another 5 days
15 to escalate that to the top of the company, right?
16     A.  Right, but then there is also language in
17 there that says "or a reasonable period of time."
18 It's not specifically 10 days.  It's like guidance to
19 companies that you can take up to 10 days unless a
20 longer period is needed.
21     Q.  Well, do the regulations provide that the
22 CPSC presumes that companies are actively informed

1  about an issue after 10 days of investigation?
2      A.  It presumes, but again, that's the
3  Commission's interpretation.  It's an interpretive
4  regulation and not substantive.
5      Q.  Sir, in your mind, companies can just take
6  that under advisement and disregard it if they see
7  necessary?
8      A.  I didn't say that.
9      Q.  You also state that, "By reporting early
10 to the Commission, it gives the staff an opportunity
11 to conduct an investigation and decide whether a
12 recall is necessary.  It gives us an early warning of
13 a potential problem with a product."  Do you see
14 that?
15     A.  Yes.
16     Q.  And that's consistent with what we talked
17 about earlier about how if the Commission doesn't
18 have information, it can't determine whether a recall
19 or even a report itself is necessary, right?
20     A.  If it has no information, yes, that's
21 correct.
22     Q.  And would you agree that the entity in the

---

Page 122

1     best position to get this information to the CPSC is
2     the manufacturer itself?
3          A.   It may be the manufacturer.   In some cases
4     it may be retailers.
5          Q.   In this instant case, do you agree --
6          A.   The instant case being Spectrum?
7          Q.   Spectrum case.   Do you agree, based on
8     your review of the documents, that Spectrum was in
9     the best position to inform the CPSC about this issue
10    if it decided to do so?
11         MR. MULLIN:   Object to the form of the
12    question as beyond the scope of what he was retained
13    to do, but you can answer.
14         THE WITNESS:   I don't know what
15    information retailers, for example, had so I don't --
16    I'm a little qualifying that whether they were in the
17    best position.   They were in a position to know.
18    BY MR. ROSS:
19         Q.   Based on your review of the documents,
20    did --
21         A.   But I didn't review any --
22         Q.   Go ahead.   Please, I interrupted you.

---

Page 123

1          A.   I didn't review any documents having to do
2     with -- I don't recall reviewing any documents having
3     to do with what retailers knew.   So I don't know
4     whether there was any other entity that also had a
5     reporting or may have had a reporting obligation to
6     CPSC.   So I'm only quibbling with your use of the
7     word of whether they were in, I think you said best
8     position.
9          Q.   Well, were they in a better position than
10    the Commission to know about this issue?
11         MR. MULLIN:   Same objection.
12         THE WITNESS:   I don't know exactly what
13    information the Commission had to know whether
14    Spectrum was in a better position than the Commission
15    but I'm not quibbling with whether Spectrum had a
16    reporting obligation if it believed that it had
17    reportable information.
18    BY MR. ROSS:
19         Q.   And is that the standard, that a reporting
20    obligation only exists if the company believes it has
21    one?
22         A.   Well, a company has to evaluate the

---

Page 124

1     information it has and determine whether the
2     information reasonably supports the conclusion that
3     there is a defect that could create a substantial
4     product hazard or creates an unreasonable risk of
5     serious injury or death.   If it doesn't meet that
6     standard, then there is no reporting obligation.
7          Q.   But just because a company has reached
8     that conclusion, is it necessarily reasonable?
9               Can a company be wrong?
10         A.   Anybody -- the Commission is very good at
11    second-guessing companies' decisions whether to
12    report.   And I suppose that's what this case is all
13    about, if Spectrum made an informed decision that it
14    didn't think it had a reporting obligation.   The
15    Commission, the government, disagrees with that
16    conclusion.
17         Q.   So just because a company reaches a
18    decision and believes it doesn't have to report, that
19    doesn't necessarily mean that it's true that they
20    didn't in fact have to report under the law, right?
21         A.   I guess that's what the Court will decide
22    in this case.

---

Page 125

1          Q.   Please turn to page 1-33.   Starting on
2     line 22, do you see that?
3          A.   Yes.
4          Q.   Mr. Jasperse asked you, "You mentioned the
5     reporting requirement several times.   Can you just
6     refresh us on what the reporting requirement is?"
7               And you see your answer starting on
8     page 1-33 and going to the next page.
9          A.   Yes.
10         Q.   And you state that, "In 15 U.S.C. 2064(b),
11    if a manufacturer, distributor, retailer or importer
12    obtains information which reasonably suggests the
13    conclusion that a product has a defect which could
14    create a substantial product hazard or presents an
15    unreasonable risk of serious injury or death, is
16    required to immediately report to us," right?
17         A.   You said reasonably suggests and the
18    language is reasonably supports.
19         Q.   "Reasonably supports" is the language from
20    the statute, right?
21         A.   Right.
22         Q.   If I said suggests, that's a mistake.   It

---

| Page 126 | Page 128 |
|---|---|

**Page 126**

1 says supports. But you're quoting the standard right
2 here, right?
3   A.  Yes.
4   Q.  And that standard is interpreted in CPSC
5 regulations, right?
6   A.  Yes.
7   Q.  And the CPSC from time to time issues
8 guidance documents about what it thinks the reporting
9 requirement means, right?
10   A.  It's issued an interpretative regulation.
11   Q.  It's issued a recall handbook too, right?
12   A.  It's got a recall handbook which more or
13 less parrots the interpretative regulation.
14   Q.  And from time to time CPSC representatives
15 will participate in public forums or conferences to
16 talk about this issue?
17   A.  Yes.
18   Q.  And you did that when you were at
19 Compliance, right?
20   A.  Yes.
21   Q.  Now, you continue to say here that, "Under
22 our regulations, we have interpreted 'immediately' to

**Page 127**

1 mean within 24 hours, and we do provide that if firms
2 aren't sure, they could take up to 10 days to
3 investigate, but our regulations tell firms to err on
4 the side of safety, err on the side of caution." Do
5 you see that?
6   A.  Yes, I do.
7   Q.  Do you agree that firms should err on the
8 side of safety and err on the side of caution?
9   A.  If they have -- if they believe they have
10 reportable information, yes, they should.
11   Q.  And you say, "If you have any question,
12 report to us or pick up the phone, call us and talk
13 to us about whether you should report." Do you see
14 that?
15   A.  Yes.
16   Q.  Now, are you familiar with CPSC's public
17 statements that when in doubt, a company should
18 report?
19   A.  Yes.
20   Q.  So is it the CPSC's view that unless a
21 company is certain that it doesn't have to report,
22 that it probably should?

**Page 128**

1        MR. MULLIN:  Object to the form of the
2 question.  You can answer.
3        THE WITNESS:  What the Commission has said
4 is if you're in doubt, you should report.  The
5 corollary is if you're not in doubt, then you don't
6 have to report.
7 BY MR. ROSS:
8   Q.  And companies have the ability to call up
9 the CPSC and ask them about these issues if they're
10 not certain, right?
11   A.  They do but I think things have changed at
12 the Commission since I was there and since I made
13 these statements.  When I was at the Commission,
14 companies would call up and lay out a scenario and
15 say, do you think this is reportable?  And in a
16 number of cases, we would say, no, we don't think
17 that's reportable.
18        Today I don't think the staff is quite as
19 forthcoming as it was when I was there.  I'm not sure
20 that the staff was then as self-confident as the
21 staff was when I was there.  Supervisors, team leads,
22 when I was at the Agency, when they thought

**Page 129**

1 something -- when there was a matter that the staff
2 had looked at previously, decided that this doesn't
3 rise to the level of a substantial hazard, it would
4 convey that to a company that might call or a lawyer
5 that might call for a company and say, this is the
6 scenario we've got, do you think this is reportable.
7 We might say, you know, we've been there, done that,
8 we've looked at this information in the past, we
9 don't think this type of information is reportable.
10 If this is what you have, then we don't think it's
11 reportable.
12        And I would always tell companies, when
13 you're getting that opinion from somebody on staff,
14 from a team lead, a supervisor, document it, put it
15 in writing, send in an email that says, this is to
16 confirm that you told us this.  And that was just to
17 protect the company from some other compliance
18 officer who might initiate investigation of the same
19 matter that they had previously been told wasn't an
20 issue.
21   Q.  So if a firm is materially relying on
22 something they believe the CPSC is saying, it's

33 (Pages 126 to 129)

1    probably a good idea for them to document it so that
2    there is some proof of that fact?
3        A.   Yes.
4        Q.   And I'm just trying to understand what you
5    said before.  Is it your testimony that if somebody
6    called up CPSC staff now, they wouldn't discuss the
7    issue of whether something might be reportable?
8        A.   They might discuss it but I think at the
9    end of that call, they would say you better report,
10   as opposed to, no, I don't think this is reportable.
11       Q.   And you see this as a problem?
12       A.   It's not that it's a problem.  It's just
13   that the staff is not using as much discretion as
14   they used to do in trying to provide advice and
15   guidance to companies to help guide them on what the
16   staff or the Commission considers to be a substantial
17   product hazard.
18       Q.   And you're talking about guidance provided
19   over the phone?
20       A.   Yes.
21       Q.   When --
22       A.   I mean, when we talk about err on the side

1    of safety in the report, as I say in my report, the
2    guidelines that the Commission has, except for the
3    definition of defect and serious injury, are fairly
4    general.  It's look at this type of information, look
5    at these criteria.  If you're not sure what to do,
6    report.  And it's because the guidance isn't
7    specific.  It doesn't say if you have this situation,
8    it's clearly reportable or if you have this type of
9    risk or this type of injury.
10       We're always going to find it's a
11   substantial hazard.  Now, the Commission has done
12   that on a few occasions.  It has issued rules.  I
13   think there are children's outerwear garments where
14   it has clarified for the industry that if you have a
15   cord on an outerwear of a child's garment at the neck
16   or the waist area, we've determined that's a
17   substantial product hazard.  And I think they may
18   have done it for hair driers.  If you don't have an
19   immersion protection device on a hair drier, its a
20   substantial product hazard.
21       The Commission hasn't done that for things
22   like coffee makers.  They've done it on two or three

1    occasions, I believe.
2        Q.   And we discussed a moment ago the 15,000
3    different types of consumer products that the
4    Commission receives, right?
5        A.   Yes.
6        Q.   And the many different kinds of products
7    and hazards that can present with each one of those
8    kinds of products, right?
9        A.   Yes.
10       Q.   Do you think it's feasible that the
11   Commission would provide specific guidance on whether
12   every single one of those possible combinations of
13   product and hazard should be reported?
14       A.   Not in every one but I think the
15   Commission could give guidance on specific product
16   areas that have been issues over the years.  I do
17   suggest in here and -- you know, I've been out of the
18   Commission for 12 years now so I've learned a lot
19   more than when I was at the Agency and I think the
20   Commission could give more specific guidance to
21   companies on what it considers to be a substantial
22   product hazard.

1        Q.   So if the Commission, for instance,
2    thought that issues with carafe handle failures on
3    coffee makers was something that should be reported
4    and the Commission knew about this issue, you're
5    saying that they should inform the public that, yes,
6    carafe handle failures should be reported?
7        A.   It should at least inform manufacturers.
8    When you go through the PI and the RP cases that I
9    looked at, with the one exception, the Commission
10   staff, when it was a conventional report, where it
11   was a staff-initiated investigation, the Commission
12   staff closed eight or nine cases where there was
13   contact between a hot liquid, either from a broken
14   carafe handle, from exploding pods, allegations and
15   reports of burns, scalds, second degree burns, the
16   Commission staff closed those cases and they said no
17   substantial product hazard.
18       Don't you think it's important that the
19   Commission inform companies that we don't think this
20   type of risk rises to the level of a substantial
21   product hazard?  It would cut down on the number of
22   Fast Track reports perhaps where companies report the

Page 134

1  same type of risk and incidents that the staff is
2  closing cases on and not pursuing corrective action
3  and yet companies are reporting and staff routinely
4  accept those under Fast Track and announces a recall.
5      Q.  So is it your testimony that the
6  Commission has decided that hot water scalds can
7  never be a substantial product hazard?
8      A.  I didn't say that.
9      Q.  Is it your testimony that the handful of
10 cases that you review represent every possible
11 combination of facts and circumstances under which a
12 coffee maker might present a substantial product
13 hazard because of scald injuries?
14     A.  I didn't say that either.  I know that the
15 government provided to Spectrum in discovery all of
16 the -- was supposed to provide in discovery all of
17 the closed coffee maker cases for some period of time
18 and I don't know if it was 10 years or shorter or
19 longer, so if all of the documents were in fact
20 provided -- I know at least one file seems to be
21 missing -- that would give the universe of hot water,
22 hot liquid contact by consumers in all of these

Page 135

1  different coffee maker cases that the Commission has
2  looked at for, let's say, 10 years, which ought to
3  give a good benchmark of how the Commission staff or
4  the Commission feels about hot water from coffee
5  makers contacting consumers.
6      Q.  So this is your opinion on what the CPSC
7  could do to, in your view, improve the reporting
8  process?
9      A.  Yes.
10     Q.  It's not something that under the law the
11 CPSC is required to do, is it?
12     A.  No, but it's good government, in my
13 opinion.  I didn't say there were -- I never said
14 they were required to do this.
15     Q.  Is there any legal importance whatsoever
16 to your argument?
17     A.  How do you define legal importance?  Legal
18 importance in what context?
19     Q.  Did the cases that the CPSC decided, of
20 which Spectrum never had any knowledge, bear on
21 Spectrum's reporting requirement?
22     A.  If Spectrum had no knowledge of those

Page 136

1  other company cases, then no, it doesn't bear on the
2  reporting obligation.  But Spectrum had at least two
3  cases where the Commission staff investigated and
4  decided that the risk did not rise to the level of a
5  substantial product hazard and closed the cases.  And
6  if Spectrum relied on those decisions -- I said if
7  Spectrum relied on those decisions, then it would be
8  reasonable for Spectrum to conclude, in my opinion,
9  that they didn't have a reporting obligation in this
10 case where the risk of injury was significantly less
11 than it was in the cases where the Commission staff
12 closed the cases.
13     Q.  How do you reach the determination that
14 the risk in this case was significantly less than
15 other cases?
16     A.  I skimmed and I didn't read all of the
17 1,500 or so complaints that had been submitted.  I
18 looked at the full report information.  I looked at
19 the government's complaint in this matter.  And while
20 there may have been 1,500 or so claims of carafe
21 handles breaking or splitting or coming loose, there
22 were 67 or 68, I think I said less than 70 complaints

Page 137

1  of a hot liquid actually contacting a consumer in
2  some way and, of those cases, I didn't see any
3  reports of serious injuries.  There were two reports
4  of consumers seeking medical treatment and I don't
5  know if that was for glass breakage or for liquid,
6  but from the documents I read, it doesn't appear that
7  there were any medical claims submitted to Spectrum.
8  But the nature of that risk seemed significantly less
9  than what I saw in the two PI cases that the staff
10 closed.
11     Q.  And you're basing that on injuries that
12 you believe occurred or didn't occur, right?
13     A.  I'm basing it on the materials that I
14 looked at and representations that were made to the
15 Commission in the full report and in the Commission
16 preliminary determinations that were made.
17     Q.  Is it your understanding that preliminary
18 determinations were made the those PI cases?
19     A.  Well, the staff hemmed and hawed about
20 whether it was a formal preliminary determination but
21 my impression is that was more form over substance.
22     Q.  Do you know whether the preliminary

35 (Pages 134 to 137)

Page 138

1  determination panel considered either of those cases?
2      A.   Well, I know in the Judy Hayes case, it
3  was the one that ends in 23, doesn't appear -- from
4  what she said, there was never a formal preliminary
5  determination panel that met.  But when I was there,
6  preliminary determination panels didn't always meet.
7          And I thought there was something maybe in
8  the current Compliance manual that says you don't
9  always to have a panel meeting, things can be done by
10 paper with sign-offs.  In this case, there was no
11 attorney sign-off -- in 23, the Judy Hayes case,
12 there was no attorney sign-off.  There was a
13 supervisor sign-off.
14     Q.   You're talking about Mary Toro?
15     A.   Yes.
16     Q.   And do you know better than Judith and
17 Mary Toro about that forum went and what happened in
18 that meeting?
19     A.   No, because I wasn't at that meeting.
20     Q.   So you don't know what they talked about
21 at all, right?
22     A.   I know what's on the preliminary

Page 139

1  determination form, because I read it, and I know
2  what's in the letter that they sent closing the case.
3      Q.   And if it wasn't a preliminary
4  determination, is it merely a staff consideration
5  that there is no substantial product hazard?
6      A.   Even preliminary determinations in the
7  form of a panel are still staff considerations.
8  There would have been a few more people perhaps
9  involved in the process.  There would have been an
10 attorney involved and I think that's the only other
11 person that would have been involved according to the
12 2002 complains manual.  If I'm remembering correctly,
13 it's the compliance officer, the supervisor and the
14 attorney who vote, is my recollection from that
15 manual.  So you didn't have the attorney voting on
16 this case.
17     Q.   So in your mind, actually convening a
18 panel and following procedures is just form over
19 substance?
20     A.   I didn't say that either.
21     Q.   And you don't know what happened in this
22 particular case, right?

Page 140

1      A.   I know -- I can only know from reading the
2  documents.  That's the only thing that's publicly
3  available.  I wasn't at the meetings.  I didn't
4  attend the meeting.  I don't know what Mary said to
5  Judy or Judy said to Mary.  I just know that there is
6  a preliminary determination form which lays out, just
7  like on the form when there is a formal preliminary
8  determination panel meeting, there is a form that was
9  filled out and it was signed off on by the compliance
10 officer and the compliance officer's supervisor.
11     Q.   Is there any legal import with respect to
12 firms when the Commission makes a preliminary
13 determination of a substantial product hazard?
14     MR. MULLIN:  Object to the form of the
15 question.
16     THE WITNESS:  What do you mean?  I don't
17 understand your question.
18 BY MR. ROSS:
19     Q.   Is there no difference in practical
20 purposes when a firm makes a preliminary
21 determination versus when it doesn't?
22     MR. MULLIN:  Object to the form of the

Page 141

1  question.  You can answer.
2      THE WITNESS:  When the staff -- I don't
3  understand your question.
4  BY MR. ROSS:
5      Q.   Now, your assessment of the risk here is
6  based off of your review of the reported incidents in
7  the three different cases, right?  Is that what you
8  said?
9      A.   Which three cases?
10     Q.   The three Applica cases, the current one
11 and the two PI cases.
12     A.   Yes.
13     Q.   And with respect to the instant case, you
14 only know what you saw in those incident reports,
15 right?
16     A.   Yes.  And what was in the government's
17 complaint and what was in the full report
18 information.
19     Q.   Do you know whether Spectrum verified or
20 attempted to verify any of those complaints?
21     A.   What do you mean by verified?  Did they go
22 out on-site to talk to the consumer?  I don't know.

36 (Pages 138 to 141)

1    Q.   Do you know whether Spectrum followed up
2    and found out whether or not more serious injury
3    occurred than was reported in those complaints?
4    A.   I don't know.  I don't recall, again,
5    because I skimmed the complaints.  I don't know if
6    there was some follow-up of what was reflected in any
7    of those complaints, and that's why I'm hesitating on
8    my answer is I don't recall from the incident reports
9    whether they reflected that Spectrum did any
10   follow-up or not.
11   Q.   So you don't know if they did follow-up?
12   A.   So I don't know.
13   Q.   And you did not perform any kind of
14   assessment of the failure mechanisms in those three
15   cases, right?
16   A.   No.
17   Q.   So your assessment of the risk of the
18   product is based entirely on injuries that in fact
19   happened or that you believe happened, right?
20   A.   It's based on the documents that I
21   reviewed.  That's all I can base it on.
22   Q.   And does the reporting requirement state

1    that companies can wait to see what kind of injuries
2    happen to decide whether or not they have to report a
3    product?
4    A.   No, it doesn't say that.  But again, if
5    Spectrum was relying on the Commission staff's
6    decision that there was no substantial hazard in the
7    two PI cases that it closed, I think it was
8    reasonable for them to rely on.  Remember this case
9    is -- they got a letter that says, we decided the
10   information doesn't rise to the level of a
11   substantial hazard but Spectrum, because it was the
12   company that was the recipient of that letter, also
13   had all of the incident information available to it
14   in those two cases.  So it's reasonable for it to use
15   the information in those cases to inform its decision
16   in the instant case as to whether it had a reporting
17   obligation.
18   Q.   So you're saying that based on those two
19   letters, Spectrum reasonably concluded that no coffee
20   maker case presenting risks of second degree burns,
21   hospitalization and possible surgery needed to be
22   reported?

1    A.   I didn't say no coffee maker cases.  I
2    said in this case.  In this case, it was reasonable
3    for Spectrum to look at those two PI cases, to look
4    at the determinations that had been made by the staff
5    that there was no substantial product hazard and take
6    that into consideration in determining whether it had
7    a reporting obligation to CPSC in this case.  Because
8    in those cases, there were serious burn injuries,
9    there were allegations and reports of second degree
10   burns and I didn't see that in this case.
11        In this case, all I saw were reports of
12   minor burn incidents.  I didn't see that there was
13   any reflection of serious burns.  I looked at the
14   government complaint thinking that the government in
15   its complaint would likely use the most serious
16   injuries and reflect that in the complaint and I
17   didn't see that.
18   Q.   So from here on out, as long as the coffee
19   maker doesn't cause more or more serious injuries
20   than those two PI cases, Spectrum doesn't have to
21   report them?
22        MR. MULLIN:  Object to the form of the

1    question.
2         THE WITNESS:  Spectrum has to look at the
3    information that it has in its possession and make a
4    factual determination as to whether it has an
5    obligation to report based on the information -- all
6    of the information that it reviews.
7    BY MR. ROSS:
8    Q.   And that includes both injuries that have
9    happened and the potential for injuries, correct?
10   A.   Yes.
11   Q.   Now, when you were reviewing files for
12   this case, did you review historical emails and
13   documents from 2008 and 2009?
14   A.   I reviewed the documents that I reflect in
15   my report that I reviewed.
16   Q.   Did those documents include historical
17   documents from 2008 and 2009?
18   A.   Yes.
19   Q.   What kinds of documents?
20   A.   If you have specific documents in mind
21   that you would like me to look at, I'm happy to look
22   at them.

Page 146

1    Q.   Well --
2    A.   But I looked at the documents that --
3  there were emails that -- between the company and the
4  compliance staff.  There were full reports.  I mean,
5  those are historical documents, I guess.  There was
6  full report information that was provided.  There
7  were some back and forth between the company and the
8  compliance staff.  I looked at those documents.
9        I mean, I don't know what you're getting
10 at.  I don't know really what your question is and
11 what you're asking me.
12   Q.   Do you know what Spectrum knew about this
13 issue before most or all of these reported burns
14 actually happened?
15       MR. MULLIN:  Object to the form of the
16 question.
17       THE WITNESS:  No.  I only know what was
18 reported in the full report.
19 BY MR. ROSS:
20   Q.   Now -- are you done?  I'm sorry.
21   A.   Yes.
22   Q.   Now, you testified earlier that you agree

Page 147

1  that if a handle breaks off a coffee pot, it can
2  spill on somebody, right?
3    A.   Yes.
4    Q.   And if hot coffee at sufficient
5  temperature spills on somebody, it can cause severe
6  burns, right?
7    A.   If it's the right temperature, it can
8  cause severe burns, yes, I would agree with that.
9  It's possible.
10   Q.   And if it's a fairly prevalent problem, it
11 might expose a number of consumers to that risk,
12 right?
13   A.   Yes.
14   Q.   So sometimes, though, companies discover
15 problems through other ways, engineering analyses,
16 before there is a significant number of incidents
17 reported, right?
18   A.   It's possible, yes.
19   Q.   And if a company was sitting there and
20 discovered that there was an issue with a product
21 that caused the handle to fall off the coffee pot but
22 there hadn't been many incidents reported yet, should

Page 148

1  the company consider whether or not it has to report
2  that information?
3    A.   It should consider that.  It would also
4  look at, you know, what's the consequence of the
5  handle breaking.  You have to look at the likelihood
6  of injury.  If the carafe is at a certain level.  It
7  depends on if it's been sitting for a while.  If it's
8  freshly brewed coffee, presumably hotter than it is
9  if it's been sitting there for an hour.  Take all of
10 that information into consideration, yes.
11   Q.   But if you've identified the failure mode
12 before there are many incidents, you have no way of
13 comparing the injuries from one case and what
14 injuries ultimately would happen in that case, right?
15   A.   I wouldn't say you can't compare.  If
16 you've got similar issues, again, it's reasonable for
17 a company to look at what has happened to it or what
18 it's done in the past with respect to a particular
19 product.
20   Q.   What I'm asking is, if you have a product
21 that you understand presents a risk of burning
22 people, potentially severely, and you recognize this

Page 149

1  problem before many incidents or injuries have even
2  been reported, how do you go about comparing the
3  injuries in that case to a prior case?
4        MR. MULLIN:  Object to the form of the
5  question.
6        THE WITNESS:  You'd have to look at
7  whether there is the potential for severe burn
8  injuries or not.
9  BY MR. ROSS:
10   Q.   Well, did you -- I'm sorry.
11   A.   Again, the reporting obligation doesn't
12 say if you have incidents or some engineering
13 information that you're automatically obligated to
14 report.  You have to look at whether that information
15 rises to the level of a -- let's assume that that's a
16 defect and the handle shouldn't be falling apart.
17 Does that defect rise to the level of it could create
18 a substantial risk of injury to the consumers.
19       And so the company should be looking at
20 all of the information that it has in its possession
21 with respect to that risk in making an informed
22 decision as to whether it has a reporting obligation

38  (Pages 146 to 149)

Page 150

1    to CPSC.

2        Q.  So the company can't rely entirely on what

3    happened in a prior case, right?

4        A.  No, it can't rely entirely.  It can use

5    that to help inform its decision as to whether it has

6    a reporting obligation, but it still has to look at

7    all of the information that it has -- that it

8    reasonably has in its possession.

9        Q.  If you would please turn to page 1-40 in

10   this document.

11       I'm not going to read the whole Q and A

12   here because it's quite long but if you look at

13   line 18, you say, "The sooner we get -- if a company

14   reports and we're getting early information about a

15   potential hazard and a recall is necessary, the

16   sooner we can get a recall in place, the less likely

17   it is that consumers will be injured or we'll cut

18   down on the number of injuries that occur."  Do you

19   see that answer?

20       A.  Yes, I do.

21       Q.  Do you agree with that answer?

22       A.  I do.  And I would just emphasize it's

Page 151

1    early information about a potential hazard and a

2    recall is necessary, is what I said there.

3        Q.  And the Commission --

4        A.  And it's talking in the context of the

5    recall.  The sooner we get the recall in place, then

6    you can reduce the -- potentially reduce the injuries

7    that might occur.

8        Q.  And the Commission can't decide whether a

9    recall is necessary until it knows about the problem,

10   right?

11       A.  That's right.

12       Q.  And the earlier the Commission knows about

13   a potential problem, the more likely it is that the

14   Commission, through a recall or some other way, can

15   avoid injuries, right?

16       A.  Right.  But you can't read out of the

17   statute when the reporting obligation is triggered.

18   And as I say in my report and what you seem to be

19   suggesting is that this is an incident-reporting

20   statute and it's not an incident-reporting statute.

21   You don't have to report to the Commission just

22   because you have incidents with a product.  Those

Page 152

1    incidents have to be a situation where those

2    incidents or the problem with the product could

3    create a substantial risk of injury to the public.

4        Q.  And that's a factual determination based

5    on the information in the company's possession as

6    applied to the reporting requirement under the CPSA,

7    right?

8        A.  Yes.  And the company can decide -- a

9    company can look at all the information that it has

10   in its possession.  It can look at all the past

11   dealings that it's had with the Commission.  It can

12   then make a decision, we've looked at all of this

13   information and we don't think we have a reporting

14   obligation and it doesn't report.

15       The Commission can second-guess that

16   company's decision and tell the company that it

17   thinks it was wrong and can demand that it pay a

18   civil penalty.  And if the company believes that it

19   did not have a reporting obligation, the company has

20   the right to say, no, I'm not going to pay a civil

21   penalty and then the government has the right to file

22   a lawsuit against it to resolve the issue of whether

Page 153

1    there was a reporting obligation.

2        Q.  Do you know all information that Spectrum

3    had in its possession in early 2009 relating to the

4    carafe handle failures?

5        A.  No.

6        Q.  So is your testimony simply that if

7    Spectrum were correct that the risk in that case was

8    the same as the risk in the PI cases, that Spectrum

9    was reasonable in not reporting?

10       A.  I don't know if it would have to be the

11   same.  The information should be similar.  I don't

12   know all the information that Spectrum had that it

13   evaluated and considered and determined, based on

14   that information, it did not have a reporting

15   obligation.

16       Now, again, it did report.  Of course the

17   government thinks it was late.  It says it was

18   reported for reasons other than safety.

19       Q.  Timeliness is the issue in this case,

20   right?

21       A.  Yes.

22       Q.  So I'm just trying to clarify, when you

39 (Pages 150 to 153)

Page 154

1   state that Spectrum did not have a reporting
2   obligation, you did not actually undertake the kind
3   of factual analysis that the company would be
4   expected to take under the law in order to reach that
5   determination?
6       A.  I say based on the documents that I
7   reviewed.
8       Q.  And assuming that those documents are
9   complete, then you say Spectrum didn't have to
10  report, right?
11      A.  Right.
12      Q.  But you don't know all the information
13  that Spectrum had, right?
14      A.  That's right.
15      Q.  And you don't know whether Spectrum's
16  decision makers even considered this issue in 2008 or
17  2009, do you?
18      A.  I don't know that specifically, that's
19  right.  And I say that, that I'm relying on what
20  Nigel Stamp told me, the information that the legal
21  division, legal department uses to determine whether
22  it has a reporting obligation to CPSC.

Page 155

1       Q.  Can we turn back to Exhibit 85?  I'm done
2   with this one now.
3           MR. MULLIN:  Do you want to take a lunch
4   break?
5           MR. ROSS:  Yes.
6           (Whereupon, at 12:46 p.m., the deposition
7   in the above-entitled matter was recessed, to
8   reconvene at 1:34 p.m., this same day.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 156

1           AFTERNOON SESSION
2               (1:34 p m )
3           MR  ROSS:  We're back on the record having
4   just gotten back from lunch  We're looking at
5   Exhibit 85 which is Mr  Schoem's second expert
6   report
7           EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
8   BY MR  ROSS:
9       Q   Would you please turn to page 5 of your
10  report?  We are still in the background section about
11  the CPSC
12      A   Okay
13      Q   Now, section B talks about Office of
14  Compliance organizational structure and
15  responsibilities, right?
16      A   Yes
17      Q   And in the third paragraph of that
18  section, you reference the April 1st, 2002 Office of
19  Compliance Recalls & Compliance Division's Section 15
20  procedures manual  Do you see that?
21      A   Yes
22      Q   Now, that document came into being while

Page 157

1   you were the head of Compliance, right?
2       A.  Yes.
3       Q.  Did you have a role in drafting that
4   document?
5       A.  I don't think I drafted it.  I'm sure I
6   reviewed it.
7       Q.  And you reviewed it to make sure that it
8   was consistent with what the Office of Compliance
9   should be doing in those kinds of cases?
10      A.  Generally, yes.
11      Q.  I mean, if it contained something that was
12  really objectionable to you, would you have had the
13  ability to change it?
14      A.  I would have had the ability if I
15  recognized that it was something that was
16  objectionable.
17      Q.  Before we move on, I just want to cover
18  two quick clarifying questions.  The first is I
19  noticed in Attachment 1, in the cases that you
20  considered, you didn't actually list PI 050023, Home
21  Cafe.  Did you review that file?
22      A.  Where are you looking?

40  (Pages 154 to 157)

1    Q.   In your Attachment 1, I didn't see
2   PI 050023.
3    A.   If it's not there, it's certainly an
4   oversight since I talk about it in my report.
5         Bear with me while I find the attachment.
6   It should be there.  It should have been in there.
7    Q.   You did review that case file?
8    A.   I did.
9    Q.   And it's consistent with your recollection
10  that that consisted of no more than a handful of
11  documents?
12   A.   23 was the Judy Hayes case, if I'm not
13  mistaken, and so the documents I looked at were the
14  exhibits to her deposition.
15   Q.   And other than the ones that were attached
16  as exhibits to the deposition, you didn't look at any
17  other exhibits from that case?
18   A.   I don't recall that I received any others.
19  I might have to go back and check my file.  I think
20  there was some other ones that I received but I don't
21  recall.  I have to look at my file.
22   Q.   So just so I'm clear about what exactly

1   you are opining about here, when you say that
2   Spectrum did not have a reporting obligation based on
3   this prior case, you did not undertake the kind of
4   factual analysis of this case that Spectrum would be
5   expected to under the regulations, did you?
6    A.   I only looked at the documents that I
7   reflect in my report, except for 0023 which should
8   have been added.
9    Q.   And the documents in 0023 that you
10  reviewed were the handful of ones that were attached
11  to exhibits to Judy Hayes' deposition transcript,
12  right?
13   A.   Yes.  There may have been a few others but
14  I would have to look at my file.
15   Q.   So what I'm trying to understand is are
16  you saying that Spectrum in fact reasonably relied on
17  the decision in that prior case based on its
18  analysis, or are you saying that if Spectrum
19  undertook that analysis and it showed that the cases
20  were similar, then it reasonably relied?
21   A.   I'm saying that Spectrum had the right to
22  rely on the letter that it received from the staff in

1   that 0023 case along with all of the documents that
2   Spectrum had provided to CPSC and, based on all of
3   those documents, reach a conclusion, the same
4   conclusion that the staff reached, that the risk of
5   injury presented by that coffee maker didn't rise to
6   the level of a substantial hazard.
7    Q.   I'm not trying to be tricky about this.
8   Again, I'm just trying to understand exactly what
9   your opinion means.  You're saying that Spectrum had
10  the right to review all the information from both
11  cases and compare them in determining whether it had
12  a reporting obligation, right?
13   A.   Yes.  Those -- it could look at those two
14  cases plus all the information, the other information
15  that it had in the current case and make its decision
16  as to whether it believed it had a reporting
17  obligation.
18   Q.   And when you opine at the end that
19  Spectrum did not have an obligation to report, my
20  question is, are you assuming that Spectrum undertook
21  that analysis and that that analysis in fact showed
22  that the cases were similar, or did you undertake

1   that kind of factual analysis yourself?
2    A.   I did not undertake that factual analysis
3   myself.  I am saying that Spectrum could do that
4   analysis and it would be reasonable for them to reach
5   the conclusion that they didn't have a reporting
6   obligation, but I didn't do that analysis.
7    Q.   Okay.  I understand.  So you're saying
8   that Spectrum could or had the right to do that kind
9   of comparison.  That's the basis of your testimony
10  today?
11   A.   That and the documents that I reviewed,
12  which indicate that there wasn't the significant risk
13  presented by the product in this case based on my
14  cursory review of some number of the -- I don't know
15  if it's 1,200 or 1,500 complaints that were in the
16  files that I looked at.
17   Q.   And just it's helpful to clarify these
18  things sometimes.
19   A.   Sure.
20   Q.   So that we're not talking past each other
21  for the next two hours.
22        Would you please turn to page 7 and 8 of

1  your expert report, Exhibit 85?  In this section,
2  you're discussing conventional versus Fast Track
3  reporting, right?
4        A.   Yes.
5        Q.   And the main difference between those two
6  is that in a Fast Track case, there is no staff
7  determination of whether a substantial product hazard
8  exists, right?
9        A.   Yes.  Correct.
10       Q.   And do you know, in 2005 to 2008, whether
11 preliminary determinations were made in PI cases?
12       A.   The 0023 that we're talking about and
13 the --
14       Q.   Well, I'm sorry, let me step back so that
15 we're not getting off track.  Do you know what CPSC
16 policy was about whether preliminary determinations
17 were made in PI cases?
18       A.   If the staff believed that it was going to
19 lead to more, they would convert the PI to a CA case
20 and all CA cases were supposed to go to preliminary
21 determination panels.
22       Q.   But before the conversion happened, the

1  panel doesn't convene and actually consider the case,
2  right?
3        A.   They don't have to.  I think they could.
4  They could convene -- I believe they could convene,
5  at least when I was there, to decide whether to make
6  it a CA case.
7        Q.   And in this case, actually the PI case
8  that we're referring to, the Applica case, you've
9  seen the document that is written on a preliminary
10 determination form, right?
11       A.   Yes.
12       Q.   And so I'm clear, is it your determination
13 that that is an actual preliminary determination or
14 something else?
15            MR. MULLIN:  I want to object to the form
16 of the question.  You can answer.
17            MR. ROSS:  Let me rephrase it to him
18 because that's a fair objection.
19 BY MR. ROSS:
20       Q.   Do you know whether the CPSC considered
21 that to be a preliminary determination at the time
22 they made it?

1            MR. MULLIN:  I'm going to object to the
2  form of the question.  But you can answer.
3            THE WITNESS:  The box that's checked on
4  that form I believe is the one that says preliminary
5  staff determination.  Judy Hayes in her deposition
6  said that it wasn't a formal preliminary
7  determination because there hadn't been a preliminary
8  determination panel but that these were her
9  conclusions.  And when I say that it was more form
10 over substance, there is no difference between that
11 document and one that would be signed off on through
12 a preliminary determination panel other than who the
13 signatories were.
14       Q.   What is the purpose of making a
15 preliminary determination in a conventional case?
16       A.   It's to present the staff's opinion that
17 the risk presented rises to the level of a
18 substantial product hazard that would warrant a
19 product recall.
20       Q.   So the CPSC can't pursue a recall in a
21 conventional report unless that determines
22 preliminarily that a substantial product hazard

1  exists, is that what you're saying?
2        A.   I think the staff could pursue without
3  making a preliminary determination.  It would be
4  inconsistent with the general procedures.  But when I
5  was there, what the staff would do, and even after I
6  left, is the staff would go to companies and say, we
7  will forgo making a preliminary determination if
8  you'll agree to do a recall.  And they would give
9  those cases a wide designation because the thinking
10 was, if we can get a company to agree to do a recall
11 without making a preliminary determination, then we
12 may not have to do as much work, technical and other
13 work, as we would otherwise have to do.
14            So it was a vehicle that the staff used to
15 convince companies to do recalls.  It was the carrot
16 that the staff would hold out to a company.  We won't
17 make a PD if you agree to do a recall.
18       Q.   You state in here that the CPSC would
19 disclose to the subject firm whether a substantial
20 product hazard was found but not disclose the hazard
21 classification, right?
22       A.   Correct.

42 (Pages 162 to 165)

1    Q.   And other than a cursory description of
2  the risk, like in the letter that we saw earlier, the
3  CPSC doesn't disclose sort of the bases of the
4  determination as set forth in a PD form, right?
5    A.   Right.
6    Q.   And that was true from 1997 to 2004 when
7  you ran Compliance, wasn't it?
8    A.   Yes.
9    Q.   And that's true today?
10   A.   Yes.
11   Q.   And it's been true in all the years
12 between 2004 and 2016?
13   A.   That's true.
14   Q.   Would you please turn to page 11 of your
15 report?  You make a statement here that I would like
16 to understand where you say, "The CPSC's regulations
17 on the reporting requirement are general in nature."
18      What did you mean by that?
19   A.   Where are you looking, just so I can be on
20 the same page as you, on the same line.
21      MR. MULLIN:  The second paragraph, first
22 sentence.

1  BY MR. ROSS:
2    Q.   There we go.  "The Commission's
3  interpretative reporting rule is general in nature
4  identifying criteria firms should consider in
5  determining whether they have a reporting obligation,
6  and identifying the type of information that firms
7  should consider."  Do you see that?
8    A.   Yes.
9    Q.   What do you mean by general in nature?
10   A.   Well, let me contrast it to the
11 Commission's interpretation of what a defect is.  In
12 defining defect, the Commission gives specific
13 examples of problems with the product that they would
14 consider to be a defect or not to be a defect.  In
15 the case of reporting, the Commission doesn't give
16 specific examples in saying if you have this type of
17 risk, we think it is clearly reportable.
18      Instead they give criteria.  Look at
19 engineering information, look at consumer complaints,
20 look at incident information, evaluate all of this
21 information, look at the likelihood of injury, look
22 at the pattern of defect, look at the number of

1  products involved, look at the vulnerability of the
2  population.  Take all that information, evaluate it
3  and then determine whether you have a reporting
4  obligation.
5    Q.   The Commission from time to time publishes
6  settlement agreements in the Federal Register, right?
7    A.   Yes.
8    Q.   And although the subject firm oftentimes
9  denies the allegations, the staff will set forth what
10 violations it believed occurred, right?
11   A.   Yes.
12   Q.   Now, is that an example, just as a general
13 matter, of the kind of notice the Commission can give
14 on whether it thinks that certain kinds of failures
15 and hazards are reportable?
16   A.   Yes.
17   Q.   And you agree it would be helpful if
18 you're a consumer products manufacturer if there was
19 a settlement agreement out there that said that, you
20 know, the specific kind of product you're selling is
21 reportable in certain circumstances?
22   A.   Yes.  But I'm also saying that the

1  Commission could be more affirmative in giving out
2  information on product categories, for example.  If
3  the Commission thinks that scalds are a problem with
4  coffee makers, you could put out information that
5  says that or you could disclose sanitized versions of
6  preliminary determination forms or letters to give
7  industries a better idea of what the Commission is
8  looking for and how the Commission feels about
9  particular product issues.
10   Q.   I'm sorry, I forgot to mention something
11 earlier as one of the preliminary matters.  You said
12 that the chart you reviewed of coffee maker cases in
13 the last 10 years omitted a case.  What case was
14 omitted?
15   A.   There was one case that was listed on
16 there that there didn't seem to be any files for.
17   Q.   Oh, I see.  I see.
18   A.   It wasn't that -- I wouldn't know whether
19 you omitted a case on that chart that should have
20 been on there, but there was one -- at least one case
21 that was on there where I didn't see any documents.
22   Q.   Okay.  Just making sure.

1    A.   I didn't mean to impugn what you --
2    Q.   No, you weren't.  We're apart on that one.
3  I just wanted to make sure it was complete.
4         Now, when you're talking about things the
5  Commission affirmatively could do to provide more
6  guidance to industry, you're not suggesting that the
7  Commission is legally required to do so, right?
8    A.   No.  I'm suggesting it's good government.
9  As you brought out earlier, I was with the Commission
10  for 31 years.  I've been outside the Commission for
11  12 years now.  And in that 12 years, I've just
12  learned a lot.  I was always a government employee,
13  as are many of the compliance staff at CPSC and many
14  of the employees of CPSC are government employees and
15  so you don't have an appreciation or understanding of
16  what companies do and what they go through.
17         And what I've found is that companies
18  generally want to know what the rules and -- what are
19  the rules?  Tell me what I have to do.  If A, then B,
20  as opposed to look at all this information and make
21  your decision as to whether you should report,
22  understanding that you're subject to being

1  second-guessed by the Commission staff as to whether
2  you should or shouldn't have reported now or earlier;
3  that I think the Commission could be much more
4  helpful to companies if they're sincere in wanting to
5  assure the companies report when they're required,
6  legally required to do so, is give out as much
7  information as you can about product risk for
8  different product areas and say, as they've done with
9  the new authority that they got in 2008 in the
10  Consumer Product Safety Improvement Act, where they
11  can now publish in the Federal Register basically
12  preliminary determinations of hazard for certain
13  product areas.
14         As I've said, they've done it for
15  outerwear cords on children's outerwear saying,
16  you've got cords on outerwear?  We've preliminarily
17  determined it's a substantial product hazard.
18  They've just recently -- and I won't go into whether
19  I think it's appropriate or not but they did it for
20  hover boards.  They essentially preliminarily
21  determined that if you've got hover boards with
22  lithium ion batteries, it's a substantial fire

1  hazard.
2    Q.   And this is an opinion you've come to
3  since you've left the government?
4    A.   Yes.
5    Q.   Because this is not the way that you ran
6  Compliance when you were the head of Compliance, was
7  it?
8    A.   No.  If I ever went -- if I were back in
9  the Office of Compliance now, I would advocate for
10  disclosing more information sanitized so that the
11  companies would better understand what the Commission
12  believes their responsibilities are.
13    Q.   And so with respect to this case, you're
14  suggesting that what the CPSC should do, although
15  it's not really required to, is publish something in
16  the Federal Register about coffee scalds and risks of
17  that nature?
18    A.   They don't have to publish it in the
19  Federal Register.  They could just make information
20  available to companies.  In this case, Spectrum had
21  available to it the Commission staff's decision in
22  the two PI cases where Spectrum knew what the

1  incidents were, and Spectrum made -- in response to
2  staff's requests, Spectrum made reports to the
3  Commission where they set forth all of the incident
4  information that they had.  They knew that the
5  Commission had all of that information because of
6  whatever else they gave them in the full report, the
7  Commission staff had evaluated that information and
8  reached the conclusion that the product didn't rise
9  to the level -- the risk didn't rise to the level of
10  a substantial hazard.
11         So I'm just suggesting that if Spectrum
12  had had access to even the class B determination in
13  the other case that we talked about plus the other
14  preliminary determinations where the staff concluded
15  the risk did not rise to the level of a substantial
16  hazard, that Spectrum or any other coffee maker could
17  use that information to help inform it as to whether
18  the Commission thought there was a reporting
19  obligation in these cases.  I'm just saying that the
20  more transparent the Agency is, the more helpful it
21  would be to companies in determining whether they
22  have a reporting obligation.

Page 174

1    Q.   And if the CPSC was more transparent in
2  publicly disclosing things that should be reported,
3  you're saying that firms wouldn't have to try to read
4  the tea leaves in these letters that they receive
5  from the Commission that don't always explain the
6  bases of the decisions, right?
7    A.   Well, the company who receives the letter
8  isn't so much reading the tea leaves, but every other
9  company doesn't even get to see the tea leaves.
10  Because Spectrum got to see a letter that at least --
11  in Spectrum's case, it doesn't really matter how
12  general the letter was saying we've concluded there
13  is no substantial product hazard because Spectrum
14  knew what information it had given the Commission and
15  so it at least knew -- didn't necessarily know what
16  other information the Commission had but knew what
17  information it had given the Commission.
18    Q.   No, but what I'm trying to understand is,
19  because lots of companies out there get letters from
20  the CPSC about various matters, right?
21    A.   Sure.
22    Q.   And so is having public guidance a way to

Page 175

1  sort of harmonize the expectations of the industry so
2  that you don't have different companies with
3  different expectations based on the information they
4  have?
5    A.   I think that would be helpful.  And you
6  look at -- you know, even a hazard classification
7  that the Commission uses, the recall handbook says
8  that that's intended to promote consistency in
9  decision making within the Commission, and that's so
10  that one compliance officer doesn't look at virtually
11  identical information that another compliance officer
12  is looking at and reaching different conclusions.
13    Q.   At the bottom of page 11 -- are you on 11
14  now?
15    A.   Yes.
16    Q.   You state at the bottom, "If a firm
17  reasonably believes the information it has does not
18  reasonably support the conclusion that a product
19  could create a substantial product hazard or an
20  unreasonable risk of serious injury or death, the
21  information would not be reportable under 15 U.S.C.
22  2064(b)," right?

Page 176

1    A.   Yes.
2    Q.   I want to clarify exactly what you're
3  saying here.  Is there, in the CPSA, a statement that
4  says a firm that reasonably believes it doesn't have
5  to report doesn't have an obligation to do so?
6    A.   No.  What I said is the Commission is free
7  to second-guess or disagree with a company's decision
8  not to report, as is done in this case; that the
9  reporting obligation doesn't say you have to report
10  every incident.  It says you have to report a defect
11  that could create a substantial risk of injury to the
12  public or an unreasonable risk of serious injury or
13  death.
14       If the information you have doesn't meet
15  that criteria, you're not obligated to report to the
16  Commission.  And if a company believes that the
17  information it has doesn't obligate it to report to
18  the Commission, then it doesn't have to report,
19  subject to the Commission coming in at some later
20  time and saying, you know, we've looked at all that
21  same information, however the Commission gets it,
22  through a preliminary investigation where they send a

Page 177

1  letter out to a company that says please give us all
2  the information, give us full report information.
3  The Commission is then free to say we disagree with
4  the conclusion you've reached, company, on not
5  reporting, and we think you should have reported it
6  and therefore we want a penalty from you.
7       And the company is free to say, we
8  disagree, we don't think we had a reporting
9  obligation and we don't want to pay a penalty and
10  then end up in federal court.
11    Q.   I don't want to get too off track here.
12  That wasn't exactly what I was asking.
13       My question is, does the CPSA state that
14  firms don't have to report as long as they have a
15  reasonable basis for reaching that conclusion?
16    A.   The statute says if you obtain information
17  reasonably supporting a conclusion that there is a
18  defect that could create a substantial product hazard
19  or creates an unreasonable risk of serious injury or
20  death, you're required to report.
21    Q.   So what --
22    A.   If you don't meet that criteria, then I

45 (Pages 174 to 177)

Page 178

1    don't believe the company is required to report.
2        Q.   These are often fact-intensive
3    determinations under the legal standard, right?
4        A.   These are fact determinations, yes.
5        Q.   And they're under a legal standard that's
6    in a statute, right?
7        A.   Yes.
8        Q.   And it's interpreted by regulations,
9    right?
10       A.   Yes, by regulations or by courts.
11       Q.   And in that process, is it possible that
12   reasonable minds could differ as to the existence of
13   a reporting obligation in a given case?
14       A.   Sure.  That's probably why this case is in
15   litigation.  Reasonable minds have differed.
16       Q.   Well, what I'm trying to understand is, if
17   there is a reasonable argument for reporting and a
18   reasonable argument against it, under the law, does a
19   firm have to report in that situation?
20       A.   I can repeat my answer.  If the firm
21   believes that the information it has obtained does
22   not reasonably support the conclusion that there is a

Page 179

1    defect that could create a substantial hazard or
2    creates an unreasonable risk of serious injury or
3    death, it's not required to report to the Commission.
4        Q.   My question is, is the firm absolved of
5    liability when the government comes and investigates
6    the issue as long as the firm's initial determination
7    was reasonable?
8        A.   It's a question of whether there would be
9    a knowing violation in that case, I suppose, and
10   there can be disagreement between the government and
11   the company as to whether the company's evaluation
12   assessment was reasonable.  And that's what courts
13   are here to decide.
14       Q.   So to get back to my question -- well,
15   let's step back a second.  What you were reciting
16   before, just a second ago, is the reporting standard
17   under Section 15(b), correct?
18       A.   Yes.  That's the statute that companies
19   operate under.
20       Q.   And Section 15(b) says if a firm obtains
21   information which reasonably supports the conclusion
22   that a product could create a substantial product

Page 180

1    hazard, et cetera, then it has to report, right?
2        A.   If a product has a defect that could
3    create a substantial product hazard, then they have
4    to report.
5        Q.   So is the meaning of that language as long
6    as there is a reasonable conclusion that can be drawn
7    that the product contains a defect that could create
8    a substantial product hazard, that the firm has to
9    report?
10       MR. MULLIN:  Object to the form of the
11   question, but you can answer.
12       THE WITNESS:  Repeat the question again so
13   that I understand it.
14   BY MR. ROSS:
15       Q.   My question is, as long as there is some
16   reasonable conclusion that could be drawn that the
17   product contains a defect that could create a
18   substantial product hazard, need a firm report in
19   that circumstance?
20       A.   I guess it depends.  If the firm
21   reasonably believes that the information does not
22   reasonably support the conclusion there is a defect

Page 181

1    that could create a substantial hazard, then it
2    doesn't have an obligation to report.
3        Q.   So the only --
4        A.   And so the question would be how the firm
5    is evaluating that information and how the firm is
6    looking at it.  If a firm isn't in doubt, if they
7    say, we're not in doubt, we don't have a reporting
8    obligation, we reasonably believe this information
9    does not support the obligation to report because it
10   doesn't meet these criteria, then the firm is free to
11   not report, and the government is free to say we
12   disagree with your decision not to report and we're
13   going to sue you if we can't reach an agreement on a
14   civil penalty where you don't have to admit
15   liability.
16       Q.   I'm still trying to understand.  If there
17   is a reasonable argument for reporting and a
18   reasonable argument against it, if reasonable minds
19   could differ in a situation, under this statute, is a
20   firm required to report?
21       MR. MULLIN:  Object to the form of the
22   question.

46 (Pages 178 to 181)

1     THE WITNESS:  Not if the firm reasonably
2  believes that the information doesn't lead to the
3  conclusion that there is a defect that could create a
4  substantial product hazard.
5  BY MR. ROSS:
6     Q.  So as long as the firm has a reasonable
7  belief that it doesn't have to report, then it
8  doesn't have to report, period?
9     A.  The firm takes the chance that the
10  Commission will disagree with its decision not to
11  report.
12     Q.  And in that situation, the Commission can
13  take the firm to court to determine whether or not
14  there was a -- you know, the firm could reasonably
15  conclude, or there is information which reasonably
16  supports the conclusion that the product contains a
17  defect which could create a substantial product
18  hazard, right?
19     A.  Yes.
20     Q.  So the fact that the firm might have
21  thought initially that its reasoning was reasonable
22  does not immunize it from a potential civil penalty

1  suit, right?
2     MR. MULLIN:  Object to the form of the
3  question.
4     THE WITNESS:  Right.
5  BY MR. ROSS:
6     Q.  The firm just makes the determination that
7  it makes and then courts and the Commission and the
8  Department of Justice after the fact get together
9  and, under the law, decide whether the firm met the
10  standard?
11     A.  Right.  And ultimately a court will
12  decide.  As I said, I used the term second-guess but
13  the government is free to disagree with a company's
14  decision not to report.
15     Q.  Can you turn to page 12, please?  The top
16  paragraph says, "The CPSC has been making PDs based
17  on information it believes leads to the conclusion
18  that a product presents a substantial product hazard
19  or does not present a substantial product hazard for
20  more than 35 years."  And you go on to say the staff
21  has a well-developed body of evidence of specific
22  information that it has preliminarily determined

1  creates an SPH and thus is reportable.  Do you see
2  that?
3     A.  Yes.
4     Q.  And then you say, "However, the Commission
5  has not been transparent with the regulated industry
6  about this body of evidence," right?
7     A.  Yes.
8     Q.  And basically what you're saying there is
9  the Commission has not in some way publicized data on
10  different preliminary determinations it makes?
11     A.  Yes.
12     Q.  And, again, that's consistent with how the
13  CPSC has done business forever, right?
14     A.  I wouldn't say forever.  I think in the
15  early days of the Commission, reports were made
16  public.  This was before there was a prohibition on
17  disclosing information reported under Section 15.
18  And I believe the preliminary determination forms
19  were made public and when I was the director of
20  Compliance, we did give out PDs I believe on some
21  occasions in response to FOIA requests.
22     So I can't say forever but generally the

1  attorneys would want the PD form withheld because
2  they didn't want the company to see either risk
3  assessment that the Agency had conducted for its
4  product because they were afraid that if they ended
5  up litigating, they didn't want to have to give this
6  document out too early.
7     Q.  But the Commission, when you were the head
8  of Compliance, didn't publicize data; it sort of
9  aggregated these decisions so that companies could
10  see trends in how the CPSC made preliminary
11  determinations, right?
12     A.  Unfortunately, that's correct.
13     Q.  And this is something that you've learned
14  after the fact?
15     A.  This is something I've learned from
16  12 years outside the Commission working with lots of
17  different companies in lots of different product
18  areas.
19     Q.  I would like to show you what's previously
20  been marked as Government Exhibit 72.  If you would
21  kindly turn to the page that ends in 16475.
22     Well, first of all, this is the Section 15

Page 186

1    manual that was in place when you were the head of
2    Compliance, right?
3        A.   Yes.
4        Q.   And this is the one that you said that you
5    had input in and perhaps could have changed if you
6    saw something objectionable?
7        A.   Right, I probably reviewed it at the time.
8        Q.   Now, this is a section on timeliness of
9    reporting, and there is a bullet that says, "Whether
10   companies believe, or do not believe, the product
11   actually presents a substantial hazard is not the
12   issue in reporting.  Companies are required to report
13   at an early stage of the evaluative process.  (Have
14   they received information that would cause a
15   reasonable company to think a defect could create a
16   substantial hazard?)."  Do you see that?
17       A.   Yes.
18       Q.   What's the meaning of this paragraph?
19       A.   It means that the reporting obligation is
20   broader than the obligation to conduct a recall,
21   because the reporting obligation is if you obtain
22   information reasonably supporting the conclusion that

Page 187

1    there is a defect that could create a substantial
2    product hazard.  The Commission can only compel a
3    recall if it can prove that a defect actually creates
4    a substantial product hazard.
5        Q.   Now, this paragraph says, "Whether
6    companies believe, or do not believe, the product
7    actually presents a substantial product hazard is not
8    the issue in reporting."  Do you see that?
9        A.   Yes.
10       Q.   So if there is some reasonable argument
11   that a product could create a substantial product
12   hazard based on a defect, must that be reported?
13       MR. MULLIN:  Object to the form of the
14   question.
15       THE WITNESS:  If the information meets the
16   criteria for reporting, then the company is obligated
17   to report.  But if a company has experience with the
18   Commission and the Commission has concluded that
19   certain risks are just not going to rise to the level
20   of a substantial product hazard, then I don't see
21   that there would be an obligation to report because
22   someone might think that it could create a

Page 188

1    substantial hazard because the Commission has already
2    decided it doesn't create a substantial hazard.
3        It's kind of like going around and around
4    but if the Commission advises the company that a
5    product does not present a substantial product hazard
6    and you've got a factual scenario where the risk is
7    significantly lower than in the case where the
8    Commission staff says the product doesn't or a risk
9    doesn't present a substantial product hazard, then I
10   don't think you've reached the "could create"
11   situation.  I don't think you've met that criteria.
12       Q.   And we're talking hypothetically here,
13   right, because you haven't undertaken that analysis
14   in this case, have you?
15       A.   No, I haven't looked at the -- well, I've
16   looked at the -- I've randomly looked at the incident
17   reports that were involved in this case.  I looked at
18   the full report that was provided to the Commission.
19   I've looked at the characterization of the incidents
20   that occurred in this case.  I've seen no indication
21   that there were severe injuries or serious injuries.
22   I haven't seen indications of second degree or third

Page 189

1    degree burns as were present in cases where the
2    Commission, in the two Spectrum cases, the two PI
3    cases where there were serious injuries, there were
4    reports of second degree burns.  I don't see that
5    present in this case.
6        So if Spectrum in fact looked at those two
7    PI decisions where Spectrum knew what the incidents
8    were -- it's not that they had to have that PD form
9    to know what the incidents were.  Since it was
10   Spectrum or Applica reporting, they knew what the
11   incidents were.  They knew what the risk was.  They
12   knew how serious the injuries were, and yet the
13   Commission staff closed those cases and says it
14   doesn't rise to the level of a substantial hazard.
15       So if I have a situation in which the risk
16   is much less serious, I wouldn't think -- I think
17   it's reasonable to think that you don't have a "could
18   create" situation.
19       Q.   Just to be clear, did the CPSC tell
20   Spectrum that coffee spills risking second degree
21   burns cannot be an SPH?
22       A.   They told Spectrum in the two cases that

1   they closed that the incidents that had occurred and
2   the risk of injury that was present did not rise to
3   the level of a substantial product hazard.
4        Q.   So that's not my question, though.  My
5   question is, did the CPSC tell the company that in no
6   circumstances in which a coffee maker presents a risk
7   of spilling and second degree burns, that it could
8   never be a substantial product hazard?  Is that how
9   you read that letter?
10       MR. MULLIN:  Object to the form of the
11  question.
12       THE WITNESS:  They didn't use that
13  specific language.
14  BY MR. ROSS:
15       Q.   They didn't state that language at all,
16  did they?
17       A.   They stated language that said that the
18  risk doesn't rise to the level of a substantial
19  product hazard.
20       Q.   The risk in that case, right?
21       A.   But the risk in -- you can't look at cases
22  in a vacuum.  When you're dealing with the same

1   company, you expect to have consistency in the
2   decisions that are being made by the compliance
3   staff.  That's the reason for the hazard
4   classification.  The A, B, C, D, E, in part, it helps
5   inform what corrective action you want to seek from a
6   company, but it also tells the company -- it's also
7   to assure consistency in the decision making by the
8   compliance staff.
9        I guess you weren't interested in my
10  answer so I can repeat it if you want.
11       Q.   So when your testimony is firms should be
12  able to reasonably rely on prior CPSC decisions, as
13  an initial matter, they can only rely on decisions of
14  which they are aware, right?
15       A.   Right.  That's why I encourage the
16  Commission to give out more information and have more
17  transparency so that other companies in similar
18  situations can know what the Commission is thinking.
19       Q.   So if another company that hadn't had the
20  experience of this PI case, the Brew Basket case, or
21  Home Cafe case -- if another firm had had the
22  problems that Spectrum was having with these coffee

1   makers, the 1,600 complaints we're talking about in
2   this case, but they did not have the prior experience
3   in the PI case, they couldn't have relied on that
4   document, right?
5        A.   That's right.
6        Q.   And a firm in that case would be left to,
7   under your analysis, would be left to interpret its
8   reporting obligation based on the statute and the
9   regulations and other public statements of the CPSC,
10  right?
11       A.   That's right.
12       Q.   So could there be a different threshold
13  for reporting for the two companies in this
14  hypothetical, one who had the PI case previously and
15  one who didn't?
16       A.   Yes, I think that's possible.  And I would
17  also think that if the company who didn't have that
18  PI information reported under the conventional
19  reporting program, that the staff would then look at
20  that information and reach a conclusion that there is
21  a defect but it's a class D hazard, doesn't rise to
22  the level of a substantial hazard.

1        If you look at the other nine or ten cases
2   where the staff evaluated very similar information --
3   and the similar information that I'm talking about is
4   hot liquid contacting consumers, in the face, in the
5   arms, in the chest, in the legs.  With one exception,
6   the staff routinely, consistently closed those cases
7   saying no substantial product hazard.
8        If all those companies got together -- I
9   don't know what the antitrust implications are but if
10  all those companies got together and shared the
11  results of the PD letter that they sent saying no
12  substantial product hazard, then they would all be
13  informed and have the same body of knowledge and
14  information to decide -- to use that to factor into
15  their decision whether to report to the Commission.
16       Q.   Okay.  Let's step back about five steps.
17  Got a little far afield of my question there.
18       You've answered that the reporting
19  obligation could be different depending on the
20  specific information that any given firm has, right?
21       A.   Yes.
22       Q.   And so potentially, in your view, there

49 (Pages 190 to 193)

| Page 194 | Page 196 |

**Page 194**

1  are any number of firms out there, all of which are
2  subject to different reporting requirements based on
3  the information that they have known that other
4  companies don't?
5          MR. MULLIN: Object to the form of the
6  question.
7          THE WITNESS: Every company has to look at
8  the body of information that it has in its
9  possession, look at the past dealings that it's had
10  with the Commission, look at the statutory criteria
11  and make a decision as to whether they have a
12  reporting obligation to CPSC.
13  BY MR. ROSS:
14      Q.   So that's a yes?
15      A.   So companies who are in different
16  positions could perceive that they have different
17  reporting obligations.
18      Q.   And is the standard as long as that
19  company has a reasonable argument that it doesn't
20  need to report, that it can't be held liable for the
21  failure to do so?
22      A.   If the company has reasonable cause to

**Page 195**

1  believe that there is a defect that could create a
2  substantial product hazard, then it's obligated to
3  report. If it doesn't have that information, it
4  doesn't believe that the information rises to that
5  level, then it doesn't have an obligation to report
6  in my opinion. And if the government disagrees, the
7  government can let the company know that it disagrees
8  once it finds out about the issue that the company
9  decided not to report, and the Commission and the
10  company can either resolve it or they can litigate
11  it.
12      Q.   Now, you said "in my opinion" there. Why
13  did you qualify your statement with "in my opinion"?
14      A.   Because I'm the one giving the opinion.
15      Q.   Is your --
16      A.   I can't speak for anybody else.
17      Q.   So if at the end of the day the Court says
18  that a firm had a reasonable basis for thinking that
19  this product did not rise to the level of a
20  substantial product hazard but on the other hand
21  reasonable minds could differ and there is a
22  reasonable argument in the other direction too, could

**Page 196**

1  the firm be held liable for not reporting?
2          MR. MULLIN: Object to the form of the
3  question.
4          THE WITNESS: That's a decision for the
5  Court, not for me. Isn't that the ultimate decision
6  in this case that the Court has to render?
7  BY MR. ROSS:
8      Q.   I'm asking as a general matter, if
9  reasonable minds could differ and that's the Court's
10  finding, under your understanding of this statute and
11  these regulations, can a firm still be held liable
12  for an untimely report?
13          MR. MULLIN: Object to the form of the
14  question.
15          THE WITNESS: If the Court finds that the
16  company didn't comply with the reporting obligation,
17  it can be held liable under the statute.
18  BY MR. ROSS:
19      Q.   You opined in this report about Spectrum
20  and its reasonableness in not reporting and whether
21  or not it complied with the reporting obligation.
22  I'm trying to understand what you think the reporting

**Page 197**

1  obligation means. If a Court says there is a
2  reasonable argument in both directions, under the
3  statute as it exists, can the firm still be held
4  liable for an untimely report?
5          MR. MULLIN: Object to the form of the
6  question.
7          THE WITNESS: It's going to depend on how
8  the Court rules. I can't answer how the Court rules.
9  It's my opinion in this case that based on the
10  information in the documents that I reviewed, that
11  Spectrum presumably considered, that it reasonably
12  could conclude that it didn't have an obligation to
13  report. The government disagrees with Spectrum's
14  decision not to report before it reported for reasons
15  other than safety. And as a result, they sued
16  Spectrum seeking a penalty and seeking a
17  determination by this court, by the Court, whether
18  Spectrum had an obligation to report.
19  BY MR. ROSS:
20      Q.   I'm not not even talking about this case at
21  this point. I'm talking about as a matter of law.
22          As a matter of law, if reasonable minds

1  could differ and that's the Court's conclusion, that
2  there is a reasonable argument that it could rise to
3  an SPH and there is a reasonable argument that it
4  couldn't, does that absolve the manufacturer of any
5  liability?  Is what you're saying that the legal
6  standard is as long as a manufacturer has a
7  reasonable basis for not reporting, it can't be held
8  liable?
9          MR. MULLIN:  Object to the form of the
10 question.
11         THE WITNESS:  I'm not giving a legal
12 conclusion.  I'm going to leave that to the Court.
13 I'm trying to look at the facts of this case and give
14 my opinion whether, based on those facts, I believe
15 Spectrum had an obligation to report.  And I
16 concluded that I didn't believe that they had an
17 obligation to report.
18         I'm not giving a legal opinion or a legal
19 conclusion because that's what the Court is going to
20 ultimately do, the Court or a jury.
21 BY MR. ROSS:
22     Q.  Your final conclusion here is, "It is my

1  opinion that Spectrum did not have a reporting
2  obligation to CPSC for its Applica/Black & Decker
3  brand 12-cup coffee makers that are the subject of
4  this litigation."  Do you see that?
5      A.  Right.  And it's based on my review of the
6  documents that I identified that I reviewed in this
7  case and my understanding of how Spectrum goes
8  through its process and the documents that Spectrum
9  looked at in determining whether to report.
10     Q.  And are you saying that you can reach that
11 conclusion without even knowing what the law
12 requires?
13         MR. MULLIN:  Object to the form of the
14 question.
15         THE WITNESS:  I'm saying that the law says
16 that if Spectrum obtains information reasonably
17 supporting the conclusion that there is a defect that
18 could create a substantial product hazard, that
19 they're required to report it.  Spectrum didn't reach
20 that conclusion.  They didn't reach that conclusion
21 because of the nature of the injuries that were
22 occurring, the risk of injury that was present with

1  this product, Commission previous actions with
2  Spectrum, that they made a factual determination that
3  they didn't have to report.
4  BY MR. ROSS:
5      Q.  Would you turn to page -- continuing on to
6  page 12 on Exhibit 85, your report again -- you talk
7  about how a preliminary determination letter is often
8  the only window a firm has into determining whether
9  something is reportable.  Do you see that?
10     A.  Yes.
11     Q.  Now, it is your opinion in this case that
12 a firm can reasonably rely on the decisions in prior
13 CPSC cases in determining whether a reporting
14 obligation has arisen, right?
15     A.  Previous cases involving that company.
16     Q.  Involving that company.
17         Is that your opinion or is that the law?
18         MR. MULLIN:  Object to the form of the
19 question.
20         THE WITNESS:  That's my opinion and --
21 that's my opinion.
22 BY MR. ROSS:

1      Q.  Does it say in the Consumer Product Safety
2  Act anywhere that CPSC decisions have some sort of
3  precedential value?
4      A.  No, and it doesn't say that it doesn't
5  have precedential value.
6      Q.  So it's in the eye of the beholder, is
7  that what you're saying?
8          MR. MULLIN:  Object to the form of the
9  question.
10         THE WITNESS:  I'm saying it's reasonable
11 for a company to be treated in a -- and to assume or
12 to presume it's going to be treated in a consistent
13 manner, that it's not going to one day get a letter
14 from a compliance officer that says we've reviewed
15 incident information involving your coffee maker
16 where people had serious injuries, a handful of
17 second degree burns, and we've concluded that that
18 doesn't rise to the level of a substantial product
19 hazard; and then two weeks later get a letter from a
20 different compliance officer involving a different
21 coffee maker that the company makes but with the same
22 risk of injury presented by that product and having

Page 202

1  less significant injuries or incidents, and reaching
2  a conclusion that your product has a defect that
3  creates -- that we believe your product has a defect
4  that creates a substantial product hazard, we've
5  classified it as a C and we want you to conduct a
6  recall. Companies are entitled to have some
7  consistency in the decision making by the compliance
8  staff, and that's the reason for the A, B, C, D, E
9  criteria, in part, and so that there is consistency
10  in decision making.
11  BY MR. ROSS:
12      Q. But it's not your opinion that as a matter
13  of law, a staff determination in one case precludes
14  staff from determining in another case that -- let me
15  take that back.
16          If in the first case staff determines that
17  no further action is necessary, is staff precluded as
18  a matter of law from finding differently in future
19  cases on similar facts?
20          MR. MULLIN: Object to the form of the
21  question.
22          THE WITNESS: Well, they're not -- I mean,

Page 204

1  product and similar risk patterns, have the -- it's
2  reasonable and right for them to take that
3  information into consideration in deciding whether
4  they have a reporting obligation to CPSC.
5  BY MR. ROSS:
6      Q. Are prior cases among the kind of
7  information the regulations state firms should
8  consider in deciding whether to report?
9      A. No. And in fact, I specifically say in
10  the report that the interpretative reg is silent on
11  the -- and doesn't take into account the effect that
12  previous cases have. I don't think anybody thought
13  about it when the regulations were originally written
14  back in 1974 or so. There weren't that many cases.
15      Q. So this idea of it's reasonable to rely on
16  prior cases is not based on some affirmative
17  statement that the CPSC has said to the public,
18  right? The CPSC -- to clarify, the CPSC has never
19  said if we found one way in a prior case, you can
20  rely on that in future cases?
21      A. They've never said that. They've never
22  said lots of things, though.

Page 203

1  the staff can do almost anything it wants to do, so I
2  can't say that they're precluded from doing that. It
3  wouldn't be good government. I don't think it would
4  be reasonable.
5          I think that the staff -- if the staff
6  does that, then maybe they ought to reopen the other
7  cases where they concluded that the risk didn't rise
8  to the level of a substantial hazard and go seek
9  recalls in all of those other cases. Companies are
10  entitled to be treated consistently, in my opinion.
11  BY MR. ROSS:
12      Q. So is the point of your opinion here just
13  to state that it's reasonable for companies to assume
14  that if the CPSC decided a case one way, at some
15  point it's going to decide future cases in a similar
16  way?
17          MR. MULLIN: Object to the form of the
18  question.
19          THE WITNESS: I think a company is
20  entitled to consider, among the other things that
21  it's considering, how the staff, how the Commission
22  has dealt with it in prior cases with the similar

Page 205

1      Q. Look at the bottom of page 12. You say,
2  "The lack of transparency by CPSC on particular
3  issues it considers to be reportable and that could
4  create a substantial product hazard results in
5  reporting under Section 15 becoming a game of
6  'gotcha' where the Commission second-guesses firm's
7  decisions not to report. This second-guessing might
8  not occur if CPSC were more forthcoming in sharing
9  with firms its decisions on the types of risks that
10  it believes do not rise to the level of a substantial
11  product hazard."
12          Do you see that?
13      A. Yes.
14      Q. And that's your opinion?
15      A. Yes.
16      Q. So how many games of gotcha did you play
17  when you were the head of Compliance?
18          MR. MULLIN: Object to the form of the
19  question.
20          THE WITNESS: I would like to think we
21  didn't play gotcha when I was at the Commission, that
22  we looked at the information that was available to us

Page 206

1  and made reasoned decisions on whether we believed a
2  firm had a reporting obligation. If you look back at
3  the history, we didn't have that many civil penalty
4  cases when I was there. Sure, sometimes I think we
5  touted that we've got, you know, a record amount of
6  penalty this year because the Commissioners and
7  chairmen like to do that, but I would like to think
8  that we were very thoughtful and very careful before
9  we brought civil penalty actions from -- at least
10  when I was the head of Compliance.
11  BY MR. ROSS:
12      Q.   And is it your opinion that today CPSC is
13  neither thoughtful nor careful in bringing civil
14  penalty actions?
15      A.   I don't think they're as thoughtful and as
16  careful as they were when I was there.
17      Q.   And what are you basing that on?
18      A.   I base it on anecdotal information. I
19  base it on some cases I've been involved in. It's a
20  perception that I have from dealing with staff at the
21  Commission.
22      Q.   So your perception that people like

Page 207

1  Harriet here just throw darts trying to figure out
2  who to prosecute in these cases?
3          MR. MULLIN: Object to the form of the
4  question.
5          THE WITNESS: I didn't say that.
6          MR. MULLIN: For arrogance sake.
7          THE WITNESS: I don't know what Harriet
8  does. I don't know how she evaluates information and
9  I would never throw darts at Harriet.
10  BY MR. ROSS:
11      Q.   The Office of General Counsel, then?
12          MR. MULLIN: Object to the form of the
13  question.
14  BY MR. ROSS:
15      Q.   Are they just throwing darts in deciding
16  who to prosecute?
17          MR. MULLIN: Object to the form of the
18  question.
19          THE WITNESS: I don't know what they're
20  doing.
21  BY MR. ROSS:
22      Q.   But you feel compelled and entitled to

Page 208

1  stand here today and say that they're neither
2  thoughtful or not careful compared to the way you did
3  things, right?
4      A.   I didn't say that. I said I don't think
5  they're as thoughtful. My perception is they're not
6  as thoughtful or as insightful as when I was there.
7      Q.   And they lack self-confidence, right?
8  Isn't that what you said?
9      A.   I don't think I ever said they lack
10  self-confidence.
11      Q.   I think you said that they lacked the
12  self-confidence to tell firms about the bases of
13  their decisions in cases. That's what we talked
14  about right before lunch.
15      A.   I thought I talked about compliance
16  officers not having the self-confidence to tell
17  companies they didn't have to report, but I could be
18  wrong.
19      Q.   So is it your testimony today that the
20  CPSC cares more about playing games than protecting
21  public safety?
22      A.   No, I think you're mischaracterizing what

Page 209

1  I said. I said if the Commission is more transparent
2  in disclosing to firms situations where it thinks
3  product risks either rise to the level of a
4  substantial hazard or don't rise to the level of a
5  substantial hazard, that companies would understand
6  better their reporting obligation to CPSC. Companies
7  can't tell from Commission press releases whether a
8  recall is being conducted because a company reported
9  under Fast Track and there has been no determination
10  of hazard, or whether companies reported under the
11  conventional reporting program and the staff made a
12  preliminary determination and then pursued a recall.
13          If the Commission were more transparent in
14  disclosing information about its decisions as to when
15  it believes and the circumstances under which it
16  believes products rise to the level of a substantial
17  hazard or don't rise to the level of a substantial
18  hazard, it would make it easier for companies to
19  fulfill their reporting obligation.
20          As I also said, companies in my experience
21  just want to know what the rules of the road are.
22  Lay out for me very clearly in black and white.

53 (Pages 206 to 209)

Page 210

1  Don't tell me what the criteria are that I have to
2  look at. I mean, that's fine. But can you give me
3  some specific examples of when you think you should
4  report? And even if all the examples are you should
5  report, that's okay because you're giving some
6  specific guidance to a company that if these
7  circumstances arise or if these risks arise,
8  regardless of whether we pursue a recall, we think
9  you need to report this information to the
10  Commission.
11         I mean, that's what I've learned from
12  being outside the Commission and working with the
13  companies. When you're in the government, you're
14  working on the other side of companies. When you're
15  outside of companies, you're working with the
16  companies trying to get them to comply with all of
17  the rules and regulations that they're obligated to
18  comply with. And they want to know, what are the
19  rules? Be clear. Be succinct. Tell me what the
20  Commission thinks about this particular risk or that
21  particular risk.
22         Q.   I'm going to show you an exhibit that

Page 211

1  we're going to mark as Government Exhibit 87.
2         (Government Exhibit No. 87 was
3         marked for identification.)
4  BY MR. ROSS:
5         Q.   Do you see on May 8th, 2006, notice of
6  settlement published in the Federal Register
7  regarding West Bend Housewares, LLC?
8         A.   Yes.
9         Q.   Have you seen this document before?
10        A.   I don't think I've read it before.
11        Q.   Now, if it's in the Federal Register, it's
12  public, right?
13        A.   Yes.
14        Q.   And if it was published on May 8th, 2006,
15  it was about a year and a half before these coffee
16  makers were manufactured, right?
17        A.   Yes.
18        Q.   So you were never shown this document in
19  formulating your opinions and you were never aware of
20  it, right?
21        A.   Right.
22        Q.   Now, if you look at section III in the

Page 212

1  right-hand column, allegations of staff, you'll see
2  in paragraph 4 that this settlement relates to a
3  10-cup automatic coffee maker and replacement
4  carafes. Do you see paragraph 4?
5         A.   Yes.
6         Q.   So that's fairly similar to a 12-cup
7  automatic coffee maker that we're talking about here,
8  right?
9         A.   Yes.
10        Q.   In theory?
11        A.   Yes.
12        Q.   Paragraph 6 states, "The 10-cup automatic
13  coffee maker is a programmable automatic coffee maker
14  with a glass carafe that has a plastic black handle."
15           Now, in our case, we're talking about
16  glass carafes with plastic handles, right?
17        A.   Right.
18        Q.   "The 10-cup replacement carafe was
19  distributed as a replacement carafe for the 10-cup
20  automatic coffee maker. The carafe's handle can
21  unexpectedly loosen or break, resulting in the carafe
22  failing. If this should occur, consumers may sustain

Page 213

1  burn injuries from hot coffee or lacerations from
2  broken glass."
3           Do you see that?
4         A.   Yes.
5         Q.   So this is another case talking about the
6  plastic handle falling off of a glass carafe
7  potentially causing burns or lacerations, right?
8         A.   Yes.
9         Q.   Now, if you look at paragraph 7, it says,
10  "The company started receiving reports in October of
11  2004, right?
12        A.   Yes.
13        Q.   Paragraph 8, "In December 2004, West Bend
14  acquired a couple of samples of broken handles for
15  evaluation. A brief evaluation of these handles
16  revealed a problem with the plastic material and/or
17  the processing. West Bend asked the foreign
18  manufacturer to investigate the breakage problem and
19  to make the necessary corrections."
20           That's paragraph 8, right?
21        A.   Correct.
22        Q.   In this case, were you aware that Spectrum

Page 214

1   received two returned coffee makers and performed an
2   engineering analysis on those coffee makers?
3       A.   I don't remember the number but I know
4   they performed analysis on returned coffee makers,
5   yes.
6       Q.   Two, in March and April of 2009
7   respectively, right?
8       A.   That sounds right.
9       Q.   And are you aware that the conclusions of
10  those were that there were problems with the plastic
11  material and the processing, among other things?
12      A.   Yes.
13      Q.   So that's also similar, right?
14      A.   Yes.
15      Q.   And in West Bend, they asked the foreign
16  manufacturer to investigate the problem and to make
17  necessary corrections.  And in this case, Spectrum
18  asked the manufacturer to investigate the problem and
19  make necessary corrections, right?
20      A.   Right.
21      Q.   So we're still going similar here.
22           Number 9, "On or about February 2, 2005,

Page 215

1   the foreign manufacturer advised West Bend that the
2   material used in the handles was not so good.  At
3   that time, West Bend retained an outside plastics
4   expert who found that the material used in the broken
5   handle did not meet West Bend's specifications."
6            Now, in our case, are you aware that
7   Spectrum determined that there had been a problem in
8   how the coffee makers were being manufactured which
9   led to handle weakness?
10      A.   Generally, yes.
11      Q.   Now, if you look at paragraph 12 and skip
12  down a little bit, it says, "West Bend reported to
13  the Commission on or about July 15, 2005."  So that's
14  about nine months later, after officially receiving
15  reports, right?
16      A.   Right.
17      Q.   "At the time of its report, West Bend had
18  received at least 169 reports of handle breakage and
19  at least two reports of minor burns and/or cuts as a
20  result of the handle breakage."
21           Now, the 169 reports is considerably less
22  than we had in this case, correct?

Page 216

1       A.   Correct.
2       Q.   And here it says at least two reports of
3   minor burns and/or cuts.  Now, based on your
4   cursory -- and this is using your word, I don't want
5   to characterize it -- your cursory review of the data
6   in this case, you said that all of the incidents that
7   were reported appeared to be minor, right?
8       A.   Yes.
9       Q.   But there were considerably more than two,
10  right?
11      A.   Yes.
12      Q.   Many, many multiples more than two, right?
13           MR. MULLIN:  Object to the form of the
14  question.
15  BY MR. ROSS:
16      Q.   Well, there were approximately 70 in our
17  case and two in this case, right?
18      A.   Right.
19      Q.   Now, finally, if you look at paragraphs 13
20  through 15, As indicated in paragraph 4, by February
21  2005, West Bend obtained information which reasonably
22  supported the conclusion that the 10-cup automatic

Page 217

1   coffee maker, item 56870, and its replacement carafe,
2   item 5815, contained a defect which could create a
3   substantial product hazard, but failed to report such
4   information in a timely manner."
5            Do you see that?
6       A.   Yes.
7       Q.   "14.  By failing to furnish information as
8   required by Section 15(b), West Bend violated CPSA."
9            Do you see that?
10      A.   Yes.
11      Q.   "15.  West Bend committed this failure to
12  timely report to the Commission 'knowingly' as the
13  term 'knowingly' is defined in the CPSA."
14           Do you see that?
15      A.   Yes.
16      Q.   And then West Bend gives its response in
17  which it gives the standard denials of all of the
18  CPSC's allegations, right?
19      A.   Yes.
20      Q.   Now, we talked earlier about how
21  settlement agreements posted in the Federal Register
22  is some kind of public statement that the CPSC can

1  give that helps firms determine whether they have to
2  report, right?
3      A.   Right.
4      Q.   Reviewing this, does this sound like a
5  similar fact pattern to what we have in our case?
6      A.   Well, it's a similar fact pattern.  West
7  Bend of course denied the allegations.  West Bend
8  settled rather than litigating to see what a court
9  would determine.  I don't know whether West Bend had
10  received letters from the staff in other cases
11  advising it that the risk, which is worse than this
12  risk, did not rise to the level of a substantial
13  product hazard.
14          So in the other two PI cases, there were
15  serious injuries, there were reports of second degree
16  burns and the staff tells Applica/Spectrum that this
17  product doesn't rise to the level of a substantial
18  hazard.
19          So companies come in and settle civil
20  penalty cases with the Commission all the time
21  because they don't want to litigate.  And as you
22  note, they denied the allegations and you don't know

1  why they settled.  At least I don't know why they
2  settled.  I don't know what their thought process was
3  and why they decided not to take their chance in
4  litigation.
5      Q.   But even though the company denied the
6  allegations, everything that we read in section 3 was
7  under allegations of the staff, right?
8      A.   Yes, in 2006.
9      Q.   And what we're talking about is
10  information that firms have that sheds light on what
11  the Commission considers to be a reportable issue,
12  right?
13      A.   Well, yes and no.  Spectrum had
14  information from the Commission in two cases in which
15  there were, in one case, 500 or so reports of
16  incidents.  There were serious burn injuries to
17  consumers.  There were second degree burns to
18  consumers.  If this was the Commission's thinking,
19  then why wouldn't they have converted that from a PI
20  case to a CA case and asked Spectrum to conduct a
21  recall?  Why did they close it and say, this doesn't
22  rise to the level of a substantial product hazard?

1  If I were Spectrum, I could sit there and say, well,
2  gee, the Commission must have changed its mind, they
3  thought that -- they alleged that there was late
4  reporting in this case but since this case, they must
5  have changed their minds because now we've gotten two
6  letters from the Commission saying these product
7  risks, severe burns, serious injuries, second degree
8  burns, don't rise to the level of a substantial
9  hazard.
10      Q.   So it's your testimony that Spectrum could
11  essentially ignore a public statement where the CPSC
12  is saying carafe handle failures, even if it only
13  leads to minor cuts and burns, are reportable?
14          MR. MULLIN:  Objection to the form of the
15  question.
16          THE WITNESS:  I didn't say that Spectrum
17  could ignore it.
18  BY MR. ROSS:
19      Q.   So Spectrum should consider it?
20      A.   Spectrum should consider it.
21      Q.   But you're saying given the fact that they
22  got letters in other cases, they just can assume that

1  this does not actually state that they should report,
2  right?
3      A.   I think they take into account the full
4  body of the information that they have and make an
5  informed decision as to whether they believe they
6  have a reporting obligation.  And if they've gotten
7  letters from the Commission that says serious burns,
8  scalds, second degree burns do not rise to the level
9  of a substantial hazard and you don't need to take
10  any action, you don't have to recall the product,
11  that that's something that they seriously should take
12  into consideration along with this and any other
13  settlements, because they've been specifically
14  informed by the staff that these risks do not rise to
15  the level of a substantial hazard.
16      Q.   And by risk, you're talking about
17  injuries, right?
18      A.   I'm talking about hot water contacting the
19  skin of consumers.
20      Q.   Which can happen in any number of
21  different ways, right?
22      A.   It can happen in any number of different

Page 222

1  ways but the results can be the same.  When hot
2  liquid contacts your skin, a variety of things can
3  happen.
4     Q.   So the failure mode doesn't matter in
5  assessing risk?
6     A.   Failure mode is a factor to take into
7  account.
8     Q.   What I'm trying to understand is, so
9  you're saying Spectrum can decide that even though
10 the CPSC has come out publicly and said carafe handle
11 failures leading to minor burns or cuts are
12 reportable, Spectrum can say, well, because we got a
13 letter in a different case involving a different
14 coffee maker and a different failure mode, we don't
15 have to report?
16    A.   I think Spectrum can look at the letters
17 that they got because they were specific as to
18 Spectrum products.  They can look at the risk that
19 was presented in those two cases which is a lot worse
20 in my opinion than a carafe handle cracking or
21 breaking or splitting.  When you've got steam being
22 ejected onto consumers' faces and onto their bodies

Page 223

1  and you've got second degree burns, reports of second
2  degree burns and serious injuries, they'll take that
3  into consideration in deciding whether they have a
4  reporting obligation in the instant case.
5     Q.   So in your mind, is this just another
6  aberration?
7     A.   This is a piece of information that
8  Spectrum certainly can take into consideration in
9  deciding whether it has an obligation to report.
10 This is not definitive by any means because it's a
11 settlement.
12    Q.   And in your mind, it's not a statement by
13 CPSC that it considers carafe handle failures to be
14 reportable?
15    A.   In this case, the Commission took the
16 position that carafe handle failures in this case
17 were reportable.  In other cases, the Commission
18 staff has taken the position that carafe handle cases
19 do not rise to the level of a substantial product
20 hazard and would lead me to conclude that the staff
21 doesn't believe that it's a "could create substantial
22 product hazard" situation.

Page 224

1     Q.   So you're saying the cases are
2  inconsistent?
3     A.   I'm saying that the Commission has been
4  inconsistent in its approach to coffee maker burn
5  risks.
6     Q.   In your view of what a company can
7  reasonably rely on in deciding whether to report, are
8  you saying that notices that that company receives,
9  and that company alone, should be given more weight
10 than public statements to the industry at large?
11    A.   Well, a public statement in the context of
12 a settlement, I'm not sure how much that means.  It
13 gives the staff view in the allegations that they
14 think carafe handle breakage is reportable and if a
15 company doesn't report in a timely manner, the staff
16 believes that that's a violation of the reporting
17 obligation.
18         West Bend didn't agree with the staff's
19 conclusions, settled the case, and now Spectrum's got
20 specific information about its coffee makers and how
21 the staff views risk and makes a decision based on
22 the information that it has available.  And that's

Page 225

1  where the government will disagree or disagrees with
2  the conclusions that Spectrum reaches and that's why
3  you're in court with them.
4     Q.   Do you think that the filing of this
5  lawsuit gives companies notice that the CPSC believes
6  carafe handle failures should be reported?
7     A.   It gives notice to companies that the
8  Commission staff believes that in this case, Spectrum
9  should have reported these carafe handle failures and
10 we'll find out whether the government is right or
11 whether the company is right at the end of the day.
12    Q.   So it's specific to the facts of this
13 case?  I'm just trying to understand --
14         MR. MULLIN:  Let him answer your question.
15         THE WITNESS:  It doesn't have to be
16 specific to the facts of this case.  This Spectrum
17 case, the government is saying that it believes that
18 these carafe handle failures were a defect that rose
19 to the level that could create a substantial product
20 hazard and should have been reportable, should have
21 been reported by Spectrum.  Spectrum disagrees.
22 BY MR. ROSS:

57 (Pages 222 to 225)

1      Q.   Just quickly, I would like to put in what
2   I'm marking as Government's Exhibits 88 and 89.
3            (Government Exhibit Nos. 88 and 89
4            were marked for identification.)
5   BY MR. ROSS:
6      Q.   By the way, do you know whether Spectrum
7   weighed this case in 2012?
8      A.   Yes.
9      Q.   I'm talking about West Bend in deciding
10  whether to report.
11     A.   Did Spectrum weigh the West Bend case?  I
12  don't know.
13     Q.   And do you know --
14     A.   It's among the litany of things that Nigel
15  Stamp said that the company considers.
16     Q.   Assuming of course that the company
17  actually did consider, before March 2012, whether
18  they needed to report this issue, right?
19     A.   Right.
20     Q.   I mean, because you don't -- just sitting
21  here today, and it's not an accusation, I'm just
22  trying to ascertain a fact -- you don't know whether

1   or not the company ever considered, prior to March
2   2012, whether this issue should be reported?
3      A.   That's right.  I said I wasn't privy to
4   their discussions.
5      Q.   So I've marked Government Exhibits 88 and
6   89 which both relate to the West Bend settlement.  Do
7   you see that?
8      A.   Yes.
9      Q.   And 88 is a screen shot of the press
10  release that CPSC issues on its website, right?
11     A.   Looks like it, yes.
12     Q.   And the CPSC tends to issue press releases
13  when it comes to settlements, right?
14     A.   Yes.
15     Q.   So somebody who is online could pull up
16  this fairly easily, right?
17     A.   Yes.
18     Q.   And if you look at 89, even today, if you
19  Google -- if you put coffee maker handle into the
20  search bar on the CPSC website, West Bend pops up on
21  the very first page in .03 seconds.  Do you see that?
22     A.   Uh-huh.

1      Q.   So if a firm was trying to consider
2   whether it needed to report carafe handle failures,
3   it would be fairly easy for it to go online and find
4   another case in which the CPSC considered this issue,
5   right?
6      A.   Yes.
7      Q.   And that's among the information that the
8   firm should consider in deciding whether it should
9   report, right?
10     A.   Yes.
11     Q.   And whether the firm ultimately reports is
12  going to depend on other information it has too,
13  right?
14     A.   Yes.
15     Q.   And depending on the specific information
16  that that company has based on past dealings with the
17  CPSC, it's your testimony that the obligation to
18  report might arise for some companies but not for
19  others?
20     A.   It's fact based.  Companies have to make a
21  decision whether they believe they have a reporting
22  obligation.  It's interesting that there were some

1   other -- I don't recall if it was PI or RP cases with
2   carafe handle breakage cases where consumers were
3   being struck with hot liquid.  And the staff closed
4   those cases and said it doesn't rise to the level of
5   a substantial hazard.
6            And again, how is the company supposed to
7   know where the Commission is coming from if it brings
8   cases in one case, bringing civil penalty actions in
9   one case and in other cases on similar facts or
10  similar risk, it's closing the cases and saying it
11  doesn't rise to the level of a substantial product
12  hazard?  That makes it really hard for companies to
13  know what the Commission expects from them.
14     Q.   Well, you base your analysis on the facts
15  of that particular case, right?
16     A.   Well, you base it on the facts of that
17  case but I also look at the risk that's presented by
18  the product.  If carafe handles are breaking,
19  slipping and hot liquid is spilling, I would think
20  generally at least that the risk is the same in each
21  of those cases, if it's a, you know, counter top
22  coffee maker.  It might be a little different than a

1    space saver coffee maker.
2        Q.   And is the risk different depending on
3    whether the handle separates a little or it falls off
4    completely?
5        A.   It might.
6        Q.   And is the risk different depending on
7    whether 1 in 100 units fails versus 1 in 10,000 units
8    fails?
9        A.   You would look at the likelihood of
10   injury, is one of the factors that you would take
11   into account, but you're looking more at not whether
12   it breaks but what the risk of injury is as a result
13   of that breakage.
14       Q.   So even if a coffee maker breaks 1 in
15   10,000 times, if there is a risk of serious injury
16   from that, that's something that might be reportable?
17   And when I say reportable, I mean it might be
18   something that has to be reported?
19       A.   It might be.  Again, you have to take into
20   account, not in isolation, but take into account all
21   the information that the company has in its
22   possession.

1        Q.   I'm going to show you a document that I'm
2    marking as Government Exhibit 90.
3            (Government Exhibit No. 90 was
4        marked for identification.)
5    BY MR. ROSS:
6        Q.   Is this among the case files you
7    considered, case file RP090279?
8        A.   If it was on the spreadsheet that you
9    provided to Spectrum's counsel and if there were
10   documents associated with it, then yes, it's a case
11   that I would have looked at.
12       Q.   Well, I notice it's not listed on your
13   materials considered list.  Are you certain that you
14   looked at this case?
15       A.   I can't be certain if it's not on my list
16   of -- I'm just looking at page 15 where I also listed
17   some cases.
18       Q.   Now, in this case, I'm talking about the
19   case that gave rise to the lawsuit at bar, the
20   government's allegations in counts 1 and 2 of the
21   complaint are that Spectrum failed timely to report
22   the issue of the coffee handles, right?

1        A.   Right.
2        Q.   This was a Fast Track case, so there was
3    no preliminary determination of substantial product
4    hazard made, right?
5        A.   Right.
6        Q.   And in fact, in none of the cases that
7    Spectrum or Applica reported themselves was a
8    substantial product hazard found because all those
9    cases were Fast Track cases, right?
10       A.   Right.
11       Q.   So in a Fast Track case, there can be a
12   reporting violation despite the fact that no Fast
13   Track cases result in preliminary determinations,
14   right?
15       A.   Right.
16       Q.   The question is whether the hazard could
17   create a substantial product hazard based on the
18   defect, right?
19           MR. MULLIN:  Object to the form of the
20   question.
21           THE WITNESS:  Yes.
22   BY MR. ROSS:

1        Q.   And you've testified before that the
2    company's dealings with the CPSC in prior cases
3    should inform the company's decision of whether to
4    report, right?
5        A.   They should take that into account, yes.
6        Q.   Now, this letter is dated June 24th, 2010,
7    right?
8        A.   Yes.
9        Q.   So this would have been almost two years
10   before Spectrum reported the coffee makers in this
11   case, right?
12       A.   Right.  And I haven't read this letter so
13   I'm -- the response to the question is I haven't read
14   this letter.
15       Q.   My question was about date, at least the
16   first one.  The first paragraph reads -- well, I'm
17   going to summarize.  The CPSC staff has started an
18   investigation to determine whether Applica Consumer
19   Products, Inc. has complied with the reporting
20   requirements of Section 15(b) of the CPSA regarding
21   certain Black & Decker brand Spacemaker coffee makers
22   that were involved in the CPSC File Number RP090279

1  and were recalled by the firm on June 23, 2009.
2      Do you see that?
3      A.  Yes.
4      Q.  So in June 2010, Spectrum was informed
5  that they were being investigated for a potential
6  timeliness violation under section B, right?
7      A.  Right.
8      Q.  And this case also involved Spacemaker
9  coffee makers, Black & Decker brand, right?
10     A.  Right.
11     Q.  Does any of this ring a bell?  Do you
12 remember reviewing this case?
13     A.  Yeah, is this the second PI case, the
14 0725?
15     Q.  Nope.
16     A.  Or is this a different case?
17     Q.  This is one of the cases that Applica
18 reported.
19     A.  I'm just looking to see if it's in my
20 document list which you said it was not.  I don't
21 know if I -- I don't recall if I read this letter
22 because it's not in the list of documents that I

1  listed as having reviewed.  So I don't think I saw
2  this letter.
3      Q.  Now, this is a prior CPSC case involving
4  Applica, right?
5      A.  Right.
6      Q.  So under your analysis, Applica would be
7  reasonable in relying on this interaction with staff
8  in determining whether it needed to report the carafe
9  handle issue, right?
10     MR. MULLIN:  Object to the form of the
11 question.
12     THE WITNESS:  Well, this says that the
13 staff is investigating whether Applica -- whether it
14 believes Applica reported in a timely manner.
15 BY MR. ROSS:
16     Q.  Does staff typically investigate
17 timeliness violations if it doesn't believe under any
18 circumstances the firm should have had to have
19 reported?
20     A.  Well, it has to have some reasonable cause
21 to believe that there may have been a reporting
22 violation before it investigates.  I would think that

1  the staff would have some reasonable basis to believe
2  there may be a violation.
3      Q.  Would a firm receiving a letter like this
4  about a coffee maker be reasonable to think that
5  perhaps coffee makers present hazards that should be
6  reported?
7      A.  I think they would have to take this into
8  consideration but Applica might have looked at this
9  and said, fine, the staff is investigating, we'll
10 provide them all the information that they're asking
11 for, but we don't think we had a reporting
12 obligation.
13     Q.  They might have thought that but you don't
14 know that they did, right?
15     A.  I don't know that they did.
16     Q.  But this is a CPSC communication telling
17 the firm that they are being investigated for a
18 timeliness violation involving a coffee maker
19 presenting a burn hazard, right?
20     A.  Yes.
21     Q.  So this is after both of those two PI
22 cases on which Spectrum reasonably relied, right?

1      A.  Yes.  Or I said they could have reasonably
2  relied.
3      Q.  They could have reasonably relied?
4      A.  Yes.
5      Q.  Among other information?
6      A.  Right.
7      Q.  Now, in June 2010, Spectrum was receiving
8  significant numbers of complaints about carafe handle
9  failures, right?
10     A.  In which case?
11     Q.  Well, there is only one -- in the carafe
12 handle failures case.
13     A.  Yes.
14     Q.  So when Applica receives a letter saying
15 you're being investigated for this kind of potential
16 hazard, in assessing whether it should report the
17 carafe handle issue, it should take this into account
18 under your analysis, right?
19     A.  It should take it into account but it
20 doesn't mean that it has a reporting obligation, so
21 they can account for it in any number of ways.
22     Q.  Just like they can account in any number

1  of ways the two PI cases, right?

2     A.  Yes.

3     Q.  And you're not making an assessment that

4  that case was materially different in terms of the

5  hazard of this case, right?

6     A.  Right.  And I don't know if this case is

7  still going on.  I don't know if this case has been

8  concluded.  I don't know if they got a letter that

9  says we're not pursuing any civil penalty.

10      I'm kind of dealing with this in the

11  abstract, that if they got a letter subsequent to

12  this that says we closed our investigation, that's

13  also a piece of information that they can take into

14  account.  If the investigation is still open, then

15  that's a piece of information they have to take into

16  account.

17      And Applica -- and I can't speak for them

18  because I don't know what's in their minds but they

19  could very well believe that they didn't have a

20  reporting obligation in this case, Government

21  Exhibit 90, or in the instant case that's in

22  litigation, and that may be their position that they

1  don't have a reporting obligation in either case

2  because they don't believe that they met the

3  threshold criteria for reporting.  And if the

4  Commission still has this as an open case and wants

5  to litigate with Spectrum on this case, then I

6  suppose they could do that too.

7     Q.  I just want to establish what you're

8  saying in terms of firms -- what they must do.  In

9  deciding whether or not a reporting obligation arose

10  in this case, you're saying Applica should have sat

11  down and considered not only the information in this

12  case but the information from the two PI cases, from

13  this particular RP case and all other information it

14  had relating to coffee hazards, right?

15     A.  Right.

16     Q.  So absent that information, like the

17  information from this case, you personally cannot

18  make a determination of whether Applica should have

19  reported, can you?

20     A.  I can only make my determination based on

21  the documents that I reviewed.

22     Q.  And in order to make a determination

1  consistent with your own standard that you set forth

2  in your report, you would need more information

3  including information from this case, right?

4     A.  It would be helpful if I had all of this

5  information.

6     Q.  I'm going to show you what's previously

7  been marked as Government Exhibit 28.

8      MR. MULLIN:  Is this a good time for a

9  quick break?

10      MR. ROSS:  Sure.

11      (Recess.)

12  BY MR. ROSS:

13     Q.  Mr. Schoem, I'm going to hand you what's

14  been previously marked as Government Exhibit 28.

15      Mr. Schoem, we talked about incident

16  notifications and investigation reports earlier,

17  right?

18     A.  Yes.

19     Q.  And have you seen this document before?

20     A.  I don't recall that I've seen it.

21     Q.  Well, does this appear to be a CPSC letter

22  forwarding an epidemiologic investigation report

1  regarding a carafe handle failure involving the

2  coffee makers in this case?

3     A.  Yes.  And to the best of my knowledge,

4  I've not seen this previously.

5     Q.  And this was sent to Applica on June 30th,

6  2009 and you see there is a received stamp at the top

7  that says July 6, 2009?

8     A.  Yes.

9     Q.  And if you take a look through it, you'll

10  see that there is a narrative.  Do you see that?

11     A.  What page are you looking at?

12     Q.  SB078149.

13     A.  Yes.

14     Q.  And there is a decently long narrative and

15  one of the sentences says, "On the morning of

16  March 30, 2009, the complainant began brewing

17  approximately 10 cups of coffee in the incident

18  coffee maker.  Upon completion of the brewing, she

19  grabbed the handle of the carafe and removed it from

20  the warming plate."

21      Do you see that?

22     A.  Yes.

Page 242

1     Q.   And that's sort of how you would expect
2   someone to brew a pot of coffee and then grab it off
3   the coffee maker, right?
4     A.   Yes.
5     Q.   It continues, "While the complainant was
6   holding the carafe, the handle suddenly failed
7   causing hot coffee to spill on the kitchen
8   countertop, floor, and the complainant's hand and
9   foot," right?
10    A.   Yes.
11    Q.   "She explained that the plastic handle,
12  which appeared to be secured by one screw, had
13  detached which resulted in the carafe of hot coffee
14  to drop onto the countertop and spill."  And then she
15  goes on to say that she had minor burns and she
16  didn't need medical attention, et cetera.
17       Do you see all of that?
18    A.   Yes.
19    Q.   Now, this is another piece of information
20  that the company should have considered in deciding
21  whether to report the carafe handle case, right?
22    A.   Yes.

Page 243

1     Q.   Because this is a letter from the CPSC
2   attaching one of the incidents received in this case,
3   right?
4     A.   Right.
5     Q.   And there is a cover letter at the top
6   which contains the language, "The reports we have
7   provided you may - either alone or with other
8   information you may now have or may later receive -
9   reasonably support a conclusion that the product
10  contains a defect which could create a substantial
11  product hazard," and goes on to say it might be
12  reportable, right?
13    A.   Right.
14    Q.   So whether or not you agree that this is
15  ultimately reportable, there is no question that this
16  is the kind of information that the company should
17  assess, right?
18    A.   Yes.
19    Q.   And do you think it has particular weight
20  because it's coming from the Commission?
21    A.   I think you pay attention to it because
22  it's coming from the Commission but I don't know that

Page 244

1   I would give it more weight than a complaint that I
2   got directly from a consumer.  And this consumer
3   might very well complain to the company as well.
4     Q.   And this was sent to Applica three years
5   before it reported, right?
6     A.   Yes.
7     Q.   And it says, "For more information, please
8   call Mark Schoem."  Do you see that part?
9     A.   Yes.  I'm sorry, where is that?
10    Q.   Page 2.  Sorry.  Page 2.
11    A.   Of the Pam McDonald letter.
12    Q.   Well, anyways, "If you have any questions
13  regarding this letter, please email us at
14  clearinghouse@cpsc.gov."  Do you see that?
15    A.   Yes.
16    Q.   And it's just basically inviting the
17  company to contact the Commission and it has your
18  brother's name and phone number up at the top, right?
19    A.   Yes.
20    Q.   You didn't review this document in forming
21  your conclusions in this case?
22    A.   No.  Not that I'm aware of anyway.

Page 245

1     Q.   Do you know how many different incident
2   reports the company received from the CPSC alleging
3   carafe handle failures in the coffee maker at issue
4   in our case?
5     A.   No.
6     Q.   Do you know whether Spectrum or Applica
7   ever called the CPSC to discuss this issue?
8     A.   No.  And they're not required to call the
9   Commission.  If they want more information on
10  reporting, it says please call Mark Schoem but if --
11  again, we're both speculating, I guess.  If they felt
12  they had sufficient information to understand the
13  reporting obligation, they wouldn't have needed to
14  call Mark Schoem.
15    Q.   My question is, if they had wanted clarity
16  on whether they had to report this issue, they could
17  have called Mark, right?
18       MR. MULLIN:  Object to the form of the
19  question.
20       THE WITNESS:  They might have been clear
21  on their reporting obligation without contacting Mark
22  Schoem.

62 (Pages 242 to 245)

Page 246

BY MR. ROSS:

1  Q.  I'm saying if they wanted to, they could
2  have called the Commission and discussed this issue?
3  A.  They could have.
4  Q.  And do you think Mark Schoem would have
5  had that discussion with them?
6  MR. MULLIN:  Object to the form of the
7  question.
8  THE WITNESS:  I can speculate.  Probably.
9  BY MR. ROSS:
10 Q.  He's not among the people at the CPSC who
11 would have lacked the self-confidence to discuss
12 whether a case should be reported, right?
13 A.  Right.
14 Q.  He was pretty assertive in his opinions,
15 right?
16 A.  Yes.
17 Q.  And he has a pretty decent understanding
18 of the reporting requirements, right?
19 A.  Yes.
20 Q.  So if there was doubt, they could have
21 called?  That's all I'm asking.

Page 247

1  A.  They could have.
2  I will note that when companies called,
3  they usually called anonymously.  In my experience,
4  they didn't identify -- they usually have their
5  lawyers call.
6  Q.  Looking back at your report, please,
7  page 13, Exhibit 85.
8  A.  Yes.
9  Q.  Now, you reference PI050023, the Home Cafe
10 case, right?
11 A.  Yes.
12 Q.  And you also mention PI070025, right?
13 A.  Yes.
14 Q.  And those are two of the cases you say
15 that Spectrum could have and perhaps should have
16 considered in deciding whether to report carafe
17 handle failures, right?
18 A.  Yes.
19 Q.  In addition to the West Bend settlement,
20 right?
21 A.  Yes.
22 Q.  In addition to the incident reports that

Page 248

1  were received from the CPSC, correct?
2  A.  Yes.
3  Q.  In addition to the firm's notice that it
4  was being investigated for a timeliness violation
5  regarding another Spacemaker coffee maker, right?
6  A.  Yes.
7  Q.  It's all information that you consider or
8  could consider reasonably in your opinion?
9  A.  Yes.
10 Q.  Now, in PI050023, you've noted that there
11 were allegations of serious burns in that case,
12 right?
13 A.  Yes.
14 Q.  And were those serious burns caused by
15 coffee?
16 A.  They were caused, to my recollection, by
17 hot liquid spilling, probably coffee, yes, spilling
18 on the consumer.
19 Q.  Do you know whether the coffee maker or
20 the liquid in that case was of a different
21 temperature than the liquid in our case, the instant
22 case?

Page 249

1  A.  No.
2  Q.  Do you know whether the volumes of liquid
3  that were being spilled on people or could have been
4  spilled on people in that case are different from the
5  volumes at issue in our case?
6  A.  Bear with me one minute.
7  I can't recall offhand what the incidents
8  were in that case and whether they were -- it seems
9  to me it was hot liquid being spewed forth from a
10 pot. I don't -- you can help me if you want.  I
11 don't remember if this is the pod case or not with
12 hot liquid spilling out.
13 Q.  My question is, is it the type of liquid
14 or the temperature and volume that determines the
15 potential injury?
16 A.  It's the temperature and volume.
17 Q.  So if it was the same temperature and
18 volume in the two cases and if it were to spill on
19 the consumer in both cases, the extent of possible
20 injury would be the same, wouldn't it?
21 A.  Yes.  But that also would allow Spectrum
22 to look at how the Commission handled 0023 where it

63 (Pages 246 to 249)

| Page 250 | Page 252 |
|---|---|

**Page 250**

1 closed the cases concluding no substantial product
2 hazard, but the incidents that Spectrum was getting
3 in the instant case were not of the same nature as
4 the incidents that were getting in 0023.
5     Q.   Now, you said the risk in this case is
6 greater, right, than the current case?
7         MR. MULLIN:  Object to --
8         THE WITNESS:  In 0023, I said that the
9 injuries appeared to be more severe and more serious.
10 BY MR. ROSS:
11     Q.   Well, the injuries were more severe; I'm
12 asking about the risk.  Is the possible injury from a
13 carafe handle falling off and spilling hot coffee on
14 somebody different from the risk of an injury posed
15 by the failures that were occurring in this case also
16 involving hot coffee?
17     A.   If this case was a pod case, I mean, my
18 opinion, and it's my personal opinion, would be that
19 the carafe case is less risky than if I've got my
20 face near a pod that's exploding and spewing forth
21 hot liquid.
22     Q.   And are you basing that on some scientific

**Page 251**

1 literature?
2     A.   Nope.  I'm basing it on personal point of
3 view.  If I've got a carafe in my hand, it's not
4 going to be -- less likely to be near my face.  I'm
5 just thinking about the way I, as an ordinary
6 consumer, take the carafe out of a coffee maker and
7 pour it into a cup.
8     Q.   So sitting here today, you don't actually
9 know whether the failure mode in this case was
10 capable of causing more severe injuries than the
11 failure mode in the case that's the subject of this
12 lawsuit?
13         MR. MULLIN:  I'm sorry, I object to the
14 form of the question.  You used "this case" and "this
15 lawsuit" and I'm not sure what you're referring to.
16 BY MR. ROSS:
17     Q.   Sitting here today, can you say that the
18 risk of injury in PI 050023 was different than the
19 risk of injury in the carafe handle case?
20     A.   From the documents I read, it's my view
21 that the risk of injury in PI 050023 was greater than
22 the risk of injury in the instant carafe handle case.

**Page 252**

1     Q.   But you're not basing that on knowledge of
2 how hot the liquid was, right?
3     A.   I'm basing it on the incidents that were
4 reported to have occurred.
5     Q.   So you're analyzing the injuries that
6 actually happened and then comparing the cases
7 retrospectively?
8     A.   Yes.  But the incidents were coming in
9 fairly close to the beginning, I thought.  In 2008 or
10 so, the incidents started occurring and so
11 Applica/Spectrum would at least understand the nature
12 of the incidents that were occurring at that time.
13 They would presumably, if they did what they said
14 they did, have information about other injuries that
15 had occurred with other of their coffee makers that
16 were very serious and the Commission said, eh,
17 doesn't rise to the level of a substantial hazard,
18 we're closing the case, and they could have taken
19 that into consideration.
20     Q.   Now, in footnote 1 on page 14 of your
21 report -- and it might be helpful to have these two
22 exhibits, 91 and 85, next to each other just so we

**Page 253**

1 wrap up here.
2         MR. MULLIN:  I don't think you've given us
3 91.
4         MR. ROSS:  Oh, I'm sorry.  I'm going to
5 mark as Government Exhibit 91.
6         (Government Exhibit No. 91 was
7         marked for identification.)
8 BY MR. ROSS:
9     Q.   Do you recognize this document?
10     A.   Yes.
11     Q.   Is this a close letter from PI 050023?
12     A.   Yes, it is.
13     Q.   And in the first paragraph, it states,
14 "While the staff believes it was appropriate for your
15 client to report to the Commission, based upon the
16 information currently available, the staff does not
17 believe the nature and degree of the risk of injury
18 presented by this product necessitate action by the
19 Commission under Section 15."
20         Do you see that?
21     A.   Yes.
22     Q.   And it's this sentence here along with the

64 (Pages 250 to 253)

Page 254

1    information that Applica knew about this case that
2    you say they could have relied on in deciding whether
3    to report the carafe handle failures, right?
4        A.   Not so much this sentence because if I
5    were Spectrum/Applica and I had gotten this letter, I
6    might scratch my head, at least the lawyers might
7    scratch their heads and say, well, we didn't
8    proactively report.
9            I think this is -- as I said in my
10   footnote, I think this is the wrong letter.  It's
11   boilerplate when a company affirmatively reports to
12   the Commission under the conventional program, the
13   staff evaluates, reaches the conclusion that the risk
14   doesn't rise to the level of a substantial hazard and
15   they send them this letter.  It's not the letter that
16   I've seen or that, when I was at the Commission, that
17   we would use when the staff was closing a PI case or
18   a CA case.
19       Q.   So you're saying that Applica, upon
20   receiving this letter, reasonably could assume that
21   this was just a wrong letter?
22       A.   They reasonably could assume that, well,

Page 255

1    what the staff is talking about is that it was nice
2    of you to report in response to our request that you
3    report.  So it could be the staff believes it's
4    appropriate for your client to report to the
5    Commission.  Well, the only reason Applica reported
6    to the Commission in this case is because the staff
7    sent them a letter saying we initiated an
8    investigation, please submit a full report.
9        Q.   So you think when Applica sees a letter
10   that says Section 15(b) of the CPSC, 15 USC 2064(b),
11   it should assume it means something other than
12   Section 15(b) of the CPSA, 15 USC 2064(b)?
13          MR. MULLIN:  Object to the form of the
14   question.
15          THE WITNESS:  That's not quite what I'm
16   saying.  Kerrie Campbell is an experienced
17   practitioner before the Commission and she knew that
18   the company had not proactively reported to the CPSC.
19   When she got this letter -- if I had received this
20   letter -- if this had been my client and I had
21   received this letter, I would have said to the
22   client, well, they're closing the investigation, they

Page 256

1    found no substantial product hazard but it looks like
2    they sent the wrong letter or it's the wrong
3    boilerplate because you didn't proactively report to
4    the Commission, you reported in response to the
5    staff's request for a report.
6    BY MR. ROSS:
7        Q.   So this is another situation where the
8    firm got information and you think there might be a
9    reasonable basis to not place much weight on it?
10       A.   Not place weight on the sentence that
11   says, "While the staff believes it was appropriate
12   for your client to report," because again, the client
13   reported in response to the staff request.  This is a
14   management issue at CPSC where compliance staff need
15   to be trained on using the right form letter for the
16   right types of cases.
17       Q.   So the words "it was appropriate to
18   report" means you don't need to report --
19       A.   No, it -- sorry.
20          MR. MULLIN:  Object to the form of the
21   question.
22          THE WITNESS:  Didn't mean to overtalk you.

Page 257

1    It means it was appropriate to report in response to
2    the staff's request that you submit a report.
3    BY MR. ROSS:
4        Q.   That's your assumption, right?
5        A.   That's what happened.
6        Q.   That's not what the letter says.
7            MR. MULLIN:  Object to the form of the
8    question.
9    BY MR. ROSS:
10       Q.   I'm just asking if it's your
11   interpretation of what this letter is or if that's
12   what the letter actually says.
13       A.   The letter doesn't say you had an
14   obligation to report.  It doesn't say you were
15   required to report.  This company reported in
16   response to the staff request, so I think a
17   reasonable interpretation is while the staff believes
18   it appropriate for your client to report, it's to
19   report in response to the request of the staff that
20   you submit a report.  That's how this came about.
21       Q.   I would like to ask you a couple of
22   questions about page 15 of your report, please.  Is

65 (Pages 254 to 257)

1  this this the section of your report where you talk about
2  the other Section 15 cases of which Applica had no
3  knowledge?
4      A.  Yes.
5      Q.  And you testified before that because it
6  had no knowledge of them, it couldn't reasonably rely
7  on them, right?
8      A.  That's correct.
9      Q.  Now, in looking at these cases, did you do
10 some sort of statistical analysis comparing the
11 incidents and injuries in each case?
12     A.  No.
13     Q.  And yet you've come to the conclusion that
14 the risk of injury in each case is consistent, right?
15     A.  Well, the staff presumably did a risk
16 analysis in assessing the risk in these cases because
17 the staff knew how many products were in the
18 marketplace.  It knew that it had some number of
19 incidents with each of those cases.  It knew that
20 there could be additional future incidents of the
21 same nature with this product.
22         If there was a defect in the product, then

1  there was a defect in all of the products.  And if
2  the staff was concerned about this defect manifesting
3  itself in a way that presented a significant risk of
4  injury, it presumably wouldn't have closed these
5  cases but instead would have said, we're converting
6  these to CA cases and we want you to do a recall.
7      Q.  So you didn't do an analysis, but you're
8  inferring that based on what staff ultimately did in
9  these cases, right?
10     A.  Well, the staff has a PD form and that's
11 their risk analysis.  That's the analysis that the
12 staff has done of the risk presented by these
13 products.
14     Q.  So you didn't do a statistical analysis
15 but you're inferring that these are all consistent
16 risks based on the CPSC staff's ultimate disposition
17 of each case, right?
18     A.  That's their ultimate disposition and
19 their rationale for the disposition.  In each of
20 those cases, the staff believed that there was a
21 defect.  In each case, they said the defect doesn't
22 rise to the level of a substantial product hazard,

1  we're closing the case.
2          Again, that's where the hazard
3  classification comes into play in that the staff
4  should be consistent in its decision making when
5  there are the same or essentially identical or
6  similar risks presented.  In each of these cases, the
7  risk was hot liquid contacting the consumer's skin.
8  And in each of those cases, with that one exception,
9  the staff concluded that the hot liquid contacting a
10 consumer's skin doesn't rise to the level of a
11 substantial hazard even though there may have been
12 medical injuries, medical treatment.
13     Q.  I'm listening.  Was that your whole
14 answer?
15     A.  That's my answer.  I'll wait until you're
16 done.
17     Q.  So staff had a consistent methodology in
18 risk analysis that applied in all these cases and
19 then suddenly it applied something different in
20 RP090423, is that your estimation?
21     A.  That's what it appears to have done.
22     Q.  And again, you're inferring that based

1  upon the ultimate disposition of this case as opposed
2  to the other seven or eight that you considered,
3  right?
4      A.  I'm basing it on the documents that I
5  reviewed in this case.
6      Q.  Which were the preliminary determination
7  forms, right?
8      A.  Well, there were some other documents in
9  there.  There was full report information, there was,
10 in some cases, incident information.
11     Q.  And you reviewed all those documents?
12     A.  Yes.
13     Q.  And you performed some sort of risk
14 analysis yourself where you compared information from
15 each case to determine that they were consistent?
16     A.  I didn't do a statistical or a formal
17 analysis.  I made notes of how many incidents were in
18 each case.  I made notes of how many products were
19 involved in each case.
20         But ultimately what I was looking at is
21 what's the risk.  The risk is hot liquid contacting a
22 consumer's skin.  In some cases, it might be from a

66 (Pages 258 to 261)

Page 262

1  pod exploding.  In other cases, it might be from a
2  carafe handle breaking.  And again, what was
3  consistent, with one exception, was the way the staff
4  treated those cases.
5        You know, it was interesting -- there were
6  just a number of different compliance officers who
7  handled those different cases and they all came to
8  the same conclusion with one exception.
9     Q.   Is it your testimony that the CPSC has a
10  policy that hot liquid contacting skin cannot be a
11  substantial product hazard?
12     A.   No, I didn't say that.  In these cases,
13  the Commission staff concluded that hot liquid
14  contacting skin from coffee makers did not rise to
15  the level of a substantial product hazard.  Could
16  there be a different case, different circumstances?
17  Perhaps.
18     Q.   So at the end of the day, is your opinion
19  anything other than certain cases were consistent and
20  one case was inconsistent?
21        MR. MULLIN:  Object to --
22  BY MR. ROSS:

Page 263

1     Q.   Is that just the sum total of this
2  opinion?
3        MR. MULLIN:  Object to the form of the
4  question.
5        THE WITNESS:  In the coffee maker cases,
6  the staff's position was consistent that hot liquid
7  contacting consumer's skin causing -- resulting in
8  scalding, whatever that term means, but they use the
9  term scalding, resulting in burns, resulting in first
10  degree burns and resulting in second degree burns did
11  not rise to the level of a substantial product
12  hazard.  And the staff closed seven or eight or nine
13  cases.  And in one case, they made a preliminary
14  determination of hazard and sought a recall.
15  BY MR. ROSS:
16     Q.   And that's all just factual information in
17  your opinion?
18     A.   It's all factual information but I think
19  it's something that companies -- there sure is a
20  pattern among the compliance staff that it doesn't
21  think hot liquid from coffee makers contacting
22  consumer's skin is particularly hazardous.  And in

Page 264

1  fact, there was -- in one of the cases, and I think
2  it was in the one that ends in 27, the engineer is
3  basically saying why are you sending me more hot
4  water contact cases?  You know, this isn't a problem
5  and we've checked with health sciences and they don't
6  think it's a problem.
7     Q.   Are you sure that that characterization of
8  that document is accurate?
9     A.   All I can tell you is what I read in the
10  document.  That's what the document says.
11     Q.   What was the temperature of the liquid
12  discussed in that document?
13     A.   He says it would help to know what the
14  temperature is and there was some back and forth
15  about, well, have you gone to human factors or have
16  you gone to health sciences to evaluate that
17  information?
18     Q.   Are you sure he doesn't say exactly how
19  hot the water was in that document?
20     A.   I don't recall him saying exactly how hot
21  the water was.
22     Q.   Do you recall he said that the water was

Page 265

1  close to 150 degrees?
2     A.   I don't recall that.
3     Q.   Do you know how that compares to the
4  coffee makers in this case?
5     A.   No.
6     Q.   Do you know what the medical literature
7  says hot water can do to skin at 150 degrees as
8  opposed to 190 degrees?
9     A.   No, but regardless of what it says, the
10  water presumably in some of these other cases that
11  the Commission closed -- and I don't know whether
12  they did that assessment as to how hot the water got.
13  All I can look at is the documents and the decisions
14  that the Commission compliance staff made that it was
15  closing these other cases.
16     Q.   So you don't think it would be relevant
17  whether the water in one case was hotter than the
18  other in terms of the risk the coffee maker
19  presented?
20     A.   I don't see that the staff took that into
21  account, at least in the documents that I reviewed.
22     Q.   So is it now CPSC policy that the

67 (Pages 262 to 265)

Page 266

1  temperature of the water doesn't matter in
2  determining the risk of scalding --
3      A.  I don't know --
4      Q.  -- which, by the way, means burn caused by
5  hot liquid.
6      A.  You would have to ask CPSC if that's what
7  they believe.
8      Q.  In order to do that, I could call somebody
9  like your brother when he was still there, right?
10     A.  I don't think he would know.  He's not a
11 physiologist.  You would have to go to somebody in
12 health sciences and ask them.
13     Q.  Sitting here today, you are not a medical
14 doctor, right?
15     A.  Nope.
16     Q.  And you haven't read any literature on the
17 potential injuries from hot water or any kind of
18 liquid, right?
19     A.  I read one document that talked about
20 scalds, but I only skimmed it.  It was the -- let me
21 see if I can identify it.  The econometric report,
22 Scald Hazards.

Page 267

1      Q.  Which doesn't discuss temperature at all,
2  does it?
3      A.  I don't recall.
4      Q.  So sitting here today, you can't say
5  whether water temperatures at the -- strike that.
6          Sitting here today, you can't say that
7  coffee at the temperature of volumes these coffee
8  makers were designed to achieve can cause serious
9  burns or serious injury as those terms are used in
10 the CPSA?
11     A.  I can't say that and I didn't see in any
12 of the PDs that the staff made that I reviewed, I
13 don't recall them talking about the temperature of
14 the water was an issue or a reason or a factor in why
15 they closed those cases.  All I can do is base my
16 information on what I read.
17     Q.  And if what you read doesn't include all
18 pertinent information, then what kind of conclusions
19 can you actually draw?
20     MR. MULLIN:  Object to form.
21 BY MR. ROSS:
22     Q.  Other than the firm in your opinion is

Page 268

1  entitled to rely on things that the CPSC says?
2      MR. MULLIN:  Object to the form of the
3  question.
4      THE WITNESS:  I don't know whether the
5  government produced all of the documents that were
6  requested in this case so that I could have read --
7  if you're suggesting there are additional documents
8  that I didn't have access to that would lead me to
9  reach a different conclusion than I reached, then
10 it's correct, then -- if in fact there are other
11 documents that I didn't read, then, sure, if I read
12 those documents, maybe I would reach a different
13 conclusion.
14         But I'm not aware of those documents, I
15 didn't see those documents, and so my analysis, my
16 opinion, my report is based on the documents that I
17 did in fact review.  And I thought the government had
18 provided all the documents in the closed cases with
19 that one exception where I didn't see any documents.
20     Q.  Can you look at page 16, please?
21         Do you see the paragraph that starts with,
22 "Spectrum was on notice"?

Page 269

1      A.  Yes.
2      Q.  Now, you're an attorney, right?
3      A.  Yes.
4      Q.  And in the law, notice is a loaded word,
5  isn't it?
6      MR. MULLIN:  Object to the form of the
7  question.
8      THE WITNESS:  I wasn't using it in a legal
9  sense.
10 BY MR. ROSS:
11     Q.  So when you're saying notice here, you're
12 not arguing that Spectrum had notice in a due process
13 sense, are you?
14     A.  No, I'm just saying that they were
15 informed.
16     Q.  Aware of or something like that?
17     A.  Aware of, yes.
18     Q.  In the last sentence of that paragraph,
19 "There is no evidence that staff communicated with
20 Spectrum a different position in the relevant time
21 period."  Do you see that?
22     A.  Yes.

68  (Pages 266 to 269)

Page 270

1    Q.   Now, when you wrote that sentence, you
2  weren't taking into account the epidemiologic
3  investigation report that staff sent to them, right?
4    A.   Right.
5    Q.   And you weren't taking into account the
6  June 24th, 2010 investigation letter saying that they
7  were under investigation for a potential timeliness
8  violation, right?
9    A.   Wait, can we up on that though?  Because
10 I'm saying there is no evidence that the staff
11 communicated with Spectrum a different position in
12 the time period, which is not -- I mean, that -- that
13 epidemiologic report is not the staff taking a
14 different position with respect to the significance
15 of burns.  They're passing on to the company an
16 in-depth investigation that they had conducted of a
17 consumer who said her carafe handle broke and she
18 received a minor burn.
19    Q.   You're not saying here that Spectrum
20 didn't have other information bearing on the issue of
21 the CPSC's view of whether hot coffee scalds might be
22 reportable, right?

Page 271

1    A.   No.  This is going to the information
2  that's in the non-Spectrum -- primarily the
3  non-Spectrum cases.
4    Q.   Now, in addition to this information,
5  Spectrum was on notice of the Consumer Product Safety
6  Act, right?
7    A.   Yes.
8    Q.   And it was on notice of the interpretative
9  regulations that the CPSC has promulgated, correct?
10   A.   They should be, yes.
11   Q.   And they were on notice of the recall
12 handbook that the CPSC has issued, correct?
13   A.   I would expect that they would be.
14   Q.   And they were on notice of the West Bend
15 settlement which was published, right?
16   A.   They should be.
17   Q.   And they presumably knew of the common
18 sense proposition that hot coffee can cause serious
19 burns, right?
20        MR. MULLIN:  Object to the form of the
21 question.
22        THE WITNESS:  I don't know what they knew

Page 272

1  about hot coffee causing serious burns.  They had
2  reported the incidents of course to the Commission in
3  the previous cases so presumably they knew something
4  about the potential risk.
5  BY MR. ROSS:
6    Q.   So you don't know what Spectrum knew about
7  this?
8    A.   Right.
9    Q.   And Spectrum and the CPSC, but nobody
10 else, knew about the PI 050023 case, right?
11   A.   Right.  As far as I know, nobody else
12 outside of Spectrum and the CPSC and Spectrum's
13 attorneys knew about it.
14   Q.   And in your opinion, that might impact
15 Spectrum's reporting obligation but not other firms,
16 right?
17   A.   Right.
18   Q.   So this was just a little secret between
19 the Agency and Spectrum?
20        MR. MULLIN:  Objection to the form of the
21 question.
22        THE WITNESS:  The Commission doesn't make

Page 273

1  public its preliminary determinations, the Commission
2  doesn't make public what it does with other
3  companies, so it's secret in the sense that the
4  Commission is precluded from disclosing this
5  information by statute to other companies or to the
6  public.
7  BY MR. ROSS:
8    Q.   Now, finally, you say that the CPSA is not
9  an incident reporting system and the number of
10 incidents doesn't affect the risk, right?
11   A.   I said that the CPSA reporting requirement
12 is not an incident reporting system meaning that the
13 law does not require each incident of a product
14 failure or injury to be reported.
15   Q.   Is that the government's allegation in
16 this case?
17   A.   Whether it is or isn't, I would have to go
18 back and look at the complaint but I'm just making
19 the point that just because companies have incidents
20 doesn't necessarily mean that those incidents are
21 reportable to the Commission under the reporting
22 requirement.

1    Q.   And you state here that the risk of injury
2  in this case is the same regardless of the number of
3  incidents, right?
4    A.   Yes.
5    Q.   And are you saying -- by that, do you mean
6  in the event of a carafe handle failure, the
7  potential injury is the same regardless of the number
8  of failures that different customers experience?  Is
9  that what you're saying?
10    A.   I'm not necessarily limiting it to this
11  case except to the extent that I do in the last
12  sentence.  I mean, I think this is across the board.
13  The reporting requirement does not say you have to
14  report every incident that occurs with a product.  It
15  says you have to report information, which could
16  include incidents, but includes lot of other
17  information.  You have to report information that
18  reasonably supports the conclusion that there is a
19  defect that could create.
20    Q.   So if Spectrum sat down in early 2008 and
21  decided not to report this because it didn't think it
22  had a reporting obligation, is it your testimony that

1  Spectrum is justified in ignoring all 1,500 or so
2  consumer complaints that they received after that
3  date?
4         MR. MULLIN:  Object to the form of the
5  question.
6         THE WITNESS:  If I were a company and I
7  was getting -- continuing to get complaints, I would
8  continue to look at those complaints to see if they
9  changed the nature of the risk, to see if I was now
10  getting reports of second or third degree burns.  I
11  would look to see if I had numerous reports of
12  medical treatment, and that might change my mind as
13  to whether I had a reporting obligation.
14  BY MR. ROSS:
15    Q.   I just want to briefly touch on your
16  conclusions again so that I understand what you've
17  testified to today.  Is it your conclusion that
18  Spectrum did not in fact have a reporting obligation?
19         MR. MULLIN:  Object to the form of the
20  question.
21         THE WITNESS:  In this case?
22  BY MR. ROSS:

1    Q.   Yes.
2    A.   Based on the documents that I reviewed,
3  it's my opinion that they didn't have a reporting
4  obligation.
5    Q.   And in doing that, you're not applying any
6  law?
7    A.   No, I'm applying -- I'm looking at the
8  facts of this case and giving my opinion as to
9  whether I believe Spectrum had a reporting
10  obligation.
11    Q.   Under the Consumer Product Safety Act,
12  right?
13    A.   Under the Consumer Product Safety Act.
14    Q.   And you haven't reviewed all the
15  information from all of these cases to your
16  knowledge, have you?
17    A.   Again, I said that this opinion is based
18  on the documents that I have reviewed.
19    Q.   And you don't know what Spectrum sat down
20  and actually discussed and considered between 2008
21  and 2012, right?
22    A.   Right.

1    Q.   So your entire opinion is basically had
2  Spectrum sat down and discussed the information that
3  you considered, that you think they would have had a
4  reasonable basis not to report?
5    A.   That's correct.
6    Q.   And that's your understanding of what the
7  reporting requirement is, right?
8    A.   What's my understanding of the reporting
9  requirement?  I don't understand your question.
10         MR. MULLIN:  I object to the form of the
11  question.
12  BY MR. ROSS:
13    Q.   In your report, you do not address the
14  regulatory factors under the CPSC's regulations, do
15  you?
16    A.   When you say the regulatory factors, are
17  you talking about the interpretive rule that the
18  Commission has issued?
19    Q.   Yes.  You don't address those regulations
20  in this report, do you?
21    A.   Well, I don't specifically address them
22  but do take into account the likelihood of injury,

1  the severity of the risk of injury.  When I say they
2  didn't have a reporting obligation, it's because the
3  information doesn't reasonably lead to a conclusion
4  that there was a defect that could create a
5  substantial product hazard or creates an unreasonable
6  risk of serious injury or death.
7          So yes, I am taking into account the
8  regulatory provisions in the Commission's
9  interpretative rule and in the statute.
10         Q.   So you assessed the facts of this case
11 under the reporting standard as you understand it and
12 came to a conclusion that they do not have a
13 obligation to report?
14         A.   Based on the documents that I reviewed, I
15 reached the conclusion that they did not have an
16 obligation to report.
17         Q.   Second, you state that the CPSC
18 consistently has concluded that there is a moderate
19 risk from these kind of coffee spills and that they
20 don't rise to a substantial product hazard, right?
21         A.   I'm saying that the staff consistently
22 concluded that, yes.

1          Q.   And you did not perform some sort of
2  statistical comparison.  You're just saying the staff
3  reached consistent conclusions in these cases, right?
4          A.   I'm saying they restate consistent
5  conclusions and I looked at the documents that the
6  staff -- that's in the files that were provided to me
7  that the staff relied on to reach those conclusions.
8          Q.   So you did perform some sort of analysis
9  that's not described in your report?
10         A.   I reviewed the document -- I think I've
11 answered this before.  I reviewed the documents that
12 were provided to me and, based on my review of those
13 documents, it appears to me that the staff was
14 consistent in concluding that when hot water, hot
15 liquids from coffee makers contact a consumer's skin,
16 that that did not rise to the level of a substantial
17 hazard, and I'm reflecting what the staff concluded
18 in the cases that I reviewed.
19         Q.   And you excluded one case as an
20 aberration, right?
21         A.   I excluded one case as an aberration and,
22 as I also said at the beginning, consistent to me

1  does not mean 100 percent unanimous.  It means
2  regularly or routinely.
3          Q.   And finally, you opine that Spectrum
4  systems and programs for compliance with the CPSA are
5  reasonable, right?
6          A.   Yes, that they -- I concluded that the
7  aspect of their -- the aspect of what I looked at in
8  terms of information that Spectrum considers that I
9  identified in my report, that that's appropriate
10 information to consider and to use to form a
11 determination as to whether there is a reporting
12 obligation.
13         Q.   But you did not investigate how the
14 systems actually work in practice, right?
15         A.   That's correct.
16         MR. ROSS:  Thank you for your time.
17         MR. MULLIN:  I have a couple of questions
18 but I want to take a couple of minutes.
19         MR. ROSS:  Go ahead.
20         (Recess.)
21         EXAMINATION BY COUNSEL FOR DEFENDANT
22 BY MR. MULLIN:

1          Q.   Mr. Schoem, as part of your review, did
2  you have an opportunity to review the full report
3  that was filed by Spectrum in connection with this
4  case?
5          A.   Yes.
6          Q.   And is the full report -- and that's a
7  document that's requested by the CPSC, correct?
8          A.   Yes.
9          Q.   And is that a document that provides the
10 information that the CPSC staff typically used to
11 evaluate a hazard and a remedy?
12         A.   Yes.
13         Q.   You were asked about Government Exhibit
14 Number 28, which is an IDI?
15         A.   Yes.
16         Q.   Would you take a moment to just skim
17 through that IDI?  And let me ask -- I want you to do
18 that but let me ask my question first.
19         My question is, I want you to look at that
20 IDI and tell me whether or not there is anything in
21 that IDI that's inconsistent with what you saw in the
22 full report materials that you reviewed.

Page 282

1    A.   Okay.  (Witness complies.)

2        There is nothing in the IDI that is

3    inconsistent with what I read in the full report.

4    And I see in here that she did contact the company.

5        Q.   In anything that you reviewed in

6    connection with this case, did you see any evidence

7    that consumers have reported second degree burns as a

8    result of any failure?

9        A.   No, not in the documents that I looked at.

10       Q.   In the documents that you reviewed in

11   connection with PI050023 and PI070025, did you see

12   evidence that consumers had reported second degree

13   burns in connection with those cases?

14       A.   Yes, I did, in both cases.

15           MR. MULLIN:  That's all I have.

16           MR. ROSS:  Appreciate you taking the time.

17           THE WITNESS:  Thank you.

18           MR. MULLIN:  We do want to read and sign.

19           (Whereupon, at 4:00 p.m., the taking of

20   the instant deposition ceased.)

21

22

Page 283

1    Notice Date: May 6, 2016

2    Deposition Date: April 29, 2016

3    Deponent: Alan H. Schoem

4    Case Name: US v. Spectrum Brands, Inc.

5    Page:Line      Now Reads         Should Read

6    _____ _____ _____

7    _____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17   _____ _____ _____

18   _____ _____ _____

19   _____ _____ _____

20   _____ _____ _____

21   _____ _____ _____

22   _____ _____ _____

Page 284

1            CERTIFICATE OF DEPONENT

2    I hereby certify that I have read and examined the

3    foregoing transcript, and the same is a true and

4    accurate record of the testimony given by me.

5    Any additions or corrections that I feel are

6    necessary, I will attach on a separate sheet of

7    paper to the original transcript.

8

9    _____

            Signature of Deponent

10   I hereby certify that the individual representing

11   himself/herself to be the above-named individual,

12   appeared before me this _____ day of _____,

13   2016, and executed the above certificate in my

14   presence.

15

16   _____

17        NOTARY PUBLIC IN AND FOR

18

19   _____

20            County Name

21

22   MY COMMISSION EXPIRES:

Page 285

1            CERTIFICATE OF REPORTER

2    UNITED STATES OF AMERICA ) ss.:

3    DISTRICT OF COLUMBIA    )

4        I, MARY GRACE CASTLEBERRY, RPR, the officer

5    before whom the foregoing deposition was taken, do

6    hereby certify that the witness whose testimony

7    appears in the foregoing deposition was duly sworn by

8    me; that the testimony of said witness was taken by

9    me to the best of my ability and thereafter reduced

10   to typewriting under my direction; that I am neither

11   counsel for, related to, nor employed by any of the

12   parties for the action in which this deposition was

13   taken, and further that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties thereto, nor financially or otherwise

16   interested in the outcome of the action.

17

18   ----------------------------

19        Notary Public in and for

20        The District of Columbia

21

22   My commission expires: 07/14/2016

72 (Pages 282 to 285)

**A**

**aberration**
19:19 26:6
27:2 39:7
223:6 279:20
279:21
**ability** 9:6 88:8
89:14 128:8
157:13,14
285:9
**able** 10:7 43:2
47:14 51:18
73:4 88:14,17
191:12
**aboveentitled**
1:15 155:7
**abovenamed**
284:11
**absent** 239:16
**absolve** 198:4
**absolved** 179:4
**abstract** 238:11
**accept** 134:4
**acceptable**
40:16
**accepted** 86:15
**access** 173:12
268:8
**account** 26:14
26:16 46:3
60:20 101:2
204:11 221:3
222:7 230:11
230:20,20
233:5 237:17
237:19,21,22
238:14,16
265:21 270:2,5
277:22 278:7
**accurate** 264:8
284:4
**accusation**
226:21
**achieve** 267:8
**acquired** 213:14

**act** 9:13 11:5
37:6 118:19
171:10 201:2
271:6 276:11
276:13
**acting** 80:14
**action** 9:20 36:9
36:12,13 39:21
40:5,8,8,11,14
40:15,21 41:1
41:5 87:3,8,20
88:3 89:2 98:3
98:7 101:11,14
101:20 102:1,2
102:13,19
134:2 191:5
202:17 221:10
253:18 285:12
285:16
**actions** 40:2
200:1 206:9,14
229:8
**actively** 120:22
**acts** 11:7,11
**actual** 18:8 92:9
163:13
**added** 159:8
**addition** 247:19
247:22 248:3
271:4
**additional** 14:11
35:18 258:20
268:7
**additions** 284:5
**address** 6:4 7:22
44:3 59:10
60:4 88:3 96:6
277:13,19,21
**addresses** 58:20
61:16
**addressing**
43:14 60:13
**administer**
119:12
**administration**

46:9
**admit** 181:14
**advice** 130:14
**advised** 74:9
84:22 215:1
**advisement**
121:6
**advises** 188:4
**advising** 218:11
**advocate** 172:9
**affect** 42:14
70:12 273:10
**affirmative**
169:1 204:16
**affirmatively**
170:5 254:11
**afield** 193:17
**afraid** 185:4
**afternoon** 4:6
156:1
**agency** 44:14,20
45:21 46:2
49:6 61:10
117:10 128:22
132:19 173:20
185:3 272:19
**agents** 73:1,7
**aggregated**
185:9
**ago** 16:16 67:4
132:2 179:16
**agree** 32:9 52:16
82:4,11 85:5
118:2,5,21
119:2,21 120:2
121:22 122:5,7
127:7 146:22
147:8 150:21
165:8,10,17
168:17 224:18
243:14
**agreed** 86:11
**agreement**
168:19 181:13
**agreements**

168:6 217:21
**agrees** 40:10
**ahead** 79:6
112:18 122:22
280:19
**alan** 1:13 2:5 4:3
4:11,12 6:3,13
6:17 8:1 283:3
**allegation** 91:13
273:15
**allegations**
133:14 144:9
168:9 212:1
217:18 218:7
218:22 219:6,7
224:13 231:20
248:11
**alleged** 10:5
220:3
**alleging** 10:11
245:2
**allencompassi...**
58:1
**allow** 15:10,18
60:17 249:21
**allowed** 43:3
**allows** 103:21
**amazon** 87:22
**amended** 18:16
**america** 1:4
285:2
**amount** 89:12
206:5
**analyses** 74:22
147:15
**analysis** 26:18
27:9 29:19,22
72:7 104:14
154:3 159:4,18
159:19 160:21
160:21 161:1,2
161:4,6 188:13
192:7 214:2,4
229:14 235:6
237:18 258:10

258:16 259:7
259:11,11,14
260:18 261:14
261:17 268:15
279:8
**analyzing** 252:5
**anecdotal**
206:18
**announcement**
10:13
**announces**
134:4
**anonymously**
247:3
**answer** 7:7
17:20 24:15
31:11 69:18
77:14 87:18
93:2 101:9
122:13 125:7
128:2 141:1
142:8 150:19
150:21 163:16
164:2 178:20
180:11 191:10
197:8 225:14
260:14,15
**answered**
193:18 279:11
**answering** 94:15
**answers** 7:13
**anticipate** 61:2
**antitrust** 193:9
**anybody** 89:1
100:17 124:10
195:16 204:12
**anyway** 102:14
244:22
**anyways** 244:12
**apart** 149:16
170:2
**apparently** 21:9
71:21 96:13
**appear** 21:22
54:7,10 137:6

138:3 240:21
**appearances** 2:1
3:1
**appeared** 216:7
242:12 250:9
284:12
**appears** 21:19
53:5 260:21
279:13 285:7
**appliance** 53:8
**appliances**
47:13 51:17
**applica** 11:16,22
12:3,6 25:5,11
26:15 63:12
64:1,10,20
65:3,5 66:1,10
66:20 67:2,3
67:10,12 99:2
141:10 163:8
189:10 199:2
218:16 232:7
233:18 234:17
235:4,6,13,14
236:8 237:14
238:17 239:10
239:18 241:5
244:4 245:6
252:11 254:1,5
254:19 255:5,9
258:2
**applicable** 46:15
47:3,22
**applied** 152:6
260:18,19
**applies** 32:11,17
**applying** 276:5
276:7
**appreciate**
282:16
**appreciation**
170:15
**apprised** 111:2
**approach** 224:4
**appropriate**

8:18 54:12
80:16 81:1
82:6 171:19
253:14 255:4
256:11,17
257:1,18 280:9
**approximately**
11:16 24:22
45:6 56:4
93:15,17
216:16 241:17
**april** 1:1,20 9:1
12:15 13:11
41:14 42:10,11
68:10 69:15
98:9 156:18
214:6 283:2
**area** 63:1 74:19
131:16
**areas** 23:7,11
48:7 132:16
171:8,13
185:18
**arent** 51:11 78:9
89:17 96:4
127:2
**arguing** 269:12
**argument**
135:16 178:17
178:18 181:17
181:18 187:10
194:19 195:22
197:2 198:2,3
**arisen** 200:14
**arms** 23:6,11
193:5
**arose** 64:20
239:9
**arrive** 40:20
**arrogance** 207:6
**ascertain** 226:22
**aside** 25:5,10
**asked** 9:17
10:14,19 14:11
16:14 47:21

82:13 84:10
116:17 117:6
118:9,10 125:4
213:17 214:15
214:18 219:20
281:13
**asking** 23:15
24:14,17 27:8
94:17 109:21
146:11 148:20
177:12 196:8
236:10 246:22
250:12 257:10
**asks** 119:8
**aspect** 280:7,7
**aspects** 71:8
89:16
**asserting** 8:7,13
**assertive** 246:15
**assess** 36:8
45:10 46:13
47:7 48:3 49:7
68:20 243:17
**assessed** 49:10
278:10
**assessing** 45:15
46:3 57:8
222:5 237:16
258:16
**assessment** 33:8
47:6 141:5
142:14,17
179:12 185:3
238:3 265:12
**assign** 111:21,22
**assigned** 51:6
112:18 113:3
**assigning** 113:4
**assisted** 44:13
44:19
**associated**
231:10
**assume** 65:5
149:15 201:11
203:13 220:22

254:20,22
255:11
**assumed** 68:19
**assuming** 99:19
154:8 160:20
226:16
**assumption**
257:4
**assure** 171:5
191:7
**assuring** 69:6
**attach** 284:6
**attached** 158:15
159:10
**attaching** 243:2
**attachment**
54:22 55:1,4
56:9 157:19
158:1,5
**attempt** 73:12
**attempted**
141:20
**attend** 80:10,13
80:17 81:3,5
140:4
**attendance**
85:18
**attended** 79:20
**attends** 80:19
**attention** 242:16
243:21
**attorney** 6:12
114:4 138:11
138:12 139:10
139:14,15
155:1 156:3,4
**attorneys** 185:1
272:13
**authority**
111:20 171:9
**authorized**
116:20
**automatic** 212:3
212:7,12,13,20
216:22

**automatically**
149:13
**available** 81:1
86:22 140:3
143:13 172:20
172:21 205:22
224:22 253:16
**avoid** 151:15
**aware** 14:2
17:21 18:7
30:13 39:1,3
191:14 211:19
213:22 214:9
215:6 244:22
268:14 269:16
269:17

---

**B**

**b** 4:9 10:3 11:1
33:1,10 43:5
107:12,16
119:13 125:10
156:13 170:19
173:12 175:22
179:17,20
191:4 202:8
217:8 233:20
234:6 255:10
255:10,12,12
**back** 19:2 41:1
41:21 50:1
71:6 74:11
86:10 93:17
110:14,17
113:8,20 146:7
155:1 156:3,4
158:19 162:14
172:8 179:14
179:15 193:16
202:15 204:14
206:2 247:6
264:14 273:18
**background**
106:6 156:10
**bad** 69:16

**baltimore** 3:7
**bar** 227:20
  231:19
**base** 96:20 105:1
  142:21 206:18
  206:19 229:14
  229:16 267:15
**based** 8:19
  13:12 17:5
  22:16 23:16
  24:2 31:22
  56:13,22 59:21
  63:2 72:17
  74:3 87:20
  104:13 105:4
  113:9 122:7,19
  141:6 142:18
  142:20 143:18
  145:5 152:4
  153:13 154:6
  159:2,17 160:2
  161:13 175:3
  183:16 187:12
  192:8 194:2
  197:9 198:14
  199:5 204:16
  216:3 224:21
  228:16,20
  232:17 239:20
  253:15 259:8
  259:16 260:22
  268:16 276:2
  276:17 278:14
  279:12
**bases** 9:4 166:3
  174:6 208:12
**basically** 87:6
  98:4 105:20
  171:11 184:8
  244:16 264:3
  277:1
**basing** 99:17
  137:11,13
  206:17 250:22
  251:2 252:1,3

261:4
**basis** 37:12
  102:4 109:6
  161:9 177:15
  195:18 198:7
  236:1 256:9
  277:4
**basket** 191:20
**bates** 23:1
**batteries** 171:22
**bear** 13:16
  28:18 93:22
  94:9,21 135:20
  136:1 158:5
  249:6
**bearing** 270:20
**becoming** 205:5
**began** 106:13
  241:16
**beginning** 252:9
  279:22
**behalf** 2:3 3:3
  80:14
**beholder** 201:6
**belief** 182:7
**believe** 25:18
  31:13 38:21
  60:21 67:16
  68:8 77:16
  98:11 127:9
  129:22 132:1
  137:12 142:19
  163:4 164:4
  178:1 181:8
  184:18,20
  186:10,10
  187:6,6 195:1
  195:4 198:14
  198:16 202:3
  221:5 223:21
  228:21 235:17
  235:21 236:1
  238:19 239:2
  253:17 266:7
  276:9

**believed** 47:3
  123:16 160:16
  162:18 168:10
  206:1 259:20
**believes** 36:11
  38:14 123:20
  124:18 152:18
  172:12 175:17
  176:4,16
  178:21 180:21
  182:2 183:17
  205:10 209:15
  209:16 224:16
  225:5,8,17
  235:14 253:14
  255:3 256:11
  257:17
**belinda** 4:19
**bell** 4:19 234:11
**benchmark**
  135:3
**bend** 211:7
  213:13,17
  214:15 215:1,3
  215:12,17
  216:21 217:8
  217:11,16
  218:7,7,9
  224:18 226:9
  226:11 227:6
  227:20 247:19
  271:14
**bends** 215:5
**best** 9:6 105:2
  108:12 117:16
  117:22,22
  118:5 119:15
  122:1,9,17
  123:7 241:3
  285:9
**bethesda** 2:16
**better** 67:9
  123:9,14 130:9
  138:16 169:7
  172:11 209:6

**beyond** 81:20
  122:12
**big** 50:7,15
**billion** 53:5
**bit** 106:5 117:13
  215:12
**black** 199:2
  209:22 212:14
  233:21 234:9
**board** 274:12
**boards** 171:20
  171:21
**bodies** 222:22
**bodily** 25:2
**body** 27:12,15
  183:21 184:6
  193:13 194:8
  221:4
**boilerplate**
  254:11 256:3
**booklet** 57:21
**born** 51:11
  78:10
**bosch** 38:3,15
  42:7
**bother** 112:15
  113:4
**bottom** 64:7
  96:9 175:13,16
  205:1
**bought** 65:3
**box** 164:3
**boxes** 87:11
**branch** 2:8
**brand** 199:3
  233:21 234:9
**brands** 1:7 6:19
  283:4
**break** 22:9 63:4
  67:14 71:2,7
  155:4 212:21
  240:9
**breakage** 137:5
  213:18 215:18
  215:20 224:14

229:2 230:13
**breakdown**
  68:18
**breaking** 22:3
  136:21 148:5
  222:21 229:18
  262:2
**breaks** 147:1
  230:12,14
**brew** 191:20
  242:2
**brewed** 148:8
**brewer** 21:3
**brewing** 241:16
  241:18
**brief** 213:15
**briefly** 275:15
**bring** 52:4
**bringing** 206:13
  229:8
**brings** 229:7
**broad** 50:8
  60:19
**broader** 30:5
  32:19 106:11
  186:20
**broadly** 23:15
**broke** 22:1
  270:17
**broken** 133:13
  213:2,14 215:4
**brother** 266:9
**brothers** 244:18
**brought** 170:9
  206:9
**brown** 1:18 3:11
  6:17
**bsh** 38:3,8
**build** 64:14
**bullet** 186:9
**burn** 52:19
  144:8,12 149:7
  213:1 219:16
  224:4 236:19
  266:4 270:18

**burned** 52:1
85:10
**burning** 148:21
**burns** 14:20
23:7,12,18,21
24:1,4,6,8
25:22 33:15
34:2,14,21
81:18 82:12
133:15,15
143:20 144:10
144:13 146:13
147:6,8 189:1
189:4,21 190:7
201:17 213:7
215:19 216:3
218:16 219:17
220:7,8,13
221:7,8 222:11
223:1,2 242:15
248:11,14
263:9,10,10
267:9 270:15
271:19 272:1
275:10 282:7
282:13
**business** 6:4
7:21 85:4
116:15 184:13

——————
**C**
**c** 1:11,19 2:6,10
3:13 4:1 6:1,17
107:16 119:13
125:10 175:21
191:4 202:5,8
**ca** 29:15 162:19
162:20 163:6
219:20 254:18
259:6
**cafe** 157:21
191:21 247:9
**call** 10:7 15:5
31:21 35:13
48:17 49:4

51:20 71:10,18
72:4 73:7,16
76:3,11,14,15
78:4 84:17
127:12 128:8
128:14 129:4,5
130:9 244:8
245:8,10,14
247:5 266:8
**called** 1:14 6:5
92:1 130:6
245:7,17 246:3
246:22 247:2,3
**calls** 29:15 51:22
56:9
**campbell** 4:19
4:21 255:16
**cant** 7:14 33:21
62:10,19 67:6
67:8 95:22
97:9 101:6
112:14 118:15
121:18 148:15
150:2,4 151:8
151:16 164:20
181:13 184:22
190:21 194:20
195:16 197:8
198:7 203:2
209:7 231:15
238:17 249:7
267:4,6,11
**capable** 34:14
251:10
**carafe** 22:8,13
101:16 133:2,6
133:14 136:20
148:6 153:4
212:14,18,19
212:21 213:6
217:1 220:12
222:10,20
223:13,16,18
224:14 225:6,9
225:18 228:2

229:2,18 235:8
237:8,11,17
241:1,19 242:6
242:13,21
245:3 247:16
250:13,19
251:3,6,19,22
254:3 262:2
270:17 274:6
**carafes** 212:4,16
212:20
**careful** 206:8,13
206:16 208:2
**cares** 208:20
**carrot** 165:15
**carry** 49:8
**case** 1:6 8:5,19
9:16,22 12:18
13:15 14:1,2,7
17:3,14,20,21
18:3,7,13,21
19:5,9,14,18
20:4,17,19,21
21:12 25:7
26:5,17 30:19
30:21 39:2,19
40:21 46:5,7,8
47:20 56:16,20
64:3 67:15
69:5,8,12
75:19 83:5
84:5 85:1 91:8
97:22 101:11
113:20 114:5
122:5,6,7
124:12,22
136:10,14
138:2,10,11
139:2,16,22
141:13 143:8
143:16,20
144:2,2,7,10
144:11 145:12
148:13,14
149:3,3 150:3

153:7,19 158:7
158:12,17
159:3,4,17
160:1,15
161:13 162:6
162:19 163:1,6
163:7,7,8
164:15 167:15
169:13,13,15
169:19,20
172:13,20
173:13 174:11
176:8 178:13
178:14 179:9
188:7,14,17,20
189:5 190:20
191:20,20,21
192:2,3,6,14
196:6 197:9,20
198:13 199:7
200:11 202:13
202:14,16
203:14 204:19
212:15 213:5
213:22 214:17
215:6,22 216:6
216:17,17
218:5 219:15
219:20,20
220:4,4 222:13
223:4,15,16
224:19 225:8
225:13,16,17
226:7,11 228:4
229:8,9,15,17
231:6,7,10,14
231:18,19
232:2,11
233:11 234:8
234:12,13,16
235:3 237:10
237:12 238:4,5
238:6,7,20,21
239:1,4,5,10
239:12,13,17

240:3 241:2
242:21 243:2
244:21 245:4
246:13 247:10
248:11,20,21
248:22 249:4,5
250:5,6,15,17
250:17,19
251:9,11,14,19
251:22 252:18
254:1,17,18
255:6 258:11
258:14 259:17
259:21 260:1
261:1,5,15,18
261:19 262:16
262:20 263:13
265:4,17 268:6
272:10 273:16
274:2,11
275:21 276:8
278:10 279:19
279:21 281:4
282:6 283:4
**cases** 14:11 20:3
20:9 24:7,10
24:12 25:5,11
25:13,14,15
26:13,15,19,21
27:3,18 29:5
29:12 30:13
32:1 35:14,16
40:10 48:8
63:12,15,15
64:4,10,19
65:2,13,14,15
66:10 86:7
103:18 112:18
122:3 128:16
133:8,12,16
134:2,10,17
135:1,19 136:1
136:3,5,11,12
136:15 137:2,9

137:18 138:1
141:7,9,10,11
142:15 143:7
143:14,15
144:1,3,8,20
153:8 157:9,19
159:19 160:11
160:14,22
162:11,17,20
165:9 169:12
172:22 173:19
189:1,2,3,13
189:22 190:21
193:1,6 200:13
200:15 202:19
203:7,9,15,22
204:6,12,14,16
204:20 206:4
206:19 207:2
208:13 218:10
218:14,20
219:14 220:22
222:19 223:17
223:18 224:1
229:1,2,4,8,9
229:10,21
231:17 232:6,9
232:9,13 233:2
234:17 236:22
238:1 239:12
247:14 249:18
249:19 250:1
252:6 256:16
258:2,9,16,19
259:5,6,9,20
260:6,8,18
261:10,22
262:1,4,7,12
262:19 263:5
263:13 264:1,4
265:10,15
267:15 268:18
271:3 272:3
276:15 279:3
279:18 282:13

282:14
**castleberry** 1:17
1:21 285:4
**categories** 115:8
169:2
**category** 113:11
115:22
**cause** 23:10,17
23:20,22 24:18
34:1 81:18
82:12,18 89:7
89:15 144:19
147:5,8 186:14
194:22 235:20
267:8 271:18
**caused** 147:21
248:14,16
266:4
**causing** 24:3
34:14 213:7
242:7 251:10
263:7 272:1
**caution** 127:4,8
**ceased** 282:20
**ceiling** 116:21
**center** 48:17
49:4 51:21
71:10 72:4
73:7,16 76:3
76:14,15 78:4
84:17
**central** 48:20
**certain** 80:3
84:16 127:21
128:10 148:6
168:14,21
171:12 187:19
231:13,15
233:21 262:19
**certainly** 158:3
223:8
**certainty** 66:9
**certificate** 284:1
284:13 285:1
**certify** 284:2,10

285:6
**cetera** 180:1
242:16
**chain** 52:13
**chairmen** 206:7
**chance** 182:9
219:3
**change** 18:17
19:17 39:10,15
41:19 42:10
62:6 75:21
86:18 157:13
275:12
**changed** 41:18
42:19 43:17
66:21 106:20
128:11 186:5
220:2,5 275:9
**changes** 41:4
43:15 93:1
**changing** 87:1
**characterizati...**
188:19 264:7
**characterize**
216:5
**chart** 74:10 92:2
169:12,19
**check** 158:19
**checked** 164:3
264:5
**chest** 23:6,11
193:5
**children** 34:2,14
109:15
**childrens** 131:13
171:15
**childs** 131:15
**circumstance**
180:19
**circumstances**
134:11 168:21
190:6 209:15
210:7 235:18
262:16
**cite** 107:15

**civil** 10:1 114:2
152:18,20
181:14 182:22
206:3,9,13
218:19 229:8
238:9
**claims** 136:20
137:7
**clarified** 131:14
**clarify** 61:20
153:22 161:17
176:2 204:18
**clarifying**
157:18
**clarity** 245:15
**class** 43:5 98:3,7
101:10,14,20
102:1,2,13,19
173:12 192:21
**classification**
33:1,10 165:21
175:6 191:4
260:3
**classified** 202:5
**clean** 7:6
**clear** 19:8 21:12
43:7 53:21
106:7 158:22
163:12 189:19
210:19 245:20
**clearinghouse**
244:14
**clearly** 131:8
167:17 209:22
**client** 47:7
253:15 255:4
255:20,22
256:12,12
257:18
**close** 18:12
25:19,21 27:18
50:21 219:21
252:9 253:11
265:1
**closed** 24:11

64:4 133:12,16
134:17 136:5
136:12 137:10
143:7 189:13
190:1 193:6
229:3 238:12
250:1 259:4
263:12 265:11
267:15 268:18
**closing** 134:2
139:2 229:10
252:18 254:17
255:22 260:1
265:15
**code** 9:11
**coffee** 11:14,19
13:7 14:21
17:8,14 19:14
21:13 22:8,13
23:10,17 24:3
24:18 27:14
38:17 64:1
81:17 82:11
83:7 85:9 91:8
91:16 97:15,19
100:13 102:6
115:11,22
116:4,7 131:22
133:3 134:12
134:17 135:1,4
143:19 144:1
144:18 147:1,4
147:21 148:8
160:5 169:4,12
172:16 173:16
189:20 190:6
191:22 199:3
201:15,21
211:15 212:3,7
212:13,13,20
213:1 214:1,2
214:4 215:8
217:1 222:14
224:4,20
227:19 229:22

230:1,14
231:22 233:10
233:21 234:9
236:4,5,18
239:14 241:2
241:17,18
242:2,3,7,13
245:3 248:5,15
248:17,19
250:13,16
251:6 252:15
262:14 263:5
263:21 265:4
265:18 267:7,7
270:21 271:18
272:1 278:19
279:15
**coffeepots** 22:17
**collect** 52:3
54:11 57:2,6
70:14
**collected** 48:16
48:19
**collecting** 105:8
**collects** 58:12
**color** 112:3
**columbia** 1:18
285:3,20
**column** 212:1
**combination**
116:13 134:11
**combinations**
132:12
**come** 172:2
218:19 222:10
258:13
**comes** 74:10
79:4 89:10
179:5 227:13
260:3
**coming** 21:22
88:4 95:3
136:21 176:19
229:7 243:20
243:22 252:8

**comission** 108:8
**comment** 110:14
**commerce** 10:12
58:22
**commission**
2:14 6:15 9:13
11:8 14:19
17:17 18:4
29:14 32:1
35:10 36:1,3,7
38:11,12 40:15
99:16 100:12
101:4,21
102:16,18
103:1,3,9,13
106:13 108:7
108:19 109:1
109:17 110:12
110:12,15,21
111:2,8,12,20
112:12,13
118:11 119:9
119:18 120:4
121:10,17
123:10,13,14
124:10,15
128:3,12,13
130:16 131:2
131:11,21
132:4,11,15,18
132:20 133:1,4
133:9,11,16,19
134:6 135:1,3
135:4 136:3,11
137:15,15
140:12 143:5
151:3,8,12,14
151:21 152:11
152:15 167:12
167:15 168:5
168:13 169:1,3
169:7,8 170:5
170:7,9,10
171:1,3 172:11
172:21 173:3,5

173:7,18 174:5
174:14,16,17
175:7,9 176:6
176:16,18,19
176:21 177:3
179:3 182:10
182:12 183:7
184:4,9,15
185:7,16 187:2
187:18,18
188:1,4,8,18
189:2,13
191:16,18
193:15 194:10
195:9 200:1
203:21 205:6
205:21 206:21
209:1,7,13
210:10,12,20
215:13 217:12
218:20 219:11
219:14 220:2,6
221:7 223:15
223:17 224:3
225:8 229:7,13
239:4 243:20
243:22 244:17
245:9 246:3
249:22 252:16
253:15,19
254:12,16
255:5,6,17
256:4 262:13
265:11,14
272:2,22 273:1
273:4,21
277:18 284:22
285:22
**commissioners**
206:6
**commissions** 8:9
21:19 37:13
108:16 121:3
167:2,11
219:18 278:8

**commitment**
66:11
**committed**
217:11
**committee** 48:21
83:11 84:5
**common** 22:16
271:17
**communicate**
42:6
**communicated**
42:2,7,8
269:19 270:11
**communication**
236:16
**companies**
35:12,21 42:9
49:7,11 50:15
53:15 59:19
60:7,19 61:2
61:11 88:6
102:22 103:1
105:5,14 108:8
108:11,12
109:21 110:21
119:17 120:3
120:13,19,22
121:5 124:11
128:8,14
129:12 130:15
132:21 133:19
133:22 134:3
143:1 147:14
165:6,15
170:16,17
171:4,5 172:11
172:20 173:21
174:19 175:2
179:18 185:9
185:17 186:10
186:12 187:6
191:17 192:13
193:8,10 194:4
194:15 202:6
203:9,13

208:17 209:5,6
209:10,18,20
210:13,14,15
210:16 218:19
225:5,7 228:18
228:20 229:12
247:2 263:19
273:3,5,19
**company** 13:10
29:8 32:19
34:12,19 37:4
41:6 45:9
46:15,22 47:15
48:9 49:3,14
50:7,15,16,19
50:22 52:20
53:2,5 57:9
59:12 60:12,17
67:14 70:18
71:1 73:3,22
74:18 82:3,4
82:22 89:6
90:14 91:15
97:18 99:16
101:6,10
102:20 105:6,9
108:12 110:14
110:18 111:3
113:9 120:15
123:20,22
124:7,9,17
127:17,21
129:4,5,17
136:1 143:12
146:3,7 147:19
148:1,17
149:19 150:2
150:13 152:8,9
152:16,18,19
154:3 165:10
165:16 174:7,9
176:16 177:1,4
177:7 178:1
179:11 185:2
186:15 187:16

187:17 188:4
190:5 191:1,6
191:6,19
192:17 194:7
194:19,22
195:7,8,10
196:16 200:15
200:16 201:11
201:21 203:19
209:8 210:6
213:10 219:5
224:6,8,9,15
225:11 226:15
226:16 227:1
228:16 229:6
230:21 242:20
243:16 244:3
244:17 245:2
254:11 255:18
257:15 270:15
275:6 282:4
**companys** 8:10
46:4 48:3 55:8
60:3 88:8
89:14 110:16
152:5,16 176:7
179:11 183:13
233:2,3
**compare** 25:7
67:11 148:15
160:11
**compared** 27:3
208:2 261:14
**compares** 84:17
265:3
**comparing**
26:18 148:13
149:2 252:6
258:10
**comparison**
161:9 279:2
**compel** 187:2
**compelled**
207:22
**complain** 71:19

244:3
**complainant**
241:16 242:5
**complainants**
242:8
**complaining**
73:13 88:1
**complains** 76:7
110:11 139:12
**complaint** 49:4
51:11 52:6
62:5 76:12
91:14 110:12
110:13 111:16
136:19 141:17
144:14,15,16
231:21 244:1
273:18
**complaints**
48:15,17 57:9
59:21 60:13
77:2 81:19
87:21 88:4
107:3,7 109:2
111:1,10
136:17,22
141:20 142:3,5
142:7 161:15
167:19 192:1
237:8 275:2,7
275:8
**complete** 7:15
14:5 24:16
68:19 154:9
170:3
**completely** 7:7
230:4
**completion**
241:18
**compliance** 8:10
10:7,16,18
12:22 15:22
16:1,3 34:9
41:2,2,4 44:6
45:10,12,15

46:4 48:3 50:1
50:3,5,6,18
55:2,9 56:1,11
60:4,16 62:7
62:11 64:11
65:22 66:12
67:5 71:8
75:20,22 77:6
78:3,6,17 79:8
88:6 107:19,22
111:19 114:9
126:19 129:17
138:8 139:13
140:9,10 146:4
146:8 156:14
156:19,19
157:1,8 166:7
170:13 172:6,6
172:9 175:10
175:11 184:20
185:8 186:2
191:2,8 201:14
201:20 202:7
205:17 206:10
208:15 256:14
262:6 263:20
265:14 280:4
**complied** 196:21
233:19
**complies** 282:1
**comply** 60:17
62:20 196:16
210:16,18
**complying** 44:14
44:19,21
**component**
71:13,16
**concerned** 90:9
112:12 259:2
**concerning** 10:6
**conclude** 57:1
104:9 136:8
182:15 197:12
223:20
**concluded** 14:20

17:7 20:3
23:13 26:12
27:1 43:19
93:5,20 94:6
103:14 143:19
173:14 174:12
187:18 198:16
201:17 203:7
238:8 260:9
262:13 278:18
278:22 279:17
280:6
**concluding**
250:1 279:14
**conclusion** 13:5
17:12 18:17
19:22 20:8,10
21:15 26:9
28:2 67:8
104:3,13,22
105:17 124:2,8
124:16 125:13
160:3,4 161:5
173:8 175:18
177:4,15,17
178:22 179:21
180:6,16,22
182:3,16
183:17 186:22
192:20 198:1
198:12,19,22
199:11,17,20
199:20 202:2
216:22 243:9
254:13 258:13
262:8 268:9,13
274:18 275:17
278:3,12,15
**conclusions** 13:2
27:16 28:4
32:2 39:11
42:14 43:18
44:2 63:2
164:9 175:12
214:9 224:19

225:2 244:21
267:18 275:16
279:3,5,7
**conduct** 30:6
32:19 104:17
121:11 186:20
202:5 219:20
**conducted** 54:9
102:20 185:3
209:8 270:16
**conducting**
46:10
**conducts** 111:12
**conferences**
56:3,4 126:15
**confirm** 129:16
**congress** 119:13
119:16 120:2
**connect** 86:10
**connection** 8:13
72:7 281:3
282:6,11,13
**consequence**
148:4
**consider** 19:18
28:9 39:11
47:11 51:7
58:7 82:5
83:14,20,22
84:2 111:4
113:12 148:1,3
163:1 167:4,7
167:14 203:20
204:8 220:19
220:20 226:17
228:1,8 248:7
248:8 280:10
**considerably**
215:21 216:9
**consideration**
70:22 139:4
144:6 148:10
204:3 221:12
223:3,8 236:8
252:19

Alderson Court Reporting

considerations
139:7
considered
42:15 55:3
69:7 84:5
97:18 98:19
99:10,20
100:18 101:6
138:1 153:13
154:16 157:20
163:20 197:11
227:1 228:4
231:7,13
239:11 242:20
247:16 261:2
276:20 277:3
considering
83:18 203:21
considers 28:8
38:4 84:16
97:5 99:15
130:16 132:21
205:3 219:11
223:13 226:15
280:8
consisted 158:10
consistency
175:8 191:1,7
202:7,9
consistent 17:17
17:18 18:18
19:18 27:17
28:4 51:1
96:15 121:16
157:8 158:9
184:12 201:12
240:1 258:14
259:15 260:4
260:17 261:15
262:3,19 263:6
279:3,4,14,22
consistently
14:20 17:7
193:6 203:10
278:18,21

construed 30:14
30:15
consultant 44:10
consults 40:19
40:22
consumer 2:8,14
6:14 8:8 9:12
11:5,16 24:19
28:1 37:6
48:15,17 51:22
52:5 53:8 57:8
59:21 60:13
62:5 73:7,13
74:14 76:6,11
82:19 85:6
87:20 107:3,10
109:2 110:11
111:16 118:18
119:4 132:3
137:1 141:22
167:19 168:18
171:10 201:1
233:18 244:2,2
248:18 249:19
251:6 270:17
271:5 275:2
276:11,13
consumers 21:4
27:12,14 37:18
38:7 52:17
53:14 58:21
59:10,16 71:18
75:4 78:12
81:22 87:22
89:17 90:1
96:2 100:13
101:16 112:11
115:4 134:22
135:5 137:4
147:11 149:18
150:17 193:4
212:22 219:17
219:18 221:19
222:22 229:2
260:7,10

261:22 263:7
263:22 279:15
282:7,12
contact 25:2
133:13 134:22
244:17 264:4
279:15 282:4
contacting 27:11
27:14 100:13
135:5 137:1
193:4 221:18
245:21 260:7,9
261:21 262:10
262:14 263:7
263:21
contacts 28:1
222:2
contain 72:16,17
contained 72:15
110:5 157:11
217:2
contains 180:7
180:17 182:16
243:6,10
context 135:18
151:4 224:11
continue 126:21
275:8
continued 3:1
continues 118:8
242:5
continuing
200:5 275:7
continuous
59:13
continuously
59:20
contrast 167:10
control 48:18
convene 163:1,4
163:4
convening
139:17
conventional
103:6 133:10

162:2 164:15
164:21 192:18
209:11 254:12
conversion
162:22
convert 162:19
converted
219:19
converting
259:5
convey 129:4
conveyed 86:17
convince 165:15
cord 131:15
cords 171:15,16
corner 114:18
corollary 128:5
corporation 1:8
correct 13:8
14:17 16:17
22:15 29:6,21
43:10 61:19
62:3 65:16
88:14 89:4,7
89:15 96:18
97:13 104:15
104:21 114:9
114:16 115:19
116:11 121:21
145:9 153:7
162:9 165:22
179:17 185:12
213:21 215:22
216:1 248:1
258:8 268:10
271:9,12 277:5
280:15 281:7
corrected 42:4
corrections
213:19 214:17
214:19 284:5
corrective 36:9
36:12,13 39:20
40:2,5,8,11,13
40:14,21 41:1

41:5 87:3,8,20
88:3 89:2
134:2 191:5
correctly 15:7
104:1 139:12
couldnt 47:14
100:2 192:3
198:4 258:6
counsel 1:14 4:2
6:6,9,14 14:7
156:7 207:11
231:9 280:21
285:11,14
count 33:21
55:19
counter 229:21
countertop
242:8,14
counts 231:20
county 284:20
couple 63:5
213:14 257:21
280:17,18
course 116:14
117:9 153:16
218:7 226:16
272:2
court 1:1 19:13
19:16 30:13,19
69:5,14 70:10
114:11 124:21
177:10 182:13
183:11 195:15
196:5,6,15
197:1,8,8,17
197:17 198:12
198:19,20
218:8 225:3
courts 178:10
179:12 183:7
196:9 198:1
cover 157:17
243:5
covered 41:16
cpsa 10:22 60:18

152:6 176:3
177:13 217:8
217:13 233:20
255:12 267:10
273:8,11 280:4
**cpsas** 62:21
**cpsc** 4:16,17
8:10,16,17
9:11 10:3,9,13
10:16,22 12:22
15:12,18 17:6
17:13 19:13
20:17 21:6
23:16 29:18,22
30:3 31:8,8
33:18,22 34:17
36:8 39:18
40:7,10,19
44:21 45:10,12
46:5 48:4
50:12 53:20
54:12 57:11,14
57:18,22 58:16
63:12 64:2,16
75:20 76:4,22
79:12 96:14
98:6 99:1,13
100:8,9 101:11
102:21 104:1
104:12 106:6
107:1,10 110:6
111:9 112:2,6
113:2 114:21
115:5 116:14
116:18 117:3,7
118:2,5,9,21
119:2 120:22
122:1,9 123:6
126:4,7,14
128:9 129:22
130:6 135:6,11
135:19 144:7
150:1 154:22
156:11 160:2
162:15 163:20

164:20 165:18
166:3 170:13
170:14 172:14
174:1,20
183:16 184:13
185:10 189:19
190:5 191:12
192:9 194:12
199:2 200:13
201:2 203:14
204:4,17,18,18
205:2,8 206:12
208:20 209:6
217:22 220:11
222:10 223:13
225:5 227:10
227:12,20
228:4,17 233:2
233:17,22
235:3 236:16
240:21 243:1
244:14 245:2,7
246:11 248:1
255:10,18
256:14 259:16
262:9 265:22
266:6 268:1
271:9,12 272:9
272:12 278:17
281:7,10
**cpscs** 61:15
120:10 127:16
127:20 166:16
217:18 270:21
277:14
**cracked** 22:1
**cracking** 222:20
**create** 28:2
31:14 112:14
124:3 125:14
149:17 152:3
175:19 176:11
177:18 179:1
179:22 180:3,7
180:17 181:1

182:3,17
186:15 187:1
187:11,22
188:2,10
189:18 195:1
199:18 205:4
217:2 223:21
225:19 232:17
243:10 274:19
278:4
**creates** 124:4
177:19 179:2
184:1 187:3
202:3,4 278:5
**cribs** 109:15,16
109:18,19
**criteria** 38:12
131:5 167:4,18
176:15 177:22
181:10 187:16
188:11 194:10
202:9 210:1
239:3
**critical** 71:13
86:4 89:22
**cumbersome**
11:11
**cup** 22:7 251:7
**cups** 241:17
**current** 55:8
64:18 72:11
92:12 138:8
141:10 160:15
250:6
**currently**
253:16
**cursory** 161:14
166:1 216:4,5
**customer** 73:1
**customers** 94:7
274:8
**cut** 133:21
150:17
**cuts** 215:19
216:3 220:13

222:11

---

**D**

**d** 1:11,19 2:10
3:13 6:1,17
191:4 192:21
202:8
**daily** 66:19
**dangerous** 52:2
52:19 59:10
78:12 112:7
118:13 119:17
120:3
**darts** 207:1,9,15
**data** 73:21 77:19
88:7 89:5
96:22 108:9,17
109:13 184:9
185:8 216:5
**database** 48:20
107:4
**databases** 110:6
**date** 233:15
275:3 283:1,2
**dated** 233:6
**dates** 68:18 70:6
**day** 7:9 155:8
195:17 201:13
225:11 262:18
284:12
**days** 120:13,14
120:18,19
121:1 127:2
184:15
**deal** 10:22 113:6
**dealing** 75:20
190:22 206:20
238:10
**dealings** 152:11
194:9 228:16
233:2
**deals** 89:1
**dealt** 48:14 86:8
87:17 203:22
**death** 31:16

124:5 125:15
175:20 176:13
177:20 179:3
278:6
**december** 45:8
213:13
**decent** 246:18
**decently** 241:14
**decide** 31:9 36:9
40:16 82:5
113:9 121:11
124:21 143:2
151:8 152:8
163:5 179:13
183:9,12
193:14 203:15
222:9
**decided** 100:12
102:15 112:13
122:10 129:2
134:6 135:19
136:4 143:9
188:2 195:9
203:14 219:3
274:21
**decides** 96:14
**deciding** 49:5
82:7 97:19
98:20 101:2
204:3,8 207:15
223:3,9 224:7
226:9 228:8
239:9 242:20
247:16 254:2
**decision** 37:13
38:13 70:19
83:1,6 86:11
98:5 102:5,12
105:10 124:13
124:18 143:6
143:15 149:22
150:5 152:12
152:16 154:16
159:17 160:15
170:21 172:21

175:9 176:7
181:12 182:10
183:14 191:7
193:15 194:11
196:4,5 197:14
202:7,10 221:5
224:21 228:21
233:3 260:4
decisions 17:17
19:6,20 27:18
38:15 49:1
68:17 100:9
103:13 124:11
136:6,7 174:6
185:9 189:7
191:2,12,13
200:12 201:2
205:7,9 206:1
208:13 209:14
265:13
decker 199:2
233:21 234:9
deep 58:9
defect 21:6,7,20
22:19 28:10
34:14 103:4
118:17 124:3
125:13 131:3
149:16,17
167:11,12,14
167:14,22
176:10 177:18
179:1 180:2,7
180:17,22
182:3,17
186:15 187:1,3
187:12 192:21
195:1 199:17
202:2,3 217:2
225:18 232:18
243:10 258:22
259:1,2,21,21
274:19 278:4
defective 21:16
30:9,18,20

52:18
defend 102:7
defendant 1:9
3:3 4:3 280:21
deficient 60:14
62:5
define 135:17
defined 91:4
93:7,21 217:13
defining 167:12
definition 21:19
131:3
definitive
223:10
degree 23:7,12
24:4,6,8 33:15
34:2 81:18
133:15 143:20
144:9 188:22
189:1,4,20
190:7 201:17
218:15 219:17
220:7 221:8
223:1,2 253:17
263:10,10
275:10 282:7
282:12
degrees 265:1,7
265:8
delaware 1:8
delegate 80:14
demand 152:17
demonstrates
22:19
denials 217:17
denied 218:7,22
219:5
denies 168:9
department 2:7
6:12 74:12
84:13 85:4
96:7 97:5
100:19 154:21
183:8
depend 197:7

228:12
depending
193:19 228:15
230:2,6
depends 69:19
106:9 148:7
180:20
deploying 45:2
deponent 283:3
284:1,9
deposed 6:21
deposition 1:13
6:17 7:2 55:5,8
66:3,15 68:14
72:10 155:6
158:14,16
159:11 164:5
282:20 283:2
285:5,7,12
depositions 79:7
described 77:4
279:9
description
37:22 166:1
design 22:14
59:3 60:8,21
61:3,14
designation
165:9
designed 22:13
54:10 267:8
designing 52:11
53:12 70:8
despite 232:12
detached 242:13
detail 27:9 59:6
detailed 58:4
determination
18:4,9 19:4
20:5,17 28:7
29:1,10,18
30:1 32:4,17
37:1,5,8 38:22
42:21 43:5
103:4,9 136:13

137:20 138:1,5
138:6 139:1,4
140:6,8,13,21
145:4 152:4
154:5 162:7,21
163:10,12,13
163:21 164:5,7
164:8,12,15
165:3,7,11
166:4 169:6
173:12 179:6
183:6 184:18
197:17 200:2,7
202:13 209:9
209:12 232:3
239:18,20,22
261:6 263:14
280:11
determinations
18:18 26:3
29:4 137:16,18
139:6 144:4
162:11,16
171:12 173:14
178:3,4 184:10
185:11 232:13
273:1
determine 8:17
10:8 15:11
34:11 45:11
53:19 54:12
58:15 61:9
103:22 104:11
104:18 110:2
111:5,6 112:6
121:18 124:1
154:21 168:3
182:13 218:1,9
233:18 261:15
determined
131:16 153:13
171:17,21
183:22 215:7
determines
69:14 164:21

202:16 249:14
determining
26:5 30:3
32:11 35:3
109:7 144:6
160:11 167:5
173:21 199:9
200:8,13
202:14 235:8
266:2
device 131:19
devices 46:11
didnt 9:12 14:14
14:16 18:20
19:12 20:20
22:14 27:10
28:5 34:1 35:9
35:10 36:2
39:5,8,10
41:18 42:6,13
43:4 55:19
56:2 58:9 59:2
59:3,4 60:9
61:2 64:16
67:2,11 68:20
70:3 73:17
75:10 77:22
80:18 83:21,22
86:4,10 89:1,5
91:11,19 92:17
93:3 95:18
97:16 98:17
100:1 103:16
103:17 105:1
121:8 122:21
123:1 124:14
124:20 134:8
134:14 135:13
136:9,16 137:2
137:12 138:6
139:15,20
140:3 144:1,10
144:12,17
154:9 157:20
158:1,16 160:5

| | | | | |
|---|---|---|---|---|
| 161:5,6 169:16 | 194:15,16 | **discovery** | **distributor** | 102:11,16 |
| 169:21 170:1 | 201:20,20 | 134:15,16 | 125:11 | 104:7,15 122:8 |
| 173:8,9 174:15 | 221:21,22 | **discretion** | **distributors** | 122:19 123:1,2 |
| 185:2,5,8 | 222:13,13,14 | 130:13 | 119:14 | 126:8 134:19 |
| 190:12,15 | 229:22 230:2,6 | **discuss** 16:7 | **district** 1:1,2,17 | 137:6 140:2 |
| 192:15,17 | 234:16 238:4 | 43:22 44:5 | 6:20 285:3,20 | 142:20 145:13 |
| 196:16 197:12 | 245:1 248:20 | 56:1 58:5,7 | **dive** 58:9 | 145:14,16,17 |
| 198:16 199:19 | 249:4 250:14 | 71:7,9 81:9,17 | **division** 50:17 | 145:19,20 |
| 199:20 200:3 | 251:18 260:19 | 81:21,22 82:1 | 74:12 101:2 | 146:2,5,8 |
| 203:7 205:21 | 262:6,7,16,16 | 83:6 86:2 | 154:21 | 154:6,8 158:11 |
| 206:3 207:5 | 268:9,12 | 100:1,7,11,15 | **divisions** 50:16 | 158:13 159:6,9 |
| 208:4,17 | 269:20 270:11 | 106:5 130:6,8 | 156:19 | 160:1,3 161:11 |
| 220:16 224:18 | 270:14 274:8 | 245:7 246:12 | **doctor** 266:14 | 169:21 197:10 |
| 238:19 242:16 | **differentiate** | 267:1 | **document** 12:14 | 199:6,8 231:10 |
| 244:20 247:4 | 58:17 | **discussed** 14:15 | 20:12,14,15 | 234:22 239:21 |
| 254:7 256:3,22 | **differently** | 16:9 80:21 | 32:22 36:20 | 251:20 261:4,8 |
| 259:7,14 | 202:18 | 81:13 83:12 | 38:19 39:4 | 261:11 265:13 |
| 261:16 262:12 | **direction** 1:22 | 99:6 100:18 | 42:15 68:4 | 265:21 268:5,7 |
| 267:11 268:8 | 58:18 195:22 | 132:2 246:3 | 73:9 76:8,19 | 268:11,12,14 |
| 268:11,15,19 | 285:10 | 264:12 276:20 | 77:17 91:22 | 268:15,16,18 |
| 270:20 274:21 | **directions** 197:2 | 277:2 | 92:1,3,4,5,8,11 | 268:19 276:2 |
| 276:3 278:2 | **directly** 67:21 | **discussing** 162:2 | 92:12,14,17,19 | 276:18 278:14 |
| **differ** 178:12 | 86:1 244:2 | **discussion** 41:3 | 98:2 101:19 | 279:5,11,13 |
| 181:19 195:21 | **director** 54:18 | 41:6 43:12 | 129:14 130:1 | 282:9,10 |
| 196:9 198:1 | 184:19 | 44:6 58:18 | 150:10 156:22 | **doesnt** 17:18 |
| **differed** 178:15 | **disagree** 52:9 | 84:9 86:6 | 157:4 163:9 | 18:17 19:17 |
| **difference** 27:20 | 53:10 176:7 | 246:6 | 164:11 185:6 | 29:2,14,18 |
| 92:18 140:19 | 177:3,8 181:12 | **discussions** | 192:4 211:9,18 | 31:13 39:15,15 |
| 162:5 164:10 | 182:10 183:13 | 54:17 72:18 | 231:1 234:20 | 59:18,21 78:15 |
| **different** 11:4 | 225:1 | 98:14 99:5,8 | 240:19 244:20 | 80:13 103:1 |
| 16:8,8 20:9,11 | **disagreement** | 227:4 | 253:9 264:8,10 | 111:10,13 |
| 22:4 27:4,5 | 179:10 | **disposition** | 264:10,12,19 | 121:17 124:5 |
| 30:2 42:3,7 | **disagrees** 124:15 | 259:16,18,19 | 266:19 279:10 | 124:18,19 |
| 44:3 48:7 | 195:6,7 197:13 | 261:1 | 281:7,9 | 127:21 129:2 |
| 49:15,19 50:10 | 225:1,21 | **dispute** 21:14 | **documentation** | 131:7 136:1 |
| 50:16 64:2 | **disclose** 19:13 | 23:10,17 24:17 | 91:11 | 137:6 138:3 |
| 68:10,12 86:22 | 165:19,20 | **disputing** 23:13 | **documents** 9:7 | 140:21 143:4 |
| 115:4,9 116:1 | 166:3 169:5 | **disregard** 121:6 | 13:13,15,19 | 143:10 144:19 |
| 116:9 117:4 | **disclosing** | **distinct** 88:15,16 | 14:3,4 42:22 | 144:20 149:11 |
| 132:3,6 135:1 | 172:10 174:2 | **distinction** 12:4 | 48:10,11,13 | 152:14 163:1 |
| 141:7 171:8 | 184:17 209:2 | 59:1 95:20 | 54:6,8,17,21 | 166:3 167:15 |
| 175:2,3,12 | 209:14 273:4 | **distributed** | 55:13,14,17 | 174:9,11 |
| 184:10 185:17 | **discover** 147:14 | 10:11 212:19 | 56:8 63:22 | 175:10 176:4,5 |
| 185:17 192:12 | **discovered** | **distribution** | 74:3 93:2 | 176:9,14,17,18 |
| 193:19 194:2 | 93:17 147:20 | 94:8 | 96:21 99:6 | 181:2,10 182:2 |

182:7,8 188:2
188:8,9 189:14
190:18 192:21
194:19 195:3,4
195:5 201:4,4
201:18 204:11
218:17 219:21
222:4 223:21
224:15 225:15
229:4,11
235:17 237:20
252:17 254:14
257:13,14
259:21 260:10
263:20 264:18
266:1 267:1,17
272:22 273:2
273:10,20
278:3
**doing** 47:5 48:8
50:2 61:4 88:6
103:1 157:9
203:2 207:20
276:5
**dont** 7:10,11,12
9:10,12 11:1
13:21 15:4
16:14 22:8
25:17,17 29:13
30:10,19,21
34:16 35:15,17
45:22 49:10
53:17 55:10,12
55:16,18 58:3
58:5 61:1,21
63:8 65:8 66:2
66:3,4,5 67:20
67:20,21 68:12
68:18 69:10,13
70:4,6,11
71:17 75:14
76:4 77:21
80:10 81:2,8
83:9,17 84:7
84:10 85:14

86:20 89:11
92:20,22 94:13
95:10,18,19,22
97:4,17 99:4,5
99:7 100:17
101:12 102:1,9
102:9,15 110:3
111:16 117:5
117:11 122:14
122:15 123:2,3
123:12 128:5
128:16,18
129:9,10
130:10 131:18
133:18,19
134:18 137:4
138:8,20
139:21 140:4
140:16 141:2
141:22 142:4,4
142:5,8,11,12
146:9,10
151:21 152:13
153:10,11
154:12,15,18
157:5 158:18
158:20 161:14
163:3 170:15
172:18 174:5
175:2 177:8,9
177:11,14,22
178:1 181:7,14
187:20 188:10
188:11 189:4
189:17 193:9
194:4 203:3
204:12 206:15
207:7,8,19
208:4,9 209:4
209:17 210:1
211:10 214:3
216:4 218:9,21
218:22 219:1,2
220:8 221:9,10
222:14 226:12

226:20,22
229:1 234:20
234:21 235:1
236:11,13,15
238:6,7,8,18
239:1,2 240:20
243:22 249:10
249:11 251:8
253:2 256:18
264:5,20 265:2
265:11,16,20
266:3,10 267:3
267:13 268:4
271:22 272:6
276:19 277:9
277:19,21
278:20
**door** 61:13 95:4
**doubt** 127:17
128:4,5 181:6
181:7 246:21
**drafted** 17:11
157:5
**drafting** 157:3
**draw** 67:8
267:19
**drawn** 180:6,16
**drier** 131:19
**driers** 131:18
**drip** 116:4
**drop** 242:14
**drug** 46:8
**due** 269:12
**duly** 1:16 6:6
285:7
**duties** 49:9 79:2
79:5

———————————
**E**

**e** 2:4 4:1,9 6:1,1
191:4 202:8
**earlier** 73:1 78:5
82:13 91:7
92:18 121:17
146:22 151:12

166:2 169:11
170:9 171:2
217:20 240:16
**early** 113:21
121:9,12
150:14 151:1
153:3 184:15
185:6 186:13
274:20
**easier** 101:21
102:6,9 209:18
**easily** 227:16
**east** 2:15
**easy** 228:3
**econometric**
266:21
**economic** 98:4
**effect** 204:11
**effective** 92:6
**effectiveness**
94:1,9 95:4
**eh** 252:16
**eight** 133:12
261:2 263:12
**either** 35:16
36:15 80:21
85:4,17 88:10
99:1 133:13
134:14 138:1
139:20 185:2
195:10 209:3
239:1 243:7
**eject** 21:3 37:17
**ejected** 222:22
**ejecting** 38:6
**electrical** 109:11
115:16
**element** 101:13
**email** 71:20
129:15 244:13
**emails** 72:1
145:12 146:3
**emergency**
109:15
**emphasize** 7:4

150:22
**employed**
285:11,14
**employee** 51:21
79:4 117:10
170:12 285:14
**employees** 48:6
49:13 53:6
73:16 75:8,12
75:14,19 76:3
76:16 77:5
78:4,7,16,22
114:20,21
116:18,21
117:3,8 170:14
170:14
**employment**
56:20
**empty** 85:10
**encourage**
191:15
**ended** 185:4
**ends** 52:11
138:3 185:21
264:2
**engage** 39:20
**engaged** 59:13
**engaging** 101:18
101:20
**engineer** 51:18
52:4 74:11
264:2
**engineering**
74:22 89:10
147:15 149:12
167:19 214:2
**engineers** 59:14
74:12
**enormous**
116:12
**ensure** 49:8
50:12 51:5
53:13 61:12
62:1 75:8
78:11 90:14

96:1
**ensuring** 78:6
**entail** 48:4,5
  74:8
**entails** 75:16
**enterprises**
  113:20
**entire** 13:9 77:2
  78:2 105:17
  277:1
**entirely** 96:22
  97:2 104:14
  142:18 150:2,4
**entirety** 56:13
**entities** 81:4
**entitled** 92:4
  202:6 203:10
  203:20 207:22
  268:1
**entity** 12:1
  121:22 123:4
**epidemiologic**
  240:22 270:2
  270:13
**erika** 3:10
**err** 127:3,4,7,8
  130:22
**escalate** 70:17
  73:3 85:1 86:1
  86:5 120:15
**escalated** 29:14
  76:13 85:19
**escalates** 70:22
**escalating** 57:9
  85:14,21 105:8
**escalation** 49:3
  84:13
**especially** 26:14
**esq** 2:4,5,6,13
  3:4,10
**essentially** 66:21
  171:20 220:11
  260:5
**establish** 239:7
**establishing**

44:22
**estimation**
  260:20
**et** 180:1 242:16
**evaluate** 15:10
  16:15 40:16
  52:4,21 57:2,6
  60:9 61:8
  64:17 74:13
  83:2 90:8
  103:21 104:10
  106:17 111:6
  123:22 167:20
  168:2 264:16
  281:11
**evaluated** 48:14
  48:21 54:11
  64:18 86:12
  104:11 153:13
  173:7 193:2
**evaluates** 60:14
  74:6 84:16
  207:8 254:13
**evaluating** 8:16
  47:1 59:20
  62:14 75:3
  77:3 105:5
  181:5
**evaluation** 31:9
  61:5 74:16
  89:10 179:11
  213:15,15
**evaluations** 88:6
**evaluative**
  186:13
**event** 274:6
**eventually** 108:9
**evidence** 42:1
  183:21 184:6
  269:19 270:10
  282:6,12
**exactly** 65:8
  70:4 80:5 99:5
  123:12 158:22
  160:8 176:2

177:12 264:18
264:20
**examination**
  1:14 4:2 6:9
  156:7 280:21
**examined** 6:7
  284:2
**example** 29:9
  48:20 51:22
  58:11 59:13
  61:9 87:15
  109:4,15
  110:13 111:21
  112:22 115:11
  122:15 168:12
  169:2
**examples** 86:7
  167:13,16
  210:3,4
**exception** 133:9
  193:5 260:8
  262:3,8 268:19
**excerpt** 4:14,15
**exclude** 26:15
  39:9
**excluded** 39:7
  279:19,21
**exclusively**
  110:4 113:13
**executed** 284:13
**executing** 88:19
  93:7,21
**executives** 48:6
**exhibit** 4:10
  12:8,9,10
  20:13 36:17,18
  41:8,8,9 72:9
  113:15,16
  155:1 156:5
  162:1 185:20
  200:6 210:22
  211:1,2 226:3
  231:2,3 238:21
  240:7,14 247:7
  253:5,6 281:13

**exhibits** 5:1
  158:14,16,17
  159:11 226:2
  227:5 252:22
**exist** 16:1,12
  21:7 47:17,19
  54:6
**existence** 19:22
  46:16 50:2
  178:12
**existing** 45:10
  48:10,11 49:10
**exists** 32:13
  123:20 162:8
  165:1 197:3
**expansive** 53:11
**expect** 9:15 22:8
  22:12 90:13
  191:1 242:1
  271:13
**expectations**
  175:1,3
**expected** 154:4
  159:5
**expects** 229:13
**experience**
  23:16 24:2
  44:10 105:4
  187:17 191:20
  192:2 209:20
  247:3 274:8
**experienced**
  255:16
**expert** 8:4 12:17
  14:6 26:19
  46:21 47:12
  56:20 156:5
  162:1 215:4
**expertise** 8:8,13
**expires** 284:22
  285:22
**explain** 37:12
  51:14 174:5
**explained** 69:4
  242:11

**explanation**
  104:8 117:14
**explode** 21:10
**exploding**
  133:14 250:20
  262:1
**expose** 147:11
**extension** 43:3
**extent** 69:3
  75:15 77:16
  249:19 274:11
**extra** 43:3
**extremely**
  117:15 118:3
**eye** 23:8 201:6

**F**

**face** 23:6,11
  193:4 250:20
  251:4
**faced** 49:21
**faces** 222:22
**facility** 48:5
**fact** 19:13 20:2
  21:7 29:17
  30:9 31:22
  36:4 43:18
  66:10,18 72:14
  73:7 75:11,19
  78:15 84:4
  90:15 91:15
  97:4 100:9
  124:20 130:2
  134:19 142:18
  159:16 160:21
  178:4 182:20
  183:8 185:14
  189:6 204:9
  218:5,6 220:21
  226:22 228:20
  232:6,12 264:1
  268:10,17
  275:18
**factintensive**
  178:2

factor 113:12
193:14 222:6
267:14
factors 230:10
264:15 277:14
277:16
facts 20:11
31:22 34:10
94:14 97:18
134:11 198:13
198:14 202:19
225:12,16
229:9,14,16
276:8 278:10
factual 35:1
145:4 152:4
154:3 159:4
161:1,2 188:6
200:2 263:16
263:18
failed 94:7 217:3
231:21 242:6
failing 212:22
217:7
fails 94:18 230:7
230:8
failure 22:3
142:14 148:11
194:21 217:11
222:4,6,14
241:1 251:9,11
273:14 274:6
282:8
failures 22:4
71:14 133:2,6
153:4 168:14
220:12 222:11
223:13,16
225:6,9,18
228:2 237:9,12
245:3 247:17
250:15 254:3
274:8
fair 163:18
fairly 8:22 50:8

53:1,11 58:4
85:15 108:20
131:3 147:10
212:6 227:16
228:3 252:9
fall 21:14 22:1,9
147:21
falling 21:22
101:16 149:16
213:6 250:13
falls 230:3
familiar 20:15
24:3 36:19
57:11 127:16
far 193:17
272:11
fashion 89:15
fast 29:8 65:14
98:6 103:18
133:22 134:4
162:2,6 209:9
232:2,9,11,12
feasible 132:10
features 16:12
50:11 51:17,20
february 4:20
214:22 216:20
federal 4:15
9:11 44:14,20
45:21 46:2
117:10 168:6
171:11 172:16
172:19 177:10
211:6,11
217:21
feel 207:22
284:5
feels 135:4 169:8
felt 86:3 101:16
245:11
field 52:12 53:13
71:14
fifth 2:9
figure 207:1
figures 27:4,6

file 13:22 92:20
134:20 152:21
157:21 158:7
158:19,21
159:14 231:7
233:22
filed 98:4 103:6
281:3
files 13:20,21
14:4 17:3,6
24:5 25:7,9,20
26:1,5 145:11
161:16 169:16
231:6 279:6
filing 225:4
filled 140:9
filter 108:17
final 67:13
74:19 96:6
198:22
finally 216:19
273:8 280:3
financially
285:15
find 69:5 77:15
90:22 109:19
111:22 131:10
158:5 225:10
228:3
finding 37:4
65:17 71:14
196:10 202:18
finds 33:9 70:10
195:8 196:15
fine 63:9 210:2
236:9
fire 85:9 115:18
171:22
fires 109:11
firm 11:5 24:22
30:7,16 31:11
31:13 32:4
33:13 34:16
35:8 36:5
37:10 39:20

40:4,11,13,14
40:19,22
129:21 140:20
165:19 168:8
175:16 176:4
178:19,20
179:4,20 180:8
180:18,20
181:4,5,6,10
181:20 182:1,6
182:9,13,14,20
183:6,9 191:21
192:6 193:20
195:18 196:1
196:11 197:3
200:8,12 206:2
228:1,8,11
234:1 235:18
236:3,17 256:8
267:22
firms 29:19 30:2
33:22 36:6
38:1 44:13,19
127:1,3,7
140:12 167:4,6
174:3 177:14
179:6 191:11
194:1 204:7
205:6,9 208:12
209:2 218:1
219:10 239:8
248:3 272:15
first 13:5 15:3
21:1 30:4 33:7
35:8 37:20
43:9 44:5
54:16 58:22
59:4 60:3,16
61:22 68:3
71:22 72:4
80:9 83:13
157:18 166:21
185:22 202:16
227:21 233:16
233:16 253:13

263:9 281:18
five 16:15,19
49:18 193:16
fix 87:11 88:17
floor 242:8
florida 68:16
focused 58:11
58:12
foia 184:21
follow 79:1
95:18,22
112:20
followed 96:4
142:1
following
139:18
follows 6:8
92:10
followup 142:6
142:10,11
food 46:8
foods 46:11
foot 242:9
footnote 252:20
254:10
force 40:7
foregoing 284:3
285:5,7
foreign 213:17
214:15 215:1
forever 184:13
184:14,22
forgo 165:7
forgot 19:2
42:17 169:10
forgotten 19:1
39:3,10 43:11
form 15:13 18:9
28:15 31:10
33:5,7 34:4
37:9 39:1
45:16 69:17
76:1 77:8,13
78:18 83:15
93:10 94:2,11

95:6 100:4
110:7 120:6
122:11 128:1
137:21 139:1,7
139:18 140:6,7
140:8,14,22
144:22 146:15
149:4 163:10
163:15 164:2,4
164:9 166:4
180:10 181:21
183:2 185:1
187:13 189:8
190:10 194:5
196:2,13 197:5
198:9 199:13
200:18 201:8
202:20 203:17
205:18 207:3
207:12,17
216:13 220:14
232:19 235:10
245:18 246:7
251:14 255:13
256:15,20
257:7 259:10
263:3 267:20
268:2 269:6
271:20 272:20
275:4,19
277:10 280:10
**formal** 137:20
138:4 140:7
164:6 261:16
**formed** 8:20
105:13
**forming** 244:20
**forms** 29:19
169:6 184:18
261:7
**formulating**
211:19
**forth** 13:2 26:19
27:9 38:12
146:7 166:4

168:9 173:3
240:1 249:9
250:20 264:14
**forthcoming**
128:19 205:8
**forum** 138:17
**forums** 126:15
**forwarding**
240:22
**found** 17:13
18:14,21 19:13
21:7 30:7,16
30:20 31:1
34:13 36:3
39:2 107:12
142:2 165:20
170:17 204:19
215:4 232:8
256:1
**four** 63:15 64:2
65:13,14 93:16
93:17 97:20
**frame** 42:22
**free** 176:6 177:3
177:7 181:10
181:11 183:13
**freshly** 148:8
**friday** 1:12,20
**fulfill** 209:19
**full** 7:22 17:2
35:22 36:2
79:17 98:2
136:18 137:15
141:17 146:4,6
146:18 173:6
177:2 188:18
221:3 255:8
261:9 281:2,6
281:22 282:3
**fully** 9:4 70:7
**function** 50:4
54:2 68:21
69:4
**functioned**
104:19

**functioning** 69:2
**functions** 16:9
50:11
**furnish** 217:7
**further** 62:10
202:17 285:13
**fuse** 43:1
**future** 38:2,15
202:18 203:15
204:20 258:20

## G

**g** 6:1
**game** 205:5
**games** 205:16
208:20
**garment** 131:15
**garments**
131:13
**gather** 56:10
**gathering** 77:2
**gee** 109:17 220:2
**general** 32:9
76:17 82:2
131:4 165:4
166:17 167:3,9
168:12 174:12
196:8 207:11
**generally** 7:1
9:19 31:12
37:14 57:13
80:4,8,15 81:7
106:19 109:20
157:10 170:18
184:22 215:10
229:20
**generic** 108:21
**getting** 17:19
59:9 60:2,15
63:17 66:22
81:19 101:17
102:1 129:13
146:9 150:14
162:15 250:2,4
275:7,10

**girl** 33:14
**give** 35:18,21
49:20 86:7
112:22 117:14
132:15,20
134:21 135:3
165:8 167:15
167:18 168:13
169:6 171:6
177:1,2 184:20
185:5 191:16
198:13 210:2
218:1 244:1
**given** 77:17
81:10 174:14
174:17 178:13
193:20 220:21
224:9 253:2
284:4
**gives** 121:10,12
167:12 217:16
217:17 224:13
225:5,7
**giving** 169:1
195:14 198:11
198:18 210:5
276:8
**glass** 137:5
212:14,16
213:2,6
**global** 54:18
80:7
**go** 47:7 48:1,3
49:4,14 50:17
58:9 60:5
61:13 76:20
79:6 86:10
109:18 111:9
118:12 122:22
133:8 141:21
149:2 158:19
162:20 165:6
167:2 170:16
171:18 183:20
203:8 228:3

266:11 273:17
280:19
**goes** 25:2 40:22
62:1 70:18
74:11 85:3
199:7 242:15
243:11
**going** 12:2,8
20:12 34:18,20
34:22 36:17
41:7 44:2
47:18 48:5
52:5,6 58:22
63:20 79:12
87:10 96:9
105:5 106:2
109:19,20
111:17 112:1
112:20,21
113:5,6,14
119:16 125:8
131:10 150:11
152:20 162:18
164:1 181:13
187:19 188:3
197:7 198:12
198:19 201:12
201:13 203:15
210:22 211:1
214:21 228:12
231:1 233:17
238:7 240:6,13
251:4 253:4
271:1
**good** 6:11 57:12
63:4 108:21
109:9 124:10
130:1 135:3,12
170:8 203:3
215:2 240:8
**google** 227:19
**gotcha** 205:6,16
205:21
**gotten** 156:4
220:5 221:6

254:5
**gov** 107:5 109:3
  110:5,10
  244:14
**government**
  4:10 10:4,10
  12:9,10 13:18
  13:20 14:3,5
  36:18 41:8,9
  91:14 113:15
  113:16 114:2
  124:15 134:15
  135:12 144:14
  144:14 152:21
  153:17 170:8
  170:12,14
  172:3 179:5,10
  181:11 183:13
  185:20 195:6,7
  197:13 203:3
  210:13 211:1,2
  225:1,10,17
  226:3 227:5
  231:2,3 238:20
  240:7,14 253:5
  253:6 268:5,17
  281:13
**governments**
  136:19 141:16
  226:2 231:20
  273:15
**grab** 242:2
**grabbed** 241:19
**grace** 1:16,21
  285:4
**greater** 250:6
  251:21
**green** 6:4 8:2
**groat** 2:6 6:15
**ground** 7:1
**grounds** 21:3
  37:17 38:5
**group** 46:20
  70:22
**guess** 39:14 43:2

76:11 101:15
124:21 146:5
180:20 191:9
245:11
**guidance** 35:19
  35:21 120:18
  126:8 130:15
  130:18 131:6
  132:11,15,20
  170:6 174:22
  210:6
**guide** 58:4 61:16
  130:15
**guidelines** 131:2

___

**H**

**h** 1:13 4:3,9,11
  4:12 6:3 8:1
  283:3
**hadnt** 147:22
  164:7 191:19
**hair** 131:18,19
**half** 56:7 61:22
  98:15 102:7
  211:15
**hand** 195:20
  240:13 242:8
  251:3
**handbook**
  126:11,12
  175:7 271:12
**handful** 134:9
  158:10 159:10
  201:16
**handle** 21:18
  22:2,3,8
  101:16 133:2,6
  133:14 147:1
  147:21 148:5
  149:16 153:4
  212:14,20
  213:6 215:5,9
  215:18,20
  220:12 222:10
  222:20 223:13

223:16,18
224:14 225:6,9
225:18 227:19
228:2 229:2
230:3 235:9
237:8,12,17
241:1,19 242:6
242:11,21
245:3 247:17
250:13 251:19
251:22 254:3
262:2 270:17
274:6
**handled** 76:14
  249:22 262:7
**handles** 21:13
  21:21 136:21
  212:16 213:14
  213:15 215:2
  229:18 231:22
**handling** 51:11
  90:22 91:4
**hands** 31:7
  53:14 58:21
  59:10 89:17
  90:1 96:2
  108:16
**happen** 61:1,2,7
  92:14 143:2
  148:14 221:20
  221:22 222:3
**happened** 74:14
  74:14,15 99:8
  113:1 138:17
  139:21 142:19
  142:19 145:9
  146:14 148:17
  150:3 162:22
  252:6 257:5
**happening**
  22:18 94:14
  95:19
**happens** 113:7
**happy** 26:2 88:1
  145:21

**hard** 71:18
  77:15 229:12
**harm** 28:22 85:6
**harmed** 28:19
**harmonize**
  175:1
**harriet** 2:13
  6:14 207:1,7,9
**hasnt** 85:7
  131:21
**havent** 13:16
  53:7 56:17
  103:2 106:20
  188:13,15,22
  233:12,13
  266:16 276:14
**hawed** 137:19
**hayes** 4:21 138:2
  138:11 158:12
  159:11 164:5
**hazard** 14:22
  17:8,14 18:5
  18:13 20:1,4,6
  28:3,6,9,22
  29:2 31:4,15
  32:3,12,22
  33:9,10 35:4,5
  37:6 39:2
  52:19 65:18
  90:10 100:11
  100:14 103:5
  103:10,15
  109:7 115:12
  115:14,16,18
  118:17 124:4
  125:14 129:3
  130:17 131:11
  131:17,20
  132:13,22
  133:17,21
  134:7,13 136:5
  139:5 140:13
  143:6,11 144:5
  150:15 151:1
  160:6 162:7

164:18,22
165:20,20
171:12,17
172:1 173:10
173:16 174:13
175:6,19
177:18 179:1
180:1,3,8,18
181:1 182:4,18
183:18,19
186:11,16
187:2,4,7,12
187:20 188:1,2
188:5,9 189:14
190:3,8,19
191:3 192:21
192:22 193:7
193:12 195:2
195:20 199:18
201:19 202:4
203:8 205:4,11
209:4,5,10,17
209:18 217:3
218:13,18
219:22 220:9
221:9,15
223:20,22
225:20 229:5
229:12 232:4,8
232:16,17
236:19 237:16
238:5 243:11
250:2 252:17
254:14 256:1
259:22 260:2
260:11 262:11
262:15 263:12
263:14 278:5
278:20 279:17
281:11
**hazardous**
  263:22
**hazards** 51:18
  86:12 115:9,20
  116:13 132:7

168:15 236:5
239:14 266:22
**head** 68:6 92:21
107:18,21
114:8 157:1
172:6 185:7
186:1 205:17
206:10 254:6
**heads** 254:7
**health** 264:5,16
266:12
**hearing** 9:16
114:1
**heavily** 118:18
118:22
**held** 91:1,4
194:20 196:1
196:11,17
197:3 198:7
**help** 49:7 114:22
116:18 119:9
130:15 150:5
173:17 249:10
264:13
**helpful** 19:12
161:17 168:17
171:4 173:20
175:5 240:4
252:21
**helps** 38:15
191:4 218:1
**hemmed** 137:19
**heres** 76:19 79:4
79:5,5
**hes** 33:4 66:22
81:1 85:18,20
85:20 86:8
246:11 266:10
**hesitating** 142:7
**hide** 19:15
**high** 99:11
**higher** 49:5
**highlevel** 98:14
**highway** 2:15
**historical** 72:12

72:13 145:12
145:16 146:5
**history** 206:3
**hold** 90:4,7,11
90:15,15,19
91:17,20 92:2
93:9,18 94:1,8
94:9,20,21
95:5,11 165:16
**holding** 242:6
**holds** 89:20 92:5
92:10
**home** 80:7
157:20 191:21
247:9
**hospital** 109:14
**hospitalization**
143:21
**hot** 21:2 23:10
23:17 24:3,18
27:11,14,22
37:16,17 38:5
38:5 82:11
100:12 133:13
134:6,21,22
135:4 137:1
147:4 193:4
213:1 221:18
222:1 229:3,19
242:7,13
248:17 249:9
249:12 250:13
250:16,21
252:2 260:7,9
261:21 262:10
262:13 263:6
263:21 264:3
264:19,20
265:7,12 266:5
266:17 270:21
271:18 272:1
279:14,14
**hotline** 109:3
110:13
**hotter** 148:8

265:17
**hour** 56:7,7
148:9
**hours** 120:11
127:1 161:21
**house** 85:10
**housewares**
211:7
**hover** 171:20,21
**human** 90:17
95:17 264:15
**hundreds** 22:18
22:19 55:20
**hypothetical**
192:14
**hypothetically**
188:12

---

## I

**idea** 34:6 130:1
169:7 204:15
**identical** 50:20
50:21 175:11
260:5
**identification**
12:11 41:10
113:17 211:3
226:4 231:4
253:7
**identified** 90:4
104:11 148:11
199:6 280:9
**identifies** 57:22
**identify** 47:18
47:21 51:19
59:14 70:20
73:2 88:8,12
88:14,17 89:6
89:14 118:12
247:4 266:21
**identifying**
47:16 108:21
108:22 167:4,6
**idi** 281:14,17,20
281:21 282:2

**ignore** 220:11
220:17
**ignoring** 275:1
**iii** 211:22
**ill** 7:4 11:9 12:3
15:5 53:10
63:6 260:15
**illness** 7:18
**im** 6:12 9:17
11:20 12:8
14:2 15:1 16:6
17:16 20:2,12
20:15 22:14
23:13,15 24:13
24:17 25:10,12
26:2 27:8,19
31:22 33:3
36:17 41:7
53:21 54:3
58:6,17 61:20
63:13 70:8
73:10 76:21,22
79:13 80:17
83:20 88:18
94:14,17 97:21
97:22 99:16
106:2,7,15
107:12 113:14
122:16 123:6
123:15 128:19
130:4 137:13
139:12 142:7
145:21 146:20
148:20 149:10
150:11 152:20
153:22 154:19
155:1 157:5
158:12,22
159:15,21
160:7,8 162:14
163:12 164:1
168:22 169:10
170:8 173:11
173:19 174:18
178:16 181:16

193:3 195:14
196:8,22
197:20,21
198:11,12,13
198:18 199:15
201:10 210:22
221:18 222:8
224:3,12
225:13 226:2,9
226:21 231:1,1
231:16,18
233:13,16
234:19 238:10
240:6,13 244:9
244:22 246:2
246:22 250:11
251:2,4,13,15
252:3 253:4,4
255:15 257:10
260:13 261:4
268:14 269:14
270:10 273:18
274:10 276:7,7
278:21 279:4
279:17
**immediately**
119:18 120:4
120:11 125:16
126:22
**immersion**
131:19
**immunize**
182:22
**impact** 77:5
95:4 272:14
**implications**
193:9
**import** 140:11
**importance**
135:15,17,18
**important** 39:13
39:16 51:9
52:16 76:15
78:6 80:20
82:4 83:1

Alderson Court Reporting

85:15 88:21,22
89:16 90:10
95:20 96:12
108:6,15
119:11 133:18
**importer** 125:11
**importers**
119:14
**impression**
17:13 80:19
89:9 101:14,19
137:21
**improve** 135:7
**improvement**
9:13 59:13
171:10
**impugn** 170:1
**inaccurate**
111:7
**inadvertent** 43:4
**inadvertently**
19:16
**incident** 28:18
29:3 33:14
48:17 76:10
110:1 141:14
142:8 143:13
167:20 173:3
176:10 188:16
201:15 240:15
241:17 245:1
247:22 261:10
273:9,12,13
274:14
**incidentreport...**
151:19,20
**incidents** 25:1,1
25:6,16 26:9
27:21 28:13,17
28:18 33:13
83:2,14 85:2
109:11,18
134:1 141:6
144:12 147:16
147:22 148:12

149:1,12
151:22 152:1,2
173:1 188:19
189:7,9,11
190:1 202:1
216:6 219:16
243:2 249:7
250:2,4 252:3
252:8,10,12
258:11,19,20
261:17 272:2
273:10,19,20
274:3,16
**include** 90:18,21
145:16 267:17
274:16
**included** 42:18
43:12
**includes** 12:6
101:3 145:8
274:16
**including** 33:14
64:3 107:3
240:3
**incomplete**
13:20,22
**inconsistent**
19:6,19,21
20:7 165:4
224:2,4 262:20
281:21 282:3
**incorrect** 42:5
86:17
**independent**
35:11 104:18
**independently**
108:10
**indepth** 110:15
110:16 111:21
112:2,19 113:2
270:16
**indicate** 93:8
102:16 161:12
**indicated** 216:20
**indicating** 18:13

**indication**
188:20
**indications**
188:22
**individual**
109:21 284:10
284:11
**individuals** 48:9
80:3
**industries** 169:7
**industry** 42:3
44:15,21 46:12
47:12 105:2
109:12 131:14
170:6 175:1
184:5 224:10
**inferring** 259:8
259:15 260:22
**inform** 38:15
49:11 94:7
122:9 133:5,7
133:19 143:15
150:5 173:17
191:5 233:3
**information**
8:17 10:8
15:10 21:14,17
27:15 31:7
35:1,8,11,18
36:7 38:14
43:8 48:16,18
48:18,19,21
52:3 54:11
56:11,14 57:3
57:6 58:12,14
58:19 60:2
61:8 62:10
66:22 67:1
69:7 70:14,15
70:17,21 72:15
74:2 76:18
77:19 83:2,7
84:2,16,17
86:16,21,22
87:21 88:8

89:12 97:6,18
98:19 101:1
103:22 104:10
105:8,9,18
106:6 108:5,7
108:13,16,20
109:21 110:5
110:11 111:3,4
111:6,8 121:18
121:20 122:1
122:15 123:13
123:17 124:1,2
125:12 127:10
129:8,9 131:4
136:18 141:18
143:10,13,15
145:3,5,6
146:6 148:2,10
149:13,14,20
150:7,14 151:1
152:5,9,13
153:2,11,12,14
154:12,20
160:10,14,14
167:6,19,20,21
168:2 169:2,4
170:20 171:7
172:10,19
173:4,5,7,17
174:14,16,17
175:3,11,17,21
176:14,17,21
177:2,2,16
178:21 179:21
180:21 181:5,8
182:2,15
183:17,22
184:17 186:14
186:22 187:15
191:16 192:18
192:20 193:2,3
193:14,20
194:3,8 195:3
195:4 197:10
199:16 201:15

204:3,7 205:22
206:18 207:8
209:14 210:9
216:21 217:4,7
219:10,14
221:4 223:7
224:20,22
228:7,12,15
230:21 236:10
237:5 238:13
238:15 239:11
239:12,13,16
239:17 240:2,3
240:5 242:19
243:8,16 244:7
245:9,12 248:7
252:14 253:16
254:1 256:8
261:9,10,14
263:16,18
264:17 267:16
267:18 270:20
271:1,4 273:5
274:15,17,17
276:15 277:2
278:3 280:8,10
281:10
**informed** 103:2
120:22 124:13
149:21 193:13
221:5,14 234:4
269:15
**informing** 37:3
102:21
**inherent** 24:21
**initial** 12:17
18:1,14 20:20
38:20 42:16
43:12,19 179:6
191:13
**initially** 182:21
**initiate** 118:16
129:18
**initiated** 255:7
**injunction** 10:6

**injunctive** 10:2
**injured** 59:11
  109:16 150:17
**injuries** 23:8
  26:10 81:22
  109:14 134:13
  137:3,11
  142:18 143:1
  144:8,16,19
  145:8,9 148:13
  148:14 149:1,3
  149:8 150:18
  151:6,15
  188:21,21
  189:3,12
  199:21 201:16
  202:1 213:1
  218:15 219:16
  220:7 221:17
  223:2 250:9,11
  251:10 252:5
  252:14 258:11
  260:12 266:17
**injury** 23:6
  24:18 27:12
  31:16 59:16
  76:12,14 82:18
  85:3,7,14
  113:10 124:5
  125:15 131:3,9
  136:10 142:2
  148:6 149:18
  152:3 160:5
  167:21 175:20
  176:11,12
  177:19 179:2
  190:2 199:22
  201:22 230:10
  230:12,15
  249:15,20
  250:12,14
  251:18,19,21
  251:22 253:17
  258:14 259:4
  267:9 273:14

  274:1,7 277:22
  278:1,6
**innate** 51:11
  78:10
**input** 186:5
**inquire** 75:7
**insightful** 208:6
**instance** 59:4
  89:6 109:5
  133:1
**instant** 14:1,2
  64:3 67:15
  69:8 83:5 84:5
  97:22 122:5,6
  141:13 143:16
  223:4 238:21
  248:21 250:3
  251:22 282:20
**instructions**
  95:18
**intended** 175:8
**intent** 120:2
**intentionally**
  39:8
**interaction**
  99:12 105:14
  235:7
**interactions**
  99:1,15 101:3
  101:8
**interest** 111:18
  111:19
**interested** 191:9
  285:16
**interesting**
  228:22 262:5
**internal** 54:15
  57:1
**interpret** 192:7
**interpretation**
  121:3 167:11
  257:11,17
**interpretative**
  9:14 21:20
  38:10 46:6

  126:10,13
  167:3 204:10
  271:8 278:9
**interpreted**
  126:4,22 178:8
**interpretive**
  121:3 277:17
**interrelated**
  88:16
**interrogatory**
  75:18 77:22
**interrupted**
  122:22
**interview** 73:16
  73:18 89:1
  104:14
**interviewed**
  73:19
**interviews** 48:8
  54:9 74:4
**inventory** 95:11
**investigate**
  109:19 118:10
  119:4 120:14
  127:3 213:18
  214:16,18
  235:16 280:13
**investigated**
  136:3 234:5
  236:17 237:15
  248:4
**investigates**
  179:5 235:22
**investigating**
  111:9 235:13
  236:9
**investigation**
  29:12,15 73:15
  74:21 104:18
  110:15,17
  111:13,21
  112:3,16 113:2
  121:1,11
  129:18 133:11
  176:22 233:18

  238:12,14
  240:16,22
  255:8,22 270:3
  270:6,7,16
**investigations**
  64:4 112:19
  118:16
**inviting** 244:16
**involved** 28:13
  28:14,17 50:10
  67:21 70:7
  139:9,10,11
  168:1 188:17
  206:19 233:22
  234:8 261:19
**involvement**
  67:18
**involving** 33:14
  101:15 109:11
  109:18 110:22
  200:15,16
  201:15,20
  222:13 235:3
  236:18 241:1
  250:16
**ion** 171:22
**isnt** 31:6 100:13
  113:5 131:6
  174:8 181:6
  196:5 208:8
  264:4 269:5
  273:17
**iso** 46:21 105:2
**isolation** 230:20
**issue** 13:7 27:22
  30:14,15 34:17
  36:5 38:9 76:7
  81:10 82:9,10
  82:12,16,22
  83:12 84:5
  86:4 87:16
  93:17 99:11,20
  100:18 101:6
  113:5 120:14
  121:1 122:9

  123:10 126:16
  129:20 130:7
  133:4 146:13
  147:20 152:22
  153:19 154:16
  179:6 186:12
  187:8 195:8
  219:11 226:18
  227:2,12 228:4
  231:22 235:9
  237:17 245:3,7
  245:16 246:3
  249:5 256:14
  267:14 270:20
**issued** 38:11
  126:10,11
  131:12 271:12
  277:18
**issues** 38:2
  57:21 58:20
  64:2 76:9,10
  80:20 81:13,17
  82:5 85:14,22
  87:21 88:9,12
  88:15,20,21
  98:5 100:10
  101:15 111:1
  126:7 128:9
  132:16 133:2
  148:16 169:9
  205:3 227:10
**item** 217:1,2
**ive** 35:13 36:21
  105:4,14,14
  132:17,18
  170:10,11,17
  171:14 185:15
  188:15,16,19
  188:20 206:19
  210:11 211:10
  227:5 240:20
  241:4 250:19
  251:3 254:16
  279:10

## J

**jasperse** 114:5
119:8 125:4
**job** 69:6,15,19
79:9 117:8
**jobs** 51:6 52:14
75:9 77:12
**jones** 3:10
**jr** 3:4
**judge** 32:8
**judith** 4:21
138:16
**judy** 138:2,11
140:5,5 158:12
159:11 164:5
**july** 92:6,15
215:13 241:7
**june** 4:18 65:3
93:15 233:6
234:1,4 237:7
241:5 270:6
**jurisdiction**
115:5 117:15
**jury** 32:8 198:20
**justice** 2:7 6:13
183:8
**justified** 275:1

## K

**k** 1:19 3:12
**keep** 90:11
**keeping** 17:22
89:16,22
**kept** 78:12
**kerrie** 4:18,20
255:16
**kerwin** 2:13
6:14
**key** 48:6,6 51:21
80:20 82:7
108:11
**keyword** 72:20
**keywords** 73:2,8
73:10,11 77:18
**kind** 7:18 45:14

46:12 47:5
48:4,11 65:6
66:6 67:7
71:18 74:10
79:9 85:22
86:1 104:17
105:1 106:9
112:14,15
142:13 143:1
154:2 159:3
161:1,8 168:13
168:20 188:3
204:6 217:22
237:15 238:10
243:16 266:17
267:18 278:19
**kindly** 16:22
185:21
**kinds** 81:12,16
116:9 132:6,8
145:19 157:9
168:14
**kitchen** 242:7
**knew** 47:2 51:5
123:3 133:4
146:12 172:22
173:4 174:14
174:15,16
189:7,10,11,12
254:1 255:17
258:17,18,19
271:17,22
272:3,6,10,13
**know** 9:10 13:18
15:4 16:14
30:21 34:1,17
34:20 38:1,4,9
56:19 58:4
61:21 63:13
64:19 65:8,21
66:4,5 67:17
69:10,13 70:4
72:14 73:6
75:8,11,14
76:16 77:21

81:2,4,6,9,12
81:16 83:5,9
83:17 84:4,7,8
84:10 86:20
87:11,13 90:5
90:6 92:14,19
92:22 93:3
94:13 95:10,18
95:19 97:4,7
97:17 98:18
99:4,5,7
100:17 101:12
102:1,9,10,13
102:15 109:22
111:13,17
113:1,5 119:15
122:14,17
123:3,10,12,13
129:7 132:17
134:14,18,20
137:5,22 138:2
138:16,20,22
139:1,21 140:1
140:1,4,5
141:14,19,22
142:1,4,5,11
142:12 146:9
146:10,12,17
148:4 153:2,10
153:12 154:12
154:15,18
161:14 162:10
162:15 163:20
168:20 169:18
170:18 174:15
175:6 176:20
182:14 189:9
191:18 193:9
195:7 206:5
207:7,8,19
209:21 210:18
214:3 218:9,22
219:1,2 226:6
226:12,13,22
229:7,13,21

234:21 236:14
236:15 238:6,7
238:8,18
243:22 245:1,6
248:19 249:2
251:9 262:5
264:4,13 265:3
265:6,11 266:3
266:10 268:4
271:22 272:6
272:11 276:19
**knowing** 16:18
62:18 179:9
199:11
**knowingly**
10:11 217:12
217:13
**knowledge**
31:13 51:12
52:14,17 78:10
135:20,22
193:13 241:3
252:1 258:3,6
276:16
**known** 36:22
66:19,20 194:3
**knows** 151:9,12

## L

**l** 3:4
**labs** 47:18
**laceration**
115:14
**lacerations**
213:1,7
**lack** 12:21 205:2
208:7,9
**lacked** 93:6,21
208:11 246:12
**language** 21:11
120:16 125:18
125:19 180:5
190:13,15,17
243:6
**large** 53:2,8

117:16 118:3
224:10
**late** 57:15
153:17 220:3
**law** 30:2 124:20
135:10 154:4
178:18 183:9
197:21,22
199:11,15
200:17 202:13
202:18 269:4
273:13 276:6
**lawsuit** 6:18
13:7 98:4
101:21 102:8
102:10,13,19
152:22 225:5
231:19 251:12
251:15
**lawyer** 68:4
129:4
**lawyers** 247:5
254:6
**lay** 128:14
209:22
**lays** 140:6
**lead** 28:2 129:14
162:19 182:2
223:20 268:8
278:3
**leading** 222:11
**leads** 104:8
128:21 183:17
220:13
**learn** 77:1 79:10
108:9,11,19
111:17
**learned** 108:4,7
132:18 170:12
185:13,15
210:11
**learning** 119:18
120:4
**learns** 107:1,10
**leave** 86:21

198:12
**leaves** 174:4,8,9
**led** 215:9
**left** 19:16 85:20
165:6 172:3
192:6,7
**legal** 14:15
31:19,21 32:5
32:7 40:8
70:19 84:13
85:4 96:7,13
97:5 99:14,19
100:18 101:1
135:15,17,17
140:11 154:20
154:21 178:3,5
198:5,11,18,18
269:8
**legally** 170:7
171:6
**legs** 193:5
**lengthy** 89:11
**letter** 4:18,20
18:12 37:1,3,9
37:12 38:8
39:18 139:2
143:9,12
159:22 166:2
174:7,10,12
177:1 190:9
193:11 200:7
201:13,19
222:13 233:6
233:12,14
234:21 235:2
236:3 237:14
238:8,11
240:21 243:1,5
244:11,13
253:11 254:5
254:10,15,15
254:20,21
255:7,9,19,20
255:21 256:2
256:15 257:6

257:11,12,13
270:6
**letters** 71:21
72:1 143:19
169:6 174:4,19
218:10 220:6
220:22 221:7
222:16
**level** 14:22 28:5
31:14 49:5
86:5 99:11
129:3 133:20
136:4 143:10
148:6 149:15
149:17 160:6
164:17 173:9,9
173:15 187:19
189:14 190:3
190:18 192:22
195:5,19
201:18 203:8
205:10 209:3,4
209:16,17
218:12,17
219:22 220:8
221:8,15
223:19 225:19
229:4,11
252:17 254:14
259:22 260:10
262:15 263:11
279:16
**liability** 179:5
181:15 198:5
**liable** 194:20
196:1,11,17
197:4 198:8
**life** 86:8
**light** 3:6 219:10
**likelihood** 28:11
148:5 167:21
230:9 277:22
**limit** 106:10
**limited** 53:22
**limiting** 274:10

**line** 63:6,6
114:19 117:7
125:2 150:13
166:20 283:5
**liquid** 21:2
27:11,14,22
37:16 38:5
133:13 134:22
137:1,5 193:4
222:2 229:3,19
248:17,20,21
249:2,9,12,13
250:21 252:2
260:7,9 261:21
262:10,13
263:6,21
264:11 266:5
266:18
**liquids** 100:13
279:15
**list** 14:14 15:8
46:21 47:2
94:8 157:20
231:13,15
234:20,22
**listed** 9:8,10,12
13:13,19 14:13
54:22 169:15
231:12,16
235:1
**listen** 51:21 73:8
73:10
**listening** 260:13
**lists** 73:9
**litany** 226:14
**literature** 251:1
265:6 266:16
**lithium** 171:22
**litigate** 195:10
218:21 239:5
**litigating** 185:5
218:8
**litigation** 6:14
12:6 98:7
101:20 178:15

199:4 219:4
238:22
**little** 23:15
55:11 117:13
122:16 193:17
215:12 229:22
230:3 272:18
**llc** 211:7
**loaded** 269:4
**long** 45:6 56:6
81:6,9 89:6
144:18 150:12
177:14 179:6
180:5,15 182:6
194:18 198:6
241:14
**longer** 120:20
134:19
**look** 14:16 21:1
25:20 26:1,2
28:11,11,12,13
28:14,16,21
34:10,18,20
38:10 41:12
46:5,7,9,14
48:15 59:2,3,4
69:16 77:17
84:11 88:7
91:19 93:1
103:19 109:12
113:3 131:4,4
144:3,3 145:2
145:21,21
148:4,5,17
149:6,14 150:6
150:12 152:9
152:10 158:16
158:21 159:14
160:13 167:18
167:19,20,21
167:21,22
168:1 170:20
175:6,10
190:21 192:19
193:1 194:7,9

194:10 198:13
205:1 206:2
210:2 211:22
213:9 215:11
216:19 222:16
222:18 227:18
229:17 230:9
241:9 249:22
265:13 268:20
273:18 275:8
275:11 281:19
**looked** 14:12
19:3 24:5 26:8
26:11,22 27:5
53:4,7 63:1,3
69:1 92:17
100:9 104:5,7
104:7 129:2,8
133:9 135:2
136:18,18
137:14 144:13
146:2,8 152:12
158:13 159:6
161:16 176:20
188:15,16,16
188:17,19
189:6 199:9
205:22 231:11
231:14 236:8
279:5 280:7
282:9
**looking** 21:17
27:10,15,16
31:22 33:4
42:21 48:9
79:16 105:6
109:9 149:19
156:4 157:22
166:19 169:8
175:12 181:6
230:11 231:16
234:19 241:11
247:6 258:9
261:20 276:7
**looks** 227:11

Alderson Court Reporting

256:1
**loose** 21:22
136:21
**loosen** 22:9
212:21
**lost** 102:15
**lot** 42:22 55:11
80:22 81:19
109:10,18
132:18 170:12
222:19 274:16
**lots** 109:1,14
174:19 185:16
185:17 204:22
**lower** 32:10,16
188:7
**lunch** 155:3
156:4 208:14

_____

**M**

**m** 1:19 155:6,8
156:2 282:19
**machine** 116:4,7
**main** 162:5
**maintained**
48:16,19
**maker** 13:7
17:14 19:14
22:13 64:1
81:18 85:9
134:12,17
135:1 143:20
144:1,19 160:5
169:12 173:16
190:6 201:15
201:21 212:3,7
212:13,13,20
217:1 222:14
224:4 227:19
229:22 230:1
230:14 236:4
236:18 241:18
242:3 245:3
248:5,19 251:6
263:5 265:18

**makers** 11:14,19
21:13 38:17
83:1,6,7 91:8
91:16 97:15,19
100:13 102:6
105:10 115:11
116:1 131:22
133:3 135:5
154:16 169:4
192:1 199:3
211:16 214:1,2
214:4 215:8
224:20 233:10
233:21 234:9
236:5 241:2
252:15 262:14
263:21 265:4
267:8 279:15
**making** 27:6
30:1 32:17
49:1 52:5
65:12 68:17
86:11 149:21
164:14 165:3,7
165:11 169:22
175:9 183:16
191:7 202:7,10
238:3 260:4
273:18
**management**
256:14
**mandatory** 47:3
107:11
**manifesting**
259:2
**manner** 51:1
201:13 217:4
224:15 235:14
**manual** 51:13
79:4 138:8
139:12,15
156:20 186:1
**manufacture**
47:15 59:4
**manufactured**

60:9 211:16
215:8
**manufacturer**
53:9 122:2,3
125:11 168:18
198:4,6 213:18
214:16,18
215:1
**manufacturers**
46:22 119:14
133:7
**manufacturing**
46:17 47:13
57:12,19 58:4
61:3,15
**march** 83:7 98:9
99:8,11,20
100:2,19 101:8
214:6 226:17
227:1 241:16
**mark** 211:1
244:8 245:10
245:14,17,21
246:5 253:5
**marked** 5:1
12:11 20:13
36:18 41:10
113:17 185:20
211:3 226:4
227:5 231:4
240:7,14 253:7
**marketplace**
59:19 60:3,5
60:15 61:1,6,7
258:18
**marking** 12:9
41:8 113:14
226:2 231:2
**marsh** 44:10
45:5 47:6 48:2
88:5
**mary** 1:16,21
138:14,17
140:4,5 285:4
**maryland** 2:16

3:7 6:5 8:2
**material** 55:3,4
213:16 214:11
215:2,4
**materially** 68:10
129:21 238:4
**materials** 9:8
14:8,10,11
58:8,11 137:13
231:13 281:22
**matter** 1:15 8:20
9:20 11:15
29:2 32:9
39:14 47:12
82:2 98:3,8
102:18 129:1
129:19 136:19
155:7 168:13
174:11 191:13
196:8 197:21
197:22 202:12
202:18 222:4
266:1
**matters** 15:4
16:6 96:14
169:11 174:20
**mayer** 1:18 3:11
6:16
**mcdonald**
244:11
**mean** 14:3 16:4
16:4 17:16
19:1 35:12
37:15,16 42:17
45:18 80:4,19
85:9 100:7
106:13 108:7
109:10 124:19
127:1 130:22
140:16 141:21
146:4,9 157:11
166:18 167:9
170:1 202:22
210:2,11
226:20 230:17

237:20 250:17
256:22 270:12
273:20 274:5
274:12 280:1
**meaning** 18:3
180:5 186:18
273:12
**means** 17:18
105:12 120:11
126:9 160:9
186:19 197:1
223:10 224:12
255:11 256:18
257:1 263:8
266:4 280:1
**mechanisms**
142:14
**media** 107:4
111:15
**medical** 24:8
46:11 137:4,7
242:16 260:12
260:12 265:6
266:13 275:12
**medication** 7:17
**meet** 21:19 47:7
50:12 55:22
56:2 83:21
124:5 138:6
176:14 177:22
181:10 215:5
**meeting** 80:3,8
80:11,13,14,17
84:3 85:18
86:1,5 138:9
138:18,19
140:4,8
**meetings** 51:4
66:17 79:14,20
81:3,5,6 140:3
**meets** 28:8
187:15
**members** 80:7
**mention** 20:20
24:8 64:3

169:10 247:12
**mentioned**
43:16 63:12
125:4
**mentioning**
18:20
**merely** 139:4
**meritless** 102:8
102:10
**message** 109:16
**met** 56:16,17
138:5 183:9
188:11 239:2
**methodology**
260:17
**miles** 3:5
**mind** 17:22 20:7
30:22 63:8
64:10 121:5
139:17 145:20
220:2 223:5,12
275:12
**minds** 178:12,15
181:18 195:21
196:9 197:22
220:5 238:18
**minimizing** 45:1
**minor** 144:12
215:19 216:3,7
220:13 222:11
242:15 270:18
**minute** 20:14
63:11 249:6
**minutes** 280:18
**mirama** 30:21
113:20
**mischaracterize**
53:17
**mischaracteri...**
208:22
**misleading**
111:7
**missing** 134:21
**mission** 117:16
118:3

**misspoken**
15:15
**mistake** 125:22
**mistaken** 158:13
**misunderstan...**
7:12
**mode** 148:11
222:4,6,14
251:9,11
**models** 11:20
**moderate** 14:20
17:7 278:18
**modified** 40:17
**modifying** 87:1
**moment** 132:2
281:16
**moments** 79:13
**money** 101:17
**monica** 2:6 6:15
**monitoring**
52:11 53:13
90:19
**months** 215:14
**morning** 6:11
241:15
**move** 106:2
157:17
**mullin** 3:4 4:5
15:13 31:10
33:4 34:4
45:16 63:4,7,9
69:17 76:1
77:8,13 78:18
83:15 93:10
94:2,11 95:6
100:4 110:7
120:6 122:11
123:11 128:1
140:14,22
144:22 146:15
149:4 155:3
163:15 164:1
166:21 180:10
181:21 183:2
187:13 190:10

194:5 196:2,13
197:5 198:9
199:13 200:18
201:8 202:20
203:17 205:18
207:3,6,12,17
216:13 220:14
225:14 232:19
235:10 240:8
245:18 246:7
250:7 251:13
253:2 255:13
256:20 257:7
262:21 263:3
267:20 268:2
269:6 271:20
272:20 275:4
275:19 277:10
280:17,22
282:15,18
**multiples** 216:12

_____
**N**
**n** 1:19 2:9 3:12
4:1,1 6:1
**name** 6:11 7:22
66:21 244:18
283:4 284:20
**narrative**
241:10,14
**national** 113:10
**nature** 26:10
105:3 137:8
166:17 167:3,9
172:17 199:21
250:3 252:11
253:17 258:21
275:9
**near** 250:20
251:4
**necessarily**
50:20 76:4
78:10 80:10,13
100:6 109:22
111:13 124:8

124:19 174:15
273:20 274:10
**necessary** 12:4
19:12 36:9,12
78:11 121:7,12
121:19 150:15
151:2,9 202:17
213:19 214:17
214:19 284:6
**necessitate**
253:18
**neck** 131:15
**need** 14:8 36:2
45:1 52:3,13
60:4 61:8 76:8
76:8,19 88:11
109:18 180:18
194:20 210:9
221:9 240:2
242:16 256:14
256:18
**needed** 35:22
49:12 110:3
120:20 143:21
226:18 228:2
235:8 245:13
**needs** 34:17
40:17 85:19
**neiss** 107:6
108:17,18,20
109:5,11,13,18
110:5,9
**neither** 206:13
208:1 285:10
**never** 66:20
94:20 95:2
99:10 112:20
112:21 134:7
135:13,20
138:4 190:8
204:18,21,21
207:9 211:18
211:19
**new** 41:7 63:6
79:3 86:22

106:2 171:9
**nhtsa** 46:7
**nhtsas** 46:7
**nice** 255:1
**nigel** 54:9,17
55:5 66:3,13
69:3 70:21
72:18 73:20
74:4 75:6,13
75:17 154:20
226:14
**nine** 133:12
193:1 215:14
263:12
**nonapplica**
25:13,14 27:3
**noncpsc** 45:13
**nonsafety** 87:16
**nonspectrum**
271:2,3
**nope** 234:15
251:2 266:15
**normally** 81:20
**north** 6:4 8:2
**nos** 226:3
**notary** 1:17 6:7
284:17 285:19
**note** 29:17 43:15
54:16 218:22
247:2
**noted** 248:10
**notes** 19:3,3
33:1,12 39:4
261:17,18
**notice** 1:16
168:13 211:5
225:5,7 231:12
248:3 268:22
269:4,11,12
271:5,8,11,14
283:1
**noticed** 157:19
**notices** 224:8
**notifications**
240:16

**notifies** 110:21 111:1
**nuisance** 98:8 101:13 102:3
**number** 6:19 11:4,7 25:6,19 26:9 28:12,16 28:19 71:17 84:18 107:19 114:19 115:3,8 115:20,21 116:1,9 117:3 128:16 133:21 147:11,16 150:18 161:14 167:22 194:1 214:3,22 221:20,22 233:22 237:21 237:22 244:18 258:18 262:6 273:9 274:2,7 281:14
**numbers** 114:18 237:8
**numerically** 26:13
**numerous** 50:10 275:11

**O**
**o** 4:1 6:1
**oath** 114:12,15 117:20
**object** 15:13 31:10 34:4 45:16 69:17 76:1 77:8,13 78:18 83:15 93:10 94:2,11 95:6 100:4 110:7 120:6 122:11 128:1 140:14,22 144:22 146:15

149:4 163:15 164:1 180:10 181:21 183:2 187:13 190:10 194:5 196:2,13 197:5 198:9 199:13 200:18 201:8 202:20 203:17 205:18 207:3,12,17 216:13 232:19 235:10 245:18 246:7 250:7 251:13 255:13 256:20 257:7 262:21 263:3 267:20 268:2 269:6 271:20 275:4,19 277:10
**objection** 123:11 163:18 220:14 272:20
**objectionable** 157:12,16 186:6
**obligate** 176:17
**obligated** 149:13 176:15 187:16 195:2 210:17
**obligation** 12:21 13:6 15:11 30:5,6 32:5,18 32:19 35:6 36:6 38:16 49:2 53:20 58:15 59:17 61:10 70:11,20 76:22 82:8 104:1,12 111:5 112:15 123:5 123:16,20 124:6,14 136:2 136:9 143:17 144:7 145:5

149:11,22 150:6 151:17 152:14,19 153:1,15 154:2 154:22 159:2 160:12,17,19 161:6 167:5 168:4 173:19 173:22 176:5,9 177:9 178:13 181:2,8,9 186:19,20,21 187:21 192:8 193:19 194:12 195:5 196:16 196:21 197:1 197:12,18 198:15,17 199:2 200:14 204:4 206:2 209:6,19 221:6 223:4,9 224:17 228:17,22 236:12 237:20 238:20 239:1,9 245:13,21 257:14 272:15 274:22 275:13 275:18 276:4 276:10 278:2 278:13,16 280:12
**obligations** 31:17 76:5,16 194:17
**obtain** 60:1 76:18 177:16 186:21
**obtained** 111:8 178:21 216:21
**obtaining** 57:8
**obtains** 58:8,13 58:19 125:12 179:20 199:16
**obviously** 42:6

71:13 89:22 96:12 106:14
**occasions** 64:2 131:12 132:1 184:21
**occur** 137:12 150:18 151:7 205:8 212:22
**occurred** 85:7 137:12 142:3 168:10 188:20 190:1 252:4,15
**occurring** 199:22 250:15 252:10,12
**occurs** 274:14
**october** 213:10
**offering** 15:3
**offhand** 249:7
**office** 6:16 34:9 70:19 99:14,19 107:19,21 114:9 156:13 156:18 157:8 172:9 207:11
**officer** 111:19 129:18 139:13 140:10 175:10 175:11 201:14 201:20 285:4
**officers** 79:8 140:10 208:16 262:6
**offices** 1:18 6:16
**officially** 215:14
**oftentimes** 168:8
**oh** 169:17 253:4
**okay** 16:10 41:20 44:4,8 64:8 72:6 92:21 97:9 100:12 156:12 161:7 169:22 193:16 210:5 282:1

**old** 94:8
**omitted** 169:13 169:14,19
**once** 195:8
**ones** 18:21 54:22 158:15,20 159:10
**ongoing** 6:18
**online** 227:15 228:3
**onsite** 141:22
**open** 238:14 239:4
**operate** 179:19
**operating** 51:1 106:14
**operations** 93:8 93:22
**opine** 12:20 160:18 280:3
**opined** 196:19
**opining** 54:1 159:1
**opinion** 13:9,17 14:9 15:2,3,5,8 15:19,21 16:7 17:22 19:11,17 31:19,21 36:12 37:22 38:18 39:14,15 53:22 56:13 62:7 75:21 77:6 103:20 129:13 135:6,13 136:8 160:9 164:16 172:2 195:6,12 195:13,14 197:9 198:14 198:18 199:1 200:11,17,20 200:21 202:12 203:10,12 205:14 206:12 222:20 248:8 250:18,18

262:18 263:2
263:17 267:22
268:16 272:14
276:3,8,17
277:1
**opinions** 8:20,22
9:4 28:4 49:21
86:18 211:19
246:15
**opportunity**
121:10 281:2
**opposed** 82:9
107:7 130:10
170:20 261:1
265:8
**opposite** 18:21
**order** 35:7 44:3
52:14 60:1
154:4 239:22
266:8
**ordinary** 116:14
251:5
**organization**
50:11
**organizational**
156:14
**original** 42:18
42:20 113:8
284:7
**originally**
204:13
**ought** 135:2
203:6
**outcome** 69:12
285:16
**outerwear**
131:13,15
171:15,15,16
**outlier** 39:6,12
**outside** 170:10
185:16 210:12
210:15 215:3
272:12
**overlap** 66:13
**oversee** 114:22

116:18
**oversees** 116:14
**oversight** 158:4
**overtalk** 256:22
**owned** 64:20
66:11

_____

**P**

**p** 2:5 6:1 155:6,8
156:2 282:19
**page** 4:10 12:13
13:3 16:22
21:1 22:22
37:20 40:1
41:13,21 42:12
42:19 43:17,18
44:9 54:13
55:4 56:9 64:6
64:7 72:5
79:17 84:12
87:2 96:9
103:19 106:3
114:17 116:17
118:9 119:7
125:1,8,8
150:9 156:9
161:22 166:14
166:20 175:13
183:15 185:21
200:5,6 205:1
227:21 231:16
241:11 244:10
244:10 247:7
252:20 257:22
268:20 283:5
**pages** 55:14,17
55:19
**pam** 244:11
**panel** 28:8 138:1
138:5,9 139:7
139:18 140:8
163:1 164:8,12
**panels** 138:6
162:21
**paper** 68:22

105:7 138:10
284:7
**paragraph**
14:18 17:1
37:20 41:22
44:16,17 71:22
72:4 79:17,18
84:12 87:2
89:19 97:6
156:17 166:21
183:16 186:18
187:5 212:2,4
212:12 213:9
213:13,20
215:11 216:20
233:16 253:13
268:21 269:18
**paragraphs**
72:19 216:19
**paraphrase** 13:5
17:5
**paraphrasing**
107:13
**parent** 50:19
**parrots** 126:13
**part** 10:16,18
26:4 47:6
57:10 62:15
63:17 65:10
73:15 74:21
78:6 81:1 82:7
93:6 96:13
108:14 112:9,9
191:4 202:9
244:8 281:1
**participate** 80:3
80:4,8,12,12
80:21 126:15
**particular** 17:21
18:3 39:19
49:22 50:17
51:3 53:1 73:2
96:21 100:10
110:16 112:1
139:22 148:18

169:9 205:2
210:20,21
229:15 239:13
243:19
**particularly**
47:14 263:22
**parties** 285:12
285:15
**parts** 62:18
**passing** 270:15
**pattern** 167:22
218:5,6 263:20
**patterns** 109:9
204:1
**pay** 152:17,20
177:9 243:21
**pd** 28:15 29:16
33:4,7 37:1,12
39:18 165:17
166:4 185:1
189:8 193:11
259:10
**pds** 25:15
183:16 184:20
267:12
**penalties** 10:1
**penalty** 30:11
75:18 114:2
152:18,21
177:6,9 181:14
182:22 197:16
206:3,6,9,14
218:20 229:8
238:9
**people** 28:19
46:20 49:17,18
49:20 51:4,5
51:11,14 52:13
59:11 73:3
74:18 78:9
81:3 91:3
95:22 118:12
139:8 148:22
201:16 206:22
246:11 249:3,4

**perceive** 194:16
**percent** 73:22
280:1
**perception**
206:20,22
208:5
**perform** 142:13
279:1,8
**performed**
214:1,4 261:13
**peril** 102:22
**period** 13:10
14:19 42:4,8
68:15 70:6
98:10,16 106:7
106:18 120:17
120:20 134:17
182:8 269:21
270:12
**periodically**
48:22
**perjury** 75:18
**person** 56:2
73:19 75:5
80:12,22 85:20
139:11
**personal** 69:8,11
250:18 251:2
**personally**
239:17
**personnel** 65:22
66:5
**persons** 48:22
**pertain** 58:13
**pertained** 55:8
**pertains** 57:18
**pertinent** 267:18
**phelps** 2:5 6:13
**phone** 48:8
56:18 80:12,22
127:12 130:19
244:18
**phrase** 45:22
**physiologist**
266:11

pi 63:15 64:4
  65:2 73:18
  133:8 137:9,18
  141:11 143:7
  144:3,20 153:8
  157:20 158:2
  162:11,17,19
  163:7 172:22
  189:2,7 191:20
  192:3,14,18
  218:14 219:19
  229:1 234:13
  236:21 238:1
  239:12 251:18
  251:21 253:11
  254:17 272:10
pi050023 247:9
  248:10 282:11
pi070025 247:12
  282:11
pick 127:12
piece 223:7
  238:13,15
  242:19
pieces 88:7
place 11:22
  15:10 30:4
  35:8 41:6
  48:13 49:12
  53:12,19 54:1
  54:4 59:1 60:3
  60:7,10,13,16
  61:12 64:14
  65:9 67:7
  78:22 86:14
  88:11,13,19
  96:4 103:21
  104:10 150:16
  151:5 186:1
  256:9,10
plaintiff 1:5,15
  2:3 4:3 6:6,9
  156:7
plan 40:15,16
  41:1,5

plastic 212:14
  212:16 213:6
  213:16 214:10
  242:11
plastics 215:3
plate 241:20
play 205:16,21
  260:3
playing 208:20
please 7:7,11,21
  20:13 22:21
  32:14 41:12
  52:9 54:13
  71:3 106:3
  114:17 122:22
  125:1 150:9
  156:9 161:22
  166:14 177:1
  183:15 244:7
  244:13 245:10
  247:6 255:8
  257:22 268:20
plus 63:15
  160:14 173:13
pod 249:11
  250:17,20
  262:1
pods 133:14
point 12:2 31:6
  52:8 64:15
  65:12 90:3
  105:16 197:21
  203:12,15
  251:2 273:19
points 52:13
policies 8:9,15
  106:16
policy 162:16
  262:10 265:22
pops 227:20
population
  168:2
portion 96:21
portions 63:2
posed 250:14

poses 28:9
position 42:3,7
  108:13 119:15
  122:1,9,17,17
  123:8,9,14
  223:16,18
  238:22 263:6
  269:20 270:11
  270:14
positions 194:16
possession 43:8
  145:3 149:20
  150:8 152:5,10
  153:3 194:9
  230:22
possible 22:19
  23:6,7,11,19
  23:22 82:14,16
  82:17,20
  118:11 132:12
  134:10 143:21
  147:9,18
  178:11 192:16
  249:19 250:12
possibly 78:17
  100:2 111:10
  112:14
posted 217:21
pot 147:1,21
  242:2 249:10
potential 21:2
  76:13 82:12,15
  107:2,10
  110:21 118:16
  119:4 121:13
  145:9 149:7
  150:15 151:1
  151:13 182:22
  234:5 237:15
  249:15 266:17
  270:7 272:4
  274:7
potentially
  28:19 116:12
  119:17 120:3

120:14 148:22
  151:6 193:22
  213:7
potomac 6:5 8:2
pour 251:7
pours 22:7
practical 140:19
practice 68:21
  93:4 104:19
  280:14
practices 57:12
  105:2
practitioner
  255:17
precaution
  90:18
precautions
  90:14,16,21
precedential
  201:3,5
preceding
  105:17
precluded
  202:17 203:2
  273:4
precludes
  202:13
preliminarily
  164:22 171:16
  171:20 183:22
preliminary
  18:4,8 19:4
  20:5,16 26:2
  28:7 29:1,4,9
  29:11,18 30:1
  32:12,17 36:22
  37:5,8 38:22
  42:21 137:16
  137:17,20,22
  138:4,6,22
  139:3,6 140:6
  140:7,12,20
  162:11,16,20
  163:9,13,21
  164:4,6,7,12

164:15 165:3,7
  165:11 169:6
  169:11 171:12
  173:14 176:22
  184:10,18
  185:10 200:7
  209:12 232:3
  232:13 261:6
  263:13 273:1
premarket
  61:22
preparing 45:1
presence 284:14
present 12:5
  16:1 31:3
  51:17 52:7
  59:15 85:6
  86:18 90:10
  103:5 112:11
  115:8,12 132:7
  134:12 164:16
  183:19 188:5,9
  189:1,5 190:2
  199:22 236:5
presented 38:17
  103:10 116:13
  160:5 161:13
  164:17 201:22
  222:19 229:17
  253:18 259:3
  259:12 260:6
  265:19
presenting
  143:20 236:19
presents 31:15
  109:7 119:5
  125:14 148:21
  183:18 186:11
  187:7 190:6
press 209:7
  227:9,12
presumably
  67:1 90:5,6
  148:8 197:11
  252:13 258:15

259:4 265:10
271:17 272:3
**presume** 201:12
**presumes**
120:22 121:2
**pretty** 69:16
70:1 85:10
90:10 246:15
246:18
**prevalence**
28:10
**prevalent**
147:10
**prevent** 7:18
59:9 60:2
**prevents** 58:21
60:14
**previous** 98:22
99:15 100:9
101:3 103:13
200:1,15
204:12 272:3
**previously** 5:1
20:13 129:2,19
185:19 192:14
240:6,14 241:4
**primarily** 271:2
**primary** 108:19
**printout** 4:16,17
**prior** 19:14 65:2
83:7 98:15
99:11,12,20
100:1,19 101:7
101:8 105:16
149:3 150:3
159:3,17
191:12 192:2
200:12 203:22
204:6,16,19
227:1 233:2
235:3
**pristine** 60:12
62:6
**privy** 99:4 227:3
**proactively**

63:16 64:1
118:9,12 119:3
254:8 255:18
256:3
**probably** 32:7
38:3 53:11
72:13 117:5,10
127:22 130:1
178:14 186:7
246:9 248:17
**problem** 21:2,18
59:14 70:16
88:17 95:12
96:5 119:5,19
120:5 121:13
130:11,12
147:10 149:1
151:9,13 152:2
169:3 213:16
213:18 214:16
214:18 215:7
264:4,6
**problems** 88:14
89:7 95:15,16
95:17 107:2,11
108:10,22
110:21 147:15
167:13 191:22
214:10
**procedure** 49:3
76:20 88:13
91:21 94:22
95:5
**procedures** 8:9
8:16 15:9,17
16:19 44:22
53:19 54:3,5
54:10,15 57:2
57:5 60:7,10
88:11 90:22
91:17 93:7,21
94:1,10 96:3
103:21 104:9
105:6 106:16
106:20 139:18

156:20 165:4
**proceedings**
1:20
**process** 35:2
40:20 46:13
51:10 52:9,10
57:8 60:5,13
61:22,22 62:4
67:18 70:7
77:2,4 86:13
87:7,14 89:11
92:2 96:13
105:7 112:10
135:8 139:9
178:11 186:13
199:8 219:2
269:12
**processes** 16:8
16:11,15,19
54:15 57:2,5
57:19 90:22
91:4 93:4,9
95:21 96:3
**processing**
213:17 214:11
**processrelated**
95:15,16
**produce** 60:20
**produced** 14:3,5
46:15 268:5
**product** 2:14
6:15 8:8 9:12
11:5 14:22
17:8,14 18:13
20:1,4,6 28:3,8
28:9,20,22
29:2 30:9,18
30:20 31:3,4
31:13,15 32:3
32:12 33:10
34:13 35:3,5
37:5,6,18 38:6
39:1 45:1,2,3
47:15,17 48:7
49:22 52:1,1,4

52:7,11,18,19
52:19 58:13,14
59:15 60:8
61:4,7 65:18
70:17 71:14
72:20 73:13,14
74:10,13,17
76:7,9 82:9
85:2,5,11 88:1
89:10,20 90:4
90:9,15,19
91:17,20 92:2
92:5,10 93:9
93:13,18 94:1
94:7,9,21 95:5
100:10,14
101:15 103:5
103:10,10,15
107:10 108:10
108:21 109:7
110:3,16
111:16,18
112:1,3,7,14
115:7,8 116:13
118:10,13,16
118:19 119:4
121:13 124:4
125:13,14
130:17 131:17
131:20 132:13
132:15,22
133:17,21
134:7,12 136:5
139:5 140:13
142:18 143:3
144:5 147:20
148:19,20
151:22 152:2
161:13 162:7
164:18,19,22
165:20 167:13
168:20 169:2,9
171:7,8,10,13
171:17 173:8
174:13 175:18

175:19 177:18
179:22,22
180:2,3,7,8,17
180:18 182:4
182:16,17
183:18,18,19
185:4,17
186:10 187:2,4
187:6,7,11,11
187:20 188:5,5
188:8,9 190:3
190:8,19 193:7
193:12 195:2
195:19,20
199:18 200:1
201:1,18,22
202:2,3,4
204:1 205:4,11
209:3 217:3
218:13,17
219:22 220:6
221:10 223:19
223:22 225:19
229:11,18
232:3,8,17
243:9,11 250:1
253:18 256:1
258:21,22
259:22 262:11
262:15 263:11
271:5 273:13
274:14 276:11
276:13 278:5
278:20
**products** 10:12
11:9,16 28:12
32:2 34:1
46:10,15 47:4
47:22 48:14
52:11 53:12,14
57:3,7 58:8,20
58:22 59:3,5,9
59:11,19,20
60:2,5,8,15,20
60:21,22,22

61:3,5,12,14
62:1 70:9 74:6
75:3 77:3
78:12 84:17
87:10 89:8,16
90:1 91:1,4
93:6 94:19,20
95:3 96:1
101:22 107:2
109:1,10
110:22 113:11
114:22 115:4
116:2,10,19
117:15 119:16
119:18 120:3
132:3,6,8
168:1,18
209:16 222:18
233:19 258:17
259:1,13
261:18
**productspecific**
108:20 110:1
110:10
**program** 10:7
10:17,18 16:3
49:15 50:1,3,5
50:6,18 51:8
55:9 56:1
60:17 61:12
62:15 63:1,3
64:18 77:6
78:3,17,22
79:1 88:18,19
192:19 209:11
254:12
**programmable**
212:13
**programs** 8:10
12:22 15:22
16:1 44:7
45:10,12,13,15
46:4 47:8 48:3
49:8,11,12
50:20,21 51:14

54:1 55:3
56:11 60:4
62:8,11,20
64:11,13,14,17
65:22 66:6
67:5,7,10,11
67:12 68:21
69:1,4 71:8
75:22 88:6
104:4,5,6,19
105:21 280:4
**prohibited** 11:7
11:11
**prohibition**
184:16
**promote** 175:8
**promulgated**
271:9
**proof** 130:2
**proposed** 40:14
40:17 41:5
**proposition**
271:18
**prosecute** 207:2
207:16
**protect** 129:17
**protecting**
208:20
**protection** 2:8
131:19
**protracted**
101:18,20
**prove** 187:3
**provide** 7:14
35:17 47:1
106:6 113:19
120:21 127:1
130:14 132:11
134:16 170:5
236:10
**provided** 9:1
12:18 13:20
14:10,12 37:9
41:14 74:20
92:11 130:18

134:15,20
146:6 160:2
188:18 231:9
243:7 268:18
279:6,12
**provides** 75:8,12
111:3 281:9
**provision**
118:18 119:11
**provisions** 278:8
**public** 1:17 6:7
10:13 29:19
59:16 107:4
126:15 127:16
133:5 152:3
174:22 176:12
184:16,19
192:9 204:17
208:21 211:12
217:22 220:11
224:10,11
273:1,2,6
284:17 285:19
**publication**
57:11,14
**publicize** 185:8
**publicized** 184:9
**publicly** 140:2
174:2 222:10
**publish** 171:11
172:15,18
**published** 211:6
211:14 271:15
**publishes** 168:5
**pull** 227:15
**purpose** 59:8
164:14
**purposes** 12:5
83:21 140:20
**pursuant** 1:15
**pursue** 112:21
164:20 165:2
210:8
**pursued** 209:12
**pursuing** 134:2

238:9
**put** 49:18 61:6
90:4,7,11
94:20 95:11,11
129:14 169:4
226:1 227:19
**puts** 41:1

_____
**Q**
**qualified** 104:6
120:12
**qualifies** 58:10
**qualify** 195:13
**qualifying**
122:16
**quality** 48:18
51:10 54:18
66:17,20 68:6
69:6 72:2,8,11
72:14 76:9
79:14,20 80:7
81:10,12,17
82:10 84:16
87:21 101:15
**question** 7:10
15:14 31:11
32:6,7,21 34:5
39:22 45:17
64:9 67:13
69:18 76:2
77:9,14 78:19
83:16,21 93:11
93:19,20 94:3
94:12 95:7
100:5 110:8
113:8 115:1
117:6 118:8,13
120:7 122:12
127:11 128:2
140:15,17
141:1,3 145:1
146:10,16
149:5 160:20
163:16 164:2
177:13 179:4,8

179:14 180:11
180:12,15
181:4,22 183:3
187:11 190:4,5
190:11 193:17
194:6 196:3,14
197:6 198:10
199:14 200:19
201:9 202:21
203:18 205:19
207:4,13,18
216:14 220:15
225:14 232:16
232:20 233:13
233:15 235:11
243:15 245:15
245:19 246:8
249:13 251:14
255:14 256:21
257:8 263:4
268:3 269:7
271:21 272:21
275:5,20 277:9
277:11 281:18
281:19
**questions** 7:7
9:19 63:5 79:6
94:15 157:18
244:12 257:22
280:17
**quibbling** 123:6
123:15
**quick** 157:18
240:9
**quickly** 108:16
108:18 226:1
**quite** 57:17
128:18 150:12
255:15
**quoting** 126:1

_____
**R**
**r** 6:1
**raise** 36:5
**raised** 84:8

**ramifications**
69:9
**ran** 166:7 172:5
**randomly**
188:16
**rationale** 259:19
**raw** 58:8
**reach** 136:13
154:4 160:3
161:4 181:13
192:20 199:10
199:19,20
268:9,12 279:7
**reached** 17:12
27:17 32:2
44:2 124:7
160:4 173:8
177:4 188:10
268:9 278:15
279:3
**reaches** 124:17
225:2 254:13
**reaching** 104:13
104:22 175:12
177:15 202:1
**read** 23:8 39:4
45:3 77:22
91:22 101:12
102:2,11 104:1
136:16 137:6
139:1 150:11
151:16 174:3
190:9 211:10
219:6 233:12
233:13 234:21
251:20 264:9
266:16,19
267:16,17
268:6,11,11
282:3,18 283:5
284:2
**reading** 33:2,3
37:19 44:16
64:6 80:5
101:19 140:1

174:8
**reads** 233:16
283:5
**real** 86:8
**really** 29:2
35:21 36:4
57:7 67:8
80:20 86:3
146:10 157:12
172:15 174:11
229:12
**realm** 26:13
91:9
**reason** 7:14
42:13 103:2
108:14 191:3
202:8 255:5
267:14
**reasonable** 15:9
15:17 22:18
52:15 54:7,10
57:1 62:16
77:7 78:17
83:14 84:1
90:14,16,18,21
91:3 96:3
103:20 104:4,9
105:22 110:4
120:17 124:8
136:8 143:8,14
144:2 148:16
153:9 161:4
177:15 178:12
178:15,17,18
179:7,12 180:6
180:16 181:17
181:18,18
182:6,21
186:15 187:10
189:17 194:19
194:22 195:18
195:21,22
196:9 197:2,22
198:2,3,7
201:10 203:4

203:13 204:2
204:15 235:7
235:20 236:1,4
256:9 257:17
277:4 280:5
**reasonableness**
75:21 94:21
105:1,12
196:20
**reasonably**
21:15 60:22
124:2 125:12
125:17,18,19
143:19 150:8
159:16,20
175:17,18
176:4 177:17
178:22 179:21
180:21,22
181:8 182:1,14
182:15 186:22
191:12 197:11
199:16 200:12
216:21 224:7
236:22 237:1,3
243:9 248:8
254:20,22
258:6 274:18
278:3
**reasoned** 206:1
**reasoning**
182:21
**reasons** 153:18
197:14
**recall** 10:13
24:12 25:17
30:6,12,19
32:20 36:16
49:10 55:7,10
58:3 66:2,3
67:20,21 68:18
70:6 79:7 91:5
92:20 93:7,21
101:22 102:6
102:14,20

121:12,18
123:2 126:11
126:12 134:4
142:4,8 150:15
150:16 151:2,5
151:5,9,14
158:18,21
164:19,20
165:8,10,17
175:7 186:20
187:3 202:6
209:8,12 210:8
219:21 221:10
229:1 234:21
240:20 249:7
259:6 263:14
264:20,22
265:2 267:3,13
271:11
**recalled** 11:9
91:8,16 93:6
93:13 94:18
95:3 234:1
**recalls** 36:14
45:1,2,3 46:10
103:1 156:19
165:15 203:9
**receive** 174:4
243:8
**received** 24:22
38:8 73:22
74:6 83:3
158:18,20
159:22 186:14
214:1 215:18
218:10 241:6
243:2 245:2
248:1 255:19
255:21 270:18
275:2
**receives** 58:13
132:4 174:7
224:8 237:14
**receiving** 83:13
213:10 215:14

236:3 237:7
254:20
**recess** 71:4
240:11 280:20
**recessed** 155:7
**recipient** 143:12
**reciting** 179:15
**recognize**
148:22 253:9
**recognized**
157:15
**recollection** 68:5
75:13 139:14
158:9 248:16
**reconvene** 155:8
**record** 7:22 71:3
76:8 77:18
83:11 156:3
206:5 284:4
**recovering** 45:2
**redesigned**
33:13
**reduce** 151:6,6
**reduced** 285:9
**refer** 11:19 12:3
22:2
**reference** 55:14
156:18 247:9
**referenced** 5:1
39:17 54:17
92:9 97:6
**referring** 19:22
20:2 54:21
57:7 115:3
163:8 251:15
**reflect** 43:4
144:16 145:14
159:7
**reflected** 43:17
142:6,9
**reflecting**
279:17
**reflection**
144:13
**reflects** 92:12

| | | | | |
|---|---|---|---|---|
| **refresh** 125:6 | 239:14 | **render** 14:8 | 121:19 124:12 | 231:21 233:4 |
| **refund** 36:15 | **relative** 285:13 | 196:6 | 124:18,20 | 235:8 237:16 |
| **reg** 204:10 | **release** 227:10 | **reopen** 203:6 | 125:16 127:12 | 240:2,22 |
| **regard** 75:20 | **released** 57:15 | **repair** 36:15 | 127:13,18,21 | 242:21 245:16 |
| **regarding** 8:8 | **releases** 209:7 | **repeat** 7:11 | 128:4,6 130:9 | 247:6,16 |
| 211:7 233:20 | 227:12 | 178:20 180:12 | 131:1,1,6 | 252:21 253:15 |
| 241:1 244:13 | **relevance** 64:10 | 191:10 | 133:10,22 | 254:3,8 255:2 |
| 248:5 | **relevant** 14:19 | **rephrase** 163:17 | 136:18 137:15 | 255:3,4,8 |
| **regardless** 210:8 | 42:3,8 70:14 | **replacement** | 141:17 143:2 | 256:3,5,12,18 |
| 265:9 274:2,7 | 70:15,16 91:16 | 36:15 212:3,18 | 144:21 145:5 | 256:18 257:1,2 |
| **register** 4:15 | 91:18 265:16 | 212:19 217:1 | 145:15 146:6 | 257:14,15,18 |
| 168:6 171:11 | 269:20 | **report** 4:11,12 | 146:18 148:1 | 257:19,20,22 |
| 172:16,19 | **reliant** 36:5 | 8:17 9:1,5,9 | 149:14 151:18 | 258:1 261:9 |
| 211:6,11 | **relied** 97:2 | 10:8 12:1,14 | 151:21 152:14 | 266:21 268:16 |
| 217:21 | 98:19,22 99:12 | 12:17,20 13:14 | 153:16 154:10 | 270:3,13 |
| **regular** 61:5 | 100:2 101:7 | 14:13,14 15:18 | 156:6,10 158:4 | 274:14,15,17 |
| **regularly** 17:19 | 136:6,7 159:16 | 16:7 17:1,11 | 159:7 160:19 | 274:21 277:4 |
| 280:2 | 159:20 192:3 | 18:1,10,15,16 | 162:1 164:21 | 277:13,20 |
| **regulated** 184:5 | 236:22 237:2,3 | 19:5 20:20 | 166:15 170:21 | 278:13,16 |
| **regulation** 21:20 | 254:2 279:7 | 23:14 26:20,22 | 171:5 173:6 | 279:9 280:9 |
| 38:11 46:6 | **relief** 10:2 | 27:7,9,19 29:7 | 176:5,8,9,10 | 281:2,6,22 |
| 121:4 126:10 | **relies** 118:22 | 30:3 33:2,3 | 176:15,17,18 | 282:3 |
| 126:13 | **rely** 96:22 110:4 | 35:22 36:2,6 | 177:2,14,20 | **reportable** |
| **regulations** 9:11 | 113:13 118:17 | 38:1,20 39:5,9 | 178:1,19 179:3 | 35:14,15,17 |
| 9:14 35:22 | 143:8 150:2,4 | 39:10 41:14,18 | 180:1,4,9,18 | 36:7 38:5,9,14 |
| 120:10,21 | 159:22 191:12 | 42:11,16,18,20 | 181:2,9,11,12 | 108:13 111:11 |
| 126:5,22 127:3 | 191:13 200:12 | 43:1,4,9,12,15 | 181:20 182:7,8 | 111:14 123:17 |
| 159:5 166:16 | 204:15,20 | 43:19 44:1,9 | 182:11 183:14 | 127:10 128:15 |
| 178:8,10 192:9 | 224:7 258:6 | 49:6 54:12,14 | 186:12 187:17 | 128:17 129:6,9 |
| 196:11 204:7 | 268:1 | 58:1,15 62:22 | 187:21 188:18 | 129:11 130:7 |
| 204:13 210:17 | **relying** 103:13 | 63:18 65:13 | 193:15 194:20 | 130:10 131:8 |
| 271:9 277:14 | 119:8 129:21 | 66:18,19,20,21 | 195:3,5,9 | 167:17 168:15 |
| 277:19 | 143:5 154:19 | 67:22 68:3 | 196:12,19 | 168:21 175:21 |
| **regulatory** | 235:7 | 70:21 71:9 | 197:4,13,14,18 | 184:1 200:9 |
| 44:14,20 45:14 | **remedy** 31:9 | 72:11 74:2,17 | 198:15,17 | 205:3 219:11 |
| 45:19,22 46:2 | 281:11 | 74:17,19 82:3 | 199:9,19 200:3 | 220:13 222:12 |
| 49:6 54:19 | **remember** 39:13 | 82:22 86:18 | 200:6 204:8,10 | 223:14,17 |
| 61:10 277:14 | 55:12,18 68:14 | 87:1 96:14 | 205:7 208:17 | 224:14 225:20 |
| 277:16 278:8 | 143:8 214:3 | 97:19 98:3,6 | 210:4,5,9 | 230:16,17 |
| **relate** 227:6 | 234:12 249:11 | 98:12,20 101:3 | 215:17 217:3 | 243:12,15 |
| **related** 34:21 | **remembered** | 101:21 102:5 | 217:12 218:2 | 270:22 273:21 |
| 285:11 | 42:20 | 102:16 103:6 | 221:1 222:15 | **reported** 13:10 |
| **relates** 212:2 | **remembering** | 106:3 111:15 | 223:9 224:7,15 | 25:1,6 26:10 |
| **relating** 57:6 | 139:12 | 113:9 119:17 | 226:10,18 | 63:16 64:1,16 |
| 113:10 153:3 | **removed** 241:19 | 120:3,13 | 228:2,9,18 | 66:10 67:15 |

69:7 87:22
97:15 98:15
102:17 103:17
110:3 132:13
133:3,6 141:6
142:3 143:22
146:13,18
147:17,22
149:2 153:18
171:2 174:2
177:5 184:17
187:12 192:18
197:14 209:8
209:10 215:12
216:7 225:6,9
225:21 227:2
230:18 232:7
233:10 234:18
235:14,19
236:6 239:19
244:5 246:13
252:4 255:5,18
256:4,13
257:15 272:2
273:14 282:7
282:12
**reporter** 285:1
**reporting** 8:16
10:2,5 11:1
12:21 13:6
15:11 30:5,8
30:17 31:2,6
31:17 32:5,10
32:15,18 35:6
38:16 44:22
46:7,10 49:2
53:20 54:15
59:7,8,17
60:18 61:9
62:21 65:6
67:18 70:11,20
76:5,5,16,22
82:6,8 83:12
99:20 100:8
101:11 103:22

104:12 106:21
107:11,15
108:3,15 111:5
112:14 118:18
118:22 119:9
119:12 121:9
123:5,5,16,19
124:6,14 125:5
125:6 126:8
134:3 135:7,21
136:2,9 142:22
143:16 144:7
149:11,22
150:6 151:17
152:6,13,19
153:1,9,14
154:1,22 159:2
160:12,16
161:5 162:3
166:17 167:3,5
167:15 168:3
173:18,22
176:9 177:5,8
178:13,17
179:16 181:7
181:17 186:9
186:12,19,21
187:8,16
189:10 192:8
192:13,19
193:18 194:2
194:12,17
196:1,16,20,21
196:22 198:7
199:1 200:13
204:4 205:5
206:2 209:6,11
209:19 220:4
221:6 223:4
224:16 228:21
232:12 233:19
235:21 236:11
237:20 238:20
239:1,3,9
245:10,13,21

246:19 272:15
273:9,11,12,21
274:13,22
275:13,18
276:3,9 277:7
277:8 278:2,11
280:11
**reports** 24:3,6,7
25:2,21 29:8
33:13 48:17
66:17 72:2,8
72:15 107:4,12
108:12 133:15
133:22 137:3,3
141:14 142:8
144:9,11 146:4
150:14 173:2
184:15 188:17
189:4 213:10
215:15,18,19
215:21 216:2
218:15 219:15
223:1 228:11
240:16 243:6
245:2 247:22
254:11 275:10
275:11
**represent**
134:10
**representations**
137:14
**representatives**
126:14
**represented**
99:17 100:21
102:11
**representing**
284:10
**represents** 105:7
**request** 14:7
87:20 88:3
255:2 256:5,13
257:2,16,19
**requested** 268:6
281:7

**requesting**
39:19 40:4
**requests** 74:1
87:3,7 89:2
173:2 184:21
**require** 273:13
**required** 10:9
33:15 119:17
125:16 135:11
135:14 170:7
171:5,6 172:15
177:20 178:1
179:3 181:20
186:12 199:19
217:8 245:8
257:15
**requirement**
10:3 11:1 30:8
30:17 31:2,7
59:8,9 62:21
107:12 108:3
108:15 118:22
119:9,12 125:5
125:6 126:9
135:21 142:22
152:6 166:17
273:11,22
274:13 277:7,9
**requirements**
10:6 44:14,20
44:22 45:22
46:3,8,9 50:12
60:18 76:5
194:2 233:20
246:19
**requires** 30:2
199:12
**requiring** 24:8
34:2,15
**reread** 41:21
**resolve** 88:9,12
102:13,18
152:22 195:10
**resolved** 101:13
102:2,3

**requesting**
**resources**
117:17 118:6
119:3
**respect** 8:15
15:21 16:7
55:2 57:19
140:11 141:13
148:18 149:21
172:13 270:14
**respectively**
214:7
**respond** 117:9
119:10
**response** 116:20
118:15 173:1
184:21 217:16
233:13 255:2
256:4,13 257:1
257:16,19
**responsibilities**
78:8 79:2,5
156:15 172:12
**responsibility**
48:7 68:19
69:20 70:1,5
70:14 74:19
84:21 85:1
**responsible** 49:1
75:2 83:12
85:13,20,20
100:8
**restate** 279:4
**result** 27:13
28:22 85:14
87:1 109:13
197:15 215:20
230:12 232:13
282:8
**resulted** 27:13
102:14 242:13
**resulting** 212:21
263:7,9,9,10
**results** 193:11
205:4 222:1
**resumed** 156:7

**retailer** 125:11
**retailers** 119:14
  122:4,15 123:3
**retain** 45:9
**retained** 8:4
  14:6 122:12
  215:3
**retrievals** 72:20
**retrieve** 73:12
  73:12
**retrieving** 77:3
**retrospectively**
  252:7
**returned** 75:3
  89:10 214:1,4
**returns** 73:22
**revealed** 213:16
**review** 8:19 10:8
  17:2,6 20:14
  48:4,12 56:22
  65:11 72:8
  73:21 74:22
  89:5 91:11,20
  122:8,19,21
  123:1 134:10
  141:6 145:12
  157:21 158:7
  160:10 161:14
  199:5 216:5
  244:20 268:17
  279:12 281:1,2
**reviewed** 9:8
  13:13,16,19
  14:4 24:11
  25:8,10,15
  54:6,8,16
  63:22 74:3,18
  92:1,4 104:15
  105:18 142:21
  145:14,15
  154:7 157:6,7
  159:10 161:11
  169:12 186:7
  197:10 199:6
  201:14 235:1

239:21 261:5
261:11 265:21
267:12 276:2
276:14,18
278:14 279:10
279:11,18
281:22 282:5
282:10
**reviewing** 26:5
  56:8 123:2
  145:11 218:4
  234:12
**reviews** 41:3
  145:6
**revised** 92:15,19
  93:18
**revision** 92:5,22
  93:2
**rid** 98:6 101:10
  102:1
**right** 6:13 8:10
  10:4 11:6
  12:22 13:3,7
  15:12 16:2
  17:9 20:1,7,21
  21:4,7,10 22:5
  22:10,11,13,14
  23:2,8 24:9,15
  27:4 29:5,13
  29:20 33:10
  35:4 36:10,11
  36:14 37:6,10
  39:2 40:5,12
  42:16 43:9,20
  44:11 45:3
  50:8,13 51:6,7
  51:19 52:21
  53:2,6,9,14
  54:7,19 55:15
  55:20 57:3,15
  57:16,19,20
  58:2,18 60:6
  61:13 62:2,21
  62:22 63:16
  64:5 65:3,4,7

65:10,12,15,19
65:20 66:7,8
67:10,15 68:1
68:22 69:1
70:2 71:11,15
71:19 72:2,20
73:4 74:6 78:6
78:13,14 79:15
81:3 82:16
84:18,19 85:3
85:7,11,12,16
86:19 87:11,12
88:15,20 89:3
89:20 90:1,5
90:11 91:9,10
91:21 92:2,6
95:12,15,21
96:7,8 98:10
99:21,22 100:3
103:6,11,12,16
104:20 105:3
105:12,19
107:6,7,13,16
107:19 110:6
110:22 112:4,7
112:10 114:2,5
114:12 115:5,9
115:12,14,16
115:18 116:2,5
116:10,15,16
120:11,12,15
120:16 121:19
124:20 125:16
125:20,21
126:1,2,5,9,11
126:19 128:10
132:4,8 137:12
138:21 139:22
141:7,15
142:15,19
147:2,6,7,12
147:17 148:14
150:3 151:10
151:11,15,16
152:7,20,21

153:20 154:10
154:11,13,14
154:19 156:15
157:1 159:12
159:21 160:10
160:12 161:8
162:3,8 163:2
163:10 165:21
166:4,5 168:6
168:10 170:7
174:6,20
175:22 178:3,6
178:9 180:1
182:18 183:1,4
183:11 184:6
184:13 185:11
186:2,7 188:13
190:20 191:14
191:15 192:4,5
192:10,11
193:20 199:5
200:14 204:2
204:18 208:3,7
208:14 211:12
211:16,20,21
212:8,16,17
213:7,11,20
214:7,8,13,19
214:20 215:15
215:16 216:7
216:10,12,17
216:18 217:18
218:2,3 219:7
219:12 221:2
221:17,21
225:10,11
226:18,19
227:3,10,13,16
228:5,9,13
229:15 231:22
232:1,4,5,9,10
232:14,15,18
233:4,7,11,12
234:6,7,9,10
235:4,5,9

236:14,19,22
237:6,9,18
238:1,5,6
239:14,15
240:3,17 242:3
242:9,21 243:3
243:4,12,13,17
244:5,18
245:17 246:13
246:14,16,19
247:10,12,17
247:20 248:5
248:12 250:6
252:2 254:3
256:15,16
257:4 258:7,14
259:9,17 261:3
261:7 266:9,14
266:18 269:2
270:3,4,8,22
271:6,15,19
272:8,10,11,16
272:17 273:10
274:3 276:12
276:21,22
277:7 278:20
279:3,20 280:5
280:14
**righthand**
  114:18 212:1
**ring** 234:11
**rise** 14:21 28:5
  129:3 136:4
  143:10 149:17
  160:5 173:8,9
  173:15 187:19
  189:14 190:2
  190:18 192:21
  195:19 198:2
  201:18 203:7
  205:10 209:3,4
  209:16,17
  218:12,17
  219:22 220:8
  221:8,14

223:19 229:4
229:11 231:19
252:17 254:14
259:22 260:10
262:14 263:11
278:20 279:16
**rises** 31:14
133:20 149:15
164:17 195:4
**risk** 14:20 23:3,3
24:21 28:1
31:9,16 36:8
52:7 58:13
59:15 85:6
90:5,7,8
112:11,20
124:4 125:15
131:9 133:20
134:1 136:4,10
136:14 137:8
141:5 142:17
147:11 148:21
149:18,21
152:3 153:7,8
160:4 161:12
164:17 166:2
167:17 171:7
173:9,15
175:20 176:11
176:12 177:19
179:2 185:2
188:6,8 189:11
189:15 190:2,6
190:18,20,21
199:22 201:22
203:7 204:1
210:20,21
218:11,12
221:16 222:5
222:18 224:21
229:10,17,20
230:2,6,12,15
250:5,12,14
251:18,19,21
251:22 253:17

254:13 258:14
258:15,16
259:3,11,12
260:7,18
261:13,21,21
265:18 266:2
272:4 273:10
274:1 275:9
278:1,6,19
**risking** 189:20
**risks** 17:7 38:17
106:17 143:20
172:16 187:19
205:9 209:3
210:7 220:7
221:14 224:5
259:16 260:6
**risky** 85:11
250:19
**road** 209:21
**role** 68:10 70:8
157:3
**rolling** 6:4 8:1,2
**room** 49:17
86:21
**rooms** 109:15
**root** 89:7
**rose** 225:18
**ross** 2:4 4:4 6:10
6:12 12:12
15:16 31:18
33:6 34:7
41:11 45:20
63:5,8,10
69:21 71:2,5
77:11 78:1
79:11 83:19
93:14 94:5,16
95:9 100:16
110:19 113:18
120:9 122:18
123:18 128:7
140:18 141:4
145:7 146:19
149:9 155:5

156:3,8 163:17
163:19 167:1
180:14 182:5
183:5 190:14
194:13 196:7
196:18 197:19
198:21 200:4
200:22 202:11
203:11 204:5
206:11 207:10
207:14,21
211:4 216:15
220:18 225:22
226:5 231:5
232:22 235:15
240:10,12
246:1,10
250:10 251:16
253:4,8 256:6
257:3,9 262:22
263:15 267:21
269:10 272:5
273:7 275:14
275:22 277:12
280:16,19
282:16
**routinely** 17:19
48:22 59:19
134:3 193:6
280:2
**rp** 133:8 229:1
239:13
**rp090279** 231:7
233:22
**rp090423** 20:17
43:14 260:20
**rpo90423** 19:10
**rpr** 1:22 285:4
**rule** 167:3
277:17 278:9
**rules** 7:2 131:12
170:18,19
197:8,8 209:21
210:17,19

**S**

**s** 4:1,9 6:1,12
25:1 107:16
119:13 125:10
175:21
**safe** 52:2 53:13
60:21,21,22
62:2
**saferproducts**
107:5 109:3
110:5,10
**safety** 2:14 6:15
8:8 9:13 11:5
37:6 48:14
57:3,7,18
58:14,20 59:14
60:8,20 61:4
61:12,14 70:16
81:10,12,16
82:5,9,12,16
83:11 84:4
86:4,12 90:10
107:2,11 108:9
118:19 119:5
127:4,8 131:1
153:18 171:10
197:15 201:1
208:21 271:5
276:11,13
**safetyrelated**
76:7,19 105:8
**sake** 207:6
**salable** 95:11
**sale** 91:7
**samples** 213:14
**sanitized** 169:5
172:10
**sat** 239:10
274:20 276:19
277:2
**satisfied** 88:2
**saver** 230:1
**saw** 109:14
137:9 141:14
144:11 166:2

186:6 235:1
281:21
**saying** 13:22
17:16 27:17
54:3,5 61:11
62:16 65:5
77:1 88:18
129:22 133:5
143:18 159:16
159:18,21
160:9 161:3,7
165:1 167:16
168:22 171:15
173:19 174:3
174:12 176:3
176:20 184:8
193:7,11 198:5
199:10,15
201:7,10 220:6
220:12,21
222:9 224:1,3
224:8 225:17
229:10 237:14
239:8,10 246:2
254:19 255:7
255:16 264:3
264:20 269:11
269:14 270:6
270:10,19
274:5,9 278:21
279:2,4
**says** 14:18 15:14
21:5 23:5
24:22 37:16
42:1 51:22
54:14 57:5
77:17 117:10
120:17 126:1
129:15 138:8
143:9 153:17
164:4 169:5
175:7 176:4,10
177:1,16
179:20 183:16
186:9 187:5

188:8 189:13
195:17 197:1
199:15 201:14
213:9 215:12
216:2 221:7
235:12 238:9
238:12 241:7
241:15 244:7
245:10 255:10
256:11 257:6
257:12 264:10
264:13 265:7,9
268:1 274:15
**sb078149** 241:12
**scald** 21:4 37:18
134:13 266:22
**scalding** 14:21
25:2 38:6
115:12 263:8,9
266:2
**scalds** 109:11
133:15 134:6
169:3 172:16
221:8 266:20
270:21
**scarring** 23:6,11
**scenario** 49:22
128:14 129:6
188:6
**scenarios** 49:15
49:19 51:5
**schoem** 1:13 4:3
4:11,13,14 6:3
6:11,18,21 8:1
12:13 20:16
36:18,19 41:7
71:6 90:13
107:18 113:19
240:13,15
244:8 245:10
245:14,22
246:5 281:1
283:3
**schoems** 156:5
**sciences** 264:5

264:16 266:12
**scientific** 250:22
**scope** 58:1 62:13
122:12
**scratch** 254:6,7
**scratched** 92:21
**screen** 227:9
**screw** 242:12
**scroll** 117:13
**search** 227:20
**searches** 72:20
**second** 9:1 14:18
17:1 18:19
23:7,12 24:3,6
24:8,13 25:6
33:15 34:2
37:20 40:1
41:22 68:2
81:18 133:15
143:20 144:9
156:5 166:21
179:15,16
188:22 189:4
189:20 190:7
201:17 218:15
219:17 220:7
221:8 223:1,1
234:13 263:10
275:10 278:17
282:7,12
**secondguess**
152:15 176:7
183:12
**secondguessed**
171:1
**secondguesses**
205:6
**secondguessing**
124:11 205:7
**seconds** 227:21
**secret** 272:18
273:3
**secrets** 107:4,8
**section** 10:3
11:1 13:3 21:6

23:2 24:22
25:15 29:5
33:8 40:2
54:14 67:22
96:17 103:6
105:17 106:10
106:10,17
107:12,16
156:10,13,18
156:19 162:1
179:17,20
184:17 185:22
186:8 205:5
211:22 217:8
219:6 233:20
234:6 253:19
255:10,12
258:1,2
**secured** 242:12
**see** 12:15 17:1
23:2 25:3
33:16 40:1
44:15 48:10
52:5 64:22
79:18 80:5
84:15 86:11
87:3,21 92:17
105:6 106:12
106:21 111:15
114:18,19
115:1 116:22
117:11,17
118:13,19
119:19 121:6
121:13 125:2,7
127:5,13
130:11 137:2
143:1 144:10
144:12,17
150:19 156:20
158:1 167:7
169:17,17,21
174:9,10 184:1
185:2,10
186:16 187:8

187:20 189:4
199:4 200:9
205:12 211:5
212:1,4 213:3
217:5,9,14
218:8 227:7,21
234:2,19 241:6
241:10,10,21
242:17 244:8
244:14 253:20
265:20 266:21
267:11 268:15
268:19,21
269:21 275:8,9
275:11 282:4,6
282:11
**seeing** 109:13
**seek** 30:12 191:5
203:8
**seeking** 10:1,6
24:12 114:2
137:4 197:16
197:16
**seen** 36:21 72:9
163:9 188:20
188:22 211:9
240:19,20
241:4 254:16
**sees** 255:9
**selfconfidence**
208:7,10,12,16
246:12
**selfconfident**
128:20
**sell** 93:12
**selling** 11:9
168:20
**send** 109:16
129:15 176:22
254:15
**sending** 264:3
**senior** 6:13
54:18
**sense** 20:8 22:16
39:16 60:19

76:17 95:14
269:9,13
271:18 273:3
**sent** 110:14,17
139:2 241:5
244:4 255:7
256:2 270:3
**sentence** 37:21
42:1,5,19
54:16 80:9
166:22 253:22
254:4 256:10
269:18 270:1
274:12
**sentences**
241:15
**separate** 15:2,5
15:5 85:3
88:20,21 284:6
**separates** 230:3
**september** 45:7
**serious** 23:7,17
23:20,22 24:18
31:16 82:12,18
124:5 125:15
131:3 137:3
142:2 144:8,13
144:15,19
175:20 176:12
177:19 179:2
188:21 189:3
189:12,16
201:16 218:15
219:16 220:7
221:7 223:2
230:15 248:11
248:14 250:9
252:16 267:9
271:18 272:1
278:6
**seriously** 52:20
221:11
**seriousness** 23:5
**service** 73:1
**session** 4:6

156:1
set 13:2 25:10
   26:19 27:9
   38:12 85:9
   166:4 168:9
   173:3 240:1
setting 25:5
settle 98:7
   218:19
settled 218:8
   219:1,2 224:19
settlement 168:6
   168:19 211:6
   212:2 217:21
   223:11 224:12
   227:6 247:19
   271:15
settlements
   221:13 227:13
seven 45:7 67:4
   107:22 261:2
   263:12
severe 147:5,8
   149:7 188:21
   220:7 250:9,11
   251:10 267:8
severely 148:22
severity 23:3,3
   24:21 28:12
   278:1
share 29:18
shared 193:10
sharing 205:8
sheds 219:10
sheet 284:6
shipped 94:19
short 42:22 43:1
shorter 134:18
shorthand 11:10
   22:2 36:16
shot 227:9
shouldnt 149:16
   171:2
show 12:8 19:3
   20:12 36:17

41:7 63:22
   64:15 72:3
   113:14 185:19
   210:22 231:1
   240:6
showed 159:19
   160:21
shown 27:13
   211:18
shows 12:14
   66:11 74:10
side 62:6 127:4,4
   127:8,8 130:22
   210:14
sign 282:18
signatories
   164:13
signature 284:9
signed 67:22
   68:2,3,4 75:17
   140:9 164:11
significance
   270:14
significant
   147:16 161:12
   202:1 237:8
   259:3
significantly
   136:10,14
   137:8 188:7
signoff 138:11
   138:12,13
signoffs 138:10
silent 204:10
similar 20:11
   25:9 26:16
   38:17 50:19,20
   66:16 67:4,4,6
   148:16 153:11
   159:20 160:22
   191:17 193:2,3
   202:19 203:15
   203:22 204:1
   212:6 214:13
   214:21 218:5,6

229:9,10 260:6
simple 79:3
simply 11:1 27:8
   59:10 87:17
   105:18 153:6
sincere 171:4
single 77:4
   132:12
singleserve
   116:7
singular 119:10
sir 121:5
sit 220:1
sitting 31:19
   49:20 73:6
   97:9 98:18
   99:3 101:5
   147:19 148:7,9
   226:20 251:8
   251:17 266:13
   267:4,6
situation 28:5
   34:19 35:13
   131:7 152:1
   178:19 181:19
   182:12 188:11
   189:15,18
   223:22 256:7
situations 35:12
   191:18 209:2
six 49:18 64:19
   67:4
skim 281:16
skimmed 136:16
   142:5 266:20
skin 221:19
   222:2 260:7,10
   261:22 262:10
   262:14 263:7
   263:22 265:7
   279:15
skip 215:11
slightly 44:3
slipping 229:19
small 47:13

51:16
smile 79:7
sold 11:15 91:16
   93:6
solely 113:9
somebody 22:7
   49:5 68:16
   95:17 100:7
   102:12 111:19
   129:13 130:5
   147:2,5 227:15
   250:14 266:8
   266:11
sooner 150:13
   150:16 151:5
sop 92:9 93:18
sorry 25:10 58:6
   97:21 146:20
   149:10 162:14
   169:10 244:9
   244:10 251:13
   253:4 256:19
sort 22:3 26:12
   89:15 90:19
   97:17 113:10
   166:3 175:1
   185:8 201:2
   242:1 258:10
   261:13 279:1,8
sought 30:11
   263:14
sound 34:8
   218:4
sounds 52:15
   65:4 214:8
source 35:11
sources 58:10
   97:5 107:3
   108:9
space 230:1
spacemaker
   233:21 234:8
   248:5
spanned 33:19
speak 75:2

195:16 238:17
specialist 76:13
specialists 73:18
specialized
   52:14,17
specific 11:20
   35:19 51:20
   86:7 89:12
   109:1 110:3
   131:7 132:11
   132:15,20
   145:20 167:12
   167:16 168:20
   183:21 190:13
   193:20 210:3,6
   222:17 224:20
   225:12,16
   228:15
specifically 16:4
   25:17 37:16
   39:17 55:10
   58:3 67:20
   68:19 72:10
   81:15 87:15
   91:5 92:20
   118:10 120:18
   154:18 204:9
   221:13 277:21
specifications
   215:5
specifics 10:21
   60:11
spectrum 1:7
   6:19 8:4 10:5
   10:11 11:22
   12:3,6 13:16
   15:9,17 21:15
   22:14 42:2,6,9
   50:7 53:1,18
   53:22 57:1
   58:7,10,12,19
   58:21 60:10
   62:1,19 63:2
   63:12,16 64:1
   64:11,15,20

65:3,6,21 66:6
66:10,11 67:1
67:5,9,11
70:11 72:15
74:5 75:8,11
78:15 79:13,21
87:7 92:2,5,9
93:5,20 94:6
94:18 95:2
97:14 98:5,19
98:22 99:1
102:12 103:3,5
103:20 122:6,7
122:8 123:14
123:15 124:13
134:15 135:20
135:22 136:2,6
136:7,8 137:7
141:19 142:1,9
143:5,11,19
144:3,20 145:2
146:12 153:2,7
153:8,12 154:1
154:9,13 159:2
159:4,16,18,21
160:2,9,19,20
161:3,8 172:20
172:22 173:1,2
173:11,16
174:10,13
189:2,6,7,10
189:20,22
191:22 196:19
197:11,16,18
198:15 199:1,7
199:8,16,19
200:2 213:22
214:17 215:7
218:16 219:13
219:20 220:1
220:10,16,19
220:20 222:9
222:12,16,18
223:8 225:2,8
225:16,21,21

226:6,11
231:21 232:7
233:10 234:4
236:22 237:7
239:5 245:6
247:15 249:21
250:2 252:11
254:5 268:22
269:12,20
270:11,19
271:5 272:6,9
272:12,19
274:20 275:1
275:18 276:9
276:19 277:2
280:3,8 281:3
283:4
**spectrums** 8:15
12:21 14:7
44:6 54:14,18
55:2 56:1,11
62:7 63:1 71:8
71:10 75:22
96:7 102:5
104:4 135:21
154:15 174:11
197:13 224:19
231:9 272:12
272:15
**speculate** 246:9
**speculating**
245:11
**spent** 89:13
**spewed** 249:9
**spewing** 250:20
**sph** 19:14 184:1
189:21 198:3
**spill** 147:2 242:7
242:14 249:18
**spilled** 14:21
249:3,4
**spilling** 190:7
229:19 248:17
248:17 249:12
250:13

**spills** 17:8 147:5
189:20 278:19
**splitting** 136:21
222:21
**spreadsheet**
231:8
**ss** 285:2
**staff** 14:19 17:17
18:4,17 19:4,7
19:18,20 20:3
20:5 21:7
23:13 24:11
26:3 27:11,16
27:17 28:3,8
29:15,22 30:11
32:11,16 33:1
33:9,12 35:14
37:3 38:4
39:19 40:4,15
41:2,2,4 42:2
42:20 43:5
64:4 65:17
75:2 103:14
109:17 112:18
112:20 121:10
128:18,20,21
129:1,13 130:6
130:13,16
133:10,12,16
134:1,3 135:3
136:3,11 137:9
137:19 139:4,7
141:2 144:4
146:4,8 159:22
160:4 162:6,18
164:5 165:2,5
165:6,14,16
168:9 170:13
171:1 173:7,14
183:20 188:8
189:13 191:3,8
192:19 193:2,6
202:8,13,14,16
202:17 203:1,5
203:5,21

206:20 209:11
212:1 218:10
218:16 219:7
221:14 223:18
223:20 224:13
224:15,21
225:8 229:3
233:17 235:7
235:13,16
236:1,9 253:14
253:16 254:13
254:17 255:1,3
255:6 256:11
256:13,14
257:16,17,19
258:15,17
259:2,8,10,12
259:20 260:3,9
260:17 262:3
262:13 263:12
263:20 265:14
265:20 267:12
269:19 270:3
270:10,13
278:21 279:2,6
279:7,13,17
281:10
**staffinitiated**
133:11
**staffs** 29:19
143:5 164:16
172:21 173:2
224:18 256:5
257:2 259:16
263:6
**stage** 186:13
**stake** 69:11
**stamp** 54:9,18
55:5,22 56:10
56:16 66:14
67:14 69:3,9
69:11,14 70:12
72:18 73:20
74:4,9,20 75:6
75:13,17 77:21

80:11,16 85:13
85:22 86:7
87:16 89:3
91:22 96:18,22
97:2,7,11,12
97:14 98:1,13
100:20 104:8
104:15 105:19
154:20 226:15
241:6
**stamps** 55:7
66:3 67:17
70:13,22 74:12
84:20
**stand** 208:1
**standard** 32:10
32:11,15 46:14
107:15 123:19
124:6 126:1,4
178:3,5 179:16
183:10 194:18
198:6 217:17
240:1 278:11
**standards** 14:15
44:15,21 45:14
45:19 46:13,18
46:20,21 47:4
47:12,16,19,22
105:2
**standpoint** 93:8
93:22
**start** 84:12
96:17
**started** 213:10
233:17 252:10
**starting** 53:12
117:7 125:1,7
**starts** 17:2 52:10
55:4 268:21
**state** 7:21 12:22
17:5 63:21
81:13 84:15
87:6 103:19
107:1,9 121:9
125:10 142:22

154:1 165:18
175:16 177:13
190:15 203:13
204:7 221:1
274:1 278:17
**stated** 9:5
190:17
**statement** 27:6
117:17,19
166:15 176:3
195:13 204:17
217:22 220:11
223:12 224:11
**statements**
127:17 128:13
192:9 224:10
**states** 1:1,4 2:7
6:18 10:1 15:9
21:2 113:20
212:12 253:13
285:2
**stating** 75:19
**statistical**
258:10 259:14
261:16 279:2
**statute** 11:10
46:6 125:20
151:17,20,20
177:16 178:6
179:18 181:19
192:8 196:10
196:17 197:3
273:5 278:9
**statutes** 9:11
11:8 119:11
**statutory** 9:13
194:10
**staying** 96:1
**stays** 90:15
**steam** 21:3
37:17 38:6
222:21
**steer** 58:18
**stenotype** 1:21
**step** 162:14

179:15 193:16
**steps** 86:14
193:16
**stockbridge** 3:5
**strategic** 98:5
**street** 1:19 2:9
3:6,12
**strike** 267:5
**struck** 229:3
**structure** 156:14
**subdivisions**
50:22
**subject** 9:20
10:12,13 11:15
32:15 47:12
61:17 165:19
168:8 170:22
176:19 194:2
199:3 251:11
**submit** 35:22
36:2 40:14
255:8 257:2,20
**submits** 41:1
110:12
**submitted** 12:15
18:9,14 42:15
43:2 136:17
137:7
**subsection**
106:21
**subsequent**
238:11
**subset** 15:3
56:14
**substance** 9:18
137:21 139:19
164:10
**substantial**
14:22 17:8,13
18:13 20:1,4,6
28:3,6,9,22
29:1 31:4,15
32:3,12,22
33:10 35:3,5
37:5 39:1

59:15 65:18
100:10,14
103:5,10,15
124:3 125:14
129:3 130:16
131:11,17,20
132:21 133:17
133:20 134:7
134:12 136:5
139:5 140:13
143:6,11 144:5
149:18 152:3
160:6 162:7
164:18,22
165:19 171:17
171:22 173:10
173:15 174:13
175:19 176:11
177:18 179:1
179:22 180:3,8
180:18 181:1
182:4,17
183:18,19
186:11,16
187:1,4,7,11
187:20 188:1,2
188:5,9 189:14
190:3,8,18
192:22 193:7
193:12 195:2
195:20 199:18
201:18 202:4
203:8 205:4,10
209:4,5,16,17
217:3 218:12
218:17 219:22
220:8 221:9,15
223:19,21
225:19 229:5
229:11 232:3,8
232:17 243:10
250:1 252:17
254:14 256:1
259:22 260:11
262:11,15

263:11 278:5
278:20 279:16
**substantive**
121:4
**succinct** 210:19
**suddenly** 21:3
21:10 37:17
38:6 242:6
260:19
**sue** 181:13
**sued** 197:15
**sufficiency** 62:7
**sufficient** 38:1,3
45:11 60:1,17
62:12,20 64:11
119:3 147:4
245:12
**sufficiently** 49:9
**suggest** 132:17
**suggesting**
151:19 170:6,8
172:14 173:11
268:7
**suggests** 125:12
125:17,22
**suit** 183:1
**sum** 55:13 263:1
**summarize**
105:21 233:17
**summarized**
8:22
**summarizing**
15:1
**summary** 96:21
105:18
**supervisor** 79:6
113:3 129:14
138:13 139:13
140:10
**supervisors**
79:10 128:21
**supplemental**
4:12 19:5
41:13 68:3,4
**support** 175:18

178:22 180:22
181:9 243:9
**supported** 21:15
216:22
**supporting**
177:17 186:22
199:17
**supports** 124:2
125:18,19
126:1 179:21
182:16 274:18
**suppose** 24:20
30:10 50:9
95:8 124:12
179:9 239:6
**supposed** 54:2
68:22 73:12
76:12 81:4
88:20 110:14
110:17 134:16
162:20 229:6
**supposedly**
101:7
**sure** 15:6 22:14
27:20 50:2
62:11,19 63:7
70:8 127:2
128:19 131:5
157:5,7 161:19
169:22 170:3
174:21 178:14
206:4 224:12
240:10 251:15
263:19 264:7
264:18 268:11
**surgery** 33:15
34:3,15,21
143:21
**surrogate** 85:17
**suspect** 64:14
**sustain** 212:22
**sustainability**
33:8
**sworn** 1:16 6:6
285:7

system 53:11
273:9,12
systems 51:10
65:6 66:6
77:19 280:4,14

---

T

t 4:1,1,9
table 49:18
tables 49:20
take 20:14 26:14
26:16 40:4,13
41:6,12 46:3
52:20 71:2
90:14 93:16
109:12 120:19
121:5 127:2
144:5 148:9
154:4 155:3
168:2 182:13
202:15 204:2
204:11 219:3
221:3,9,11
222:6 223:2,8
230:10,19,20
233:5 236:7
237:17,19
238:13,15
241:9 251:6
277:22 280:18
281:16
taken 1:18,21
40:11 110:13
223:18 252:18
285:5,8,13
takes 70:22
86:14 89:6
101:2 182:9
talk 7:5 15:6
26:21 29:7
44:9 63:11
71:10 72:1,19
79:10,12,14
87:10 89:19
107:5 126:16

127:12 130:22
141:22 158:4
200:6 258:1
talked 51:3
66:15,16 75:5
78:9 91:22
121:16 138:20
173:13 208:13
208:15 217:20
240:15 266:19
talking 11:13,20
15:22 16:6,11
18:1,22 19:8
20:19,21 21:13
22:5 25:12
30:21 35:2
36:13 46:17
48:2,6 50:7
51:2,16 59:7
61:21 63:13
72:22 76:21
78:2,3 79:13
84:13 97:20,21
97:22 106:8,15
106:15,18
130:18 138:14
151:4 161:20
162:12 170:4
188:12 192:1
193:3 197:20
197:21 212:7
212:15 213:5
219:9 221:16
221:18 226:9
231:18 255:1
267:13 277:17
talks 57:12
62:22 156:13
tassimo 38:4
tdisks 21:9
tea 174:4,8,9
team 47:6,9
128:21 129:14
technical 74:16
165:12

telephone 56:3
tell 19:2 33:22
35:8 43:6
47:15 50:19
52:9 83:10
88:10 93:5
94:18 97:10
100:20 101:6
108:8 127:3
129:12 152:16
170:19 189:19
190:5 208:12
208:16 209:7
210:1,19 264:9
281:20
telling 83:20
236:16
tells 95:2 104:8
191:6 218:16
temperature
147:5,7 248:21
249:14,16,17
264:11,14
266:1 267:1,7
267:13
temperatures
267:5
ten 193:1
tends 227:12
term 50:8 80:15
183:12 217:13
263:8,9
terms 44:1 66:15
70:8 80:2
91:18 238:4
239:8 265:18
267:9 280:8
test 47:18
testified 6:7 27:1
69:22 78:5
114:1 146:22
233:1 258:5
275:17
testify 9:15
10:14,19

testifying 7:19
114:14 117:20
testimony 4:14
7:15 8:14
53:16,18 61:18
91:9 113:19
114:8,11 130:5
134:5,9 153:6
161:9 191:11
208:19 220:10
228:17 262:9
274:22 284:4
285:6,8
testing 61:5
thank 34:16
280:16 282:17
thats 14:17
15:18 16:17
17:20 19:1
20:12 21:5,11
22:15 23:2,20
29:6,13,21
31:19 35:15
38:3 39:14
40:11 41:5
42:4,5 43:6
51:5,9,13 53:3
53:15,16 55:4
61:8,15,17,19
62:3,16 63:9
65:16 68:5
70:16 71:13,16
72:22 74:20
76:14,18 77:19
78:11,14 82:7
82:15 84:1,22
85:3 87:22
90:15 92:3,11
94:17 95:12,20
96:9 97:12
98:9 99:19
101:5 102:10
104:3,21
105:17 110:20
111:14 114:16

115:3 117:9
118:17 119:21
121:2,16,20
124:12,21
125:22 128:17
131:16 139:10
140:2,2 142:7
142:21 149:15
151:11 152:4
154:14,18
161:9 163:18
164:3 166:9,13
175:8,9 178:5
178:14 179:12
179:18 184:12
185:12 190:4
191:3,15 192:5
192:11,16
194:14 196:4,9
198:1,19
200:20,21
202:8 205:14
208:13 210:2,5
210:11 212:6
213:20 214:13
215:13 221:11
224:16,22
225:2 227:3
228:7 229:17
230:16 238:12
238:15,21
242:1 246:22
250:20 251:11
255:15 257:4,5
257:6,11,20
258:8 259:10
259:11,18
260:2,15,21
263:16 264:10
266:6 271:2
277:5,6 279:6
279:9 280:9,15
281:6,7,21
282:15
theory 31:5

212:10
**thereabouts**
108:1
**thereof** 12:21
**thereto** 285:15
**theyll** 223:2
**theyre** 13:19
26:16 29:11
54:2 61:6
68:22 73:12
74:6 75:15
77:16,17,18
78:21 81:19
88:1,2,16,21
105:22 128:9
171:4,5 178:5
199:19 202:22
203:2 206:15
207:19 208:1,5
208:5 210:17
236:10 245:8
255:22 270:15
**theyve** 59:11
83:3 92:22
131:22 171:8
171:14,18
204:21,21
221:6,13
**thing** 11:14
41:17 96:6
140:2
**things** 22:10
26:10 28:14
46:19 48:15
51:10,12 52:18
60:22 61:7
71:10 78:11,16
84:18 98:22
99:15 128:11
131:21 138:9
161:18 170:4
174:2 203:20
204:22 208:3
214:11 222:2
226:14 268:1

**think** 9:12 15:14
18:20 19:12
22:17 23:19
30:10 34:15,17
35:13,15,16
39:5 55:16
61:15 63:21
64:13 66:14
67:21 68:2,12
69:15 70:3,12
78:20 82:3,13
82:21,22 84:1
89:18 91:15
96:12 106:19
108:3 110:4
111:10,12
112:5 117:5
123:7 124:14
128:11,15,16
128:18 129:6,9
129:10 130:8
130:10 131:13
131:17 132:10
132:14,19
133:18,19
136:22 139:10
143:7 152:13
157:5 158:19
163:3 165:2
167:17 171:3
171:19 175:5
177:5,8 184:14
186:15 187:22
188:10,11
189:16,16,17
192:16,17
196:22 203:3,5
203:19 204:12
205:20 206:4,7
206:15 208:4,9
208:11,22
210:3,8 211:10
221:3 222:16
224:14 225:4
229:19 235:1

235:22 236:4,7
236:11 243:19
243:21 246:5
253:2 254:9,10
255:9 256:8
257:16 263:18
263:21 264:1,6
265:16 266:10
274:12,21
277:3 279:10
**thinking** 144:14
165:9 191:18
195:18 219:18
251:5
**thinks** 41:4
57:18 126:8
152:17 153:17
168:14 169:3
209:2 210:20
**third** 15:8,18,21
44:17 156:17
188:22 275:10
**thomas** 2:4
**thorough** 31:8
**thought** 14:8
52:2 69:22
128:22 133:2
138:7 173:18
182:21 204:12
208:15 219:2
220:3 236:13
252:9 268:17
**thoughtful**
206:8,13,15
208:2,5,6
**three** 44:1 83:13
83:22 93:15
98:15 102:6
131:22 141:7,9
141:10 142:14
244:4
**threshold** 32:10
32:16,16
192:12 239:3
**throw** 49:16,19

207:1,9
**throwing** 51:4
207:15
**tie** 50:1 63:20
**ties** 63:21
**time** 13:10 14:19
18:9,14 33:18
42:4,8,22 45:9
48:2 57:18
63:4 64:20
65:7,9 66:1
67:19 68:7,17
79:14 89:12
98:9,16 106:7
106:17 114:7
116:22 120:17
126:7,7,14,14
134:17 163:21
168:5,5 176:20
186:7 215:3,17
218:20 240:8
252:12 269:20
270:12 280:16
282:16
**timeliness**
153:19 186:8
234:6 235:17
236:18 248:4
270:7
**timely** 89:15
217:4,12
224:15 231:21
235:14
**times** 22:19
106:11 125:5
230:15
**timothy** 3:4
**titled** 23:3
**today** 7:15 9:19
16:12 31:20
64:12,13 65:21
66:6,16,19
67:5 68:10
70:2 73:6
91:18 92:13

97:9 98:18
99:3 101:5
114:14 117:4
117:19 118:21
119:2,21
128:18 161:10
166:9 206:12
208:1,19
226:21 227:18
251:8,17
266:13 267:4,6
275:17
**told** 34:16 66:18
73:10,10 75:13
75:17 77:18
86:13 91:7
95:17 96:22
97:2,7,11,12
98:1,1,21,21
99:14,17
105:19 129:16
129:19 154:20
189:22
**tom** 6:11
**top** 114:18
120:15 183:15
229:21 241:6
243:5 244:18
**topic** 43:22 44:5
106:2
**topics** 8:12
**toro** 138:14,17
**total** 55:13,17
62:20 263:1
**touch** 275:15
**touted** 206:5
**track** 29:9 65:15
85:3 98:6
103:18 133:22
134:4 162:2,6
162:15 177:11
209:9 232:2,9
232:11,13
**tracking** 76:10
**trade** 107:3,7,8

**train** 49:13
75:19 78:15,22
79:1
**trained** 73:1,8
75:14,15 76:4
76:6,17 77:5
77:10,16 78:8
256:15
**training** 49:7,11
49:12,15 50:4
51:2,8,14
52:13 75:7,12
76:21 78:5
79:9
**transcribed** 1:22
**transcript** 7:6
114:19 159:11
284:3,7
**transition** 68:15
70:6
**transparency**
191:17 205:2
**transparent**
173:20 174:1
184:5 209:1,13
**travels** 80:22
**treated** 109:14
201:11,12
203:10 262:4
**treating** 12:1
**treatment** 24:9
137:4 260:12
275:12
**trends** 108:21
109:10 113:10
185:10
**trial** 4:14 6:12
9:15
**tricky** 160:7
**tried** 35:20
**trigger** 59:17
**triggered** 31:17
151:17
**true** 97:10
117:19 119:21

124:19 166:6,9
166:11,13
218:14 219:14
220:5 222:19
233:9 236:21
238:1 239:12
247:14 249:18
252:21
**truthful** 7:15
**truthfully** 7:8,19
**try** 7:5 67:11
80:21 86:10
109:6 111:22
112:15 174:3
**trying** 19:15
58:17 61:20
74:13 110:2
112:6 130:4,14
153:22 159:15
160:7,8 174:18
178:16 181:16
196:22 198:13
207:1 210:16
222:8 225:13
226:22 228:1
**turn** 12:13 16:22
22:21 54:13
106:3 114:17
125:1 150:9
155:1 156:9
161:22 166:14
183:15 185:21
200:5
**turned** 62:4
**turns** 30:8,18
31:2
**two** 56:5,9 63:15
64:4 65:2
67:13 74:3
76:10 88:15,20
93:1 131:22
136:2 137:3,9
141:11 143:7
143:14,18
144:3,20
157:18 160:13
161:21 162:5
172:22 189:2,2
189:6,22
192:13 201:19

214:1,6 215:19
216:2,9,12,17
218:14 219:14
220:5 222:19
233:9 236:21
238:1 239:12
247:14 249:18
252:21
**type** 24:12 27:12
28:1 66:22
101:13 112:19
113:5 129:9
131:4,8,9
133:20 134:1
167:6,16
249:13
**types** 76:10
114:22 115:4
116:13,19
132:3 205:9
256:16
**typewriting**
285:10
**typically** 40:22
46:21 48:1
50:17 53:15
116:21 119:15
235:16 281:10

---

**U**

**u** 6:12 25:1
107:16 119:13
125:10 175:21
**uhhuh** 227:22
**ul** 46:19
**ultimate** 19:22
20:8,10 26:8
27:16 62:6
105:9 196:5
259:16,18
261:1
**ultimately** 30:18
30:20 31:3
32:7 40:20
42:13 69:7

70:18 82:3,21
84:20 85:13
86:17 148:14
183:11 198:20
228:11 243:15
259:8 261:20
**unanimous**
280:1
**underlying**
27:22
**understand** 7:1
7:11 8:7 9:19
9:22 10:4,10
11:14,21 12:5
22:4 59:1
70:15,21 77:20
130:4 140:17
141:3 148:21
159:15 160:8
161:7 166:16
172:11 174:18
178:16 180:13
181:16 196:22
209:5 222:8
225:13 245:12
252:11 275:16
277:9 278:11
**understanding**
22:17 53:3
67:3 68:9
80:11 81:21
96:15 102:4
137:17 170:15
170:22 196:15
199:7 246:18
277:6,8
**understood**
119:13
**undertake** 154:2
159:3 160:22
161:2
**undertaken**
188:13
**undertakes** 30:1
**undertook**

159:19 160:20
**unexpectedly**
212:21
**unfortunately**
185:12
**united** 1:1,4 2:7
6:18 10:1
113:20 285:2
**units** 33:13
230:7,7
**universe** 22:4
134:21
**unreasonable**
31:16 124:4
125:15 175:20
176:12 177:19
179:2 278:5
**unsafe** 58:22
59:9 60:2,15
89:16 90:1,4
96:1
**untimely** 196:12
197:4
**usa** 44:10 45:5
**usc** 255:10,12
**use** 11:10,22
45:15 49:22
80:2 109:5,6
115:11 123:6
143:14 144:15
150:4 173:17
190:12 193:14
254:17 263:8
280:10
**uses** 58:14
154:21 175:7
**usually** 247:3,4

---

**V**

**v** 1:6 283:4
**vacuum** 190:22
**validation** 51:10
**valuations**
105:15
**value** 101:17

102:3 201:3,5
**variety** 32:1
  107:3 222:2
**various** 54:6
  71:8 74:18
  80:2 174:20
**vehicle** 165:14
**verbatim** 43:19
**verified** 141:19
  141:21
**verifies** 73:21
**verify** 41:13
  74:13 93:3
  141:20
**version** 92:18,19
**versions** 169:5
**versus** 58:21
  140:21 162:2
  230:7
**view** 20:6
  105:11,13
  117:11 119:10
  127:20 135:7
  193:22 224:6
  224:13 251:3
  251:20 270:21
**viewed** 27:11
**views** 224:21
**violate** 11:5
**violated** 10:5
  30:7,17 31:1
  32:5 70:11
  217:8
**violation** 10:20
  179:9 224:16
  232:12 234:6
  235:22 236:2
  236:18 248:4
  270:8
**violations** 10:2
  168:10 235:17
**virtually** 175:10
**volume** 249:14
  249:16,18
**volumes** 249:2,5

267:7
**voluntary** 10:12
  39:20 40:2
  44:15,21 46:12
  46:14 47:3,12
  47:16,19,21
**vote** 139:14
**voting** 139:15
**vs** 6:18 113:20
**vulnerability**
  168:1

_____

**W**

**w** 1:19 2:9 3:12
**waist** 131:16
**wait** 143:1
  260:15 270:9
**waiting** 108:17
**want** 7:12 15:6
  34:1,18,20,22
  53:17 91:3
  109:12 111:17
  155:3 157:17
  163:15 170:18
  176:2 177:6,9
  177:11 185:1,2
  185:5 191:5,10
  202:5 209:21
  210:18 216:4
  218:21 239:7
  245:9 249:10
  259:6 275:15
  280:18 281:17
  281:19 282:18
**wanted** 24:15
  26:15 103:3
  170:3 245:15
  246:2
**wanting** 171:4
**wants** 203:1
  239:4
**warehouses**
  94:18 95:2
**warming** 241:20
**warning** 121:12

**warrant** 164:18
**washington** 1:11
  1:19 2:10 3:13
  6:17
**wasnt** 10:14,19
  19:15 21:21
  30:9 39:13,16
  47:21 52:2
  55:20 58:11
  65:10 68:17
  84:10 99:4
  129:19 138:19
  139:3 140:3
  161:12 164:6
  166:7 169:18
  177:12 227:3
  269:8
**water** 134:6,21
  135:4 221:18
  264:4,19,21,22
  265:7,10,12,17
  266:1,17 267:5
  267:14 279:14
**way** 6:4 7:12 8:2
  16:18 40:18
  46:1 49:16
  54:2 65:18
  67:9 68:21
  86:11 88:19
  101:22 104:19
  107:9 108:4,6
  108:11,19
  137:2 148:12
  151:14 172:5
  174:22 184:9
  203:14,16
  204:19 208:2
  226:6 251:5
  259:3 262:3
  266:4
**ways** 11:4
  110:20 147:15
  221:21 222:1
  237:21 238:1
**weakness** 78:21

93:8 215:9
**website** 4:16,17
  227:10,20
**weekly** 66:17
**weeks** 43:3
  93:15,16,18
  201:19
**weigh** 226:11
**weighed** 226:7
**weight** 224:9
  243:19 244:1
  256:9,10
**welldeveloped**
  183:21
**went** 19:2 41:21
  112:18 138:17
  172:8
**west** 2:15 211:7
  213:13,17
  214:15 215:1,3
  215:5,12,17
  216:21 217:8
  217:11,16
  218:6,7,9
  224:18 226:9
  226:11 227:6
  227:20 247:19
  271:14
**western** 1:2 6:19
**weve** 41:16
  129:6,7,8
  131:16 152:12
  171:16 174:12
  176:20 201:14
  201:17 202:4
  206:5 220:5
  264:5
**whats** 36:22
  39:22 58:3
  66:16 109:19
  111:17,22
  119:15 138:22
  139:2 148:4
  185:19 186:18
  238:18 240:6

240:13 261:21
  277:8
**whatsoever**
  83:11 135:15
**white** 209:22
**wi83a** 92:5
**wide** 165:9
**window** 200:8
**wisconsin** 1:2
  6:20
**wish** 43:17
**withheld** 185:1
**witness** 1:13,16
  4:2 6:5 8:5
  31:12 34:6
  45:18 69:19
  76:3 77:10,15
  78:20 83:17
  93:12 94:4,13
  95:8 100:6
  110:9 120:8
  122:14 123:12
  128:3 140:16
  141:2 145:2
  146:17 149:6
  164:3 180:12
  182:1 183:4
  187:15 190:12
  194:7 196:4,15
  197:7 198:11
  199:15 200:20
  201:10 202:22
  203:19 205:20
  207:5,7,19
  220:16 225:15
  232:21 235:12
  245:20 246:9
  250:8 255:15
  256:22 263:5
  268:4 269:8
  271:22 272:22
  275:6,21 282:1
  282:17 285:6,8
**woefully** 62:5
**wont** 165:16

171:18
**word** 82:15
123:7 216:4
269:4
**words** 51:21
80:17 256:17
**work** 22:17
35:20 47:16
50:18 93:4
165:12,13
280:14
**worked** 114:4
**working** 185:16
210:12,14,15
**works** 87:14
**worse** 67:10
218:11 222:19
**worth** 18:20
**wouldnt** 31:21
34:11 36:5
39:8 100:6
109:5,6,22
112:2,5,15,17
117:21 130:6
148:15 169:18
174:3 184:14
189:16 203:3
219:19 245:13
249:20 259:4
**wrap** 253:1
**write** 43:3 44:13
71:21 74:17
**writing** 19:11
39:5,9 129:15
**written** 72:2
74:20 163:9
204:13
**wrong** 87:11
111:7 112:3
124:9 152:17
208:18 254:10
254:21 256:2,2
**wrote** 17:22
38:20 43:9
45:21 270:1

**www** 107:5

—————

**X**

**x** 1:3,10 4:9

—————

**Y**

**yeah** 55:18 65:8
87:19 234:13
**year** 206:6
211:15
**years** 16:15,19
17:15 33:19,21
45:7 67:4
83:13,22 98:15
102:7 107:19
107:22 132:16
132:18 134:18
135:2 166:11
169:13 170:10
170:11,11
183:20 185:16
233:9 244:4
**yep** 96:11
**yesterday** 53:4
**youd** 149:6
**youll** 114:18
165:8 212:1
241:9
**youre** 7:17 8:7
8:12 13:22
15:2 16:11
17:19 18:21
19:21 30:21
35:2 50:6 51:2
51:16 54:5,21
61:11 62:16
63:20 65:5
72:3 78:3 90:9
97:20,21 106:7
106:15,18
109:13 114:14
116:17 118:9
118:10 126:1
128:4,5 129:13
130:18 131:5

133:4 137:11
138:14 143:18
146:9,11
149:13 160:9
161:7 162:2
165:1 168:18
168:20 170:4,6
170:22 172:13
174:3 176:2,15
177:20 184:8
190:22 198:5
201:7 208:22
210:5,13,13,14
210:15 220:21
221:16 222:9
224:1 225:3
230:11 237:15
238:3 239:7,10
251:15 252:1,5
254:19 259:7
259:15 260:15
260:22 268:7
269:2,11,11
270:19 274:9
276:5 279:2
**youve** 90:3
100:7 148:11
148:16 163:8
171:16,21
172:2,3 177:4
185:13 188:6
188:10,11
193:18 222:21
223:1 233:1
248:10 253:2
258:13 275:16

—————

**Z**

—————

**0**

**00** 1:19 282:19
**000** 27:21 53:5
102:6 114:22
115:3 116:19
117:14 132:2

230:7,15
**0023** 159:7,9
160:1 162:12
249:22 250:4,8
**03** 227:21
**050023** 157:20
158:2 251:18
251:21 253:11
272:10
**07** 285:22
**0725** 234:14

—————

**1**

**1** 21:6 27:21
28:18,18 29:3
29:3 44:9
54:22 55:1,4
56:9 136:17,20
155:8 156:2
157:19 158:1
161:15,15
192:1 230:7,7
230:14 231:20
252:20 275:1
**10** 1:19 17:15
114:19 120:13
120:18,19
121:1 127:2
134:18 135:2
169:13 230:7
230:15 241:17
**100** 3:6 27:21
230:7 280:1
**10cup** 212:3,12
212:18,19
216:22
**10yearold** 33:14
34:2
**11** 166:14
175:13,13
**113** 4:14
**12** 4:11 53:5
132:18 155:6
170:11,11
183:15 185:16

200:6 205:1
215:11
**12cup** 199:3
212:6
**13** 216:19 247:7
131 114:17
116:17
**132** 119:7
**133** 125:1,8
**14** 117:7 217:7
252:20 285:22
**140** 150:9
**14809** 6:4 8:1
**15** 10:3 11:1
16:22 25:15
29:5 42:12
67:22 103:6
107:12,16
114:22 115:3
116:19 117:14
119:13 125:10
132:2 156:19
175:21 179:17
179:20 184:17
185:22 205:5
215:13 216:20
217:8,11
231:16 233:20
253:19 255:10
255:10,12,12
257:22 258:2
**150** 265:1,7
**156** 4:6
**159** 102:6
**15cv00371** 1:7
6:19
**15th** 12:15 42:10
**16** 41:22 42:19
43:17 268:20
**16475** 185:21
**169** 215:18,21
**17** 54:13 64:7,7
**18** 72:5 150:13
**185** 5:3
**18771** 23:1

**19** 33:13 79:17
84:12
**190** 265:8
**1973** 106:14
**1974** 204:14
**1997** 166:6
**1999** 1:19 3:12
**1st** 156:18

---
**2**

**2** 55:4 56:9
214:22 231:20
244:10,10
**20** 5:4 87:2 92:6
96:9
**200** 25:1 27:21
161:15
**2000** 113:21
**20001** 2:10
**20006** 3:13
**2002** 114:8
117:20 119:22
139:12 156:18
**2004** 45:7 166:6
166:12 213:11
213:13
**2005** 63:22
106:8,10,14
162:10 214:22
215:13 216:21
**2006** 211:5,14
219:8
**2008** 4:20 11:16
13:10 106:8,11
106:14 145:13
145:17 154:16
162:10 171:9
252:9 274:20
276:20
**2009** 145:13,17
153:3 154:17
214:6 234:1
241:6,7,16
**2010** 4:18 65:3
66:14 233:6

234:4 237:7
270:6
**2011** 45:8
**2012** 11:17
13:11 68:11
69:15 83:8
98:9,9 99:8,11
99:20 100:2,19
101:8 226:7,17
227:2 276:21
**2013** 92:6,15
93:15
**2016** 1:12,20 9:2
12:15 41:14
166:12 283:1,2
284:13 285:22
**202** 2:11 3:14
**2064** 107:16
119:13 125:10
175:22 255:10
255:12
**20814** 2:16
**20878** 6:5 8:3
**21** 12:13 13:3
41:13 43:18
96:10 103:19
**211** 4:15
**21202** 3:7
**22** 125:2
**226** 4:16,17
**22nd** 9:1 41:14
42:11
**23** 63:14 138:3
138:11 158:12
234:1
**231** 4:18
**24** 4:18 120:11
127:1
**240** 5:2
**24th** 233:6 270:6
**25** 63:14 73:22
**253** 4:20
**2633000** 3:14
**27** 264:2
**28** 5:2 240:7,14

281:14
**280** 4:5
**29** 1:12,20 283:2

---
**3**

**3** 1:7 6:19 16:7
24:22 33:8
44:5 219:6
**30** 51:4 73:22
241:16
**301** 2:17
**3040** 49:17
**3053630** 2:11
**30th** 241:5
**31** 33:20,21,21
170:10
**31st** 45:8
**34** 155:8 156:2
**35** 183:20
**36** 5:5
**3853641** 3:8

---
**4**

**4** 106:3 212:2,4
216:20 282:19
**40** 33:19 51:4
**41** 4:12
**410** 3:8
**4330** 2:15
**435** 25:1,16
**450** 2:9
**46** 155:6
**460** 116:22
**470** 116:22
**480** 116:21

---
**5**

**5** 120:14 156:9
**50** 27:21 29:3
**500** 28:18 29:3
118:12 136:17
136:20 161:15
219:15 275:1
**5047923** 2:17
**56870** 217:1

**57** 55:14,17,17
55:19
**5815** 217:2

---
**6**

**6** 4:4 212:12
241:7 283:1
**600** 25:21 192:1
**61** 25:1
**67** 136:22
**68** 136:22

---
**7**

**7** 4:20 53:5
54:14 161:22
213:9
**70** 136:22
216:16
**70s** 57:15
**72** 5:3 185:20
**74** 5:4 20:13
**75** 5:5 36:18

---
**8**

**8** 13:3 161:22
213:13,20
**84** 4:11 12:9,10
**85** 4:12 41:8,9
155:1 156:5
162:1 200:6
247:7 252:22
**86** 4:14 113:15
113:16
**87** 4:15 211:1,2
**88** 4:16 226:2,3
227:5,9
**89** 4:17 226:2,3
227:6,18
**8th** 211:5,14

---
**9**

**9** 214:22
**90** 4:18 231:2,3
238:21
**91** 4:20 252:22
253:3,5,6

**9423** 19:9

1                    CERTIFICATE OF DEPONENT

2      I hereby certify that I have read and examined the

3      foregoing transcript, and the same is a true and

4      accurate record of the testimony given by me.

5      Any additions or corrections that I feel are

6      necessary, I will attach on a separate sheet of

7      paper to the original transcript.

8      _____

9                          Signature of Deponent

10     I hereby certify that the individual representing

11     himself/herself to be the above-named individual,

12     appeared before me this _19_ day of _May_____,

13     2016, and executed the above certificate in my

14     presence.

15

16     _____

17            NOTARY PUBLIC IN AND FOR

18

19     _____

20                          County Name

21

22     MY COMMISSION EXPIRES:

       ANTHONY L GRANT JR
       NOTARY PUBLIC
       MONTGOMERY COUNTY MARYLAND
       MY COMMISSION EXPIRES 7/20/2016

| | Page:Line | | Now Reads | Should Read |
|---|---|---|---|---|
| 1 | | | Notice Date: May 6, 2016 | |
| 2 | | | Deposition Date: April 29, 2016 | |
| 3 | | | Deponent: Alan H. Schoem | |
| 4 | | | Case Name: US v. Spectrum Brands, Inc. | |
| 5 | Page:Line | | Now Reads | Should Read |
| 6 | 31 | 13 | That a product | That products |
| 7 | 31 | 14 | rises to | rise to |
| 8 | 31 | 17 | are triggered | are not triggered |
| 9 | 32 | 2 | are a | are not a |
| 10 | 101 | 13 | a nuisance element | a nuisance settlement |
| 11 | 128 | 20 | staff was then as | staff today is as |
| 12 | 139 | 12 | Complains manual | Compliance manual |
| 13 | 165 | 9 | a wide designation | a 'Y' designation |
| 14 | 185 | 2 | to see either the risk | to see the risk |
| 15 | 210 | 15 | outside of companies | outside of CPSC |
| 16 | 270 | 9 | Can we up on that | Can we hold up on that |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |