IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    vs.                                     Case No. 3:15-cv-00371

SPECTRUM BRANDS, INC.,
a Delaware corporation,

    Defendant.

    _____/

**UNITED STATES OF AMERICA'S MEMORANDUM
IN SUPPORT OF MOTION TO STRIKE OR OTHERWISE LIMIT
EXPERT TESTIMONY OF ALAN SCHOEM AND JOHN MORRALL**

    Plaintiff, United States of America (the "United States"), by and through undersigned counsel, submits this Memorandum in support of its *Motion to Strike or Otherwise Limit Expert Testimony of Alan Schoem and John Morrall* (the "Motion") filed herewith. In support thereof, the United States respectfully states as follows:

## INTRODUCTION

    Spectrum Brands, Inc. ("Spectrum"), has disclosed to the United States various purported experts whose testimony suffers from such inescapable legal infirmities as to compel their exclusion or limitation. The company relies in part on two of those experts, Alan Schoem and Dr. John Morrall, in its pending *Motion for Partial Summary Judgment as to Counts I and II* (Dkt. #73, 78). Spectrum's experts offer legal conclusions, make sweeping claims based on insufficient data, and undertake irrelevant factual analyses in an effort to distract this Court from the clear mandates of the Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.* (the

"CPSA"). This testimony by Mr. Schoem and Dr. Morrall would offer confusion rather than clarity, and should be excluded.

## LEGAL STANDARD

Federal Rule of Evidence 702 establishes four criteria for testimony by expert witnesses who are "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. First, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Second, the expert's testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(b). Third, the expert's testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Fourth, the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

The Supreme Court has explained that the trial judge must determine whether an expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to "testimony based on 'technical' and 'other specialized' knowledge"). This determination involves a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." *Daubert*, 509 U.S. at 592-93. Courts may consider factors such as whether a theory or technique (1) can be (and has been) tested, (2) has been subjected to peer review and publication, (3) is subject to a high known or potential rate of error and whether there are standards controlling the technique's operation, and (4) enjoys general acceptance within the

relevant scientific community. *Kumho Tire*, 526 U.S. at 149-150 (quoting *Daubert*, 509 U.S. at 592-94).

The Seventh Circuit repeatedly has found that expert testimony which fails to employ a reliable methodology in accordance with these factors should be excluded. *See, e.g.*, *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-43 (7th Cir. 2007); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869-71 (7th Cir. 2001); *Wintz By and Through Wintz v. Northrop Corp.*, 110 F.3d 508, 512-514 (7th Cir. 1997). The reliability test is flexible, however, and the *Daubert* factors do not necessary apply in every case. *Kumho Tire*, 526 U.S. at 141-42. "Rather, the law grants the trial court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* (emphasis in original).

Another part of the trial court's gatekeeping role is ensuring expert testimony is helpful. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92 (quotations and citations omitted). The trial court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. "[W]hether basing testimony on professional studies or personal experience," the expert must employ "the same level of intellectual rigor that characterizes the practice of the expert in the relevant field. *Kumho Tire,* 526 U.S. at 152.

Additionally, the Federal Rules of Evidence limit the permissible topics of expert testimony. For example, the Rules "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. NLRB*, 674 F.3d 638, 648 (7th Cir. 2012) (citing *United States v. Sinclair,* 74 F.3d 753, 757 n. 1 (7th Cir. 1996); *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003)). The Seventh Circuit has

reasoned that "[l]egal arguments are costly enough without being the subjects of 'experts' depositions and extensive debates in discovery, in addition to presentations made directly to the judge." *RLJCS Enters., Inc. v. Prof. Benefit Trust Multiple Emp'r Welfare Benefit Plan & Trust,* 487 F.3d 494, 498 (7th Cir. 2007). While both the judge and the jury play important roles in defining the applicable principles of law and applying those principles to the facts of the case, respectively, expert witnesses are not involved in either role. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). "It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. As a general rule, accordingly, an expert may not offer legal opinions." *Id; see also United States v. Farinella*, 558 F.3d 695, 700 (7th Cir. 2009) ("District judges, rather than witnesses, must explain to juries the meaning of statutes and regulations.") (citation omitted).

