IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION AND ORDER |
| v. |  |  |
|  |  | 15-cv-371-wmc |
| SPECTRUM BRANDS, INC., |  |  |
|  | Defendant. |  |

---

Between 2008 and 2012, Applica Consumer Products, Inc. ("Applica"), received roughly 1,600 reports from U.S. consumers that the carafes distributed as part of its Black & Decker SpaceMaker line of coffeemakers were suddenly cracking, separating and breaking at the handle. Some of these handle failures included reports of burns and lacerations. By virtue of its acquisition of Applica's parent company in 2010 and eventual merger with Applica in 2014, the defendant, Spectrum Brands, Inc., assumed legal responsibility for Applica's obligation, if any, to report these potential defects in the carafe handles under the Consumer Product Safety Act ("the Act" or "CPSA").

Congress designed the CPSA to "protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051. To achieve that goal, section 15(b) of the Act requires manufacturers, retailers and distributors of consumer products to report "immediately" to the Consumer Product Safety Commission ("CPSC") "information which reasonably supports the conclusion that [a] product contains a defect which could create a substantial product hazard . . . [or] creates an unreasonable risk of serious injury or death[.]" 15 U.S.C. § 2064(b).

While the CPSA obligates companies to self-report information about potentially defective products, the plain language of section 15(b) does not require companies to report *every* potential defect.  Under the operative regulations, companies are directed to undertake a two-step evaluation process before reporting by first determining whether a "defect" may exist, and then whether that defect could create a substantial product hazard.  15 U.S.C. § 2064(b)(3); 16 C.F.R. § 1115.4.  The parties agree that the answer to the first question is "yes," so the present dispute centers on whether the defective coffee pot handles could create a substantial product hazard.[1]

In this lawsuit, the United States of America seeks civil penalties and permanent injunctive relief against Spectrum, alleging its delay in informing the CPSC about these apparently defective handles violated reporting requirements under section 15(b) of the CPSA.  Spectrum argues that the defects in the carafes were never a substantial product hazard sufficient to give rise to a reporting obligation under section 15(b).  Alternatively, Spectrum argues that the government's claims are now procedurally barred for a variety of reasons, including statute of limitations, vagueness and denial of due process generally.

Pending before the court are dispositive motions from both sides, each asserting a right to judgment as a matter of law based on undisputed facts.  For the reasons explained below, the court finds Spectrum's procedural defenses unpersuasive and that it violated the statute, having failed to submit a section 15(b) report until years after its reporting obligation originally arose.

---

[1] The government also claims a separate obligation to report under section 15(b)(4) because Spectrum (Applica at the time) had information that reasonably supported the conclusion the carafe handles created "an unreasonable risk of serious injury."  15 U.S.C. § 2064(b)(4).  The court also addresses this claim below.

UNDISPUTED FACTS[2]

## A. The parties

The United States Department of Justice ("DOJ") filed this suit on behalf of the government, specifically the CPSC, an independent federal agency charged with enforcing the CPSA, after its five-member commission unanimously voted to refer this enforcement action to DOJ.

Spectrum is a corporation organized under Delaware law with its principal place of business located in Middleton, Wisconsin.  In June of 2010, Spectrum acquired 100% of Russell Hobbs, Inc.  By virtue of that acquisition, another company, Applica, also became Spectrum's wholly owned subsidiary.  When Spectrum and Applica merged in 2014, Spectrum assumed all of Applica's assets and liabilities.  Therefore, the parties treat Spectrum and Applica as the same entity for the purposes of this lawsuit, as will the court.

Between July of 2008 and April of 2012, Applica imported from China, and then sold in the United States, a line of Black & Decker SpaceMaker Under-the-Cabinet Coffeemakers.[3]   While Applica created the specifications for the coffeemakers, an approved Chinese vendor, Yamada, designed, tested and manufactured them.

---

[2] The following facts are material and undisputed for purposes of summary judgment, except where noted below.  Because none of the facts on which the court relies in deciding the parties' motions are gleaned from any of the parties' experts, the court will reserve on both sides' motions to strike (dkt. ##102, 105, 117) pending a determination of their relevance in the civil penalty phase of this case.  Because defendant concedes liability on plaintiff's claim that it continued to sell or distribute the coffeemakers after they were subject to recall in violation of 15 U.S.C. § 2068(a)(2)(B) (dkt. #144), this opinion similarly need not address facts relevant only to that claim.

[3] Despite conceding in response to plaintiff's proposed finding of fact (Def.'s Resp. PFOF (dkt.

3

The carafes included with the coffeemakers were glass, with a molded plastic handle attached to the glass pot with a single screw near the top and a metallic bracket encircling the pot near the bottom.  Applica's specifications for the handles required them to be capable of withstanding approximately 132 ounces, double the maximum capacity of the carafes, along with the wear and tear caused by 10,000 "test" or "brew" cycles.  In addition, the coffeemakers were designed to brew a full carafe of coffee at a temperature lasting between 165°F and 195°F for up to two minutes, and a half carafe between 160°F and 195°F up to thirty minutes.

## B.  Initial reports from consumers

Between 2008 and 2012, Applica received customer complaints about its products via phone or email through a call center operated by Fox International Ltd., Inc. ("Fox"). Fox provided Applica, and therefore effectively Spectrum, with daily reports about quality or safety concerns raised by customers.  These were then regularly reviewed by the company's directors and legal counsel.

There is no factual dispute as to Applica's (or Spectrum's imputed) contemporaneous knowledge of consumer complaints concerning the carafe handles.[4] Applica began receiving complaints in November of 2008, when a customer reported a

---

#107) ¶ 3) that Spectrum was a "manufacturer" as defined by the CPSA -- because it "manufactures or imports a consumer product," 15 U.S.C. § 2052(a) -- Spectrum now purports to dispute that characterization (Def.'s Opp'n Br. (dkt. #110) at 5 n.5).  Regardless, Spectrum effectively concedes that it is governed by the CPSA's section 15(b) reporting requirements, whether as a "manufacturer," "distributor" or "retailer."  Similarly, Spectrum asserts no material difference between these roles, at least for liability purposes.

[4] As the government points out, the individual consumer complaints are not offered for the truth of the matters asserted, but rather for the purpose of establishing notice, nullifying Spectrum's hearsay objections to those proposed facts.  (Pl.'s Reply PFOF (dkt. #114) ¶ 79.)

broken handle.  By February of 2009, reports of at least fifteen other failures followed, including a notice from a customer stating that her husband's hand was burned when the handle broke and offering to send the broken carafe to Applica so that it could be "studied."  (Pl.'s Reply PFOF (dkt. #114) ¶ 96.)

In March of 2009, Applica performed a "returned product analysis" on a customer's broken carafe at the direction of Peter Taube, Applica's Product Assurance Director.  In a report summarizing the results of that analysis, an Applica staff engineer stated:

> Plastic catches (Photo 2, 3) on the upper carafe housing are broken on both sides[.]  Additionally, the upper screw boss is fractured as is the plastic directly below the boss.  This allows the carafe to slip forward while pouring coffee.  The material thickness of this catch, the strength of the boss and the plastic material brittleness may be contributing factors in this failure.

(*Id.* at ¶ 107.)

After Applica received another report about a broken handle, Taube sent an email to Stuart Slugh, Applica's Senior Director of Consumer Services, and Leslie Campbell, Applica's Vice President of Engineering.  Dated April 4, 2009, Taube expressed his hope to "escalate" the issue of a potential defect.  (*Id.* at ¶¶ 110-11.)  Around April 16, 2009, Taube also requested that another product analysis be performed on a returned carafe. The summary of that analysis described findings similar to the first:

> Unit received with the carafe handle separation from mounting ring on the carafe bottom and broken upper handle (Photo 1).  Plastic catch on upper housing carafe is broken on one side (Photo 2).  Additionally, the upper screw boss is fractured (Photo 3) and several plastic cracks are found in carafe spout, plastic catch and handle cover, and housing

> (Photo 4, 5, 6, & 7).  The broken screw boss was also
> fractured on both sides (Photo 8.)

(Pl.'s PFOF Ex. 6 (dkt. #79-6).)  By May of 2009, Applica had received more reports of

broken handles, totaling at least 60, including four reports of resulting burns.[5]

## C. Remedial measures and additional reports

On April 1, 2009, Applica asked Yamada to find the causes of and suggest

corrections for the three issues identified in the March returned product analysis -- the

thickness of the catch, the strength of the boss and the brittleness of the plastic.  Yamada

proposed four "permanent corrective actions," which Applica developed into and issued

as an "Engineering Change Request" ("ECR"), intending to implement changes to

strengthen the handles.  That ECR included a "STOCK-SCRAP" order, which required

Yamada's remaining inventory be discarded.   Taube also followed-up by email,

emphasizing that: (1) the handle changes were "mandatory"; and (2) Applica would not

accept carafes that did not implement the new design.  By May of 2009, Applica had

tested the newly designed carafes and began stocking them as part of a "rolling change,"

meaning that they would be shipped to consumers as the inventory of the old design was

exhausted.

According to Taube, Applica monitors consumer complaints regarding a product

more closely after implementing an engineering change.  With the complaints continuing,

---

[5] Plaintiff's proposed finding of fact actually states that Applica had notice of only three burns by May of 2009 (Pl.'s Reply PFOF (dkt. #114) ¶ 127), although the declaration plaintiff cites in support of that fact states that there were four reports.  (Decl. of Christopher J. Paparo (dkt. #57) ¶ 9.)   Regardless, the discrepancy is immaterial to the resolution of the parties' dispositive motions for the reasons explained in this opinion.

Applica began receiving letters concerning the carafes from the CPSC itself.  In particular, the CPSC notified Applica's counsel by letter dated June 30, 2009, about a complaint it received from the same consumer whose report to Applica was the basis of Taube's email from April 4, 2009.  The letter specifically identified an apparent failure of the screw securing the handle to the carafe, and further admonished as follows:

> The reports we have provided you may -- **either alone or with other information you now have or may later receive** -- reasonably support a conclusion that the product contains a defect which could create a substantial product hazard, or creates an unreasonable risk of death or serious injury.  If so, you are required under section 15(b) of the CPSA, 15 U.S.C. 2064(b), to notify the Office of Compliance and Field Operations at the CPSC.

(Decl. of Thomas John Schroeder Ex. B1 (dkt. #80-2) (emphasis added).)  By the end of 2009, Applica had received at least 300 complaints about broken handles, including fourteen reports of resulting burns or lacerations.

