IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                         Plaintiff,                       OPINION and ORDER

    v.

                                                15-cv-371-wmc

SPECTRUM BRANDS, INC.,

                         Defendant.

In an earlier opinion and order, this court granted partial summary judgment on plaintiff United States of America's claim that defendant Spectrum Brands, Inc., failed to report timely to the Consumer Product Safety Commission (the "Commission" or "CPSC") information that carafes distributed as part of its Black & Decker SpaceMaker line of coffeemakers were suddenly cracking, separating and breaking at the handle in violation of Section 15(b) of the Consumer Product Safety Act (the "Act" or "CPSA"), 15 U.S.C. § 2064(b)(3). The court then held an evidentiary hearing to determine the appropriate amount of civil penalties and injunctive relief, if any, for that violation, as well as for Spectrum's related sale and distribution of those coffeemakers after their recall in violation of 15 U.S.C. § 2068(a)(2)(B). In advance of that hearing, the court also invited the parties to file briefs on those subjects. Based on the undisputed facts described in the court's summary judgment opinion and order (dkt. #196), as well as the parties' list of joint stipulated facts filed before the hearing (dkt. #224), deposition designations and designated expert reports, and additional evidence admitted at the

hearing, the court will now impose a substantial civil penalty and permanent injunctive relief as set forth below.[1]

OPINION

I.    **Civil Penalties**

A.    **Penalty Range**

As a preliminary matter, the parties disagree about possible civil penalties that may be imposed for violations of the CPSA.  In its current version, the Act provides for a "civil penalty not to exceed $100,000" for each violation of § 2068, including violations of the requirement in § 2064(b) to report "information which reasonably supports the conclusion that [a] product . . . contains a defect which could create a substantial product hazard" and the prohibition in § 2068(a)(2)(B) against selling recalled products.[2]  15 U.S.C. § 2069(a)(1).  The penalty cannot exceed $15,000,000, however, for "any related series of violations."  15 U.S.C. § 2069(a)(1).  Defendant does not dispute that its belated reporting and its sale of recalled products constitute two, distinct "related series of violations" under § 2069.

Given that there is no dispute that defendant sold tens of thousands more coffeemakers than would be required to reach this maximum penalty amount, *see United*

---

[1] The parties agree that the appropriate amount of civil penalties and, of course, injunctive relief, are to be determined by the court, not a jury.  *See Tull v. United States*, 481 U.S. 412, 426-27 (1987).

[2] As the court explained in its summary judgment decision, the requirement in § 2069(a)(1) that a violation be committed "knowingly" presents a low bar, which is easily met in this case.  *See United States v. Spectrum Brands*, No. 15-cv-371-wmc, 2016 WL 6835371, at *21 (W.D. Wis. Nov. 17, 2016) (citing 15 U.S.C. § 2069(d)).  For a detailed account of defendant's underlying misconduct, the court refers the reader to that decision.

*States v. Mirama Enterprises, Inc.*, 387 F.3d 983, 987 (9th Cir. 2004) ("a company commits a separate offense for every potentially dangerous unit it fails to report"), the government asserts that the applicable maximum penalty is $30.30 million, or $15.15 million for each series of defendant's § 2068 violations, after applying statutorily-prescribed inflation adjustments on the maximum penalty. 76 Fed. Reg. 71554-02, 2011 WL 5592923 (Nov. 18, 2011) (adjusted amounts effective January 1, 2012). In contrast, defendant argues that the maximum penalty for its *reporting violation* is not $15,150,000, but rather $1,825,000.[3] This $1.825 million maximum is derived from the $1.25 million amount provided by § 2069(a)(1) (again adjusted for inflation) before it was amended by the Consumer Product Safety Improvement Act of 2008 ("CPSIA"), Pub. L. No. 110-314, 122 Stat. 3016 (2008).[4]

At its core, defendant's argument that the pre-CPSIA amounts should apply to its reporting conduct is a thinly recast version of its unsuccessful argument at summary judgment that the government's lawsuit is time-barred. Defendant maintains that even though Spectrum did not finally report until April 2012, the substantially lower, pre-CPSIA penalty caps should still apply because the government contended that Spectrum's reporting obligation arose as early as May 2009, three months before the amended penalty amounts went into effect in August 2009. More specifically, defendant

---

[3] In so arguing, defendant effectively concedes that its series of violations of § 2068(a)(2)(B) for selling coffeemakers after they had already been recalled is subject to a maximum civil penalty of $15.15 million. (*See* Def.'s Opp'n Br. (dkt. #207) at 27 ("[T]he maximum civil penalty for both violations at issue here is $16,975,000 ($1.825 million for the reporting violation plus $15.15 million for the post-recall sale violation).").)