**ARGUMENT**

Spectrum's purported experts offer fundamentally flawed testimony. This Court, in its gatekeeping role, should strike the experts' reports and exclude their testimony, in whole or in part, as set forth below.

**A.     Alan H. Schoem**

Spectrum offers Mr. Schoem as an expert in the processes and procedures of both the U.S. Consumer Product Safety Commission (the "CPSC") and Spectrum. Dkt. #72, Expert Report of Alan H. Schoem ("Schoem Rpt.") at 1. He opines that (1) Spectrum did not have to report the coffeemakers under section 15(b) of the CPSA because prior CPSC cases, about different products, purportedly demonstrate that the coffeemakers cannot create a substantial

4

product hazard and (2) Spectrum has adequate systems and programs for ensuring compliance with the CPSA. *Id.* at 21. Each opinion is deeply flawed.

### 1. Mr. Schoem's unfounded legal opinions should be excluded from consideration.

Mr. Schoem's ultimate opinion that "Spectrum did not have a reporting obligation to CPSC for its Applica/Black & Decker brand 12-cup coffeemakers" contravenes the bedrock principle prohibiting experts from offering legal conclusions. *See* Schoem Rpt. at 21. It is inappropriate for Mr. Schoem, or any expert, to opine on the law or the application of facts thereto. *See Roundy's Inc.*, 674 F.3d at 648; *RLJCS Enters*, 487 F.3d at 498. The former is the province of the judge; the latter is the jury's function. *See Jimenez*, 732 F.3d at 721. As even Mr. Schoem recognized during his deposition, the question of whether Spectrum violated the section 15(b) reporting requirement is reserved exclusively for the judge and jury. *See* Deposition of Alan Schoem 4/29/16 ("Schoem Dep.") at 32:4-8 (testifying that "the determination of whether a firm violated its reporting obligations . . . [is] probably ultimately a legal question for a judge or a jury") (filed separately); *see also id.* at 177:13 – 178:10 (companies deciding whether to report should undertake factual analysis under statutory standard, as interpreted by CPSC regulations and courts), 179:4-13 ("[T]here can be disagreement between the government and the company as to whether the company's evaluation assessment was reasonable. And that's what courts are here to decide."), 183:6-14 ("ultimately a court will decide" if a company was required to report). This Court should reject Mr. Schoem's attempt to opine on an ultimate issue of law. *See Roundy's Inc.*, 674 F.3d at 648; *RLJCS Enters.*, 487 F.3d at 498; *Farinella*, 558 F.3d at 700.

### 2. Mr. Schoem's testimony does not apply the correct legal standard to the facts of this case.

Even if Mr. Schoem were permitted to offer legal opinions, his ultimate conclusion that Spectrum did not have to report in the instant case should be excluded, as unreliable, because he fails to undertake the proper legal analysis. *See*, *e.g.*, 15 U.S.C. §§ 2064(b)(3)-(4). Mr. Schoem reaches his conclusion without actually analyzing the facts of this case under applicable law—*i.e.*, the CPSA, CPSC regulations, and court opinions. *Compare* Schoem Rpt. at 11-17, *with* Dkt. #53 (United States' Motion for Summary Judgment) at 27-47. He instead argues that Spectrum reasonably relied on prior CPSC cases in deciding not to report the coffeemakers here. *See id.* at 13 ("[I]t is reasonable and necessary for Spectrum to formulate [reporting] decisions . . . based on CPSC decisions that are brought to its attention involving similar Spectrum product and product risk.").