On or around February 26, 2010, the CPSC sent Applica two more notifications about broken handles, which were then followed by two more on or around March 31, another on September 30, and two more on December 31, 2010.  Each of these notifications included the same warning to Applica regarding the section 15(b) reporting requirement.  Applica received more reports of broken handles directly from customers throughout 2010, culminating in over 1,000 reports, including forty-nine involving burns or lacerations.  The following year, those numbers climbed to over 1,500 reports, sixty-four of which involved burns or lacerations.[6]

---

[6] Reported injuries included: (1) on February 9, 2009, a cut from glass caused when the handle broke; (2) on February 22, 2009, a burn on the hand of the consumer's husband when the handle

**D. Spectrum reports to the CPSC**

In March of 2012, Spectrum was served with a class action complaint that alleged the carafes were defectively designed. In response, Spectrum ordered a "review of the product history" of the coffeemakers. This resulted in Spectrum ordering Applica to voluntarily recall them.

By the time Spectrum submitted a section 15(b) report to the CPSC on April 3, 2012, it had received approximately 1,600 reports of broken handles, 66 reports of burns and three reports of lacerations since November of 2008. Along with the report, Spectrum requested a "fast track recall," explaining in a letter to the CPSC that it did so as a "strategic response to a lawsuit without merit," since under a fast track procedure, "there is no determination by the staff that the product presents a substantial product hazard or unreasonable risk of serious injury or death." (Pl.'s PFOF Ex. 4 (dkt. #79-4) at 10.) Spectrum submitted an amended, supplemental report on April 27, 2012.

---

broke while he was pouring coffee; (3) on March 17, 2009, a slightly burned hand, with the consumer also noting, "luckily he did not have a full pot of coffee or he would have been seriously injured"; (4) on April 28, 2009, burns on a consumer's hand, stomach and legs, as well as burns on her dog, with a May 7, 2009, follow-up report of medical attention sought for the stomach burns; (5) on July 13, 2009, burns on a consumer's hand and arm; (6) on July 21, 2009, a cut on a consumer's hand caused by cleaning up a broken carafe; (7) on October 21, 2009, a burned hand; (8) On March 3, 2010, a consumer "pour[ing] hot coffee all over him[self]"; (9) on April 20, 2010, burns on a consumer's hand and arm; (10) on September 10, 2010, burns on a consumer and his wife; (11) on November 18, 2010, a minor burn on a consumer's wife's leg; (12) on January 13, 2011, a consumer's wife "dump[ing] hot coffee on her legs"; and (13) on January 31, 2011, burns on both a consumer and his wife's legs, for which the consumer was seeking compensation. Other reports included: (1) on July 31, 2009, that the consumer felt "very lucky [the detached carafe] did not break apart and pour scalding coffee over [him] or [his] wife; (2) on September 30, 2009, a consumer's belief that a broken handle was "very dangerous"; (3) on October 26, 2009, another consumer's belief that a broken handle was "very dangerous"; (4) on December 28, 2009, a consumer feeling "very scared the handle would break"; and (5) on February 28, 2011, a consumer stating "luckily no one was burned." (Decl. of Christopher J. Paparo (dkt. #57).)

The CPSC issued a press release announcing a recall of the coffeemakers on or around June 1, 2012.  In January of 2013, the CPSC went further, issuing an updated release to reflect that consumers would receive a full refund rather than a replacement carafe.  Since both recalls were a type of "voluntary corrective action" under the CPSA, Spectrum worked together with the CPSC to issue the recall.

OPINION

Section 15(b) of the CPSA requires companies to report certain information about a potentially defective or dangerous product:

> Every manufacturer of a consumer product . . . distributed in commerce, and every distributor and retailer of such product, who obtains information which reasonably supports the conclusion that such product --
>
> . . . .
>
> (3) contains a defect which could create a substantial product hazard described in subsection (a)(2) of this section; or
>
> (4) creates an unreasonable risk of serious injury or death,
>
> shall immediately inform the Commission of such . . . defect, or of such risk, unless such manufacturer, distributor, or retailer has actual knowledge that the Commission has been adequately informed of such defect . . . or such risk.

15 U.S.C. § 2064(b).

Any manufacturer that "knowingly" violates the CPSA's reporting requirement "shall be subject to a civil penalty not to exceed $100,000 for each such violation," up to a maximum penalty of $15,000,000 "for any related series of violations."   15

U.S.C. § 2069.   The CPSA also gives district courts jurisdiction to "[r]estrain any violation" of section 15(b) through equitable means.  15 U.S.C. § 2071(a)(1).

The government seeks summary judgment on its claims that Spectrum violated the CPSA by failing to report the defective carafe handles sooner.  Spectrum moves for dismissal of plaintiff's claims as barred by the statute of limitations.  It also moves for summary judgment on the grounds that: (1) the CPSA's reporting requirements are unconstitutionally vague; (2) the CPSC failed to provide fair notice that a report was required in light of its investigations involving other coffeemakers distributed by Spectrum; (3) the CPSC's determination that Spectrum violated the reporting requirements was arbitrary and capricious; and (4) Spectrum had no obligation to report the handle failures because the CPSC was already "adequately informed" within the meaning of section 15(b).  Spectrum also seeks leave to file: (1) additional evidence in support of its motion for summary judgment; and (2) an additional motion for summary judgment, based on its purported discovery of new evidence that the CPSC "failed to satisfy a mandatory statutory precondition for bringing suit."  (Def.'s Mot. for Summ. Judg. (dkt. # 140) at 2.)  Given their variety, the court will first address defendant's threshold procedural arguments before turning to the substantive merits.

# I.  Procedural Arguments

## A.    Motions for leave

In the preliminary pretrial conference order entered September 28, 2015, the court established May 6, 2016, as the dispositive motions deadline and July 15, 2016, as

the discovery deadline.  (Dkt. #15.)  Spectrum submitted its first set of interrogatories to the government on October 12, 2015, including interrogatory number five, which is set forth below.

> State the amount of the civil penalty you seek in each count of your Complaint, and describe in complete detail the CPSC's consideration of the factors set forth in section 20(b) of the [CPSA], 15 U.S.C. 2096(b), and 16 F.F.R. Part 1119, including, without limitation, how each factor was weighed in making the determination of the amount of the penalty to be sought.

(Pl.'s Mot. for Leave (dkt. #140) at 2.)

On November 16, 2015, the government responded as follows:

> If Spectrum is found liable under Sections 2068(a)(2)(B) and (a)(4) of the CPSA, the United States will make a specific request for a civil monetary penalty based on the facts illuminated through discovery.  The United States' request will explain the basis of the requested civil monetary penalty. Accordingly, Interrogatory 5 is also premature.

(*Id.* (citing Decl. of James Hemmings Ex. 1 (dkt. #126-1).)  After Spectrum objected to the adequacy of this original response,[7] the government provided a supplemental response at Spectrum's request on July 1, 2016, further explaining that:

> The Commissioners deliberated based on a legal memorandum provided by the CPSC's Office of General Counsel and discussions with attorneys of that office . . ., and upon considering the section 20(b) factors decided to seek up to the maximum civil penalty authorized by law.

---

[7] Spectrum's counsel reports expressing his concern with plaintiff's original response to the interrogatory in an email sent on June 13, 2016, and during a phone conference held on June 24, 2016.  (Decl. of Timothy L. Mullin, Jr. (dkt. #130) at 1.)

(Decl. of Timothy L. Mullin Ex. B (dkt. #130-2) at 5.)   In this supplement, the government also presented its own analysis of the section 20(b) factors, though again maintaining that the actual amount of the civil penalty it seeks depends on the findings as to liability.  (*Id.* at 4-10.)

Finding this response to still be inadequate, Spectrum filed a motion to compel "a full response" on July 8, 2016.  (Def.'s Mot. to Compel (dkt. #129) at 1.)  Along with a response to Spectrum's motion provided on the discovery deadline, the government filed a declaration from Elliot Kaye, the Chairman of the CPSC, in which he confirmed that "there is no written analysis of the Commissioners' consideration of the factors, and that the Commissioners deliberated individually."  (Decl. of Elliot F. Kaye (dkt. #136) ¶ 3.)  During the hearing on that motion, Spectrum's counsel conceded that the legal memorandum was privileged and, therefore, not subject to production.  (Tr. of Mot. Hr'g (dkt. #138) at 8.)   Given this concession, this court denied Spectrum's motion to compel.  (Dkt. #137.)   Nevertheless, based on supposedly "new evidence" in Kaye's declaration, Spectrum: (1) seeks leave to bolster its argument that the CPSC acted arbitrarily and capriciously in authorizing this action for civil penalties, as demonstrated by the "Justice Department's takeover of the Commission's statutorily-prescribed function to assess penalties" (Def.'s Mot. for Leave (dkt. #131) at 2); and (2) moves for summary judgment on the additional basis that the CPSC "failed to make a formal determination of the appropriate amount of penalties to seek in this matter, in violation of both the [CPSA] and the Commission's own regulations."  (Def.'s Mot. for Leave (dkt. #140) at 2.)  The court will deny both motions.

12

The initial question governing both of defendant's motions is whether the evidence is "new." *See Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995) ("A renewed or successive summary judgment motion is appropriate, especially if one of the following grounds exists: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) the need to correct a clear error or prevent manifest injustice.") (internal quotation marks and citation omitted). Ordinarily, to constitute "new evidence," the moving party must show not only that the evidence was newly discovered, but also that it could not have been timely discovered "with reasonable diligence." *See, e.g., Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996); *Exec. Ctr. III, LLC v. Meieran*, 823 F. Supp. 2d 883, 897 (E.D. Wis. 2011) ("In other words, it is not enough to show only that one has obtained new evidence; rather, the party moving the Court for reconsideration must also show that the evidence was not reasonably available at the time the original summary judgment motion was pending.").

Spectrum claims that the reason for its late assertion of new evidence is that the government's initial response to interrogatory number five "led Spectrum to believe that some documentation of the Commission's consideration of the civil penalty factors actually existed, but that the Government was not producing it at that time." (Def.'s Br. in Supp. of Additional Mot. for Summ. Judg. (dkt. #140-2) at 1 n.1.) Therefore, Spectrum claims, only after the government filed its brief in opposition to its motion to compel and Kaye's declaration did "Spectrum finally learn[] that *there is no record* of the Commission's collective consideration of the civil penalty factors and that, indeed, the

individual Commissioners apparently considered the civil penalty factors 'individually.'"
(*Id.* (emphasis in original).)

Spectrum's claim of misdirection is dubious at best. The government's offer to "explain the basis of [its] requested monetary penalty" in the event that defendant was found liable for violating section 15(b) in no way suggests that it would (or even could) later produce some contemporaneous record "of the Commission's collective consideration of the civil penalty factors." If anything, it confirms that in referring the matter for prosecution, the Commission authorized the Department of Justice to seek whatever penalty it saw fit up to the statutory maximum, depending on the facts adduced at trial. Regardless, Spectrum's asserted "new evidence" turns out to be neither new, nor undiscoverable before the dispositive motions deadline. Indeed, Spectrum already knew all it needed to bring its motion timely. The court, therefore, denies defendant's motions for leave to file additional evidence and an additional motion for summary judgment.