[4] The CPSIA raised the per-violation maximum from $5,000 to $100,000 and the total maximum from $1.25 million to $15 million. *Id.*

3

emphasizes that "Congress did not indicate any intent that the new penalty cap for CPSA violations should apply retroactively," citing a handful of cases for the purported proposition that amended penalties or damages amounts can neither be applied to conduct that took place before those amendments became effective, nor to conduct that "straddled" the old and new amounts, *unless* Congress expresses a contrary intent. (Def.'s Opp'n Br. (dkt. #207) at 7-10.)

As the government correctly points out, however, the cases defendant cites are wholly inapposite since defendant's argument is premised on an egregious misreading of the court's summary judgment opinion. Contrary to defendant's assertion, the court did *not* "agree[] that Spectrum's obligation to file a Section 15(b) report arose in May 2009." (Def.'s Opp'n Br. (dkt. #207) at 7.) Far from it, the court acknowledged in its summary judgment opinion that both plaintiff and defendant were likely "entitled to a jury trial on the limited issue of determining the specific date Spectrum's reporting obligation arose." *United States v. Spectrum Brands*, No. 15-cv-371-wmc, 2016 WL 6835371, at *21 n.23 (W.D. Wis. Nov. 17, 2016).

Given that neither party was likely to "want to undertake the expense of trying that single, narrow issue to a jury" as part of a separate liability trial, the court instead offered to account for the parties' arguments regarding the date the reporting obligation arose during the civil penalty phase of the case. *Id.* Having failed to seek a jury trial on the issue of when its obligation to report first arose, the court finds defendant's argument now for the earliest possible date to be transparently self-serving. Indeed, the court remains strongly disinclined, for reasons first explained in its summary judgment opinion,

to endorse the "perverse situation where Spectrum would insist its duty to report was non-existent, but if it existed should be found to have dated back to the date the CPSC asserts."[5]  *Id.* at *18 n.18.  Moreover, even if Spectrum were obligated to report before the amended penalties became effective, it failed to actually report (and thus did not end its illegal conduct) until long after the new penalties applied.[6]  Regardless, the court here has little trouble considering only Spectrum's violations, which continued long after the CPSIA took effect.  Accordingly, the court agrees with plaintiff that the maximum civil penalty that can be assessed against defendant is $30.30 million.

## B.    Application of factors

Although offered as guidance to the Commission, the court will consider the statutory factors Congress set forth by the CPSA to arrive at an appropriate civil penalty for defendant's violations:

> In determining the amount of any penalty to be sought upon commencing an action seeking to assess a penalty for a violation of section 2068(a) of this title, the Commission shall consider the nature, circumstances, extent, and gravity of the violation, including the nature of the product defect,

---

[5] Of course, after failing to seek a liability ruling, plaintiff has also waived any right to monetary penalties for a separate series of violations under 15 U.S.C. § 2064(b)(4) for failing to report information that the carafe handles may create "an unreasonable risk of serious injury."  As explained in its summary judgment decision, the court did not need to address this claim, having found defendant liable under § 2064(b)(3) as a matter of law for failing to report that the carafes may "contain[] a defect which could create a substantial product hazard."  *See Spectrum Brands*, 2016 WL 6835371, at *21 n.24.]

[6] In this way, defendant's argument to avoid heightened penalties for its prospective violations of the Act is the mirror image of a statute applied "retrospectively," as in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), where the Supreme Court analyzed "whether the new provision attaches new legal consequences to events *completed* before its enactment."  *Id.* at 269-70 (emphasis added).

the severity of the risk of injury, the occurrence or absence of injury, the number of defective products distributed, the appropriateness of such penalty in relation to the size of the business of the person charged, including how to mitigate undue adverse economic impacts on small businesses, and such other factors as appropriate.

15 U.S.C. § 2069(b); *see also United States v. Shelton Wholesale, Inc.*, 34 F. Supp. 2d 1147, 1165-66 (W.D.Mo. 1999) (applying similar statutory factors directed toward the CPSC for determining an appropriate fine for violations of the Federal Hazardous Substances Act ("FHSA")).