Mr. Schoem continued to argue at his deposition that Spectrum is entitled to rely on prior CPSC cases. *See* Schoem Dep. at 143:18 – 144:17 ("[I]t was reasonable for Spectrum to look at those two PI cases . . . in determining whether it had a reporting obligation to CPSC in this case."); 159:15 – 161:16 ("Spectrum had the right to rely on the letter that it received from the staff in that 0023 case. . . ."); 187:10 – 189:18 ("I don't see that there would be an obligation to report . . . because the [CPSC] has already decided [in prior cases] it doesn't create a substantial hazard."). In fact, Mr. Schoem declared that it was "reasonable" for "a company," including Spectrum, to rely on prior CPSC cases in deciding not to report. *See id.* at 148:11-19 ("If you've got similar issues, again, it's reasonable for a company to look at what has happened to it or what it's done in the past with respect to a particular product."), 152:4 – 153:1 ("[A] company can look at . . . past dealings that it's had with the [CPSC]. It can then make a decision, we've looked at all of this information and we don't think we have a reporting obligation and

it doesn't report."). In essence, Mr. Schoem substitutes a standard of his own making for the reporting requirement set forth in section 15(b) of the CPSA.

When Mr. Schoem does acknowledge the statute's existence, he misstates its requirements. Mr. Schoem argues in his report that "[i]f a firm *reasonably believes the information it has* does not reasonably support the conclusion that a product could create a substantial product hazard or an unreasonable risk of serious injury or death, the information would not be reportable. . . ." Schoem Rpt. at 11 (emphasis added). The emphasized language is nowhere to be found in section 15(b), which requires manufacturers to report as long as the information *reasonably supports* the conclusion that a product contains a defect which could create such a hazard or creates such a risk. 15 U.S.C. §§ 2064(b)(3)-(4).[1] That conclusion need not be the only, or even the most, reasonable one to be drawn from the information in the manufacturer's possession—the conclusion need only be *reasonable*. *See id.* Accordingly, the relevant inquiry is whether there is a reasonable basis *for reporting*, not the other way around. *See id.*

Mr. Schoem's "reasonable reliance" argument is based on his personal opinion, nothing more, and directly contradicts the law. Contrary to the notion that prior CPSC cases about different products have precedential value, CPSC regulations are explicit that the agency evaluates products on a "case-by-case basis" taking into account the specific factual context presented. *See* 16 C.F.R. § 1115.12(g). Indeed, Mr. Schoem admitted at his deposition that

---

[1] At Mr. Schoem's deposition, the United States questioned him about the meaning of this statement. His answers were far from clear. *See* Schoem Dep. at 175:16 – 183:14. Ultimately, however, Mr. Schoem seemed to agree that a manufacturer's "reasonable belief" that it does not have to report does not immunize it from liability. *Id.* at 182:20 – 183:14 ("Q. So the fact that the firm might have thought initially that its reasoning was reasonable does not immunize it from a potential civil penalty suit, right? A. Right.").

his reasonable reliance argument was an "opinion" grounded neither in statute nor regulation. *See* Schoem Dep. at 200:11 – 202:10 ("Q. Does it say in the Consumer Product Safety Act anywhere that CPSC decisions have some sort of precedential value? A. No, and it doesn't say that it doesn't have precedential value."); 204:6-14 ("Q. Are prior cases among the kind of information the regulations state firms should consider in deciding whether to report? A. No. And in fact, I specifically say in the [expert] report that the interpretative reg[ulation] is silent on the—and doesn't take into account the effect that previous cases have.").[2]

Mr. Schoem's "reasonable reliance" standard is not the law, and his opinion would only confuse the jury. *See Jimenez*, 732 F.3d at 721. As such, his testimony about this new "standard" should be excluded. *See id.*

### 3. Mr. Schoem's review of Spectrum's compliance program is wholly unreliable.

Mr. Schoem's opinion that Spectrum has adequate systems and programs for ensuring compliance with the CPSA is markedly deficient and should be excluded in its entirety. *See* Schoem Rpt. at 22. As an initial matter, Mr. Schoem's opinion is based on insufficient facts or data. *See* Fed. R. Evid. 702(b). The entire universe of the information he considered was a single conversation with his client's employee (Spectrum's Nigel Stamp) and approximately 50 pages of company policies, procedures, and organizational charts. *See* Schoem Rpt. at 21, Attach. 1 at 2; Schoem Dep. at 54:13 – 56:15, 73:15 – 74:4, 96:6 – 97:13, 103:19 – 104:21. Mr.