Even if the court were to consider this "new" evidence, along with Spectrum's additional motion for summary judgment, the result would be the same. Spectrum's essential argument appears to be that the CPSC could not refer this matter for prosecution without a formal, recorded presentation of evidence and deliberations that Spectrum could challenge in court. The statutory language on which Spectrum bases this argument is found in 15 U.S.C. § 2069(b):

> In determining the amount of any penalty to be sought upon commencing an action seeking to assess a penalty for a violation of [the section 15(b) reporting requirements], the Commission shall consider the nature, circumstances, extent, and gravity of the violation, including the nature of the product defect, the severity of the risk of injury, the

14

> occurrence or absence of injury, the number of defective
> products distributed, the appropriateness of such penalty in
> relation to the size of the business of the person charged,
> including how to mitigate undue adverse economic impacts
> on small businesses, and such other factors as appropriate.

Spectrum similarly points to the regulation issued by the CPSC interpreting the factors to be considered, which also includes the same "upon commencing" language.  16 C.F.R. § 1119.4.

Spectrum first emphasizes that the words "shall" and "will" connote mandatory (i.e., not optional) tasks, but it is axiomatic that "[t]he legislature's use of terms such as 'shall' and 'must,' rather than 'may,' does not automatically require that the provision be construed as mandatory, much less jurisdictional." *Milwaukee County v. Donovan*, 771 F.2d 983, 990 (7th Cir. 1985).  Instead, "[a] variety of factors should be considered in determining the effect to be given the statute, including whether a mandatory construction would yield harsh or absurd results." *Bartholomew v. United States*, 740 F.2d 526, 531 (7th Cir. 1984) (citing *Ralpho v. Bell*, 569 F.2d 607, 627-28 (D.C. Cir. 1977)). Moreover, the CPSC credibly represents that the commissioners considered the civil penalty factors, albeit individually, based on a memo prepared by its Office of General Counsel, which included an analysis of those factors.  (Pl.'s Opp'n Br. (dkt. #135) at 3.)

Nevertheless, Spectrum cries foul -- not with respect to the commissioners considering the required factors, but rather the *manner* in which they did so -- arguing that the commissioners' consideration of the evidence, deliberations and reasoning had to be contemporaneously recorded.  (*See* Def.'s Opening Br. (dkt. #78) at 21 ("Moreover, when the matter was presented to the five Commissioners for a decision as to whether

15

there was a violation warranting penalties, they did not generate any written record explaining and justifying their decision to seek penalties.   Apparently the only documentation of the final decision is the set of minutes recording the Commissioners' votes.").)   Similarly, Spectrum takes issue with the lack of specificity with which the Commission determined the civil penalty amount to be sought in this case, arguing that it is not sufficient for it to authorize an action up to the maximum penalty and give the DOJ discretion to seek some lower amount.

However, nothing in the CPSA or the regulations mandates how the Commission should consider the civil penalty factors, nor expressly limits the civil penalty amount ultimately sought by the Department of Justice, and Spectrum's policy arguments in support of its interpretation are certainly not enough to persuade the court that dismissal is required.  Far from it, Spectrum is effectively arguing for robust due process rights with regard to the Commission's decision to prosecute, including binding the Department of Justice to seeking a *specific* monetary penalty regardless of the evidence at trial, while having all its rights to again dispute liability and the amount of any penalty before this court.  Rarely would a party be extended such sweeping due process rights in a civil administrative proceeding without at least some deference given in any subsequent, judicial challenge, yet the defendant here is certainly seeking de novo review and all its due process rights before this court.

Defendant nevertheless argues that reading in a statutory requirement for the commissioners to deliberate publicly over the civil penalty factors before referring a matter for civil action would insure that the CPSC "exercise[s] judgment about the

16

seriousness of each alleged violation," since otherwise "every manufacturer of appreciable size will be potentially liable for the $15 million maximum penalty."  (Def.'s Br. in Sppt. of Additional Mot. for Summ. Judg. (dkt. #140-2) at 3.)  Of course, most prosecutorial decisions, including seeking the gravest criminal penalties, are done in private, just as they were here.  Even a grand jury's deliberations are conducted in private without anyone present, including a court reporter.  Other than pointing to large monetary penalties, which pale in comparison to life in prison or capital punishment, Spectrum offers little basis for invading that discretion here, especially since the actual decision as to the appropriate penalty is not left to the CPSC, but rather to the courts, and then only after the Department of Justice has presented sufficient evidence that Spectrum (or any other manufacturer) is deserving of the penalty sought.  Finally, nothing about the commissioners' votes to authorize the DOJ to seek up to the maximum penalty in this case reflects a failure to appreciate the relative severity of the alleged violations.

Spectrum also argues that the commissioners' consideration of the factors works hand-in-hand with 16 C.F.R. § 1119.5, which calls for written notice to a manufacturer of the CPSC's intention to seek a civil penalty.  But Spectrum again fails to explain how consideration in the manner suggested is statutorily required or materially different than receiving:  (1) the CPSC staff's detailed letter notifying defendant of its intention to recommend a civil penalty action to the commissioners (Decl. of James Hemmings Ex. G (dkt. #34-7)); or (2) the two settlement offers the government made before litigation. (Def.'s Opp'n Br. (dkt. #135) at 5.)  Again, the only difference is that Spectrum wants

an opportunity to reduce its downside risk administratively before disputing both its liability and *any* monetary penalty at trial in this court.

Spectrum next argues that Congress required the CPSC to issue a regulation providing further detail about its interpretation of the civil penalty factors to promote transparency. Again, neither the statute nor the regulations demand this. As the CPSC explains in its published final interpretive rule regarding the civil penalty factors, the requirement in the Consumer Product Safety Improvement Act of 2008 ("CPSIA") for the Commission "to interpret the civil penalty factors gives transparency to the regulated community about the *framework* the Commission will use to guide its penalty calculations in the enforcement process and may provide incentives for greater compliance." 75 Fed. Reg. 15993-01 (Mar. 31, 2010) (emphasis added). Obviously, transparency with respect to the factors the CPSC uses as a *framework* to determine what amount of civil penalties to seek is a far cry from transparency in the form of detailed, written records chronicling the commissioners' actual decision-making in any particular referral for a civil enforcement action.

Finally, none of the cases Spectrum cites suggest that dismissal is required because the government here "failed to satisfy a mandatory statutory precondition on bringing suit," or acted arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA"). (*See* Def.'s Mot. for Leave to File Additional Evid. (dkt. #131) at 3-4; Def.'s Br. in Sppt. of Additional Mot. for Summ. Judg. (dkt. #140-2) at 5-8.) Spectrum principally refers this court to a decision by the U.S. Court of International Trade in *United States v. Robert E. Landweer & Co.*, 816 F. Supp. 2d 1364 (Ct. Int'l Trade 2012).

18

In that case, U.S. Customs and Border Protection failed to perfect civil penalties assessed administratively against a customs broker before seeking enforcement in court. Of particular relevance, as the government acknowledged in that case, Customs failed to allege the specific violations of its regulations in the meticulously detailed, pre-penalty notice and process expressly required by that statute,[8] and so the court could not conclude that the defendant was aware of its potential liability for those violations. *Id.* at 1373-74.

In other words, the Court of International Trade would not permit recovery of the civil penalty (originally imposed administratively) because the defendant was not afforded the notice and process demanded by statute as part of the administrative penalty proceeding below. *Id.* at 1375; *see also United States v. Optrex Am., Inc.*, Court No. 02-00646, 2005 WL 3447611, at *4 (Ct. Int'l Trade 2005) ("The statute was designed to give an importer the opportunity to fully resolve a penalty proceeding before any action in this Court[.]"). Thus, the doctrine articulated by the Court of International Trade in *Optrex* and followed in *Landweer* bears little relationship to that before this court,

---

[8] [T]he appropriate customs officer shall serve notice in writing upon any customs broker to show cause why the broker should not be subject to a monetary penalty not to exceed $30,000 in total for a violation or violations of this section. The notice shall advise the customs broker of the allegations or complaints against him and shall explain that the broker has a right to respond to the allegations or complaints in writing within 30 days of the date of the notice. Before imposing a monetary penalty, the customs officer shall consider the allegations or complaints and any timely response made by the customs broker and issue a written decision. A customs broker against whom a monetary penalty has been issued under this section shall have a reasonable opportunity under section 1618 of this title [("Remission or mitigation of penalties")] to make representations seeking remission or mitigation of the monetary penalty. Following the conclusion of any proceeding under section 1618 of this title, the appropriate customs officer shall provide to the customs broker a written statement which sets forth the final determination and the findings of fact and conclusions of law on which such determination is based. 19 U.S.C. § 1641(d)(2)(A).

where the CPSC is *not* empowered to impose civil penalties administratively, but rather must refer a matter to the Department of Justice for possible enforcement in district court.  *See Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1490-92 (D.C. Cir. 1983).  In contrast to the detailed, statutorily mandated process afforded customs brokers, the CPSA sets forth a set of pre-enforcement factors for the CPSC to consider internally before filing suit, not unlike the factors a state prosecutor might consider before making a charging decision.  In either case, the court will not interfere with its decision-making process.[9]

Defendant's APA challenges fail for similar reasons.  The defendant argues that by failing to record the reasons for seeking civil penalties, the CPSC cannot demonstrate that "the decision was the process of 'reasoned decisionmaking.'"  *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 588 (7th Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)).  In *Owner-Operator*, the Seventh Circuit vacated as arbitrary and capricious the Federal Motor Carrier Safety Administration's final rule regarding monitoring devices for commercial vehicles after holding a single, conclusory sentence representing that the agency "ha[d] taken the[] statutory requirement[] into account

---

[9] The other two cases defendant cites involve clearing statutory *bars* to bringing a lawsuit, which is also not present under the CPSA.  *See Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989) (dismissing case brought under the citizen suit provision of the Resource Conservation and Recovery Act of 1976 for failure to follow the statute's provision prohibiting suits unless commenced a certain period after required notice); *United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 361-62 (7th Cir. 2010) (affirming dismissal of *qui tam* suit as barred by statute prohibiting a "person other than the Government [from] interven[ing] or bring[ing] a related action based on the facts underlying the pending action" because two other pending *qui tam* actions against the same defendant alleged the same type of violation).

throughout the final rule" was insufficient to satisfy Congress's mandate that the agency "shall ensure that the devices are not used to harass vehicle operators." *Owner-Operator*, 656 F.3d at 588 (alterations in original).