The court further looks for guidance to the regulations adopted under the CPSA, in particular that "[t]he policies behind, and purposes of, civil penalties include the following: [d]eterring violations; providing just punishment; promoting respect for the law; promoting full compliance with the law; reflecting the seriousness of the violation; and protecting the public." 16 C.F.R. § 1119.1. Similarly, the court considers four specific, "other factors" identified in the CPSA regulations: (1) "Safety/compliance program and/or system relating to a violation"; (2) "History of noncompliance"; (3) "Economic gain from noncompliance"; and (4) "Failure to respond in a timely and complete fashion to the Commission's requests for information or remedial action."[7] 16

---

[7] These factors closely track those that courts typically consider in imposing discretionary, civil penalties under analogous federal statutes, including: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; (4) the desire to eliminate the benefit derived from the violations; and (5) the necessity of vindicating the authority of the responsible federal agency. *See, e.g., United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 993 (11th Cir. 1984) (civil penalties under the Federal Trade Commission Act for violation of a consent decree reached after FTC investigation revealed nonconformance with standards set forth by the Flammable Fabrics Act); *United States v. J.B. Williams Co.*, 498 F.2d 414, 438 (2d Cir. 1974) (civil penalties under the Federal Trade Commission Act for violation of a cease and desist order regarding improper advertising). Because these factors largely overlap the specific factors under the CPSA and its regulations in considering civil penalties, however, the court does not see

C.F.R. § 1119.4.  With this as framework, the court applies these factors to Spectrum's reporting and recall violations below.

### a.    Reporting violation

As to the first of the § 2069(b) factors -- the nature of the product defect -- the record here establishes that the carafe handles were defective, particularly given the dozens of reports of broken handles received directly from customers and similar modes of failure identified by defendant's engineers in two of the broken carafes returned by customers.[8]  As defendant rightly points out, however, the severity of any defect remains unclear, as plaintiff failed to establish the extent to which broken handles separated completely from the carafe, rather than partially, leaving uncertain the risk of a catastrophic failure with multiple shards of sharp glass and most or all of the hot coffee being spilled on a consumer.  That said, defendant was in the best position to investigate additional details about reported handle failures through its call center employees, and it, therefore, shares some of the responsibility for those missing facts.  Ultimately, the court finds this factor weighs in favor of defendant, although not to a large degree.

The second and third factors under § 2069(b) -- the severity of the risk of injury and the occurrence or absence of injury -- weigh more strongly in defendant's favor.  As to evidence of injury, defendant correctly points out that plaintiff introduced *no*

---

any need to address these factors separately.

[8] Applica incorporated a design change for the handles and began selling the redesigned carafes in May 2009.  As the court noted in its summary judgment opinion, Spectrum assumed all of Applica's assets and liabilities when the two companies merged in 2014, and so the parties treat Spectrum and Applica as the same entity for the purposes of this lawsuit, as will this court. *Spectrum Brands*, 2016 WL 6835371, at *2.

admissible evidence regarding any injuries that a customer actually sustained by virtue of a failed handle (as opposed to those self-reported by customers), and even the reported instances of broken carafes reflect relatively infrequent, minor injuries. Applica and Spectrum distributed approximately 159,000 coffeemakers between July 2008 and April 2012, the month Spectrum reported. (Joint Stipulated Facts (dkt. #224) ¶ 6.) Between November 2008 and April 2012, Spectrum received approximately 1600 reports of broken carafe handles. (*Id.* at ¶ 38.) Of those reports, approximately 66 noted a resulting burn and three others noted cuts from broken carafe glass. (*Id.* at ¶ 39.) Out of those 69 reports of injuries, *one* indicated receipt of medical attention, and another expressed an intention to seek treatment. (*Id.* at ¶ 40 (citing Decl. of Christopher J. Paparo (dkt. #57) at ¶ 11).) Although defendant's failure to report timely was not justified by the fact that there were few reports of severe injuries for the reasons explained in the court's summary judgment opinion,[9] it does weigh in defendant's favor with respect to determining an appropriate civil penalty.

The number of *defective* coffeemakers distributed before they were recalled -- the fourth § 2069(b) factor -- is unclear for at least three reasons. First, even after Applica began selling the redesigned carafes in May 2009, defendant continued selling the old carafes through December of that year, when its inventory was finally depleted. (*Id.* at ¶ 35-36.) Second, when Spectrum finally reported, it recalled both the pre- and post-redesigned carafes, even though its engineers had not identified similar modes of failure

---

[9] As the court already acknowledged in this case, injuries from hot coffee obviously have the *potential* to be severe, particularly for children and the elderly. (*See* Ex. 120 (Expert Report of Dr. John P. Abraham).)

with respect to the redesigned carafe handles. Third, there are no facts in the record distinguishing between reports of failures of the original and the redesigned carafes. Accordingly, neither party can establish whether the attempted fix worked, and if it did, how many of the total carafes distributed were not defective. Still, given that defendant sold approximately 145,849 units before January 1, 2010, and only approximately 14,000 after that date (*id.* at ¶ 6), the fourth of the § 2069(b) factors would appear to weigh slightly in favor of the defendant.