---

[2] Moreover, a "reasonable reliance" exception to section 15(b) could have absurd consequences. As Mr. Schoem conceded at his deposition, such an exception could result in similarly situated manufacturers being subject to different reporting standards, based on their own interpretations of nonpublic documents from unrelated CPSC cases. *See id.* at 193:16 – 194:12 ("Q. And so potentially, in your view, there are any number of firms out there, all of which are subject to different reporting requirements based on the information that they have . . . that other companies don't? . . . So that's a yes? A. So companies who are in different positions could perceive that they have different reporting obligations.").

Schoem admitted at his deposition that he "entirely relied on what Mr. Stamp told [him]." *See* Schoem Dep. at 96:20 – 97:3. He has no idea how Spectrum's compliance programs are implemented or function in the real world; he performed no independent investigation into the company's programs, interviewed no company witnesses other than Mr. Stamp, and reviewed no data relevant to such programs. *See id.* at 53:11 – 54:4, 68:20 – 69:4, 93:20 – 97:3. Nor did he even consider all potentially relevant aspects of Spectrum's compliance programs. *See id.* at 58:7 – 60:10; 61:20 – 63:3. It is not surprising, then, that Mr. Schoem was unaware that Spectrum provides no specific training on CPSA compliance, *see* Dkt. #85 (United States' Proposed Findings of Fact) at ¶ 92, which he acknowledged at his deposition is a "weakness." *See* Schoem Dep. at 75:7 – 79:10.

Mr. Schoem's abbreviated review here stands in stark contrast to the kind of review he supposedly performed as a consultant, which, if true, displayed more of the "intellectual rigor" required of expert testimony. *See Kumho Tire,* 526 U.S. at 152. Mr. Schoem explained that in his consulting work, he (or his team) would take necessary steps such as visiting the client's facility, interviewing employees and key executives, reviewing a broad set of relevant documents, assessing the client's collection and maintenance of relevant information, and evaluating applicable policies and procedures. *See* Schoem Dep. at 44:9 – 50:5. Mr. Schoem failed to perform anything approaching such a review here. *See* Schoem Rpt. at 17-21. He does not have the facts or data necessary to conclude that Spectrum's compliance programs are "reasonable." *See id.* at 21.

For similar reasons, Mr. Schoem's testimony is also unhelpful. Fed. R. Evid. 702(a). Spectrum presumably offers this testimony to rebut the government's request for permanent injunctive relief under 15 U.S.C. § 2071(a)(1). *See* Dkt. #1 (Compl.) at 12-13 (requesting

permanent injunction "requiring Defendant to establish internal recordkeeping and monitoring systems designed to provide timely reports to the CPSC"). Mr. Schoem, however, only knows how the company's compliance programs appear *on paper*—he has no idea how they function in reality. *See* pp. 8-9, *supra*; *see also* Schoem Dep. at 68:20 – 69:4 ("Q. . . . [Y]ou didn't assess whether these programs actually function in practice the way they're supposed to on paper, right? A. Right. I looked at the programs that they have and not how they were actually functioning, other than to the extent to which Nigel Stamp explained to me how the programs function."). In order to grant the United States permanent injunctive relief, this Court must assess whether there is a "reasonable likelihood" that Spectrum will violate the CPSA in the future. *See SEC v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015) (citing *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)) (a government agency seeking a statutorily authorized injunction must show the defendant violated the statute and there is a "reasonable likelihood of future violations. . . ."). Mr. Schoem's limited perspective cannot possibly aid that determination. *See Daubert*, 509 U.S. at 591-92 (quotations and citations omitted) ("Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

Finally, Mr. Schoem utilizes no expert methodology at all, let alone a reliable one. *See* Fed. R. Civ. P. 702(c)-(d); *Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 765-66 (7th Cir. 2013) (Rule 702 requires trial court to determine that expert used reliable methods). He does nothing more than summarize select portions of Spectrum's compliance programs before rubber-stamping them as "reasonable." *See* Schoem Rpt. at 16-21. In that sense, Mr. Schoem is just a conduit for Spectrum's self-serving characterizations of its own business. *See id*. At his deposition, Mr. Schoem acknowledged there are industry standards for manufacturers, but admitted he is unfamiliar with, and lacks expertise in, such standards, and did not apply them