Moreover, in *Motor Vehicle Manufacturers*, the U.S. Supreme Court held that the National Highway Traffic and Safety Administration acted "arbitrarily and capriciously" by revoking its rule requiring automobile manufacturers to install passive restraints without first considering an airbags-only requirement, which was a known technological alternative already found by the agency to produce significant safety benefits. *Motor Vehicle Mfrs.*, 463 U.S. at 49-51. Similarly, in another case cited by defendant, the district court held that the defendants, including the U.S. Department of Transportation, acted arbitrarily and capriciously by failing to explain adequately their conclusions as to the environmental impact of the planned construction of a new toll road. *Sierra Club, Ill. Chapter v. U.S. Dep't of Transp.*, 962 F. Supp. 1037, 1043-44 (N.D. Ill. 1997).

In contrast to the CPSA and its enabling regulations, which fail to prescribe the manner in which the CPSC must consider the enumerated § 2069(b) factors, each of the statutes in the above cited cases do just that. *See State Farm*, 463 U.S. at 43 (noting after summarizing the well-established standard for arbitrary and capricious review under the APA, that "[f]or purposes of these cases, it is also relevant that Congress required a record of the rulemaking proceedings to be compiled and submitted to a reviewing court, 15 U.S.C. § 1394, and intended that agency findings under the Act would be supported by 'substantial evidence on the record considered as a whole'") (citations omitted); *Owner-Operator*, 656 F.3d at 588 ("The Agency concedes that it would be arbitrary and

capricious not to consider this factor or fail to explain its conclusion about the risk of harassment."); *Sierra Club*, 962 F. Supp. at 1043 ("[T]his court merely holds that information about the growth inducing impact of tollroad construction is crucial to a reasoned conclusion as to alternatives and that the final impact statement was at least required to explain in some meaningful way why such a study was not possible.").

Finally, another district court already rejected a similar challenge to "the Government's failure to consider certain specific factors in determining the amount of penalty to be sought upon commencement of the action," explaining that:  (a) the CPSA did not require the CPSC to specify the amount of penalty sought "as a jurisdictional prerequisite"; and (b) it was difficult for the defendant to show prejudice because "the amount of the penalty will ultimately be a matter for the Court."  *United States v. Advance Mach. Co.*, 547 F. Supp. 1085, 1094 (D. Minn. 1982).  While defendant argues that the district court erred in analyzing whether the determination was a "jurisdictional prerequisite," rather than a "statutory precondition on bringing suit," Congress did not disrupt the *Advance Machine* court's interpretation of the CPSA's civil penalty factors in enacting the CPSIA, even though the CPSIA required the CPSC to issue additional guidance on the meaning of those factors.  *See Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.") (internal citations omitted).  Likely, this is because the court's basic reasoning in *Advance Machine* held up to scrutiny by Congress, just as it does before this court.  The CPSA does not describe the manner in which the CPSC must analyze the factors with the

22

specificity defendant desires.[10]   Lacking any indication that Congress intended to demand a transparent, deliberative process before the CPSC can file suit, the court finds defendant's motions for leave to challenge that process to be meritless.

**B.      Other procedural arguments**

**1. Vagueness**

In two related, but not identical arguments, defendant also moves for summary judgment on plaintiff's civil penalty claims on the grounds that: (1) imposing a civil penalty on Spectrum would violate its due process rights; and (2) the CPSC's decision to seek a civil penalty was arbitrary and capricious.  Both arguments border on the frivolous.

First, with respect to due process, defendant principally argues that the CPSA's reporting requirements are so vague that they violate due process.  Defendant further contends that the CPSC's inconsistency in determining whether defects and injuries similar to the ones involved in this case qualify as requiring a report is violative of its due process right to fair notice.  This insufficient guidance, defendant argues, violates both due process concerns protected by the void for vagueness doctrine: "first that regulated parties should know what is required of them so they may act accordingly; second . . .

_____

[10] In *United States v. Athlone Industries, Inc.*, 746 F.2d 977 (3d Cir. 1984), the Third Circuit reversed a district court's grant of summary judgment on the grounds that a lawsuit under the CPSA for civil penalties was "barred by the res judicata effect of [the government's] earlier declaratory and injunctive imminent hazard suit" against the defendant.  *Id.* at 981.   In remanding the case, the Third Circuit rejected the defendant's argument that the district court should be affirmed because "the Commission failed to fulfill its statutory duty of determining the amount of penalty before commencing the civil suit," since the limited factual record did not resolve the possible "genuine dispute whether the Commission made the required determination." *Id*. at 982 n.1 (also rejecting the defendant's statute of limitations argument for affirmance, given the absence of any "factual findings on the record as to this issue").  In contrast with *Athlone*, as already discussed, the record here contains evidence that the commissioners considered the civil penalty factors and authorized the DOJ to seek civil penalties up to the maximum amount.

that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. ___, 132 S. Ct. 2307, 2317 (2012).

Defendant's facial vagueness argument would reduce the CPSA and the accompanying regulations to the absurd:

> First, Spectrum could not have known what was required of them in 2009 when the CPSC says that Spectrum should have reported in this case because the Spacemaker coffee carafe "could" create a "substantial product hazard." Since any condition "could" theoretically present a substantial product hazard, it is a standardless requirement. Under this standard, makers of envelopes would be required to report paper cuts because their products may be used by hemophiliacs and "could" present a "substantial product hazard' to those users."

(Def.'s Opening Br. (dkt. #78) at 9 (footnote omitted).) Contrary to this caricature, the CPSA and interpretive regulations establish an enforceable standard for a "substantial product hazard" -- defined as a "substantial risk of injury to the public." *See* 15 U.S.C. § 2064(a); 16 C.F.R. § 1115.12(g) (both listing as considerations the pattern of defect, the number of defective products distributed in commerce, the severity of the risk and "other considerations").[11]  A ready response to defendant's complaint that this guidance leaves

---

[11] Indeed, even with the defendant's envelope example, the regulations anticipate defendant's argument, explaining with respect to the "severity of the risk" factor that "[i]n considering the likelihood of any injury the Commission and the staff will consider the number of injuries reported to have occurred, the intended or reasonably foreseeable use or misuse of the product, and the population group exposed to the product (e.g., children, elderly, handicapped)."  16 C.F.R. § 1115.12(g)(iii).  Considering these factors, a manufacturer of envelopes could readily discern that it has no reporting obligation even to hemophiliacs.  Of course, paper cuts pose no risk of a "serious" injury to hemophiliacs generally.  *See id.* ("A risk is severe if the injury which might occur is serious and/or if the injury is likely to occur."); National Hemophilia Foundation, "Frequently Asked Questions about Hemophilia," https://www.hemophilia.org /walk/docs/NHFFAQs.pdf ("In people with bleeding disorders, the mechanism that controls clotting does not work properly, making any bleed last longer in duration.  If the cut is not very deep, such as a paper cut or scrape, the bleeding can stop by itself.").  Hopefully, this kind of

24

it uncertain as to the scope of its reporting obligation is obvious: when in doubt, report. Contrary to defendant's suggestion, the statute, the CPSC and the courts are *not* talking about existential doubt, but rather about concrete, quantifiable doubt born out of the existence of the factors identified in the statute and regulations, including the potential hazard created, the number of reported defects and injuries, and the number of potentially defective products that are in commerce.  15 U.S.C. § 2064(a)(2); 16 C.F.R. § 1115.12(f).  While defendant would prefer a more specific, unambiguous standard, defined and enforced by the CPSC itself, Congress chose not to take that route, perhaps out of concern that the governing agency could be coopted over time, or perhaps out of the realization that the manufacturers and distributors were the ones with inexpensive and ready access to the information that is required for a meaningful analysis of those factors.  *See generally* Neil K. Komesar, *Imperfect Alternatives: Choosing Institutions in Law, Economics, and Public Policy* (1994).  While Congress erred on the side of overreporting by leaving the ultimate consideration of whether a violation should be found and penalties assessed under a more general standard, the alternative is to adopt a more exacting standard that shifts the burden of underreporting to unwary consumers wholly uninformed as to the larger risk.  Indeed, the common law, state and federal statutes and regulations are all replete with such so-called "vague" standards that shift the burden to the party with the most information, which in this case, is the manufacturer.

---

hyperbolic rhetoric will end at summary judgment.  Such argument not only poisons those remaining arguments that may have merit, but will open up defendant's counsel to sanctions.

Regardless, adopting defendant's argument that the CPSA and the CPSC's interpretive regulations violate due process principles because they fail to provide sufficient clarity as to what constitutes a "substantial" or "unreasonable" risk of injury, would also render many criminal statutes -- never mind commercial regulations -- void for vagueness.  *See, e.g., Johnson v. United States*, 576 U.S. ___, 135 S. Ct. 2551, 2561 (2015) ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'") (alteration in original) (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)); *Cameron v. Johnson*, 390 U.S. 611, 616 (1968) (upholding criminal statute prohibiting picketing "in such a manner as to obstruct or *unreasonably* interfere with free ingress or egress") (emphasis added); *United States v. Article of Drug Labeled "White Quadrisect"*, 484 F.2d 748, 749 (7th Cir. 1973) (rejecting vagueness challenge to "current good manufacturing practice" provision of the Federal Food, Drug, and Cosmetic Act).

Finally, defendant attempts to cast its challenge of the CPSA's standards as involving "compelled speech" in hopes of implicating the First Amendment, and thereby avoiding an obvious bar to its facial vagueness argument.  *See, e.g., United States v. Pitt Des Moines, Inc.*, 168 F.3d 976, 986 (7th Cir. 1999) ("When, as here, a statute or regulation does not implicate the First Amendment rights of a defendant, its vagueness is determined on an 'as applied' basis.") (citations omitted).[12]  Again, however, defendant's argument proves too much.   Courts have consistently allowed impingement on

---

[12] As explained in more detail below, defendant's vagueness argument also falls short when applied to the facts of this case.

26

commercial speech where a significant public policy exists.  *See, e.g., Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515 (7th Cir. 2014) ("[C]ommercial speech is constitutionally protected but governmental burdens on this category of speech are scrutinized more leniently than burdens on fully protected noncommercial speech.").