The last specific § 2069(b) factor -- "the appropriateness of such penalty in relation to the size of the business" -- is largely neutral. As stipulated by the parties, Spectrum is a large, global company with approximately 15,000 employees in 53 countries that had net sales of $5 billion in fiscal year 2016 (*id.* at ¶ 3), and as the government noted at the civil penalty hearing, a total shareholder equity value of $1.8 billion (2/21/17 Hr'g Tr. (dkt. #232) at 66:9-12; Ex. 133 at 40). On the other hand, it appears that Spectrum sold the coffeemakers at a fairly modest profit margin.[10]

---

[10] By agreement of the parties, the court admitted into evidence exhibit 124, "Spectrum's Fourth Supplemental Response to United States of America's First Set of Interrogatories," in which defendant asserted that "Spectrum's profit from sales of the Coffeemakers was approximately $1,481,850." Neither party provided any context about how that figure was measured, including Spectrum's fixed and marginal costs incurred to make each coffeemaker, but taking its "profit from sales of the Coffeemakers" figure at face value, Spectrum would have earned a gross margin of approximately $9.30 for each of the 159,000 coffeemakers it sold, which defendant's counsel stated were sold at retail "for about $75." (2/21/17 Hr'g Tr. (dkt. #232) at 97:12-13.) Thus, while presented in a less than reliable form, the only figures available would at least suggest that the coffeemakers were a not a *high*-margin product. Of course, each sale of Spectrum's defective product on its shelfs was a windfall, unless caught or forced to reimburse that amount.

Accordingly, this factor does not weigh heavily in either direction with respect to imposing a substantial civil penalty.[11]

As for the four "other" factors set forth in the CPSA regulations, the second and fourth factors -- whether defendant has a history of failing to comply with the CPSA and whether defendant responded appropriately to CPSC's correspondence, respectively -- do not militate toward imposing a substantial penalty, since the government has offered *no* evidence with respect to either. In contrast, the first of the "other" factors, which relates to any safety or CPSA compliance program would appear to weigh strongly against defendant. As defendant's counsel acknowledged at the civil penalty hearing, although Applica and Spectrum had in place "pre-market safety systems" and "post-market surveillance," those safety compliance programs "failed" to flag for consideration the defect here, much less prompt Spectrum to report to CSPC timely that the information it was accumulating on failed coffeemakers, and more specifically, the dangerous trend emerging from the sale of the defective carafes over time. (2/21/17 Hr'g Tr. (dkt. #232) at 98:1-5.)

As the government emphasized at the civil penalty hearing and defendant's counsel also conceded, one of the most significant problems in Spectrum's program,

---

[11] Defendant insists with respect to this factor that "[t]he clear thrust of both the statute and the interpretive regulation is that a company's size should generally be considered in *mitigation* of a large fine." (Def.'s Opp'n Br. (dkt. #207) at 17 (emphasis in original).) However, the regulation explains that the factor "reflects the relationship between the size of a business and the policies behind, and purposes of, a penalty," which includes deterrence. 16 C.F.R. § 1119.4(a)(7)(i); *see also Shelton Wholesale, Inc.*, 34 F. Supp. 2d 1166 (noting that "Shelton Wholesale reaped very large profits and should have the ability to pay a large fine" for FHSA violations, including "the appropriateness of such penalty in relation to the size of the business or person charged"). In any event, defendant does not (and indeed cannot credibly) assert that it lacks the ability to pay a substantial civil penalty, and for that reason, the court views this factor as largely neutral.

which certainly contributed to defendant's failure to report timely, was a disconnect between the information being gathered about the potentially defective carafe handles by Applica and Spectrum's engineers versus the information being gathered by individuals receiving actual consumer complaints. (*See id.* at 90:22-91:4.) Although defendant demonstrated adequately that its engineers applied stringent safety standards in designing, testing and manufacturing the carafes,[12] defendant's post-sale safety compliance programs were not robust enough to raise red flags that the failing carafes presented a *safety* issue, rather than a "quality," issue on the street requiring notification to the CPSC. (*See id.* at 79:16-80:6.)

The last "other" factor -- whether the firm benefited economically by failing to comply with the CPSA -- also weighs against defendant here. On summary judgment, the court found:

> (1) was aware of 60 reports of broken handles and four burns; (2) identified a similar cause of the breakages in two separately returned carafes; and (3) implemented design changes in an attempt to remedy the handle issue. See 16 C.F.R. § 1115.12 (in deciding whether to report under section 15(b), a firm should evaluate information including "engineering, quality control, or production data" and "safety related production or design change(s)"). Even if a reasonable jury were to find that the defendant could still have doubts as to the pervasiveness of the defects or the risk of injury, no reasonable jury would find that any of defendant's doubts were justified by June 30, 2010, when defendant was aware of some 714 failures and thirty five injuries, including one requiring medical attention. That additional information unquestionably triggered defendant's obligation to report.