in his analysis here. *See* Schoem Dep. at 45:21 – 47:22, 104:22 – 105:15. Similarly, Mr. Schoem testified about "federal agency regulatory requirements," *id.* at 45:21 – 46:11, but his report never addresses them either. *See* Schoem Rpt. at 17-21. Indeed, Mr. Schoem addresses no relevant standards, requirements, or guidelines at all, or provides any other basis for evaluating his conclusion that Spectrum's compliance programs are reasonable. *See id.* An "expert" who provides no analysis and no reasonable basis to judge his methodology is no expert all. Mr. Schoem's testimony should be excluded. *See*, *e.g.*, *Manpower Inc. v. Ins. Co. of the State of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) ("An expert's opinion must be reasoned and founded on data . . . [and] utilize the methods of the relevant discipline. . . .").

Accordingly, to the extent any of Mr. Schoem's testimony is even relevant, this Court should limit such testimony to the CPSC's policies and procedures. Mr. Schoem should not be permitted to provide legal opinions, apply an incorrect legal standard, or opine without analysis on the reasonableness of Spectrum's compliance programs.

**B.     John F. Morrall**

Spectrum offers Dr. Morrall as an expert in the "best practices used in the general science of safety risk assessment," and the specific practices used by the CPSC as reflected in a single CPSC employee manual and select documents from a number of CPSC "case files" involving coffeemakers. Dkt. #71, Expert Report of John F. Morrall III, Ph.D., at 1 ("Morrall Rpt."). Primarily, Dr. Morrall opines that (1) the CPSC lacks internal processes and procedures

11

consistent with "generally accepted risk assessment methodologies," (2) the CPSC previously found no substantial product hazard with respect to some (but not all) recent coffeemaker-related cases, and (3) the CPSC has not shared with industry concerns about the risks of burns from coffeemakers. *Id.* at 16.[3]

The exact nature of Dr. Morrall's expertise, as applied to the present case, is ambiguous. Dr. Morrall claims he has reviewed hundreds of "risk assessments" by various agencies, including the CPSC, during the past 40 years. Morrall Rpt. at 1. However, when questioned at his deposition about his experience with CPSC risk assessments in particular, he could provide no examples other than reviewing some CPSC regulations 20 or 30 years ago, and attending meetings that agency representatives also attended. Deposition of John Morrall 4/26/2016 ("Morrall Dep.") at 19:9 – 23:15 (filed separately). While Dr. Morrall may have specialized knowledge regarding risk assessments generally, he does not bring that specialized knowledge to bear on CPSC procedures in any detailed way in his report. At his deposition, Dr. Morrall could not identify specifically who at the CPSC should apply which risk-assessment principles at what stage in the investigation process. *Id*. at 27:6 – 32:13. He essentially opines, as a general matter, that the CPSC should always "try to practice good government." *Id*. at 30:3-8.

Setting aside Dr. Morrall's qualifications to opine about risk assessment generally, or CPSC risk assessments in particular, his opinions here would not help the trier of fact to understand any relevant evidence or issue, as required under Fed. R. Evid. 702(a). Further, Dr. Morrall's opinions regarding the CPSC are based on insufficient facts and data about the

---

[3] Dr. Morrall also discusses in his report some facts he learned about the CPSC's Fast Track program, and describes some searches he undertook in the CPSC's National Electronic Injury Surveillance System database. *Id.* at 10-11, 13-14. Neither of these topics seems to inform his ultimate opinions.

agency and are not the product of reliable principles and methods, as required under Fed. R. Evid. 702(b)-(c).

### 1. Dr. Morrall's testimony is not relevant to understanding the evidence or to determining any fact in issue.

The thrust of Dr. Morrall's report is that the CPSC does not consistently use proper risk-assessment techniques in determining whether a product contains a defect which creates a substantial product hazard. Morrall Rpt. at 16. He also claims the CPSC typically finds no substantial product hazard in coffeemaker-related cases. *Id*. Neither of these conclusions "assist[s] the trier of fact with its analysis of any of the issues involved in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The issue here is whether *Spectrum* broke the law, not whether the CPSC employed best practices or came to the right conclusion in other, unrelated cases.