### 2.  Due process

Defendant also contends that imposing civil penalties violates the Due Process Clause of the Constitution, at least without fair notice of its duty to report information to the CPSC.  Specifically, defendant argues that "prior to this litigation, the Commission consistently found there to be no substantial product hazard in numerous coffeemaker cases that involved a number of thermal burns with severities comparable to or worse than the minor injuries reported here," establishing a "track record" upon which defendant was entitled to rely.  (Def.'s Reply Br. (dkt. #119) at 7.)  As support, defendant points to two previous CPSC investigations into "Home Café" coffeemakers manufactured by Applica, neither of which ultimately resulted in a finding of a substantial product hazard or civil penalty enforcement action, "even though those products had reportedly caused burns more severe than those caused by the Carafe Handle Issue, and in similar or greater numbers[.]"  (*Id.* at 8.)  Defendant further likens the CPSC's decision to seek civil penalties against Spectrum, after its decision to take no action against the Home Café coffeemakers, to the FCC's seeking sanctions against television networks for broadcasting "fleeting expletives and momentary nudity" after taking no similar action against such content or displays in the past.  *See Fox Television Stations,* 132 S. Ct. at 2320.  In *Fox*, however, the U.S. Supreme Court rejected the FCC

sanction because the networks "lacked notice at the time of their broadcasts that the material they were broadcasting could be found actionably indecent under then-existing policies." *Id.*

Here, the defendant's primary argument is that the CPSC lacked an established policy regarding the types of defects and injuries associated with coffeemakers that would require a section 15(b) report, at least with respect to Spectrum's situation. The parties are in essential agreement about the facts surrounding the investigations themselves. In February of 2005, the CPSC notified Applica that it had received information about at least two incidents of its HCC100 coffeemaker expelling hot steam and coffee, potentially causing burns. (Def.'s Reply PFOF (dkt. #120) ¶¶ 44-45.) At that time, Applica submitted a section 15(b) report in response. (*Id.* at ¶ 46.) By 2008, there were 531 product failures resulting in multiple injuries to children, and forty-five burns, including multiple second-degree burns. (*Id.* at ¶¶ 48, 51-52, 54-56.)

The CPSC sent Applica a letter dated February 7, 2008, advising that "the nature and degree of the risk of injury presented by [the HCC100 coffeemaker did *not*] necessitate action by the Commission under Section 15 of the CPSA." (Decl. of James Hemmings Ex. 8 (dkt. #76-8) at 1.) The CPSC compliance officer who handled the investigation recommended a finding of no "substantial product hazard" because the product presented an "unlikely risk," and her supervisor accepted that recommendation. (Def.'s Reply PFOF (dkt. #120) ¶ 59-60.)

Similarly, after receiving reports of the coffeemaker spraying hot water, steam and coffee on consumers, the CPSC opened an investigation into another Home Café

28

coffeemaker, model GT300, in March of 2007.  (Def.'s Reply PFOF (dkt. #120) ¶ 62.)

Injuries associated with the GT300 coffeemaker also included multiple reports of

second-degree burns.  (*Id.* at ¶¶ 64-67.)  Nevertheless, the investigation into the model

GT300 coffeemaker again resulted in no further action against Applica, and though the

CPSC did not formally inform Applica that the investigation was closed, Applica assumed

as much in light of the passage of time.  (*Id.* at ¶ 68.)  Defendant now argues that it was

entitled to rely on this *lack* of action regarding Home Café coffeemakers in deciding not

to report the failures of the SpaceMaker coffeemakers, particularly since the Home Café

coffeemakers caused similar, if not more severe, safety risks.[13]

In response, plaintiff argues that defendant reads too much into the Home Café

investigations, both because:  (1) the threshold for reporting a potential defect is lower

than the standard that the CPSC applies to determine whether a defect rises to a

substantial product hazard; and (2) the results of those investigations should not be

interpreted as establishing any particular "policy."  As to the first argument, plaintiff

argues that manufacturers are required under section 15(b) to report "information which

---

[13] Defendant acknowledges that "product manufacturers never know the true basis for the Commission's decisions to close a matter or request a product recall involving other manufacturer's products," but points to at least nine other CPSC investigations into allegedly defective coffeemakers presenting "comparable risks of burns or scalding . . ., including three involving handle failures" to support its claim that the results of the Home Café investigations were "not outliers."  (Def.'s Opening Br. (dkt. #78) at 16-18.)  Indeed, the CPSC concluded in all but one that no substantial product hazard existed.  (*Id.*)  On the other hand, plaintiff cites the CPSC's notice of settlement with West Bend Housewares, LLC, that was published in the federal register in 2006.  71 Fed. Reg. 26,754-01 (May 8, 2006).  The West Bend settlement resolved the CPSC's allegations that the manufacturer failed to immediately report "at least 169 reports of [carafe] handle breakage and at least two (2) reports of minor burns and/or cuts as a result of the handle breakage," as well as its analyses of two returned carafes and an engineering change it implemented.  (*Id.*)  Plaintiff argues that the published notice of this settlement should have alerted defendant to its obligation to report similar information with respect to the SpaceMaker coffeemakers.

*reasonably supports* the conclusion that [a consumer] product . . . contains a defect which *could* create a substantial product hazard." 15 U.S.C. § 2064(b) (emphasis added). On its face, this is a lower standard than whether a substantial product hazard *actually* exists. *See* 16 C.F.R. § 1115.12(1). As plaintiff also points out, this difference is confirmed in practice, as less than 20% of non-fast track section 15(b) reports result in the CPSC finding that a substantial product hazard exists. (Decl. of Robert Jackson Howell, Jr. (dkt. #98) ¶ 11).

Finally, plaintiff directs the court to the Third Circuit's decision in *United States v. Mirama Enterprises, Inc.*, 387 F.3d 983 (9th Cir. 2004), which rejected a manufacturer's argument that the government must prove that a product is actually defective before obtaining civil penalties for a notice violation under § 2064(b):

> Where a manufacturer fails to report a potential defect, but it turns out that no actual defect exists, the Commission may decide not to seek a penalty. That does not mean, however, that there was no violation of section 2064(b).
>
> It makes sense for Congress to have imposed fines for reporting failures even when a product turns out not to be defective. Information about a possible defect triggers the duty to report, which in turn allows the Commission either to conclude that no defect exists or to require appropriate corrective action. Congress's decision to impose penalties for reporting violations without requiring proof of a product defect encourages companies to provide necessary information to the Commission.

*Id.* at 988-89.

In reply, defendant argues that there must be *some* minimum standard of risk below which a company need not report and emphasizes that the CPSC's "Recall Handbook" informs companies that the CPSC "undertakes the same product hazard

30

analysis as that requested of firms" by first assessing whether there is a defect, and then "assess[ing] the substantiality of the risk presented to the public, using the criteria listed in section 15." (Def.'s Reply PFOF (dkt. #120) ¶ 22.) But this just begs the question as to what that floor is, and defendant offers no support in the language of the statute, case law or policy that it should be the *same*, or even a similar, standard.

Plaintiff does not contend that companies must report all potential defects regardless of their seriousness. Moreover, the passage from the handbook merely encourages companies to analyze the section 15 factors before deciding whether to report; it does not contradict § 2064(b), which expressly requires a company to report even when no substantial product hazard may actually exist, and certainly does not render the CPSC's decision to seek a civil penalty for defendant's failure to report the SpaceMaker carafes a violation of Spectrum's due process rights for lack of fair notice.

Defendant's other argument that the Home Café investigations established a "policy" governing injuries caused by defective coffeemakers is no more persuasive. Even crediting defendant's premise that the CPSC staff's closures of investigations *may* establish CPSC policy over time regarding certain types of defects or injuries, the CPSC determines on a case-by-case basis whether a defective product presents a substantial product hazard by applying several, general factors. Therefore, even if multiple cases involve products of a similar type or design and present similar risks of injury, a number of factors, including the nature of the defect, as well as the number and severity of injuries, could reasonably lead to different results in analogous cases. 16 C.F.R. § 1115.12 (noting that any one factor could create a substantial product hazard).

31

Here, the CPSC compliance officer assigned to investigate the HCC100 coffeemaker based her "no substantial product hazard" recommendation on at least two material factors that do not apply to the SpaceMaker coffeemakers: (1) "based on independent testing by Exponent laboratories, the failure scenario is not likely to be forceful and energetic enough to justify [a finding] that an injury is likely to occur"; and (2) "it does not appear likely that a consumer would be in close proximity of the product at the time of failure." (Def.'s Resp. Supp. PFOF (dkt. #121) ¶ 26.) Accordingly, in contrast to the fleeting expletive and momentary nudity that appeared consistent with long-standing regulatory policy in *Fox Television Stations*, 132 S. Ct. at 2318, Spectrum can point to no established CPSC policy regarding a threshold for a substantial hazard involving defective coffeemakers that the SpaceMaker carafes plainly did not meet, much less relieving it of a duty to report the possible defects in the carafes' handles.[14]

Defendant also makes a related argument invoking the APA, contending the "Commission's conclusion that Spectrum violated Section 15(b) of the CPSA is arbitrary and capricious, both because the Commission did *not* (1) ground its analysis in terms of the Act and the governing regulations, and (2) explain why it was deviating from its consistent prior decisions deeming burn hazards posed by coffeemakers like the Spacemaker not to be substantial product hazards or unreasonable risks of serious injury under Section 15(b)." (Def.'s Opening Br. (dkt. #78) at 20 (emphasis in original).) With respect to the first argument, defendant contends that the CPSC's decision to refer

---

[14] Also, defendant's fair notice arguments generally lack force given the absence of evidence that defendant actually relied on the CPSC's supposed "policy" regarding coffeemakers in deciding not to make a section 15 report.

this case to the DOJ was arbitrary and capricious because the commissioners "did not generate any written record explaining and justifying their decision to seek penalties" and failed to follow "basic, well-accepted risk assessment principles."  (*Id.* at 21.)  Recasting its argument under the APA does not change the result for reasons already discussed -- neither the CPSA or the CPSC's regulations require the commissioners to reduce their consideration of the factors for seeking a civil penalty to a formal writing, nor do those same authorities require the CPSC to apply the particular standards and procedures defendant would implement.[15]

The court likewise rejects defendant's second assertion that the CPSC's failure to explain its "departure" from the results of the Home Café investigations renders its referral of Spectrum for prosecution arbitrary or capricious.  As already discussed, the Home Café decisions do not amount to contrary or controlling "precedent" with respect to Spectrum's decision not to give the CPSC notice of the defect in the handle of SpaceMaker coffeemakers.[16]

---

[15] Again, the cases defendant cites for the proposition that the CPSC must memorialize the commissioners' consideration of the civil penalty determination factors involve agency actions that directly affect a party's rights, unlike the CPSC's referral for prosecution to the DOJ here. *See, e.g., Motor Vehicle Mfrs.*, 463 U.S. at 42-43 (noting that an agency that rescinds a rule promulgated under formal rulemaking "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation marks and citation omitted); *Rapoport v. SEC*, 682 F.3d 98, 108 (D.C. Cir. 2012) (stating that in an administrative penalty action, "the SEC must provide some meaningful explanation for imposing sanctions").

[16] While the court will grant the Association of Home Appliance Manufacturer's ("AHAM's") motion for leave to file an *amicus curiae* brief (dkt. #91), it largely retreads defendant's arguments regarding Spectrum's reliance on CPSC investigations into similar products and defects in deciding whether to submit a section 15(b) report.  Thus, for the multiple reasons discussed above, the court is not persuaded that AHAM's brief compels a different result in any respect.

C.      **Statute of limitations**

Defendant further moves for summary judgment on plaintiff's civil penalty claims as time-barred.  The parties agree that since the CPSA does not have its own statute of limitations, the default statute of limitations for civil penalty enforcement actions requires plaintiff to file suit "within five years from the date when the claim first accrued." 28 U.S.C. § 2462.