(Dkt. #196 at 47.) Though these coffeemakers may not have been high-margin products, they sold at retail for approximately $75. Since well over 100,000 carafes were sold between May 2007 and January 2010, and then another 4,000 after January 2010,

---

[12] Defendant's motion to proffer additional testimony (dkt. #230) is granted.

defendant cannot dispute that it enjoyed a substantial economic gain by selling off its inventory before belatedly reporting their serous defect.  And the gravity of those sales escalated *over time* as the complaints and injury reports mounted.

Despite the court asking the parties for a more detailed breakdown concerning sales over time, the best the government could muster is Ex. 113-A, which roughly indicates that:  (1) the number of complaints in six-month increments between January 1, 2009, and April 2, 2012; and (2) 145,000 units were sold before January 1, 2010, and 14,000 thereafter.[13]



---

[13] While the burden of proof is on the government, Spectrum is not without fault for failing to offer any more detail despite the court's repeated requests, presumably because that detail would not be helpful in light of the court's earlier findings on summary judgment.  Regardless, the court is left to fashion an appropriate penalty on this limited information.

(Hearing Ex. 113-A at 2.)

Reflecting the principle that defendant's failure to report became more egregious as time went on and complaints mounted, the court will increase the penalty for every new complaint received during six-month increments, using a starting point of $10 per complaint received on or before June 30, 2009, representing the rough profit on the sale of those defective products; then $75, representing the product's purchase price; and doubling the penalty for each 6-month period thereafter until Spectrum finally fulfilled its reporting obligation.[14]

| Period | Units Sold | Penalty per unit | Total |
|---|---|---|---|
| Jan-June/2009 | 80 | $10.00 | $800.00 |
| July-Dec/2009 | 255 | $75.00 | $19,125.00 |
| Jan-June/2010 | 379 | $150.00 | $56,850.00 |
| July-Dec/2010 | 365 | $300.00 | $109,500.00 |
| Jan-June/2011 | 227 | $600.00 | $136,200.00 |
| July-Dec/2011 | 212 | $1,200.00 | $254,400.00 |
| Jan-April/2011 | 102 | $2,400.00 | $244,800.00 |
| | | | $821,675.00 |

A $821,675 penalty is well below the ballpark of *Mirama*, which to the court's knowledge is still the only other CPSA failure-to-report case litigated to this point. In *Mirama*, the court imposed a $300,000 penalty, which was 20% of the $1.5 million penalty cap that was in place at the time. As the parties pointed out, *Mirama* involved a much more serious defect -- "exploding" juicers -- although the government points out that Mirama could only afford to pay a $500,000 penalty, and only half of that amount

---

[14] While the court would have preferred to tether its penalty to units sold as the reporting obligations mounted, that data was not provided. Since each of the six month increase represents an available way to measure Spectrum's increasingly egregious failure to report, increasing the magnitude of the penalty in those increments seems appropriate.

13

upfront. Here, in comparison, $821,675 is approximately 5.4% of $15.15m maximum. Regardless, having considered all of the above factors, the court finds this an appropriate a civil penalty for defendant's failure to report timely in violation of 15 U.S.C. § 2068(a)(4).

### b. Post-recall sale violation

After Spectrum reported the information regarding the coffeemakers to CPSC on April 3, 2012, and requested an expedited recall through CPSC's "fast-track" program, CPSC issued a press release announcing the recall around June 1, 2012. (Joint Stipulated Facts (dkt. #224) ¶¶ 44, 49.) Despite those actions, and despite Spectrum putting into place on March 23, 2012, an internal "Notice of Product Hold" designed to stop any further sale or distribution of the coffeemakers, it sold or otherwise distributed a total of 641 recalled coffeemakers in 25 different shipments between June 2012 and June 2013, when it discovered those inadvertent sales. (*Id.* at ¶¶ 65, 70-71.)