Dr. Morrall does not even attempt to address the coffeemakers at issue here or any subject related to the section 15(b) reporting requirement as applied to the facts at issue. In fact, Dr. Morrall testified at his deposition that other than reading the government's Complaint, and perhaps seeing something about this case online, he reviewed nothing relevant to the subject coffeemakers at all. Morrall Dep. at 99:18-22; 117:18-119:13. Dr. Morrall's discussion of the CPSC's methods and staff's findings in other coffeemaker cases relates only to Spectrum's arguments that the supposed absence of "fair notice" to Spectrum and the CPSC's alleged lack of "reasoned decisionmaking" under the Administrative Procedures Act somehow preclude the government's suit in this case. *See* Dkt. #78 (Spectrum's Motion for Partial Summary Judgment) at 17, 21-23. For the reasons described in the government's opposition to that summary judgment motion (filed concurrently with this Motion), these affirmative defenses are legally deficient. *See* Mem. in Opp. to Spectrum's Mot. for Partial Summ. Jmt. at §§ I(A), I(B). Expert

opinions intended to support legally invalid arguments can only confuse, rather than help, the finder of fact. *See* Fed. R. Evid. 702(a) (an expert may testify "if the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.").

### 2. Dr. Morrall's testimony is based on insufficient facts, data, and expertise.

Even if the CPSC's internal procedures had some relevance in a case about Spectrum's conduct, Dr. Morrall knows very little about the policies and procedures upon which he was asked to opine. According to his report, Dr. Morrall based his opinions on two sources: a single CPSC employee manual (Dkt. #76-2 (Apr. 2002 Sec. 15 Compliance Manual, described as Exhibit 72 in Dr. Morrall's deposition)); and a set of documents relating to some 20 CPSC files involving coffeemakers not germane to this case. Morrall Rpt. at 8, 13-15. Dr. Morrall's admissions during his deposition demonstrate that neither of these sources is sufficient to draw his broad conclusions about the agency.

Focusing first on the manual, Dr. Morrall concluded that the instructions it provides for evaluating risks seem incomplete and do not properly address the full range of risk-assessment principles. *Id.* at 9-10. However, Dr. Morrall admitted he has no knowledge of who the manual was written for and how it fits in to other knowledge and training those employees might have. Morrall Dep. at 45:1-16 ("I haven't been given the facts about how [the manual is] actually used and the way that it's used"). Dr. Morrall testified he could only "assume" who at the CPSC might read the manual, and "those are just assumptions." *Id*. Most importantly, he "personally do[es] not" know whether the manual "actually sets out all of the relevant policies and procedures and things that people consider at the CPSC." *Id*. at 54:4-7. Dr. Morrall further conceded he did not know whether CPSC employees received training other than what was in the manual. *Id*. at 47:5-17. In fact, he assumed the manual does *not* set out everything that

CPSC employees do or consider when determining how to proceed in a case. *Id*. at 52:22 – 53:5 ("I assume it doesn't set out everything, and other factors may play a role.").

Even though the compliance manual itself points readers to the CPSA, relevant regulations, and other documents for additional guidance, Dr. Morrall did not review the statute, looked at only "some" or part of the regulations, and did not review any other CPSC documents (other than portions of certain case files, as discussed below). *Id.* at 35:12-15 ("I did not review the Act"), 35:16 – 36:1 (looked at "some" of the regulations, but "I'm not familiar with the details"), 36:2 – 38:6 (looked at the regulations "in several cases"), 50:6-21 ("I guess" the regulation contains more detail). Other than what is specifically stated in the manual, Dr. Morrall is unaware of how the CPSC operates generally, *see id.* at 47:5 – 48:13, or how the agency conducts preliminary determination panels. *Id.* at 38:7 – 39:5, 51:22 – 53:5. Dr. Morrall did not speak to *anyone* at the CPSC regarding the agency's risk-assessment practices. *Id*. at 35:7-11. Based on his limited knowledge, Dr. Morrall cannot possibly help the fact finder in this case determine how CPSC employees perform their duties. His testimony about the CPSC's practices in general, based on assumptions and incomplete data, has no "reliable basis in the knowledge and experience" of any relevant discipline. *See Kumho Tire*, 509 U.S. at 592.