Under section 15(b), a manufacturer, retailer or distributor of a consumer product is obligated to "immediately" inform the CPSC of a defect "unless" it has "actual knowledge that the Commission has been adequately informed of such defect[.]"  Based on this language, defendant argues, "the obligation to report under section 15(b) first accrues or arises upon receipt of information from which one could reasonably conclude the existence of a substantial product hazard or an unreasonable risk of serious injury or death."  (Def.'s Opening Br. (dkt. #30) at 4.)  Since plaintiff contends that defendant should have filed a section 15(b) report by May of 2009, then defendant argues that plaintiff's civil penalty claims, filed on June 17, 2015, are a year too late.  In contrast, plaintiff interprets this same language from § 2064(b) as meaning that defendant's violation of section 15(b) began when it failed to report information it was obligated to report but "continued 'unless' Spectrum had actual knowledge the CPSC was adequately informed."  (Pl.'s Opp'n Br. (dkt. #40) at 9.)  In other words, plaintiff contends that "Spectrum's reporting violation was ongoing."  (*Id.*)

In support of its statute of limitations argument, defendant cites two cases for the proposition that the general five-year statute of limitations is to be applied without

34

tolling by the "continuing violations" doctrine.  In *Gabelli v. SEC*, 568 U.S. ___, 133 S. Ct. 1216 (2013), the U.S. Supreme Court reversed the Second Circuit's application of the discovery rule to toll § 2462's statute of limitations in an action for civil penalties brought by the SEC for violations that "sounded in fraud."  133 S. Ct. at 1220, 1224.  In reaching that conclusion, the Court noted several "good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties," including that the government:  (1) has investigative tools not available to private parties; (2) seeks penalties rather than recompense; and (3) can assert several privileges to make it difficult to determine what knowledge it had at any given time.  *Id.* at 1221-24.

In the second case cited by defendant, *United States v. Midwest Generation, LLC*, 720 F.3d 644 (7th Cir. 2013), the Seventh Circuit similarly rejected the government's argument that the defendant's failure to obtain a construction permit before modifying its coal-fired power plants in violation of the Clean Air Act created a "continuing violation."  *Id.* at 646.  In particular, the court concluded that defendant did not commit "fresh violations" every day the plants operated because the plain text of the act required a plant operator to act "before constructing or modifying" a plant.  *Id.* at 647.  In other words, the particular violation of the Clean Air Act alleged was "complete when construction commence[d] without a permit in hand," since the relevant provision of the act only concerned "conditions precedent to construction or modification."  *Id.*  In reaching its holding, the Seventh Circuit explained that *Gabelli* "teaches us not to read statutes in a way that would abolish effective time constraints on litigation."  *Id.*

In response, plaintiff cites two cases of its own.  In *Advance Machine*, the district court rejected a manufacturer's argument that the lawsuit was time-barred.  *See* 547 F. Supp. at 1089.  The court concluded that a cause of action under section 15(b) of the Act "first accrues" when the manufacturer fails to timely report, but further explained that "[a]s this is a continuing duty, however, the statute of limitations does not start running until a report is filed or the manufacturer acquires actual knowledge that the Commission is adequately informed."  *Id.* at 1091.  Similarly the district court in *United States v. Michaels Stores, Inc.*, No. 3:15-cv-1203, 2016 WL 1090666 (N.D. Tex. Mar. 21, 2016), denied defendants' motion to dismiss the government's CPSA civil penalty claims as time-barred, agreeing with the government that "the violations first began when Michaels obtained the information regarding the vases' defect in the expert report and continued until Michaels obtained actual knowledge that the Commission was adequately informed of the defect or risk of injury."  *Id.* at *2.

The court is persuaded that plaintiff's interpretation is correct.  Although *Gabelli* and *Midwest Generation* require courts to avoid extending the § 2462 statute of limitations where inconsistent with the text of the statute and sound policy, neither require the plaintiff to file suit before the alleged violation is "complete."  With respect to the SEC enforcement action in *Gabelli*, the Court stated that "[t]he question is whether the five-year clock begins to tick when the fraud is *complete* or when the fraud is discovered," holding that the former triggered the statute of limitations.  133 S. Ct. at 1219 (emphasis added).  Similarly, the Seventh Circuit declared in *Midwest Generation* that "[t]he

violation [of the preconstruction permitting requirement] is *complete* when construction commences without a permit in hand."  720 F.3d at 647 (emphasis added).

In contrast, a company's violation of section 15(b) is not "complete" if it fails to immediately report a defect; instead, it is complete once the company actually submits a late report or "has actual knowledge that the Commission has been adequately informed of such defect[.]"[17]  *Id*.  Certainly, defendant would not argue that its section 15(b) obligation to report a possibly defective product expires twenty-four hours after that duty first arises.  *See* 16 C.F.R. § 1115.14 (defining "immediately" in section 15(b) as "24 hours").

Although both cases defendant cites require careful application of the continuing violations doctrine, neither precludes its application to the causes of action at issue here.  Indeed, after *Midwest Generation*, the Seventh Circuit posited that the continuing violations doctrine may apply in the context of a securities disciplinary action.  *See Birkelbach v. SEC*, 751 F.3d 472, 479 n.7 (7th Cir. 2014) (raising but not addressing the possibility that the continuing violations doctrine may "permit the SEC to consider untimely violative conduct so long as there was some timely violative conduct and the conduct as a whole can be considered as a single course of conduct") (citing *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 690 (7th Cir. 2001)).  That is certainly true with respect to violations of section 15(b), which instructs courts to penalize an ongoing failure to report as a "related series of violations," not as a single violation.  15 U.S.C. §

---

[17] Defendant also argues that the CPSC was adequately informed before May of 2009, and thus it was not required to submit a section 15(b) report, but the court also rejects this argument for reasons explained below.

2069(a)(1).   Moreover, it is consistent with Seventh Circuit principles underlying the continuing violations doctrine to consider plaintiff's claims timely here.  In the Title VII context, the Seventh Circuit has explained that "[t]he continuing violations doctrine allows a court to consider as timely all discriminatory conduct relevant to a claim, so long as there is sufficient evidence of a pattern or policy of discrimination."  *Hagerud*, 259 F.3d at 690 (internal quotation marks and citations omitted).  Here, plaintiff's § 2064(b) claims are based on a single pattern or course of conduct.  Additionally, in the context of the Eighth Amendment, the Seventh Circuit has stated that "[a] violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct."  *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001).

As for section 15(b), it would be nonsensical to require plaintiff to bring a separate suit for each product in the stream of commerce (or whatever smaller unit of measurement than the complete course of conduct) that it alleges should have been reported.  *See Mirama*, 387 F.3d at 986-88 (holding that the distributor committed "30,000 to 40,000 reporting offenses," or one for each of the products in the stream of commerce it failed to report, and not only twenty-three offenses for the units about which it received customer complaints).  Nor does it make sense to preclude the CPSC from holding a company liable for a continuing failure to report a product defect that continues to manifest itself and injure simply because the first time that failure ripened to a cause of action arguably fell outside the applicable five year statute of limitations,

38

particularly where the egregiousness of the company's failure to report increases with an exponential increase in reports of the products' failures, if not injuries, as is true here.

Accordingly, the court agrees with *Advance Machine* and *Michaels* that a cause of action under § 2064(b) for a company's alleged failure to make a timely section 15(b) report accrues not when the company first fails to report, but rather when its reporting obligation ends -- that is, when it eventually reports or gains actual knowledge that the government is adequately informed.   This interpretation of the accrual of § 2064(b) claims is not only consistent with the CPSA's purpose to encourage early reporting of defects to protect the public.  *See Advance Machine*, 547 F. Supp. at 1090 (observing that the defendant's interpretation of the statute of limitations would incentivize companies to "obfuscate rather than inform").  It also satisfies the line-drawing concerns expressed by the Supreme Court in *Gabelli*.  *See* 133 S. Ct. at 1223 (reasoning that courts should avoid interpreting statutes of limitations in a manner that would "leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future" or would "hinge on speculation about what the Government knew, when it knew it, and when it should have known it").  Plaintiff's claim for the imposition of civil penalties is, therefore, still timely.[18]

---

[18] Even if the accrual date for purposes of the five year statute of limitations began with the earliest possible date that Spectrum had a duty to report, the court is not necessarily persuaded that date is May 9, 2008.  As discussed below, while this is the date the CPSC argues the duty to report ripened, the court does not find this to be true as a matter of law.  If the CPSC were to persist in its assertion as a matter of fact that Spectrum's duty arose as of that date, and Spectrum was right on the accrual date, we would have the perverse situation where Spectrum would insist its duty to report was non-existent, but if it existed dated back to the date the CPSC asserts.

## II. Substantive Merits

With defendant's myriad procedural defenses out of the way, the court turns to the merits of the parties' dispute: whether defendant violated the reporting requirement set forth in section 15(b).

### A. Duty to report

As an initial matter, defendant argues that it never had any duty to report the carafe failures because the CPSC was adequately informed of the risk by the time any arguable obligation to report arose.  In support, defendant cites a customer's complaint to the CPSC, dated March 31, 2009, of a possible defect in a carafe, which then prompted an investigation by the CPSC.  Spectrum received the results of that investigation on July 6, 2009.

In response, plaintiff argues that the statutory "safe harbor" for reporting a defect under the CPSA is availing only when the company *knows* that the CPSC has been "adequately informed," which is defined in the relevant regulation as either: (1) the company has submitted a section 15 report; or (2) the CPSC has "informed the subject firm that [it] is adequately informed."  16 C.F.R. § 1115.3(a).  Plaintiff also cites *United States v. Mirama Enterprises, Inc.*, 185 F. Supp. 2d 1148 (S.D. Cal. 2002), in which a district court reasoned that "a letter from the [CPSC] to a company about a consumer complaint does not itself relieve a company of the reporting requirement, unless the only information the company holds is the same as the information the Commission possesses."  *Id.* at 1163.