For the most part, the court's analysis of the factors as applied to defendant's reporting violation applies equally to its post-recall sales violation, with the exception of one of the "other" factors. With respect to Spectrum's safety compliance program, however, the primary measure it had in place to prevent the sale of recalled products -- placing the existing inventory of coffeemakers on "hold" in its SAP inventory management program (*id.* at ¶¶ 56, 57) -- was grossly inadequate for a variety of reasons: (1) Spectrum could have used the SAP "exclusion list" to prevent the shipment of a particular SKU, but failed to implement that function (*id.* at ¶ 58); (2) Spectrum revised the hold to permit shipment of additional coffeemakers from China (*id.* at ¶¶ 60, 63); (3)

when Spectrum discovered in June 2012 that a new shipment of recalled coffeemakers from China was in "unrestricted inventory," it merely quarantined those coffeemakers without taking the obvious, additional step of reviewing its transaction history to discover if some had already been sold, even though such an electronic search would have only taken "[a] couple of minutes" (*id.* at ¶¶ 66-68); (4) even then, Spectrum *still* did not place a hold on another shipment of coffeemakers received in July 2012 (*id.* at ¶¶ 69-70); and (5) Spectrum did not place physical "do not ship" labels on the coffeemakers until June 2013, when it finally realized that *hundreds* of the recalled coffeemakers had already been sold (*id.* at ¶¶ 71-72). Although not fitting neatly into any of the specifically-enumerated factors, the fact that Spectrum promptly contacted retailers and customers after discovering that it had sold recalled coffeemakers, as well as immediately reported the violation to the CPSC (*see* Joint Proposed Facts (dkt. #224) at ¶¶ 72-74) entitles Spectrum to some credit in determining an appropriate civil penalty amount. *See* 15 U.S.C. § 2069(b) (directing CPSC to apply "such other factors as appropriate").

Still, as a result of this litany of missteps -- any one of which would have caught many, if not all, of these wrongful sales, or at least have undone them sooner -- Spectrum sold or distributed: 167 recalled coffeemakers from a May 2012 China shipment between June 1, 2012, and June 18, 2012; and an additional 474 from a July 2012 shipment. (*Id.* at ¶¶ 65, 70.) Indeed, among the problems that Eugene Mortenson, Spectrum's Senior Director of Consumer and Customer Services, identified as specific causes of Spectrum's sale of the recalled coffeemakers as part of its internal investigation were: a lack of "defined procedures for executing the recall from an operations

standpoint"; "no pro-active material oversight on recalled product"; and "no automation to prevent outbound shipments."[15] (*Id.* at ¶¶ 76-77 (citing Ex. 62).) Given Spectrum's size and sophistication, these varied and obvious defects in its post-recall compliance system make a substantial civil penalty for the sales of recalled product justified.

The egregious nature of these post-recall sales call for a higher, more punitive per violation amount, particularly for the batch of sales from the second shipment, which occurred *after* Spectrum had discovered the second shipment that the coffeemakers from the first shipment had been erroneously received into available inventory, occurring in July 2012. Therefore, the court begins with a penalty of $1,000 for each of the 167 recalled coffeemakers Spectrum sold from the first shipment and $2,000 for each of the 474 sold from the second, reflecting that the sales from the second shipment were even more egregious than the first. Accordingly, the court finds appropriate a civil penalty in the amount of $1,115,000 for defendant's sale of recalled products in violation of 15 U.S.C. § 2068(a)(2)(B).

## II. Permanent Injunction

The goverment also seeks a permanent injunction, generally requiring Spectrum to: (1) implement or overhaul its CPSA compliance programs; and (2) certify that individuals responsible for Spectrum's CPSA compliance have been trained and made aware of the court's summary judgment opinion in this case. The CPSA grants district

---

[15] The other two entries in Mortenson's "where did things go wrong" presentation were "product shipped from China" and "customers continued to order after recall notification." (Ex. 62.)

courts the jurisdiction to "[r]estrain any violation of [15 U.S.C. § 2068]."[16]  15 U.S.C. §

2071(a)(1).  To obtain permanent injunctive relief, plaintiff must show a "reasonable

likelihood of future violations in the absence of injunctive relief."  *United States v. Toys

"R" Us, Inc.*, 754 F. Supp. 1050, 1058 (D.N.J. 1991) (addressing proposed injunction

against distribution of allegedly banned hazardous products in violation of the CPSA); *see

also SEC v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015).  In assessing the likelihood of future

violations in light of the totality of the circumstances, courts generally consider factors

including: (1) the degree of scienter involved on the part of the defendant; (2) the

isolated or recurrent nature of the infraction; (3) the defendant's recognition of the

wrongful nature of its conduct; (4) the sincerity of the defendant's assurances against

future violations; (5) the defendant's voluntary cessation of challenged practices; (6) the

genuineness of the defendant's efforts to conform with the law; (7) the defendant's

progress towards improvement; and (8) the defendant's compliance with any

recommendations made by the government.  *See Toys "R" Us*, 754 F. Supp. at 1058-59.