Following his discussion of the manual, Dr. Morrall described his review of certain "files"—or at least unspecified documents from those files—relating to other CPSC coffeemaker investigations. Morrall Rpt. at 13-15. Dr. Morrall wrote the first version of his report from an admittedly incomplete set of these documents, and hastily modified his report to take into account other documents that contradicted his original conclusions. Morrall Dep. at 16:15 – 17:12 (initial report was "based on the files that were given to me, and in some cases they were

incomplete.").[4] Even with a more complete set of documents, Dr. Morrall agreed that some of the files he was asked to review were slim, and he had little to go on in trying to determine how the CPSC actually evaluated particular products. *Id*. at 72:4 – 73:6; *see also id*. at 38:7 – 39:5 ("I don't know of course exactly actually what went on there. I don't know. I guess you'd have to be there to know."). Dr. Morrall further agreed that the 20 or so files he reviewed comprised only a small sample of all of the cases investigated by the CPSC over the relevant time period. *Id*. at 75:15 – 76:18. He acknowledged there was no way for him to know whether this handful of files is representative of the thousands of CPSC files he did not review. *Id*. at 76:19 – 77:4. Dr. Morrall further admitted he could not draw any expert conclusions about how the CPSC generally reviews products for substantial product hazards based on the small sample of documents he reviewed. *Id*. at 77:5-11.

At the same time, Dr. Morrall agreed that the coffeemaker files he reviewed involved a variety of different failure modes and potential defects. *Id*. at 85:20 – 87:3. He also agreed that

---

[4] Dr. Morrall's report originally stated that "[t]he only consistent conclusion from the files is that there was no set of risk conditions involving coffeemakers in the relevant time period that rose to the level of a Substantial Product Hazard." *Id.* at 116:3-9. He subsequently reviewed another file in which the CPSC did find a substantial product hazard related to a coffeemaker. *Id*. at 108:3-10, 112:20 – 113:16. Dr. Morrall admitted that, in light of this newly reviewed file, his original conclusions were wrong. *Id*. at 112:3 – 113:7 (original conclusion 1 must be modified); 114:6-22 (original conclusion 2 must be modified), 115:1 – 116:2 (original conclusion 3 must be modified), 116:3-9 (original conclusion 4 was wrong). Complimenting the CPSC's work in the previously unexamined case, Dr. Morrall stated that it was "to the credit of the Consumer Product Safety Commission that they did spot this and make that determination, and I missed that until I saw this case." *Id*. at 116:16-19.

Dr. Morrall then modified his report to state that "[t]he only consistent conclusion from the files is that there was <u>no set of risk conditions</u> involving coffeemakers *of the type sold by Spectrum in this case (CPSC Product Code 217)* in the relevant time period that rose to the level of a Substantial Product Hazard . . .." Morrall Rpt. at 16 (italics added). In other words, Dr. Morrall came to the same conclusion the second time around by distinguishing away the subsequently reviewed file. It is easy to find a "consistent conclusion" by brushing aside inconvenient evidence.

certain failures in coffeemakers could be more dangerous than others. *Id*. at 87:3-6. Dr. Morrall admitted that some cases he reviewed involved more reported incidents and injuries. *Id*. at 87:17 – 88:2. Some cases involved discussions of whether the defect could be reproduced. *Id*. at 88:3-6. Additionally, Dr. Morrall agreed that the files he reviewed involved different facts bearing on the nature of the risk and the known incidents and injuries, and all of those facts could lead to different conclusions about whether the CPSC should take action in a particular case, or whether a substantial product hazard existed. *Id*. at 88:19 – 89:7; 117:2-10 ("That's the idea of risk assessment.").