Defendant argues that this narrow definition of "adequately informed" in the interpretive regulations lacks the force of law, as well as persuasive force, since it essentially reduces the reporting exception to no exception at all.  While not entirely true, since an inquiry of the CPSC as to the need to report *might* result in a response that it is "adequately informed," the defendant makes a fair point.  However, this still leaves the test adopted in the *Mirama* decision, which strikes this court as sensible -- the company and CPSC have the same material information.  While defendant argues that the CPSC knew more about the nature of the defect and injuries here than it did in *Mirama*, the district court found that the CPSC was not adequately informed in *Mirama* despite the defendant's report of a potential defect in a juicer it manufactured.  *Id*. at 1163.  This is because at the time of the manufacturer's report, it was aware of 23 incidents of the juicer shattering, causing at least 22 injuries, while the CPSC only knew of seven such incidents.  *Id.*

Applying the *Mirama* test, the question here is again whether the CPSC is *adequately* informed about the potential defect.  This depends not only on the degree of knowledge that the CPSC has about the particular defect and injuries associated with the product, but on the extent to which the CPSC's knowledge overlaps with the defendant's.[19]  This overlap avoids the otherwise distinct possibility that the CPSC's

_____

[19] To be strictly exempted from the section 15(b) reporting requirement under *Mirama*, the CPSC's knowledge must not only adequately overlap with the company's, but the company must arguably have "actual knowledge" of that overlap.  185 F.3d at 1163 (explaining that a letter regarding a consumer complaint from the CPSC to a manufacturer may actually trigger the reporting requirement, because "[w]hen a consumer contacts the Commission, the consumer may not communicate the same information that is communicated to the company").  This court need not go so far, nor is it persuaded that the safe harbor under section 15(b) requires it, though

limited knowledge of a single or even a few consumer complaints might lead it to attribute the complaints as resulting from anomalous accidents, while a company having received hundreds of complaints, some including burns and cuts, would likely lead to a wholly different conclusion.   Under this definition, the section 15(b) safe harbor is admittedly a high bar, but it is one that is readily reached by a company disclosing the full extent of its knowledge with respect to the possible defect, the number of suspected failures, and the range of injuries experienced.  Of course, such a fulsome disclosure may well run counter to the instincts of a company's executives, and even its outside counsel, but then the company only loses its claim to the safe harbor under section 15(b).  As the *Mirama* court found, this interpretation of the safe harbor is also consistent with the CPSA's structure and purpose to make the reporting requirement one of the CPSC's "most potent weapons."  387 F.3d at 986.

The following table[20] illustrates the gap between the number of complaints and injuries of which Applica/Spectrum had at least imputed knowledge compared to the knowledge the CPSC had each time it sent notifications of individual consumer complaints it had received:

---

obviously a manufacturer who wants to assume the safe harbor applies is well advised to ensure the CPSC's knowledge overlaps with its own.

[20] The values in the table are derived from the table found in plaintiff's declaration (Decl. of Christopher J. Paparo (dkt. #57) ¶ 9), which summarizes a spreadsheet produced by Spectrum during discovery and contains information about all the consumer reports Applica and Spectrum received regarding carafe failures, supplemented by the parties' undisputed facts regarding the CPSC letters.  (Pl.'s Reply PFOF (dkt. #114) ¶¶ 138, 164, 165, 166, 167.)

| Date | Total complaints regarding handle | Total complaints noting a burn, scald, or cut | Date of CPSC letter (Awareness of total # of complaints; awareness of total # of injuries) |
|---|---|---|---|
| Jan. 1, 2009 | 4 | 0 | |
| Feb. 28, 2009 | 16 | 2 | |
| Mar. 31, 2009 | 24 | 3 | |
| Apr. 30, 2009 | 47 | 4 | |
| May 31, 2009 | 60 | 4 | |
| June 30, 2009 | 80 | 4 | June 30, 2009 (1; 1) |
| Jan. 1, 2010 | 335 | 14 | Feb. 26, 2010 (3; 1) |
| | | | Mar. 31, 2010 (5; 2) |
| June 30, 2010 | 714 | 35 | |
| Jan. 1, 2011 | 1079 | 49 | Sep. 30, 2010 (6; 3) |
| | | | Dec. 31, 2010 (8; 3) |
| Jan. 1, 2012 | 1518 | 64 | |
| Apr. 2, 2012 | 1620 | 69 | |

Applying the *Mirama* "overlapping knowledge" test to these undisputed facts, Spectrum is plainly not entitled to section 15(b)'s safe harbor. For example, when the CPSC first wrote on June 30, 2009, to inquire about an individual complaint, Spectrum already knew of *seventy-nine more* carafe failures than did the CPSC, as well as three more instances of injuries, one of which required medical attention. In addition, the CPSC

was unaware that Applica was already aware of a defect in the carafe handles and working on a remedial solution.  By the time the CPSC sent additional notifications on February 26 and March 31, 2010, Applica and Spectrum were aware of at least 300 more reports of carafe failures and twelve more injuries.  By the CPSC's September 30 and December 31, 2010, notifications, Applica and Spectrum knew of over *a thousand* more failures and dozens more injuries than did the CPSC.  Even at the time Spectrum finally filed its section 15 report in April of 2012, the CPSC was still not told that Applica had changed the design of the carafes in 2009 in an attempt to remedy the defect, nor that Spectrum had voluntarily recalled the carafes in March of 2012!  Accordingly, the undisputed facts demonstrate that the CPSC was not "adequately informed" about the carafe failures, and no reasonable jury could find otherwise.  As a result, Spectrum cannot rely on the 15(b) safe harbor from its obligation to report timely.

### B. Application of duty to report

The remaining question is whether either party is entitled to summary judgment as to Spectrum's obligation to submit a section 15 report for its Black & Decker coffeemakers before April of 2012.  Again, the relevant facts are not in material dispute.  Applica first received a customer complaint regarding a broken carafe handle in November of 2008.  By February of 2009, it had received fifteen more complaints, including a report of a customer's hand being burned.  Applica conducted two "returned product analyses" on broken carafes returned in March and April of 2009, both of which described similar conditions affecting the broken handles.  By May of 2009, Applica had begun selling carafes with design changes it had asked the manufacturer to propose and

44

implement.  Applica first learned that the CPSC had received a complaint regarding a carafe handle by letter dated June 30, 2009, which described the customer's report of a broken handle and minor burns.  The CPSC sent Spectrum additional notifications about seven more complaints received in 2010, but as reflected in the table, Spectrum knew by then that those few complaints and reported injuries were just the tip of the iceberg, something the CPSC would not learn until Spectrum finally filed its report in 2012.

On these facts, no reasonable jury could find that defendant "immediately" informed the CPSC about "information which reasonably supports the conclusion" that the carafes "contain[ed] a defect which could create a substantial product hazard." 15 U.S.C. § 2064(b).  Nevertheless, the defendant stresses that the actual injuries about which it had received reports were not serious, but that fact alone hardly changes the court's findings.  First, by its plain language, the section 15(b) reporting obligation is triggered under either § 2064(b)(3) or (4) not by a company becoming aware of an actual, serious injury involving its products, but rather its awareness of a substantial hazard or risk of serious injury.  Second, under § 2064(b)(3), the injury need not be "serious."  *See* 15 U.S.C. § 2064(a)(2) (defining a "substantial product hazard" as "a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of risk, or otherwise) creates a substantial risk of injury to the public"); *see also* 16 C.F.R. § 1115.12(g) (stating that the § 2064(a)(2) factors are "set forth in the disjunctive," meaning that "the existence of any one of the factors could create a substantial product hazard").  Third, there is no evidence on this record that Spectrum ever followed up on the complaints or injuries to verify their true

severity, nor that it made any independent survey to determine if other catastrophic failures were occurring without complaint to Spectrum.[21]

Even more to the point, the CPSC's interpretive regulations explain that a significant degree of exposure of the possibly defective product to the public, or the likelihood that it will cause injury, can give rise to a substantial product hazard regardless of whether there is a risk of a serious injury.  16 C.F.R. § 1115.4(e) ("Most defects could present a substantial product hazard if the public is exposed to significant numbers of defective products or if the possible injury is serious or is likely to occur.").  That same provision amplifies the driving principle of the CPSA's reporting requirement: companies are strongly encouraged not to wait to report until a potential defect causes a serious injury, but rather to report when they first appreciate that their product may contain a defect that could injure people, even when the risk of serious injury is in doubt.[22]  *Id.*

---

[21] Although only one of the approximately thirty consumer complaints cited in plaintiff's proposed findings of fact indicates that the consumer sought medical attention for an injury caused by a broken handle, reports from several consumers reflected the risk that the burns they did sustain could easily have been worse (i.e., a March 3, 2010, report from a consumer who "poured hot coffee all over him[self]") or that serious burns were narrowly avoided (i.e., a March 17, 2009, report from a consumer who "slightly" burned his hand, but also stated that "luckily he did not have a full pot of coffee or he would have been seriously injured").  (Pl.'s Reply PFOF (dkt. #114) ¶¶ 99, 159.)  Thus, Spectrum's proclaimed confidence that no risk of serious injury was presented by the carafe failures appears overly optimistic, at best, and the result of Spectrum burying its head in the proverbial sand reflected by the superficial reporting of its own customer service representatives at worst.  Of course, the likelihood of serious injuries and the seriousness of the injuries actually caused by the product may well be relevant to the amount of civil penalties that should be assessed against a company for failing to make a section 15(b) report timely.

[22] To further encourage reporting, a company submitting a section 15(b) report is deemed not to be an admission of liability.   16 C.F.R. 1115.12(a) ("A subject firm in its report to the Commission need not admit, or may specifically deny, that the information it submits reasonably supports the conclusion that its consumer product is noncomplying, contains a defect which could create a substantial product hazard within the meaning of section 15(b) of the CPSA, or creates an unreasonable risk of serious injury or death.").

("Since the extent of public exposure and/or the likelihood or seriousness of injury are ordinarily not known at the time a defect first manifests itself, subject firms are urged to report if in doubt as to whether a defect could present a substantial product hazard."). Defendant's argument that it had no duty to report the carafe handles because none of the reported injuries rose to any particular level of seriousness, therefore, fails.

Certainly, by May of 2009, defendant had information supporting the conclusion that a defect in the carafe handles constituted a substantial product hazard.  By that time, defendant: (1) was aware of 60 reports of broken handles and four burns; (2) identified a similar cause of the breakages in two separately returned carafes; and (3) implemented design changes in an attempt to remedy the handle issue.  *See* 16 C.F.R. § 1115.12 (in deciding whether to report under section 15(b), a firm should evaluate information including "engineering, quality control, or production data" and "safety-related production or design change(s)").  Even if a reasonable jury were to find that the defendant could still have doubts as to the pervasiveness of the defects or the risk of injury, no reasonable jury would find that any of defendant's doubts were justified by June 30, 2010, when defendant was aware of some *714* failures and *thirty-five* injuries, including one requiring medical attention.[23]  That additional information unquestionably triggered defendant's obligation to report.  Since defendant had actual knowledge of the information that required a report, it "knowingly" failed to do so, and no reasonable jury

---

[23] While either party is arguably entitled to a jury trial on the limited issue of determining the specific date Spectrum's reporting obligation arose, this court will consider those arguments in determining the appropriate civil penalty.  As a practical matter, however, there would appear to be little reason why either party would want to undertake the expense of trying that single, narrow issue to a jury.

could find otherwise.  *See* 15 U.S.C. § 2069(d) ("[T]he term 'knowingly' means (1) the having of actual knowledge, or (2) the presumed having of knowledge deemed to be possessed by a reasonable man who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of representations."). Accordingly, the court will grant summary judgment on liability to plaintiff as to Count I.[24]

## III. Motion to Dismiss Claim for Injunctive Relief

Defendant also moved to dismiss one count of the complaint as a matter of law, arguing that plaintiff's allegations and the CPSA do not support the award of injunctive relief.  (Dkt. #6.)  Although defendant provides reason to doubt plaintiff's ability to show that the scope of injunctive relief prayed for in the complaint is warranted, there is a dearth of case law supporting dismissal in this context at the pleadings stage, making dismissal of the prayer for injunctive relief premature at best.  For much the same reason, the court finds the same to be true at summary judgment, although defendant makes a more persuasive argument that injunctive relief may be unnecessary.