The initial two factors have generally been addressed above, and the court does

not view either as bearing strongly on the likelihood that defendant will commit similar

violations of the CPSA in the future.  The eighth factor does not apply either, since to

the court's knowledge, the government has presented no specific set of recommendations

for Spectrum to adopt to avoid a repeat of this misconduct.  As a result, the parties'

arguments largely center around the remaining factors.

---

[16] For the same reasons the court already rejected them at summary judgment, the court again
rejects defendant's arguments that "the CSPA does not provide for prospective injunctions."
(Def.'s Opp'n Br. (dkt. #207) at 28.)

As a starting point, the court disagrees with the government that defendant's counsel's vigorous (and at times, arguably overly-vigorous) denial of its client's culpability in this litigation should weigh against Spectrum with respect to its credibility and willingness to make reasonable efforts to avoid future CPSA violations going forward, at least to any appreciable degree. Thus, the third and fourth factors are largely neutral, particularly since the government articulates no other specific reason to doubt the genuineness of Spectrum's acknowledgment of its CPSA violations and professed desire to avoid future violations, as well as the obvious impetus that an even larger monetary penalty should provide.

At the same time, with respect to the sixth factor, plaintiff's criticisms with the report of defendant's expert, Alan Schoem, a former compliance director at CPSC and now a compliance program consultant, are well-taken. Although Schoem purports to provide expert opinion as to the robustness of Spectrum's policies and procedures for determining whether it has an obligation to report information to CPSC, he prepared his report by reviewing Spectrum's documents and having "discussions" with Nigel Stamp, Spectrum's Senior Director of Global Quality for Home Products, rather than conducting an independent review or audit of Spectrum's practices as actually implemented. (Ex. 714 at 17.) As already discussed, the evidence in this case showed that one of the biggest problems contributing to Spectrum's failure to appreciate its obligation to report information about the failing carafes to CPSC was a breakdown in communication among individuals responsible for evaluating consumer complaints and those knowledgeable about the carafes' engineering deficiencies, as well as a lack of

communication with and among Spectrum's senior management. Also, as already noted, a failure to implement simple solutions to prevent the inbound and outbound shipment of recalled products, poor communication and several missed opportunities to ensure that the inventory process was working properly were direct causes of Spectrum's post-recall violations.

With respect to the problems leading to the reporting violation, Schoem's report does identify several procedures Spectrum utilizes to compile, evaluate and escalate information that may require reporting to CPSC, among which are: (1) using "key words" for its call center to identify potential risks; (2) immediately escalating reports mentioning injury to the call center; (3) addressing reports at weekly "Quality Issue" meetings in Spectrum's Home Global Quality Division; (4) permitting "quality engineers and product safety managers" to make a "Request for Corrective Action," which can be used to make various changes to a product; (5) permitting a product to be placed on a "hold" in the manufacturing and distribution processes; and (6) providing for information regarding potential safety issues to be escalated from the Home Global Quality Division to the Vice President of Global Operations and the legal department. (*Id.* at 17-21.) Schoem does not address, however, whether these same procedures were in place during the years Spectrum failed to report mounting reports of failed carafes and resulting injuries. More importantly, Schoem's report does not discuss the extent to which individuals responsible for CPSA compliance receive training on that subject or whether the procedures he identifies are written, disseminated and enforced, aside from the policy regarding requests for corrective action.

Given in particular that there is no dispute that Leslie Campbell, Applica's Vice President of Engineering, and Stamp, Spectrum's Senior Director of Global Quality for Home Products, could not recall taking part in meaningful discussions about the reported problems with the carafes before 2012, even though Applica senior management became aware of a potential "issue" regarding the carafe handles as early as April 4, 2009 (Joint Proposed Facts (dkt. #224) at ¶¶ 30-31, 41-42), there remain substantial questions about the efforts Spectrum has taken to identify and improve the failed practices and systems that led directly to its reporting violation.[17]

Similar questions present themselves with respect to Spectrum's efforts to address its sale of recalled products. As the government points out, Spectrum's 30(b)(6) representative, Bryan Mihlbauer, testified at his deposition that the company took action to correct its post-recall inventory processes in two ways: (1) utilizing the "exclusion list" function in its inventory management software; and (2) physically tagging recalled products with "do not ship" labels. (Pl.'s Opening Br. (dkt. #202) at 30 (citing Dep. of Bryan Mihlbauer (dkt. #65) at 153-55).) In response to questions from defendant's counsel at the civil penalty hearing, Mihlbauer testified that Spectrum "changed its policies" after its sale of the recalled coffeemakers and "implement[ed] the

_____

[17] Defendant's attempt to downplay the importance of "in-house training" because its "professionals actively participate in industry associations and groups and routinely attend conferences relevant to their job functions" is unpersuasive. (Def.'s Opp'n Br. (dkt. #207) at 35.) This is especially true considering that Schoem acknowledged at his deposition that training could consist merely of "providing new employees with a manual that explains their duties and responsibilities and directing them to their supervisors if they have questions," which he stated "would be equivalent to what CPSC compliance officers apparently receive." (*Id.*) Defendant's argument regarding "in-house training" also does not address Spectrum's apparent lack of formalization of its "on-the-job training" for those professionals or of the other "processes utilized by Spectrum." (*Id.*)

recommendations that arose out of [its] investigation into the issue." (2/21/17 Hr'g Tr. (dkt. #232) at 39:24-40:3.) After a follow-up question, Mihlbauer clarified that in addition to using the exclusion list, Spectrum took a "big" step with regard to "notification downstream" and now also uses capability "above and beyond the exclusion list" to prevent the sale of recalled products in "multiple ways." (*Id.* at 40:5-17.) Again, however, defendant does not identify any meaningful, independent audit of its CPSA requirements, document adoption or recommendations, if any, formalized these revised procedures, or train individuals responsible for insuring that recalled products are not sold, all of which are important.[18]

As a result, questions that remain regarding the extent to which Spectrum has undertaken a meaningful independent audit of its CPSA reporting and recall obligations, and addressed the deficiencies in its systems and programs that led to its violation of these obligations. While Spectrum appears to have made some efforts to prevent similar violations from occurring in the future, the seriousness of its offensives to date require that the systems that it has in place to comply with the CPSA should by now be rigorous and well-defined. Thus, the sixth and seventh injunctive relief factors do not weigh in defendant's favor. Accordingly, the court finds that plaintiff has made an adequate showing of the need for permanent injunctive relief to address Spectrum's auditing, compliance and training regarding compliance with the CPSA's reporting requirement and post-recall sale prohibition going forward.

---

[18] As to the latter, one of the specific suggestions for "changes that should be made" after Mortenson's internal investigation advisory out of Spectrum's continued sales of the recalled coffeemakers was to "develop and agree on roles, responsibilities and expected actions." (Ex. 62.)

ORDER

IT IS ORDERED that:

1) The parties' joint stipulation regarding exhibits (dkt. #216) is ACCEPTED.

2) Defendant Spectrum Brands Inc.'s motion to proffer additional testimony (dkt. #230) is GRANTED.

3) Defendant is directed to pay civil penalties to plaintiff, the United States of America, in the amount of $1,936,675.00 on or before October 30, 2017. This amount represents a civil penalty owed to the United States pursuant to 15 U.S.C. § 2069 and is not compensation for actual pecuniary loss and, therefore, is not subject to discharge under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(7).

4) No interest shall accrue on the ordered payment if timely made.  In the event of any default in payment, the entire unpaid amount shall constitute a debt due and immediately owing to plaintiff and post-judgment interest shall be assessed from the date of this order until payment is made as set forth in 28 U.S.C. § 1961.

5) A Permanent Injunction pursuant to Federal Rule of Civil Procedure 65 is ENTERED under the following terms and conditions:

    A. Defendant shall maintain sufficient systems, programs, and internal controls to ensure compliance with the CPSA and the regulations enforced by the CPSC including, without limitation, the section 15(b) reporting requirement under 15 U.S.C. §§ 2064)b)(3)-(4) and the prohibition of the sale of recalled products under 15 U.S.C. § 2068(a)(2)(B).

    B. Defendant shall, within 14 days of the date of this order, disseminate copies of both this order and the summary judgment order (dkt. #196) by personal service or certified mail to each of its directors, officers, management-level employees, and in-house attorneys involved in the sale, offering for sale, manufacture, distribution in commerce, or importation into the United States of "consumer products" as defined in the CPSA, 15 U.S.C. § 2052(a)(5) (collectively, "Associated Persons").

    C. Defendant must implement appropriate improvements to its compliance programs as required under this subsection A above within 6 months after the date of this order.  At that time, defendant shall file with this court a notice indicating that improvements have been implemented to avoid a repetition of the violations discussed in this opinion and order.

D. This court will retain jurisdiction of this action for the purposes of construing, enforcing, or modifying this order and granting such additional relief as may be necessary or appropriate.

E. The United States may seek reasonable costs and attorney's fees upon succeeding in a suit to enforce this order.

6) The clerk of court is directed to enter judgment and close this case.


Entered this 29th day of September, 2017.

                              BY THE COURT:

                              /s/
                              _____
                              WILLIAM M. CONLEY
                              District Judge