Nevertheless, Dr. Morrall ultimately concluded that the CPSC did not always employ accepted risk-assessment methodologies, and consistently found coffeemakers did not present a substantial product hazard. Morrall Rpt. at 16. He also determined that risks in some of the other, unrelated cases exceeded the risks in the present case, even though he did not review any files related to the coffeemakers in this case. *Id*.; *see also* Morrall Dep. at 89:13-16 (did not compare other files with the file in this case), 99:20-22 ("I have no facts about the SpaceMaker coffee case. I've not been given that file."), 117:11 – 119:13 (knowledge of this case based on the Complaint and little else).

While experts commonly extrapolate conclusions from underlying data, Dr. Morrall extrapolates from almost nothing at all. His conclusions are based on one employee manual about which he admits to knowing little, and a small selection of case files he acknowledges may not be representative of CPSC work as a whole. As noted above, an "expert" opinion connected to data only by the *ipse dixit* of the expert is properly excluded under Rule 702. *Manpower Inc.*, 732 F.3d at 806; *Gen. Elec. Co.* 522 U.S. at 146. Experts must substantiate their opinions beyond providing a bottom line. *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084,

17

1087 (7th Cir.1999); *Mid–State Fertilizer Co. v. Exch. Nat'l Bank of Chi.,* 877 F.2d 1333, 1339 (7th Cir.1989).  Dr. Morrall is unable to substantiate his bottom line with much of anything.

Even if Dr. Morrall's "methodology" held up to the barest scrutiny, his conclusions fail to illuminate anything relevant to this case.  Testimony regarding how the CPSC made decisions in other investigations will never assist the finder of fact in determining whether Spectrum timely reported the defective handles on the actual coffeemaker carafes at issue.  Dr. Morrall's testimony regarding internal CPSC procedures is unhelpful, unreliable, and should be excluded from consideration.

## CONCLUSION

Spectrum should not be permitted to use this case as a soapbox for airing legally irrelevant grievances about how the CPSC pursues its public-safety mission.  For the reasons set forth herein, the United States respectfully requests that this Court grant the government's Motion by striking or otherwise limiting the expert testimony of Mr. Schoem and Dr. Morrall.  At a minimum, Mr. Schoem should be precluded from providing legal opinions, offering analysis of Spectrum's reporting obligation under the unfounded "reasonable reliance" standard, and opining on the reasonableness of the company's compliance programs.  Dr. Morrall should not be permitted to testify regarding his uninformed opinions on internal CPSC procedures.

| | |
|---|---|
| Dated: June 6, 2016 | Respectfully submitted, |

OF COUNSEL:

MARY T. BOYLE
Acting General Counsel
MELISSA V. HAMPSHIRE
Assistant General Counsel
HARRIET KERWIN
Attorney
Office of the General Counsel
U.S. Consumer Product Safety Commission
Bethesda, MD 20814

JOHN W. VAUDREUIL
United States Attorney

LESLIE K. HERJE
Assistant United States Attorney
Chief, Civil Division

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

JONATHAN F. OLIN
Deputy Assistant Attorney General

MICHAEL S. BLUME
Director
Consumer Protection Branch

JILL FURMAN
Deputy Director
Consumer Protection Branch

*/s/ Monica C. Groat*
MONICA C. GROAT
Trial Attorney
ALAN J. PHELPS
Senior Litigation Counsel
THOMAS E. ROSS
Trial Attorney
United States Dept. of Justice
Consumer Protection Branch
450 5th Street NW, Rm. 6400
Washington, DC 20001
Tel. (202) 532-4218
Fax (202) 514-8742
Monica.C.Groat@usdoj.gov

# CERTIFICATE OF SERVICE

I, THOMAS E. ROSS, hereby certify that today, June 6, 2016, I served via the CM/ECF system, on all counsel of record, a copy of the *United States of America's Memorandum in Support of Motion to Strike or Otherwise Limit Expert Testimony of Alan Schoem and John Morrall*.


Dated: June 6, 2016

    Respectfully submitted.

    */s/ Thomas E. Ross*
    THOMAS E. ROSS
    Trial Attorney
    United States Dept. of Justice
    Consumer Protection Branch
    450 5th Street NW, Rm. 6400
    Washington, DC 20001
    Tel. (202) 598-8697
    Fax (202) 514-8742
    Thomas.E.Ross@usdoj.gov