"A motion to dismiss under Federal Rule of Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief can be granted." *Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d 1009, 1013 (W.D. Wis. 2008).  A plaintiff need not provide detailed factual allegations, but must provide enough facts to state a claim that is plausible on its face and "allow the court to infer more than

---

[24] Since the court has found defendant liable under 15 U.S.C. § 2064(b)(3), there is no need to address its liability under § 2064(b)(4).

the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).   "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"   *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   When evaluating a complaint's sufficiency, the court construes it in the light most favorable to the party not seeking dismissal, accepts well-pled facts as true, and draws all inferences in favor of the non-moving party.   *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

Defendant moves to dismiss Count IV of the complaint, in which plaintiff seeks injunctive relief, alleging "a reasonable likelihood that Defendant will continue to violate the CPSA reporting requirement and the CPSA prohibition on the sale, offer for sale, distribution in commerce, or importation into the United States of recalled products[.]"[25] (Compl. (dkt. #1) ¶ 58.)   In the "Relief Requested" section of the complaint, plaintiff seeks for the court to:

> Award the United States injunctive relief against Defendant as set forth in Count IV, in accordance with 15 U.S.C. § 2071(a)(1), that would: (1) require Defendant to comply with the reporting requirements of the CPSA and its accompanying regulations; (2) require Defendant to comply with the CPSA's prohibition on the sale, distribution, or importation of recalled products; (3) assure such compliance by requiring Defendant to establish internal recordkeeping and monitoring systems designed to provide timely reports to the CSPC whenever Defendant obtains information which reasonably supports the conclusion that any of their products contain a defect which could create a substantial product hazard or creates an unreasonable risk of serious injury or death to consumers, and designed to prevent the sale,

---

[25] Counts I and II of the complaint seek civil penalties for violations of the CPSA based on the facts described above, and Count III seeks civil penalties for Spectrum's sale or distribution of the coffeemakers after the CPSC announced their recall, in violation of § 2068(a)(2)(B) of the Act.

distribution, or importation of recalled products; (4) *provide for liquidated damages* in the event that Defendant fails to comply with the reporting requirements of the CPSA and the CPSA prohibition on the sale, distribution, or importation of recalled products; and (5) *require Defendant to establish an escrow account* containing funds that could be used to pay any liquidated damages imposed by the Court.

(Compl. (dkt. #1) ¶ II (emphasis added).)

Defendant moved to dismiss plaintiff's prayer for injunctive relief on the basis that the Act does not authorize the CPSC to seek the forms of relief requested in the complaint. Specifically, defendant argues that dismissal of Count IV is appropriate because: (1) plaintiff seeks an improper "obey the law" injunction; (2) the CPSA does not authorize plaintiff to seek a *prospective* injunction, liquidated damages or the creation of an escrow account; and (3) even if the CPSA permits plaintiff to seek the injunctive relief requested, the allegations in the complaint are insufficient to support such relief. Each of these grounds for dismissal fails for largely the same reason: defendant presents strong arguments to doubt the merits of entering the various forms of injunctive relief described in the complaint, but has not convinced the court that such relief is so plainly prohibited by law as to justify dismissal of Count IV at the pleadings stage, before further development of the facts.

In relevant part, the CPSA grants district courts the jurisdiction to:

(1) *Restrain any violation* of [15 U.S.C. § 2068 ("Prohibited Acts")].

(2) Restrain any person from manufacturing for sale, offering for sale, distributing in commerce, or importing into the United States a product in violation of an order in effect under [15 U.S.C. § 2064(d)].

50

> (3) Restrain any person from distributing in commerce a product which does not comply with a consumer product safety rule.

15 U.S.C. § 2071(a) (emphasis added).

The parties disagree whether the plain language of § 2071(a)(1) -- namely, the "restrain any violation" language -- limits the court to enjoin only "a violation that is presently occurring." (Def.'s Opening Br. (dkt. #8) at 5.) Defendant argues primarily that the language of the CPSA contrasts with both the Securities Act of 1933 and the Exchange Act of 1934, which permit the SEC to seek an injunction when it appears that "any person is engaged *or is about to engage* in acts or practices" violating the securities laws. 15 U.S.C. § 77t(b) (emphasis added); 15 U.S.C. § 78u(d)(1) (emphasis added). Because the CPSA does not include language similar to the "about to engage" language in those statutes, defendant argues, Congress plainly did not intend for the CPSC to seek forward-looking injunctions. With respect to plaintiff's request for liquidated damages and the creation of an escrow account, defendant makes essentially the same arguments: because the CPSA does not expressly provide for those remedies, they are not available to plaintiff here.

As an initial matter, the case law defendant cites in support of its argument that the court should essentially evaluate the wording of a possible permanent injunction or the forms of injunctive relief requested at the motion to dismiss stage is thin, particularly in the context presented here. In *United States v. Toys "R" Us, Inc.*, 754 F. Supp. 1050 (D.N.J. 1991), the district court concluded that the CPSC had failed to show a sufficient likelihood that the defendant would commit future violations of the CPSA only after

reviewing a developed factual record.  *Id.* at 1059-61; *see also United States v. Zen Magnets, LLC*, 170 F. Supp. 3d 1365, 1378 (D. Colo. 2016) (granting the CPSC's motion for summary judgment and for a permanent injunction under § 2071(a)(1) recalling products that the CPSC alleged were hazardous, having denied earlier the CPSC's motion for a preliminary injunction recalling the products, *see United States v. Zen Magnets, LLC*, 104 F. Supp. 3d 1277, 1283 n.5 (D. Colo. 2015)).  Accordingly, the court will wait for the parties to further develop the facts before analyzing what particular types of injunctive relief are appropriate.  This is especially prudent since plaintiff has yet to even propose the wording of any permanent injunction.[26]

Regardless, defendant has failed to show at the pleadings stage that the CPSA does not permit the court to grant injunctive relief in the form of a prospective injunction, liquidated damages or the creation of an escrow account.  In particular, the court does not agree with defendant that the plain language of the CPSA precludes entering an injunction limiting conduct that is not "presently occurring," since the language authorizing the court to "restrain any violation" of the CPSA is relatively broad, nor does language of the Securities Act and the Exchange Act demonstrate that Congress intended to limit injunctive relief available under the CPSA to the extent defendant contends.

By way of example, the CPSC would arguably be authorized to "restrain any violation" of the CPSA by seeking to enjoin certain conduct for a certain period of time, if the CPSC could show to a sufficient degree of likelihood that a violation may occur

---

[26] Broadly speaking, all that plaintiff included, or needed to include, in the complaint is the forms of injunctive relief it *may* seek in the event it ultimately prevails on the merits.

absent the injunction, even if the conduct was not necessarily occurring at the moment the injunction was entered.  *See Zen Magnets*, 170 F. Supp. 3d at 1377 (noting that "the term 'restrain' . . . arguably implies that any remedy should be limited to future or ongoing violations") (citing *United States v. Rx Depot, Inc.*, 438 F.3d 1052, 1058 (10th Cir. 2006)).  Moreover, as plaintiff points out, "remedial legislation should be construed broadly to effectuate its purposes."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

The court is, therefore, persuaded on balance that rather than dismissing plaintiff's claim for injunctive relief at the pleading (or even summary judgment) stage, the more appropriate course of action is to evaluate proposed language for a permanent injunction under the familiar legal standard *and* a further development of the facts.  "In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief."  *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) (evaluating claim for injunctive relief under 15 U.S.C. § 77t(b) and 15 U.S.C. § 78u(e)) (footnote omitted) (citing *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)); *see also Toys "R" Us*, 754 F. Supp. at 1058 ("The purpose of injunctive relief awarded pursuant to statutory authority is not to punish a violator, but to deter the violator from committing future violations.").  In determining the likelihood of future violations, courts must consider the totality of the circumstances.  *See Holschuh*, 694 F.2d at 144; *Toys "R" Us*, 754 F. Supp. at 1058-59 (listing factors, including the degree of the defendant's scienter and whether the infraction was isolated or recurrent).

Of course, the court cannot consider the totality of the circumstances surrounding the facts alleged by plaintiff until the factual record is further developed. Therefore, the consideration of any proposed permanent injunction, including whether an "obey the law" injunction is warranted, will be postponed. *See EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841-44 (7th Cir. 2013) (requiring remand to the district court to "impose a reasonable time limit" on "the EEOC's proposed obey-the-law injunction" but otherwise upholding it "in light of the evidence showing AutoZone's intransigence at quite senior levels of management").

With respect to the remainder of defendant's present motion, the court simply disagrees that plaintiff has not stated a plausible claim to injunctive relief. Under the facts alleged, defendant engaged in knowing, arguably outrageous, conduct by failing to notify the CPSC about substantiated complaints that carafes were breaking due to design defects and harming individuals for over two years. Furthermore, even after issuing a recall notice for those defective carafes, Applica sold more of them, necessitating another recall. These facts are enough to plausibly plead a claim for injunctive relief.

ORDER

IT IS ORDERED that:

1.  Defendant Spectrum Brand's motions for partial summary judgment (dkt. ##30, 73) are DENIED.

2.  Defendant's motion for leave to file additional evidence in support of its motion for summary judgment (dkt. #131) and motion for leave to file an additional motion for summary judgment (dkt. #140) are DENIED.

3. Plaintiff the United States of America's motion for summary judgment (dkt. #51) is GRANTED as to defendant's liability on Count I.

4. Defendant's unopposed motion for entry of judgment as to its liability on Count III (dkt. #144) is GRANTED.

5. Defendant's motion to dismiss (dkt. #6) is DENIED.

6. AHAM's motion for leave to file an *amicus curiae* brief (dkt. #91) is GRANTED.

7. The parties' pending motions related to scheduling and exclusion of witnesses and argument at a jury trial (dkt. ##141, 166, 171, 172, 173) are DENIED as moot.

8. The court RESERVES on the parties' remaining motions (dkt. ##102, 105, 117, 150, 167, 168, 169, 170).

9. The court will hold a scheduling a conference over the phone at 10:00 am on Friday, November 18, 2016, to set a schedule for the civil penalty determination and injunctive relief phase of this case.


Entered this 17th day of November, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge